## IN THE UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

| | |
|---|---|
| LISA ROY, IN HER OFFICIAL CAPACITY AS EXECUTIVE DIRECTOR OF THE COLORADO DEPARTMENT OF EARLY CHILDHOOD; AND DAWN ODEAN, IN HER OFFICIAL CAPACITY AS DIRECTOR OF COLORADO'S UNIVERSAL PRESCHOOL PROGRAM, | Case No. 25-1187 |
| Defendants-Appellants, | |
| v. | |
| DARREN PATTERSON CHRISTIAN ACADEMY, | |
| Plaintiff-Appellee. | |

### DEFENDANTS'-APPELLANTS' APPENDIX
### VOLUME III OF X - PAGES 576 TO 847

PHILIP J. WEISER
Attorney General
HELEN NORTON*
Deputy Solicitor General
VIRGINIA R. CARRENO*
Second Assistant Attorney General
JANNA K. FISCHER*
Senior Assistant Attorney General II
*Counsel for Defendants-Appellants

1300 Broadway 10th Fl.
Denver, CO 80203
Tel.: (720) 508-6513
Tel.: (720) 508-6601
Tel.: (720) 508-6374
Email: helen.norton@coag.gov
Email: virginia.carreno@coag.gov
Email: janna.fischer@coag.gov

**VOLUME I of X: Pages 1-290**

Appendix Table of Contents…………………………………..**i-viii**

Civil Docket Sheet, United States District Court for the District of Colorado (Denver), Case No. 1:23-cv-01557-DDD-STV ……...…**1-14**

Doc. 1, Verified Complaint for Declaratory and Injunctive Relief (June 20, 2023) .......................................................................**15-43**

Doc. 1-2, Exhibit 2, *Darren Patterson Christian Academy Family Handbook* …………………………………………………………...**44-53**

Doc. 1-3, Exhibit 3, *Busy Bees Preschool at Darren Patterson Christian Academy Family Handbook* ………….…………….**54-60**

Doc. 1-6, Exhibit 6, *Universal Preschool Colorado Program Service Agreement*…………………………………………...……...**61-100**

Doc. 1-7, Exhibit 7, *Universal Preschool Colorado Frequently Asked Questions* ……...…………………………………….**101-115**

Doc 1-8, Exhibit 8, *February 17, 2023, Letter to Governor Polis from Coalition* ..……………………………………….….…..**116-118**

Doc 1-9, Exhibit 9, *February 28, 2023, Letter to Coalition from Dr. Lisa Roy* ……………………………………………………..**119-121**

Doc 1-10, Exhibit 10, *May 15, 2023, Email to Joshua Drexler from Dr. Lisa Roy and May 12, 2023, Email to Lindsey Pulsipher from Joshua Drexler* ……………………………………………...…..**122-125**

Doc 14, Plaintiff's Motion for Preliminary Injunction and Memorandum in Support (July 10, 2023) ..………………….**126-151**

i

Doc 28, Defendants' Motion to Dismiss Plaintiff's Complaint (August 7, 2023) ........................................................**152-175**

Doc 28-1, Declaration of Dawn Odean in Support of Motion to Dismiss (August 7, 2023) ...........................................**176-179**

Doc 28-2, Exhibit 1001, *Chart of UPK Payments to Busy Bees Preschool*.............................................................................**180**

Doc 29, Defendants' Response to Plaintiff's Motion for Preliminary Injunction (August 7, 2023) .............................….............**181-202**

Doc 38, Plaintiff's Response in Opposition to Defendants' Motion to Dismiss and Reply in Support of Motion for Preliminary Injunction (September 7, 2023) ....................…....…........**203-225**

Doc 42, Defendants' Combined Brief In Support of Motion to Dismiss and Opposition to Motion for Preliminary Injunction (September 28, 2023) ....................…...............................**226-244**

Doc 42-1, Supplemental Declaration of Dawn Odean In Support of Motion to Dismiss (September 28, 2023) .......................**245-250**

Doc 53, Order Denying Motion to Dismiss and Granting Preliminary Injunction (October 20, 2023) .......................**251-290**

**VOLUME II of X: Pages 291-575**

Appendix Table of Contents ................................…...................**i-viii**

Doc 54, Defendants' Answer to Complaint for Declaratory and Injunctive Relief (November 3, 2023) ..........................…....**291-314**

Doc 77, Defendants' Motion for Partial Summary Judgment (June 21, 2024) .................................................…..............**315-338**

Doc 77-3, Exhibit 1064, *Transcript of April 11, 2024, Deposition of Mary Michael Cooke* …….………………………….....…….**339-355**

Doc. 77-4, Exhibit 1065, *Transcript of April 10, 2024, Deposition of Dawn Odean* ..……………………………………………………**356-381**

Doc. 77-5, Exhibit 1066, *Transcript of April 10, 2024, Deposition of Timothy Derocher* ……………………………………………....**382-398**

Doc. 77-6, Exhibit 1067, *Transcript of April 11, 2024, Deposition of Dr. Lisa Roy* ……………………………………………………**399-417**

Doc. 77-7, Exhibit 1068, *Bench Trial Transcript Excerpts Pages 181, 231, 232, and 372, from St. Mary Catholic Parish in Littleton et al. v. Roy et al., Case No. 1:23-cv-02079 (D. Colo. January 3, 2024)* ...............………………………………………………..….**418-421**

Doc. 77-10, Exhibit 1071, *UPK Provider Handbook 2024/2025* ....…………………………………………………….……..….**422-474**

Doc. 77-11, Exhibit 1072, *Findings of Fact, Conclusions of Law and Order for Entry of Judgment by Judge John L. Kane, St. Mary Catholic Parish in Littleton et al. v. Roy et al., Case No. 1:23-cv-02079 (D. Colo. June 4, 2024)*…………………………......….**475-575**

**VOLUME III of X: Pages 576-847**

Appendix Table of Contents ……………….…………….…..**i-viii**

Doc 78, Plaintiff's Motion for Summary Judgment (June 21, 2024) ……………………………………………………………..**576-607**

Doc. 78-12, Exhibit 20, *UPK Program Rules and Regulations 8 CCR 1404-1* ……………………….…………………....…**608-620**

Doc. 78-17, Exhibit 62, *UPK Colorado Program Service Agreement* ………………………………………………………….……..**621-674**

Doc. 78-18, Exhibit 63, *CDEC Approved Decline Process* ...**675-676**

Doc. 78-20, Exhibit 65, *Transcript of April 10, 2024, Deposition of Timothy Derocher (full page)* …………………..…………**677-744**

Doc. 78-21, Exhibit 66, *Transcript of April 10, 2024, Deposition of Dawn Odean (full page)* …………………………………**745-847**

**VOLUME IV of X: Pages 848-1005**

Appendix Table of Contents …………………………..……**i-viii**

Doc. 78-23, Exhibit 68 to Plaintiff's Motion for Summary Judgment, *Transcript of April 11, 2024, Deposition of Mary Michael Cooke (full page)* …………………………………..…**848-916**

Doc. 78-24, Exhibit 69, *Transcript of April 11, 2024, Deposition of Dr. Lisa Roy (full page)* …………………………………**917-993**

Doc. 78-26, Exhibit 71, *Bench Trial Transcript Excerpts Pages 181, 182, 236-240, 243-246, from St. Mary Catholic Parish in Littleton et al. v. Roy et al., Case No. 1:23-cv-02079 (D. Colo. January 3, 2024)* ………………………………………..………………**994-1005**

**VOLUME V of X: Pages 1006-1257**

Appendix Table of Contents …………………………………**i-viii**

Doc. 78-27, Exhibit 72 to Plaintiff's Motion for Summary Judgment, *Transcript of April 17, 2024, Rule 30(b)(6) Deposition of Joshua Drexler* ..……………………………………………**1006-1257**

**VOLUME VI of X: Pages 1258-1385**

Appendix Table of Contents ……………………………….…….**i-viii**

Doc. 78-28, Exhibit 73 to Plaintiff's Motion for Summary Judgment, *Transcript of April 18, 2024, Deposition of Anne Lubbers*…………………………………………..……………**1258-1370**

Doc. 83, Defendants' Motion to Strike or, in the Alternative, Narrow the Use at Trial of Dr. Stephen Levine's Expert Disclosure (July 1, 2024)…………………………………………….…**1371-1385**

**VOLUME VII of X: Pages 1386-1640**

Appendix Table of Contents ………………………………………**i-viii**

Doc. 83-1, Exhibit 37 to Defendants' Motion to Strike or, in the Alternative, Narrow the Use at Trial of Dr. Stephen Levine's Expert Disclosure, *Expert Witness Report of Dr. Amy Tishelman with Exhibits a-c, and D-9-D-19*
…..…………………………………………………………….**1386-1601**

Doc. 83-2, Exhibit 1073, *Expert Witness Reply Report of Dr. Amy Tishelman with Exhibits 42-1and Exhibit 1059* ………..…**1602-1623**

Doc. 83-3, Exhibit 1074, *Rough Draft Transcript Excerpts of June 20, 2024, Deposition of Dr. Stephen Levine* ……………...**1624-1640**

**VOLUME VIII of X: Pages 1641-1806**

Appendix Table of Contents …………………………………..….**i-viii**

Doc. 87-1, Exhibit 78 to Plaintiff's Opposition to Defendants' Motion to Strike or, in the Alternative, Narrow the Use at Trial of Dr. Stephen Levine's Expert Disclosure*, Transcript of June 20, 2024, Deposition of Dr. Stephen Levine* …………………..…...**1641-1719**

Doc. 87-3, Exhibit 80, *Transcript of June 13, 2024, Deposition of Dr. Amy Tishelman* …………………………………….…..**1720-1806**

**VOLUME IX of X: Pages 1807-2100**

Appendix Table of Contents ………………………………………**i-viii**

Doc. 90, Defendants' Response to Motion for Summary Judgment (July 26, 2024) …………………………………………**1807-1842**

Doc. 90-1, Exhibit 1027, *Busy Bees Family Handbook April 2022* …………………………………………………………....**1843-1870**

Doc. 90-2, Exhibit 1028, *Plaintiff's Responses to Defendants' Second Set of Discovery to Plaintiff* …………………………**1871-1890**

Doc. 90-3, Exhibit 1030, *Darren Patterson Christian Academy Family Handbook April 2023* …………………………….....**1891-1914**

Doc. 90-4, Exhibit 1063, *UPK Colorado Program Service Agreement*………………………….………………………………..**1915-1967**

Doc. 90-5, Exhibit 1074, *Rough Draft Transcript Excerpts from June 20, 2024, Deposition of Dr. Stephen Levine* ...……**1968-1984**

Doc. 90-6, Exhibit 1075, *Transcript of April 24, 2024, Deposition of Emily Brown* …………………………………………..…..**1985-2004**

Doc. 90-7, Exhibit 1076, *Declaration of Dawn Odean in Opposition to Motion for Summary Judgment* …………………………...**2005-2016**

Doc. 90-8, Exhibit 1077, *Transcript of April 24, 2024, Deposition of Juliana Miller* ………………………………………………....**2017-2033**

Doc. 90-9, Exhibit 1078, *Transcript of April 18, 2024, Deposition of Joshua Drexler* ………………………………………………….**2034-2072**

Doc. 90-10, Exhibit 1079, *October 27, 2023, Emails between Ann Schimke and Ian McKenzie* ………………………………..**2073-2076**

Doc. 90-11, Exhibit 1080, *Bench Trial Transcript Excerpts Pages 181, 183, 210, 244, 245, 276-280, 372, from St. Mary Catholic Parish in Littleton et al. v. Roy et al., Case No. 1:23-cv-02079 (D. Colo. January 3, 2024)* ……………………………..……**2077-2087**

Doc. 90-12, *Exhibit List to Defendants' Response to Motion for Summary Judgment* ……………………………………….**2088-2089**

Doc. 91, Defendants' Reply in Support of Motion to Strike or, in the Alternative, Narrow the Use at Trial of Dr. Stephen Levine's Expert Disclosure (August 5, 2024) ……………………..**2090-2100**

**VOLUME X of X: Pages 2101-2307**

Appendix Table of Contents ……………………………….…..**i-viii**

Doc. 94, Defendants' Reply in Support of Motion for Partial Summary Judgment (August 9, 2024) ..……….…………**2101-2114**

Doc. 94-1, Exhibit 1081, *UPK Colorado Program Service Agreement for Darren Patterson Christian Academy* …..**2115-2168**

Doc. 94-2, Exhibit 1082, *Bench Trial Transcript Excerpts Pages 1, 232, 489, from St. Mary Catholic Parish in Littleton et al. v. Roy et al., Case No. 1:23-cv-02079 (D. Colo. January 2, 2024)* ………………………………………………………...**2169-2171**

Doc. 95, Defendants' Notice of Rulemaking (October 11, 2024) …………………………………………………....**2172-2174**

Doc. 95-1, Exhibit 1083, *Rulemaking Packet* …………..**2175-2185**

Doc. 96, Defendants' Notice of Implementation of Rule (January 16, 2025) ……………………………………………….**2186-2188**

Doc. 96-1, Exhibit 1084, *UPK Rules and Regulations 8 CCR 1404-1* ……………………………………………….….**2189-2192**

Doc. 97, Order Granting Motions for Summary Judgment (February 24, 2025) …………………………….…….**2193-2207**

Doc. 98, Final Judgment (February 24, 2025) ………….**2208-2209**

Doc. 101, Defendants' Motion to Alter or Amend a Judgment Pursuant to Rule 59(e) (March 24, 2025) ..……………**2210-2215**

Doc. 102, Plaintiff's Response to Defendants' Motion to Alter or Amend a Judgment Pursuant to Rule 59(e) (March 25, 2025) ………………………………………………………….**2216-2219**

Doc. 103, Defendants' Reply in Support of Motion to Alter or Amend a Judgment Pursuant to Rule 59(e) (April 3, 2025) ……………………………………………………….……**2220-2222**

Doc. 105, Amended Final Judgment (April 7, 2025) …..**2223-2224**

**Preliminary Injunction Hearing Exhibit**

Exhibit 1002: *Chart of August and September UPK Payments to Busy Bees* (October 5, 2023) …………………………….….**2225-2226**

**Transcripts**

Doc. 50, Preliminary Injunction Hearing Transcript (October 5, 2023) ……………………………………………………… **2227-2307**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No. 1:23-cv-01557-DDD-STV

DARREN PATTERSON CHRISTIAN ACADEMY,

                *Plaintiff,*

      v.

LISA ROY, et al.,

                *Defendants.*

---

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

---

# **TABLE OF CONTENTS**

Table of Authorities ...................................................................................... iii

Introduction ................................................................................................... 1

Statement of Undisputed Material Facts ...................................................... 2

    A.  Darren Patterson Christian Academy ....................................... 2

    B.  Universal Preschool Program ..................................................... 3

    C.  The School's policies violate the nondiscrimination rules. ......... 6

    D.  The Department enforces the nondiscrimination rules. ............. 7

    E.  The Department refuses to grant religious exemptions. ............ 9

    F.  The Department imposes even more barriers for faith-based
        participation ............................................................................... 10

    G.  The Department exempts others. .............................................. 11

Argument ...................................................................................................... 13

    I.  The nondiscrimination rules violate the Free Exercise Clause. ...... 13

        A.  The rules are not generally applicable or neutral. ................... 13

            1.  The Department allows many exceptions. ........................... 13

            2.  The Department has not acted neutrally toward the School's
               religious beliefs. ................................................................... 17

        B.  The Department seeks to exclude the School from a public benefit
           because of its religious character and exercise ........................... 18

    II.  The nondiscrimination rules violate the Free Speech Clause by
       compelling and restricting speech. ................................................. 19

    III.The Blanket Provision violates the School's religious hiring rights and
       right to expressive association. ...................................................... 20

A.  The provision interferes with the School's autonomy to employ ministers and coreligionists. ..................................................... 20

B.  The provision violates the School's right to expressive association. ......... 21

IV. The nondiscrimination rules violate the Equal Protection Clause by treating the School worse than similarly situated preschools. ...................... 22

V.  The nondiscrimination rules fail strict scrutiny. .............................................. 23

A.  The Department lacks a compelling interest. ........................................... 23

B.  The rules are not narrowly tailored. ........................................................... 23

VI. The School is entitled to a permanent injunction. ........................................... 24

Conclusion ............................................................................................................. 25

Certificate of Compliance ..................................................................................... 26

Certificate of Service ............................................................................................. 27

## TABLE OF AUTHORITIES

**Cases**

*303 Creative LLC v. Elenis,*

   600 U.S. 570 (2023) ................................................................. 19

*Ashaheed v. Currington,*

   7 F.4th 1236 (10th Cir. 2021) ................................................... 22

*Awad v. Ziriax,*

   670 F.3d 1111 (10th Cir. 2012) ................................................ 25

*Boy Scouts of America v. Dale,*

   530 U.S. 640 (2000) ........................................................... 19, 21

*Bryce v. Episcopal Church in the Diocese of Colorado,*

   289 F.3d 648 (10th Cir. 2002) ................................................. 21

*Carson v. Makin,*

   596 U.S. 767 (2022) ................................................................. 19

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah,*

   508 U.S. 520 (1993) ........................................................... 17, 18

*City of Lakewood v. Plain Dealer Publishing Co.,*

   486 U.S. 750 (1988) ................................................................. 20

*Does 1-11 v. Board of Regents of University of Colorado,*

   100 F.4th 1251 (10th Cir. 2024) .............................................. 23

*Fellowship of Christian Athletes v. San Jose Unified School District,*

   82 F.4th 664 (9th Cir. 2023) .................................................... 16

*Fulton v. City of Philadelphia,*

   593 U.S. 522 (2021) ......................................................... passim

*Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in North America*,

    344 U.S. 94 (1952) ........................................................................................... 21

*Kennedy v. Bremerton School District*,

    597 U.S. 507 (2022) ........................................................................................ 23

*Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Commission*,

    584 U.S. 617 (2018) ........................................................................................ 18

*Our Lady of Guadalupe School v. Morrissey-Berru*,

    591 U.S. 732 (2020) ........................................................................................ 21

*Prairie Band Potawatomi Nation v. Wagnon*,

    476 F.3d 818 (10th Cir. 2007) ....................................................................... 24

*St. Mary Catholic Parish v. Roy*,

    No. 1:23-cv-02079-JLK (D. Colo. June 4, 2024) ...................................... 23

*Tandon v. Newsom*,

    593 U.S. 61 (2021) .......................................................................................... 14

*Watson v. Jones*,

    80 U.S. 679 (1871) .......................................................................................... 21

**Statutes**

C.R.S. § 26.5-4-203 ............................................................................................. 4

C.R.S. § 26.5-4-204 ............................................................................... 3, 4, 18, 24

C.R.S. § 26.5-4-205 ................................................................................... 5, 16, 17

## **INTRODUCTION**

Plaintiff Darren Patterson Christian Academy (the "School") seeks to participate in Colorado's Universal Preschool Program without being excluded or penalized for its religious beliefs and practices. But the Colorado Department of Early Childhood denied the School an exemption from certain "nondiscrimination" rules that would force the School to give up (or violate) internal policies related to employment and student conduct. Thankfully, this Court stepped in, issued a preliminary injunction, and allowed the School and its families to participate in the Program's inaugural year without facing the threat of exclusion or punishment. MPI Order, ECF No. 53.

That decision was the right one. Among other things, discovery has shown that the Department exempts other Program providers from the challenged rules, giving them "the flexibility needed ... to meet their organizational requirements, or other unique situations," Statement of Undisputed Material Fact ("SUMF") ¶ 71, while steadfastly "refus[ing] to provide Plaintiff any exemptions for its policies," MPI Order 33. Such unequal treatment is unconstitutional. What's more, despite telling this Court that "[n]o facts support a credible threat of enforcement," Defs' Combined Br. 3, ECF No. 42, discovery revealed that when the School first sued, the Department had already received—and was *investigating*—two discrimination complaints alleging that preschool providers had policies much like the School's here. SUMF ¶¶ 50–54.

As detailed below, the undisputed facts prove the nondiscrimination rules violate the School's constitutional rights and that the School is entitled to summary judgment on all its claims. The Court should grant the motion and issue a permanent injunction.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

**A.    Darren Patterson Christian Academy**

1.    The School is a pre-K–8th grade Christian school in Buena Vista, Colorado. Decl. of Joshua Drexler ("Drexler Decl.") ¶ 3 (Ex. 12); DPCA Dep. 24:18-24, 25:24-26:01 (Ex. 72).

2.    Its preschool, Busy Bees, is a licensed childcare center that enrolls 30 to 50 students each year, ranging from 2 ½ to 5 years old. Drexler Decl. ¶ 13; Lubbers Dep. 15:17-25 (Ex. 73).

3.    The School is distinctly Christ-centered and educates from a Christian worldview. Drexler Decl. ¶ 6; DPCA Dep. 37:20-38:15, 67:11-68:16.

4.    The School believes and teaches that God created two unique, immutable sexes—male and female; that the Bible teaches marriage is between one man and one woman; and that any sexual activity outside of biblical marriage contradicts God's will. Ex. 5 at 16; Drexler Decl. ¶ 19; DPCA Dep. 79:21-80:14.

5.    The School's religious beliefs guide all aspects of its curriculum, staff, and policies. Drexler Decl. ¶¶ 6, 17-26; DPCA Dep. 37:20-38:15, 67:11-68:16.

6.    The School's policies on pronoun usage, bathroom usage, dress code, and student lodging during field trips are based on its religious beliefs and therefore administered based on biological sex, not gender identity. Drexler Decl. ¶ 20; DPCA Dep. 103:13-22 (bathrooms), 110:15-111:13 (pronouns), 177:09-22 and 184:13-185:14 (dress code); Lubbers Dep. 76:22-77:04 (bathrooms), 94:12-25 (dress code); 100:05-12 (pronouns).

7.    The School's religious beliefs and mission require it to hire only those who share its faith, and it will not employ someone who disagrees with, or lives

3.  App.582

contrary to, its beliefs. Ex. 5 at 3, 15-16; Drexler Decl. ¶¶ 25-26; DPCA Dep. 156:08-157:04.

8.     The School expects its teachers to disciple students, incorporate biblical teachings and principles in all classes, lead chapel services, pray for and with students, and attend devotionals. Ex. 5 at 7, 15-23; Drexler Decl. ¶¶ 21-24.

9.     Many families choose the School, including Busy Bees, because of its Christian faith and focus. DPCA Dep. 34:01-25, 45:12-25; Lubbers Dep. 22:16-23:16, 27:03-21; *see also* Joint Decl. of Jason & Sarah Tippetts ¶¶ 3, 5 (Ex. 74); Joint Decl. of Jordan & Carrie Euler ¶¶ 5-7 (Ex. 75).

10.    Because the School is evangelistic, or "missional," it welcomes students and families of all faiths and backgrounds to enroll, including non-Christians and those who identify as LGBT. Drexler Decl. ¶ 6; DPCA Dep. 70:15-71:08, 72:04-73:11, 96:18-25; Lubbers Dep. 58:15-24.

11.    The School, including Busy Bees, currently has students from non-Christian families. DPCA Dep. 75:09-76:08; Lubbers Dep. 21:02-06, 58:15-59:10.

12.    All parents must sign a parent-student agreement confirming that they "will support and uphold the school staff and the religious mission, intent, policies, rules, and requirements." Ex. 4 at 1; DPCA Dep. 73:12-74:11; Lubbers Dep. 69:04-71:07.

## B.     Universal Preschool Program

### 1. Overview

13.    Colorado's Universal Preschool Program provides children with access to "preschool services free of charge in the school year before a child enrolls in kindergarten." C.R.S. § 26.5-4-204(1)(a).

3.  App.583

14.     The Colorado Department of Early Childhood administers the Program and enforces Program rules and requirements. *Id*. § 26.5-1-204(1) and (4); CDEC-Derocher Dep. 15:03-09 (Ex. 65).

15.     The legislature directed the Department to "establish a mixed delivery system" allowing "parents to select preschool providers ... from as broad a range as possible." C.R.S. § 26.5-4-204(2).

16.     Both public and private licensed childcare providers are eligible. *Id*. § 26.5-4-203(14).

17.     To participate, providers must sign a Program Service Agreement and agree to its terms. CDEC-Odean Dep. 8:17-21 (Ex. 66).

18.     Just under 2,000 preschools participated during the first year of the Program, and there were seats available for every child who sought to participate. *Id*. 83:04-09, 84:03-06.

19.     As of April 2024, the number of preschools participating for year two had increased to 2,300. *Id*. 83:04-09.

20.     There are multiple preschools in Chaffee County participating in the Program, including the Buena Vista School District's Early Childhood Program ("The Grove"). DPCA Dep. 46:03-13; Lubbers Dep. 23:22-24:06; *see also* Ex. 77 (list of UPK providers within 25 miles of Buena Vista).

21.     Student matching is based on parental choice: families select up to ten providers, ranking them one through ten. CDEC-Odean Dep. 50:19-51:12.

22.     Providers may decline a match if they do not have open seats or based on certain criteria (addressed below). *Id*. 51:24-53:06.

### 2. The Nondiscrimination Rules

***Equal Opportunity Provision***

23.     The Department must "establish by rule the quality standards that each preschool provider must meet to receive [Program] funding." C.R.S. § 26.5-4-205(1)(a).

24.     The rule must, "[a]t a minimum," require providers to "provide eligible children an equal opportunity to enroll and receive preschool services regardless of race, ethnicity, religious affiliation, sexual orientation, gender identity, lack of housing, income level, or disability, as such characteristics and circumstances apply to the child or the child's family." *Id*. § 26.5-4-205(2)(b) ("Equal Opportunity Provision").

25.     If needed "to ensure the availability of a mixed delivery system," the Department "may allow" providers to participate in the Program "for a limited time while working toward compliance with the quality standards," though such providers must still "meet all quality standards relating to health and safety." *Id*. § 26.5-4-205(1)(b)(II).

26.     Whether a quality standard relates to health and safety "may vary" and is determined by the Department case-by-case. CDEC-Odean Dep. 40:04-41:06.

27.     The Department did not adopt quality standards, by rule, before the 2023-24 school year. CDEC-Derocher Dep. 15:13-16:16.

28.     So the Department incorporated the Equal Opportunity Provision directly into the 2023-24 Agreement. Ex. 6 at 2; Cooke Dep. 30:13-31:03 (Ex. 68).

29.     The Equal Opportunity Provision has since been adopted by rule for the 2024-25 school year. Ex. 20 § 4.109(B).

30.     The Equal Opportunity Provision applies to enrollment policies and decisions, the delivery of preschool services, and everything within Program hours. CDEC-Odean Dep. 20:05-19, 22:16-23:02, 97:15-98:17.

31.     The Department testified it would investigate a complaint alleging that a faith-based provider taught students that same-sex marriage was wrong, explaining that whether such instruction violates the Equal Opportunity Provision would "depend[] on the impact" it has "on the child and the children in that classroom" because "that's what the equal opportunity clause covers, is impact on children." CDEC-Derocher Dep. 26:25-29:19.

### Blanket Provision

32.     The 2023-24 Agreement includes a provision stating that a "[p]rovider shall not discriminate against any person on the basis of gender, race, ethnicity, religion, national origin, age, sexual orientation, gender identity, citizenship status, education, disability, socio-economic status, or any other identity." Ex. 6 at 27 ("Blanket Provision").

33.     The Department maintains it had the legal authority to include the Blanket Provision in the 2023-24 Agreement. CDEC-Odean Dep. 35:09-13; CDEC-Derocher Dep. 54:07-55:18.

34.     While the 2024-25 Agreement does not currently include the Blanket Provision, nothing prohibits the Department from adding the provision back into future agreements. CDEC-Derocher Dep. 57:13-19, 58:17-21.

### C.     The School's policies violate the nondiscrimination rules.

35.     The Equal Opportunity and Blanket Provisions (the nondiscrimination rules) require providers to use pronouns based on an individual's gender identity. CDEC-Odean Dep. 25:15-20, 27:13-28:07; Roy Dep. 57:15-59:07 (Ex. 69).

6

3.  App.586

36.     The nondiscrimination rules require providers to allow individuals to use sex-separated facilities, including bathrooms, consistent with their gender identity. CDEC-Odean Dep. 25:21-26:04; Roy Dep. 57:15-59:07.

37.     The nondiscrimination rules require providers to allow individuals to dress in a manner consistent with their gender identity. CDEC-Odean Dep. 26:05-10; Roy Dep. 57:15-59:07.

38.     The Blanket Provision also prohibits discrimination against employees and prospective employees based on religion, sexual orientation, and gender identity. Ex. 6 at 27 ("any person"); *accord* CDEC-Odean St. Mary Dep. 65:13-67:13, *St. Mary Catholic Parish v. Roy*, No. 1:23-cv-2079-JLK, ECF No. 61-4 (testifying that provision applies to employees) (Ex. 70).

39.     Although Defendant Odean claimed the Department would not enforce the Blanket Provision "against religious providers who hire co-religionists in accordance with federal law," Decl. of Dawn Odean ¶¶ 26-27 (Ex. 26), she testified that she does not know which "federal law" applies, CDEC-Odean Dep. 86:21-88:17.

**D.    The Department enforces the nondiscrimination rules.**

40.     The Department is legally obligated to enforce the nondiscrimination rules. CDEC-Odean Dep. 14:25-15:04; *see also* Standard Operating Procedure for UPK Program Service Agreement Investigations, Disputes, and Enforcement (Ex. 17).

41.     The Department investigates any complaint brought to its attention, whether submitted orally, in writing, or anonymously. CDEC-Derocher Dep. 35:07-20; Ex. 17 at 2-3.

42.     The Department also can initiate an investigation by itself. CDEC-Derocher Dep. 36:20-37:01.

3.  App.587

43.     There is no deadline for completing an investigation. *Id*. 36:17-19.

44.     If there is a violation, the Department may terminate the Agreement, suspend performance, and/or withhold or deny payment. Ex. 6 at 17-19 (2023-24 Agreement); Ex. 62 at 17-20 (2024-25 Agreement).

45.     The Department can also terminate the Agreement "in its discretion" if it "ceases to further the public interest of the State." Ex. 6 at 6; Ex. 62 at 5.

46.     The Department "need not provide notice or a cure period and may immediately terminate the Agreement in whole or in part or institute any other remedy in the Agreement in order to protect the public interest of the State." Ex. 6 at 17; Ex. 62 at 17.

47.     The Department interprets "public interest" as relating to "health and safety." CDEC-Derocher Dep. 48:03-05, 49:19-50:15, 53:10-54:06.

48.     Whether an Agreement with a provider violates the public interest "depend[s]" because "a provider could engage in conduct that simultaneously violated the public interest section and violated the equal opportunity provision, but it's also plausible that one could be in violation of the equal opportunity provision and not be in violation of the public interest." CDEC-Derocher Dep. 49:01-16.

49.     At least three discrimination complaints have been filed against Program providers, including two alleging sexual orientation and/or gender identity discrimination. Defs' Suppl. Resp. to Pl's Interrog. No. 14 (Ex. 24).

50.     On April 10, 2023, the Department received an anonymous complaint alleging that a provider "informed [a] family that unless their child ... who identifies as transgender, went by the pronouns matching their gender assigned at birth, they would not allow them to attend UPK at [the school]." Ex. 22 at 2; CDEC-Odean Dep. AEO 4:25-5:11 (Ex. 67).

3.  App.588

51. The Department investigated the complaint because it alleged a violation of the Equal Opportunity Provision. CDEC-Odean Dep. AEO 5:18-6:01.

52. The Department did not inform the provider of the complaint or investigation until eleven months later in March 2024. *Id.* 7:10-8:04.

53. On June 12, 2023, the Department received another anonymous complaint alleging that a provider "assured" the complainant "that they wouldn't find any books teaching same sex marriage concepts, and that students with differing gender identities would not be welcome as they do not accommodate different bathroom usage needs." Ex. 21 at 2; CDEC-Odean Dep. 44:24-46:02.

54. The Department investigated this complaint because it alleged violations of the Program's nondiscrimination rules. CDEC-Odean Dep. 46:03-08.

**E.    The Department refuses to grant religious exemptions.**

55. The Department knew by early 2023 that faith-based preschools objected to the sexual-orientation and gender-identity components of the nondiscrimination rules. Cooke Dep. 35:08-36:01; Roy Dep. 51:13-52:03.

56. The Department rejected exemption requests from multiple faith-based providers, including the School. Exs. 8, 10; Roy Dep. 51:13-53:17; *see also* Defs' Suppl. Resp. to Interrog. No. 8 (identifying five faith-based providers that requested exemptions).

57. In denying the School's exemption request, Defendant Roy relied on the Department's interest in "ensur[ing] that children have safe and welcoming environments." Roy Dep. 55:20-56:07.

58. But there was no evidence that the School's religious beliefs and policies prevented it from providing a "safe and welcoming" environment for children. *Cf.* Expert Rebuttal Report of Dr. Stephen Levine ¶¶ 12, 244, 247

(explaining that affirmation of "a minor's current transgender identity" and social transition is "not the sole appropriate response" and could, in fact, lead to harm) (Ex. 76).

59. The only research Defendant Roy conducted before denying the request was to review the School's website and ask Defendant Odean how many seats the School had in the Program. Roy Dep. 56:15–57:01.

60. Defendant Roy did not consider any alternatives to denying the School's exemption request. *Id.* 57:09-11.

61. The School filed this lawsuit on June 20, 2023, after the Department denied its exemption request. ECF No. 1.

62. The School requested (and received) a preliminary injunction enjoining Defendants "from expelling, punishing, withholding funds from, or otherwise disciplining" the School for its religiously based policies. MPI Order 40.

63. The School is participating in the Program and plans to keep doing so, but it will not be permitted to participate if the Department can enforce the nondiscrimination rules against its religious policies and practices. Suppl. Decl. of Joshua Drexler ¶¶ 4-5 (Ex. 13); *see also* DPCA Dep. 58:04-59:01.

**F.    The Department imposes even more barriers for faith-based participation.**

64. Before the 2023-24 school year, the Department issued a "Fact Sheet" stating that "faith-based preschools can participate in UPK" under the "condition" that "state funds cannot be applied during hours of religious programming." Ex. 16 at 1; CDEC-Derocher Dep. 18:15-19:11.

65. The Department knew as early as December 2022 that faith-based providers had concerns about this condition. Ex. 64 at 3.

3.  App.590

66.     The Department's "Fact Sheet" was incorrect: no law required providers to refrain from applying Program funds during hours of religious programming. CDEC-Derocher Dep. 19:16-21:25.

67.     But the Department never published any written document or guidance telling faith-based providers that the condition did not apply, CDEC-Derocher Dep. 22:01-25, despite receiving multiple requests for clarity, Ex. 64 at 1, 4.

68.     Instead, a Department official told a Local Coordinating Organization as late as November 2023 that "UPK funds cannot be used for religious instruction and must be used for things outside of religious time." Ex. 64 at 7.

### G.     The Department exempts others.

69.     The Department allows providers to decline student matches based on certain characteristics, called "exception criteria" or "programmatic preferences." Ex. 20 § 4.110; CDEC-Odean Dep. 53:18-54:08.

70.     The Department created this exception criteria for the 2023-24 school year and has since implemented it by rule for the 2024-25 school year. Ex. 20 § 4.110; CDEC-Odean Dep. 53:18-54:20.

71.     For the 2023-24 school year, the Department developed a process by which "providers may submit a request for a CDEC Approved Exception if the decline reasons in the UPK Registration and Seats Verification Form do not provide the flexibility needed for a provider to meet their organizational requirements, or other unique situations." Ex. 63.

72.     As examples of the "types of exceptions" it would approve through this process, the Department identified providers that "only serve[] a specific subgroup of the population," such as "teen moms" and "refugees," and situations in which a

3.  App.591

family "has failed to previously comply with [the] provider's policies and procedures," including "behavioral policies." Ex. 63.

73.    More than 1,000 providers used at least one exception for the 2023-24 school year. CDEC-Odean Dep. 54:21-25.

74.    The Department allows faith-based providers to reserve some or all of their seats for "members of their congregation," as the provider defines that community. Ex. 20 §§ 4.103(L), 4.110(A)(1); Cooke Dep. 60:23-61:05.

75.    This would allow a Catholic provider to reserve seats for Catholics and a Lutheran provider to reserve seats for Lutherans. Trial Tr. 239:13-240:1, *St. Mary Catholic Parish v. Roy*, No. 1:23-cv-2079-JLK (Ex. 71).

76.    The Department allows providers to reserve some or all of its seats for children of employees. Ex. 20 § 4.110(A)(6); CDEC-Odean Dep. 60:22-61:25.

77.    The Department allows providers with Head Start programs to consider a family's income level in deciding whether to enroll a child. Ex. 20 § 4.110(A)(5); CDEC-Odean Dep. 57:21-58:21; *see also* Ex. 19 (Addendum to Adams County Head Start Agreement).

78.    The Department allows providers with multilingual programs to decline students who do not adequately speak a certain language. Ex. 20 § 4.110(A)(9); CDEC-Odean Dep. 62:04-63:03.

79.    The Department allows providers to prefer a child based "on the child and/or family being a part of a specific community; having specific competencies or interests; having a specific relationship to the provider, provider's employees, students, or their families; receiving specific public assistance benefits; or participating in a specific activity." Ex. 20 § 4.110(A)(10).

80.     Whether the Department allows a provider to use this specific preference is determined case-by-case. CDEC-Odean Dep. 71:03-72:03.

81.     Defendant Odean has testified that a provider could use this preference to prefer gender-nonconforming children, children of color from historically underserved areas, and children and/or families from the LGBTQ community. Ex. 71 at 244:15-246:08 (*St. Mary* Trial).

82.     The Department also will not require a provider to enroll a student if it cannot accommodate the student's disability. CDEC-Odean Dep. 65:02-66:19; Cooke Dep. 57:02-58:04.

83.     And the Department has admitted that the Equal Opportunity Provision does not prohibit providers from limiting enrollment to all boys or all girls, nor does it prohibit providers from limiting enrollment to children with married parents. CDEC-Odean Dep. 29:04-30:20.

## <u>ARGUMENT</u>

## I.     **The nondiscrimination rules violate the Free Exercise Clause.**

### A.     **The rules are not generally applicable or neutral.**

Strict scrutiny applies because the nondiscrimination rules burden the School's religious exercise and are neither "generally applicable" nor "neutral." MPI Order 31-32.

#### 1.  **The Department allows many exceptions.**

A law is not generally applicable if it "prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way," or if it includes "a mechanism for individualized exemptions." *Fulton v. City of Phila.*, 593 U.S. 522, 533–34 (2021) (cleaned up).

3.  App.593

Here, the Department asserts interests in "eliminating discrimination in hiring as well as in educational access," Defs' Resp. to MPI 17, ECF No. 29, and "ensur[ing] that children have safe and welcoming environments," SUMF ¶ 57. But the record reveals many exceptions undermining these interests.

Consider the "congregation" exception. That exception allows faith-based providers to reserve some or *all* of their seats for members of their "congregation," as the provider defines that community. SUMF ¶ 74. This allows a Catholic provider to reserve seats for Catholics and a Lutheran provider to reserve seats for Lutherans. *Id.* ¶ 75. It also allows a church-operated preschool to limit enrollment to congregants even if the church conditions membership on adherence to its beliefs about marriage and sexuality—i.e., "the same sorts of rules that [the School] imposes on its staff and students." MPI Order 33. So the exception permits otherwise prohibited religious-affiliation, sexual-orientation, and gender-identity discrimination, making the rules not generally applicable.

The same is true of the "employee" exception, which allows providers to restrict enrollment to children of employees, SUMF ¶ 76, because many faith-based schools require employees to share their beliefs—including those related to marriage, sexuality, and gender.[1]

While either exception is enough to trigger strict scrutiny, *see Tandon v. Newsom*, 593 U.S. 61, 62 (2021), there are many more.

For example, despite Program rules broadly prohibiting discrimination based on "income level," "socio-economic status," "disability," "ethnicity," and "citizenship status," the Department allows providers: (1) to make enrollment decisions based on

---

[1] Neither exception alleviates the School's burden here because it (1) welcomes students and families of all faiths and backgrounds, and (2) enrolls students who are not children of employees. SUMF ¶¶ 10–11.

14

family income if they have a Head Start program; (2) to prefer families who "receiv[e] specific public assistance benefits"; (3) to decline a student if they cannot accommodate the student's disability; (4) to decline students who do not speak a certain language if the provider has a multilingual program; and (5) to serve only "refugees." SUMF ¶¶ 72, 77–82.

The Department also has admitted that the Equal Opportunity Provision does not forbid providers from limiting enrollment to all boys or all girls. *Id.* ¶ 83. Nor does it prohibit providers from limiting enrollment to children with married parents. *Id.* So sex and marital-status discrimination are fine, but Program rules forbid the School—which welcomes *everybody*—from operating consistently with its beliefs about sexuality and gender.

What's more, the Department has considered and granted individualized exception requests to give providers the "flexibility needed" to "meet their organizational requirements, or other unique situations." SUMF ¶¶ 71–73. And it has formally adopted, by rule, an exception allowing providers to grant preferences based on the child or family "being a part of a specific community," "having specific competencies or interests," or "participating in a specific activity." *Id.* ¶ 79. This broadly worded exception necessarily "invites the government to decide which reasons for not complying with the policy are worthy of solicitude," so the rules are not generally applicable for this reason as well. *Fulton*, 593 U.S. at 537 (cleaned up). Indeed, Defendant Odean has testified that providers could use this exception to prefer gender-nonconforming children, children of color from historically underserved areas, and children or families from the LGBTQ community. SUMF ¶ 81.

3.  App.595

On top of all that, the statute underlying the Equal Opportunity Provision "itself empowers the Department to grant exemptions from the quality standards (including standards pertaining to non-discrimination) if doing so is 'necessary to ensure the availability of a mixed delivery system.'" MPI Order 33 (quoting C.R.S. § 26.5-4-205(1)(b)(II)). This, too, destroys general applicability. *Fulton*, 593 U.S. at 537 (mere discretion enough "regardless whether any exceptions have been given").

The Ninth Circuit's recent en banc decision in *Fellowship of Christian Athletes v. San Jose Unified School District* is on point. 82 F.4th 664 (9th Cir. 2023) ("*FCA*"). There, a public school district stripped a Christian student group of official status because the group—which "welcome[d] all students" to join—required its leaders to affirm its "core religious beliefs." *Id.* at 672. The school district asserted interests in "prohibiting discrimination" and "ensuring equal access for all students." *Id.* at 689. But the court held that the nondiscrimination policies were not neutral or generally applicable. First because other clubs could "discriminate expressly—even on otherwise protected grounds." *Id.* The South Asian Heritage Club and Senior Women Club, for example, could restrict membership based on ethnicity and sex. *Id.* at 688–89. And second, because student groups could "discriminate based on other 'non-discriminatory' criteria," decided by the district "on a case-by-case basis." *Id.* at 688.

Same here. The Department, in its discretion, crafted the above exceptions for the 2023-24 school year and has enshrined them in rule for the 2024-25 year. The Department's "broad discretion to grant exemptions on less than clear considerations removes its non-discrimination policies from the realm of general applicability and thus subjects the[m] to strict scrutiny." *Id.*

3. App.596

### 2. The Department has not acted neutrally toward the School's religious beliefs.

Strict scrutiny also applies because the Department "proceed[ed] in a manner intolerant of religious beliefs" and "restrict[ed] practices because of their religious nature." *Fulton*, 593 U.S. at 533. Because the Free Exercise Clause "forbids subtle departures from neutrality" and "covert suppression of particular religious beliefs," the Court "must survey meticulously the circumstances of governmental categories to eliminate, as it were, religious gerrymanders." *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 534 (1993) (cleaned up).

The Department exhibited a lack of neutrality in several ways.

First, the Department refused to accommodate the School's religious objections while allowing exceptions for many secular reasons. Such unequal treatment "devalues religious reasons ... by judging them to be of lesser import than nonreligious reasons" and "single[s] out" the School's religious practice "for discriminatory treatment." *Id*. 537–38; *see also id*. at 531 ("failure to satisfy" general applicability "likely an indication that" neutrality "has not been satisfied").

Second, the Department needlessly enforced the Equal Opportunity Provision against faith-based providers for the 2023-24 school year before any quality standards were established "by rule," as required by statute. C.R.S. § 26.5-4-205(1)(a); SUMF ¶¶ 26–27. The Department then conditioned participation on compliance with another, more onerous nondiscrimination rule (the Blanket Provision) that the Department now concedes was unnecessary. SUMF ¶¶ 32–34. This led to religious schools and families being put to the choice of giving up their beliefs and participating the Program, while other schools could continue "doing what they were doing under the standards they were currently operating under." Cooke Dep. 32:06-07.

3.  App.597

Third, rather than alleviate burdens for faith-based providers, the Department fabricated even more. The Department falsely told faith-based providers in a "Fact Sheet" that they could participate in the Program only if "state funds" were not "applied during hours of religious programming." SUMF ¶ 64 (Ex. 16 at 1). This not only flouted the legislature's mandate to ensure a "mixed delivery system," C.R.S. § 26.5-4-204(2), but it imposed a "gratuitous restriction on religious conduct," *Lukumi*, 508 U.S. at 538 (cleaned up). Worse, the Department never corrected the error despite being told as early as December 2022 that the "condition" hindered faith-based participation. SUMF ¶¶ 65–67. Department officials instead continued to repeat it as late as November 2023, telling those who asked that "UPK funds cannot be used for religious instruction and must be used for things outside of religious time." *Id.* ¶ 68.

All of this, taken together, shows the Department did anything but give "full and fair consideration" to faith-based providers' "religious objection[s]." *Masterpiece Cakeshop, Ltd. v. Colo. C. R. Comm'n*, 584 U.S. 617, 640 (2018).

**B.   The Department seeks to exclude the School from a public benefit because of its religious character and exercise.**

The Department violates the Free Exercise Clause a second way by forcing the School "to choose between adhering to [its] religious beliefs and risking exclusion from the program or complying with the Department's rules." MPI Order 31. As this Court correctly explained, "the Supreme Court has thrice held that a state may not exclude religious observers from receiving otherwise available educational funding because of a school's religious status or practice." *Id.* at 31–32 (citing cases). That's because the Free Exercise Clause "protects against indirect

3.  App.598

coercion or penalties on the free exercise of religion, not just outright prohibitions." *Carson v. Makin,* 596 U.S. 767, 778 (2022) (cleaned up).

Yet the Program's rules impose such a penalty. The School "seeks to hire only coreligionists, and to continue [its] internal policies related to gender distinctions rooted in religious beliefs." MPI Order 32. Those policies violate the challenged rules, thus triggering all the enforcement mechanisms under the Program. *Id.* So the School can keep its religious policies and practices and risk complaints, investigations, and the threat of getting sued. Or it can eliminate that threat by abandoning its religious exercise or not participating altogether. "The First Amendment forbids imposing such a choice." MPI Order 32.[2]

## II.   The nondiscrimination rules violate the Free Speech Clause by compelling and restricting speech.

The Supreme Court has held that anti-discrimination laws cannot censor or compel private speech. *E.g.*, *303 Creative LLC v. Elenis*, 600 U.S. 570 (2023); *Boy Scouts of Am. v. Dale*, 530 U.S. 640 (2000). That same rule applies here: the Department cannot "require [the School] and its staff to use a student's or employee's preferred pronouns as a condition of participating in the [P]rogram." MPI Order 35. But that is what the Program's nondiscrimination rules would do. They forbid "gender identity" discrimination and thus require pronoun usage based on gender identity, not biological sex. SUMF ¶ 35.

The Department does not dispute this. It has instead been "coy" about whether the School's policies violate the Program's rules, MPI Order 19, saying only that the School "points to nothing but imagined enforcement," Defs' Combined Br. 5,

---

[2] Without a permanent injunction, the School will be excluded because it cannot agree to comply with the Program Service Agreement since it incorporates the nondiscrimination rules. *See* SUMF ¶ 63.

ECF No. 42. There is nothing imaginary about it. In fact, discovery revealed that when the School sued, the Department was investigating not one, but two, discrimination complaints alleging providers had policies much like the School's. SUMF ¶¶ 50–54. One complaint concerned pronoun usage for a transgender-identifying child; the other bathroom usage for "students with differing gender identities." *Id.* ¶¶ 50, 53. And the Department admitted that it investigated both because they alleged violations of the Equal Opportunity Provision. *Id.* ¶¶ 51, 54.

Beyond pronouns, the nondiscrimination rules also threaten to censor the School's religious instruction. The Department testified that it would investigate a faith-based school for teaching students that same-sex marriage is wrong if it received a complaint, explaining that such instruction could violate the Equal Opportunity Provision "depend[ing] on the impact" it has "on the child and the children in that classroom." *Id.* ¶ 31. In other words, the School's religious instruction violates the nondiscrimination rules if *the Department decides* it is harmful to a particular child. Such "unbridled discretion" is unconstitutional; the government may not "decide who may speak and who may not based upon the content of the speech or viewpoint of the speaker." *City of Lakewood v. Plain Dealer Publ'g Co.,* 486 U.S. 750, 763–64 (1988).

### III.   The Blanket Provision violates the School's religious hiring rights and right to expressive association.

#### A.   The provision interferes with the School's autonomy to employ ministers and coreligionists.

By prohibiting employment discrimination, the Blanket Provision further infringes the School's religious autonomy. This autonomy, which is rooted in both Religion Clauses, gives the School "independence" to decide "matters of [internal] government," *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N.*

*Am.*, 344 U.S. 94, 116 (1952), and to require "conformity of [its] members ... to the standard of morals required of them," *Watson v. Jones*, 80 U.S. 679, 733 (1871). Two separate but similar protections apply here.

First, the Religion Clauses prevent any interference with employment decisions for "ministers." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732 (2020). The School's teachers and leadership fit comfortably within this "ministerial exception" because they are "entrusted with the responsibility of transmitting the [Christian] faith to the next generation." *Id.* at 754 (cleaned up); *see* MPI Order 30; SUMF ¶¶ 7–8.

Second, the Religion Clauses protect the School's freedom to prefer coreligionists as employees. This applies to all employees, not just ministers, but shields only religiously based employment decisions. *See Bryce v. Episcopal Church in the Diocese of Colo.*, 289 F.3d 648, 657–58 (10th Cir. 2002); Suppl. Drexler Decl. ¶ 18 (Ex. 13) (explaining that some school employees would not be considered "ministerial"). Here, the School's mission is to provide "a nurturing, distinctively Christian school environment that emphasizes knowing Christ, imitating His character, [and] integrating the Bible in all of life and learning." Ex. 5 at 4. Because the School has determined that every position is essential to this mission, Drexler Decl. ¶ 22-26 (Ex. 12), that decision is entitled to deference under the First Amendment, *see Dale*, 530 U.S. at 653 (deference given "to an association's view of what would impair its expression").

## B.   The provision violates the School's right to expressive association.

The Blanket Provision similarly violates the School's right "to associate with others in pursuit of ... educational [and] religious ... ends." *Dale*, 530 U.S. at 647.

"The freedom to associate with others also includes the freedom not to associate with others if doing so would compromise the associating group's expression of beliefs." MPI Order 31. This Court already held that the School is an expressive association and that the Blanket Provision mandates employment of "those who disagree with [the School's] religious expression and evangelistic mission." *Id*. Because such a mandate places a "significant burden on [the School's] religious expression," the Blanket Provision "triggers strict scrutiny" for this reason too. *Id*.

## IV. The nondiscrimination rules violate the Equal Protection Clause by treating the School worse than similarly situated preschools.

The unequal treatment also violates the Equal Protection Clause. *See Ashaheed v. Currington,* 7 F.4th 1236, 1249 n.11 (10th Cir. 2021) (free exercise and equal protection claims often overlap). The Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike." *Id*. at 1249 (cleaned up). So when the government discriminates based on "a suspect classification or a deprivation of a fundamental right such as free exercise of religion, strict scrutiny applies." *Id*. at 1250.

Here, the Department's many exceptions allow other providers to skirt the nondiscrimination rules, "but so far the Department has refused to provide Plaintiff any exemptions for its policies." MPI Order 33. Because the Department's impermissible line-drawing treats the School worse than similarly situated preschools and deprives the School of a fundamental right, strict scrutiny applies. *See Ashaheed*, 7 F.4th at 1251 ("similarly situated" entities must only be "alike in 'all relevant respects'—not all respects").

3.  App.602

## V.   The nondiscrimination rules fail strict scrutiny.

Now the "burden shifts" to the Department to prove the challenged rules "serve a compelling interest and are narrowly tailored to that end." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 531–32 (2022). It cannot.[3]

### A.   The Department lacks a compelling interest.

The Department asserts interests in preventing discrimination and ensuring equal treatment in the Program. Neither justify burdening the School's constitutional rights. The Department cannot rely on "broadly formulated interests," but must instead show a compelling interest in "denying an exception" to the School. *Fulton*, 593 U.S. at 541.

And on that point, *Fulton* is dispositive. There, Philadelphia advanced a nearly identical interest in equal treatment of foster parents and children to justify excluding Catholic Social Services. *Id.* But the city's "system of exceptions" undermined any "contention that its non-discrimination policies can brook no departures." *Id.* at 542. So too here: the exceptions to the nondiscrimination rules prove the Department's interests are "not of the highest order." MPI Order 34.

### B.   The rules are not narrowly tailored.

The exceptions are also fatal to narrow tailoring. The Department cannot "explain why its interest[s] [are] served by granting exemptions" to some providers "but not others." *Does 1-11 v. Bd. of Regents of Univ. of Colo.*, 100 F.4th 1251, 1273 (10th Cir. 2024). Indeed, the Department never even *considered* whether less restrictive alternatives were available. Defendant Roy said she denied the School's

---

[3] Nor does the recent decision in *St. Mary Catholic Parish v. Roy*, No. 1:23-cv-02079-JLK (D. Colo. June 4, 2024), ECF No. 116, change the analysis. The court there said the "two cases differ materially," *id.* p.61 n.32, and that its "conclusion d[id] not contradict" this Court's preliminary-injunction ruling, *id.* p.83 n.44.

exemption request based on the Department's interest in "ensur[ing] that children have safe and welcoming environments," SUMF ¶ 57, but later admitted that all she did was review the school's website and never considered any alternatives to denying the request, *id*. ¶¶ 59-60.

And make no mistake: there are alternatives to trampling on religious freedom. For example, the Department could better tailor its matching and placement process to ensure that those families who desire an "affirming" environment for transgender-identifying children are placed *only* in preschools willing to take an "affirming" approach (*e.g.*, by using preferred pronouns and allowing restroom use based on gender identity). This would allow those families to have the desired environment for their children, while still allowing other families—like the Eulers and Tippetts—to choose an educational environment that reinforces their beliefs and values to their children. *See* SUMF ¶ 9. And, of course, it would allow religious preschools like Darren Patterson to participate in the Program without sacrificing their religious beliefs and practices. Such an alternative is far more respectful of religion, ensures that everyone who wants to participate in the Program gets to, and better facilitates the "mixed delivery system" that the legislature said it wanted. C.R.S. § 26.5-4-204(2).

## VI.    The School is entitled to a permanent injunction.

The elements required for a permanent injunction are the same as for a preliminary injunction, except that it "requires showing actual success on the merits." *Prairie Band Potawatomi Nation v. Wagnon*, 476 F.3d 818, 822 (10th Cir. 2007). This Court held these factors were met at the preliminary injunction stage, MPI Order 36–39, and the School still satisfies them now.

3.  App.604

First, the School has proven actual success, so "no further showing of irreparable injury is necessary." *Awad v. Ziriax*, 670 F.3d 1111, 1131 (10th Cir. 2012). That's because a First Amendment violation "*unquestionably* constitutes irreparable injury." MPI Order at 37.

Second, a permanent injunction will benefit the public interest. When a law is "unconstitutional, the interests of the government 'do not outweigh' the plaintiff's rights to have its constitutional rights protected." *Id.* at 38 (quoting *Awad*, 670 F.3d at 1131). The public interest also is not served by excluding faith-based providers because of their sincere religious beliefs and practices, thereby reducing the number of Program providers ultimately available to students and families. "Indeed, exclusion of a preschool is inherently anti-universal, and denying participation based on one's protected beliefs or speech is not equitable." *Id.* The Department has been enjoined for eight months now, and everyone has benefitted: the School has participated in the Program while remaining true to its religious convictions; children and families have benefitted by using Program funds at the school of their choice; and the Department lacks any evidence of harm to it or the public.

## <u>CONCLUSION</u>

For all these reasons, Plaintiff requests that the Court grant its motion for summary judgment and issue an order awarding the declaratory and injunctive relief requested in its Complaint.

3.  App.605

Respectfully submitted this 21st day of June, 2024,

                                            s/ Jeremiah Galus

Philip A. Sechler, VA Bar #99761       David A. Cortman, AZ Bar #029490
Jacob E. Reed, VA Bar #97181           Ryan J. Tucker, AZ Bar #034382
ALLIANCE DEFENDING FREEDOM             Jeremiah Galus, AZ Bar #030469
44180 Riverside Parkway                Bryan Neihart, AZ Bar #035937
Lansdowne, VA 20176                    ALLIANCE DEFENDING FREEDOM
Telephone: (571) 707-4655              15100 N. 90th Street
Email: psechler@adflegal.org           Scottsdale, AZ 85260
        jreed@adflegal.org             Telephone: (480) 444-0020
                                       Email: dcortman@adflegal.org
                                               rtucker@adflegal.org
                                               jgalus@adflegal.org
                                               bneihart@adflegal.org

                    *Attorneys for Plaintiff*

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing pleading complies with the type-volume

limitation set forth in Judge Domenico's Practice Standard III(A)(1), as modified by

Court Order dated June 17, 2024 (ECF No. 76).

## **CERTIFICATE OF SERVICE**

I hereby certify that on June 21, 2024, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated:  June 21, 2024

<u>s/ Jeremiah Galus</u>
Jeremiah Galus
Attorney for Plaintiff

27

3.  App.607

# EXHIBIT 20



DEPARTMENT OF EARLY CHILDHOOD

Colorado Universal Preschool Program

UNIVERSAL PRESCHOOL PROGRAM RULES AND REGULATIONS

8 CCR 1404-1

*[Editor's Notes follow the text of the rules at the end of this CCR Document.]*

---

...

### 4.103   DEFINITIONS

A.   "Additional preschool services" means hours of preschool services provided to a child in the year preceding enrollment in kindergarten that are in addition to the universal preschool services the child receives.

B.   "Administrative unit" means a school district, a board of cooperative services, a multi-district administrative unit, a charter school network, a charter school collaborative, or the state charter school institute that is providing educational services to exceptional children and that is responsible for the local administration of the education of exceptional children pursuant to article 20 of title 22.

C.   "Applicant 2" means an individual that resides in a family child care home and provides care regularly, in a recurring pattern and must have the same required training as the Primary Provider as specified in the "Rules Regulating Family Child Care Homes" located in 8 CCR 1402-1, rule section 2.304(A)(5).

D.   "Child Find" means the program component of IDEA that requires states to find, identify, locate, evaluate, and serve all children with disabilities, from birth to twenty-one (21) years of age. Child Find includes: (a) Part C child find, which is the program component of IDEA that requires states to find, identify, locate, evaluate, and serve children with disabilities from birth through two (2) years of age; and (b) Part B child find, which is the program component of IDEA that requires states to find, identify, locate, evaluate, and serve children with disabilities from three (3) to twenty-one (21) years of age.

E.   "Children with disabilities" has the same meaning as provided in section 22-20-103, C.R.S.

F.   "Classroom" means the educational or instructional location used to support a preschool program by any Preschool Program provider, including schools, child care centers, family child care homes, or other approved Colorado Universal Preschool Program locations.

G.   "Colorado Academic Standards" means the comprehensive set of academic standards across all content areas adopted by the State Board of Education pursuant to section 22-7-1005, C.R.S.

H.   "Colorado Early Learning and Development Guidelines" means the set of guidelines across all early childhood domains endorsed by the early childhood leadership commission that includes approaches to learning, health and physical development, social and emotional development, language, literacy, numeracy, logic and reasoning, and other subject-specific learning.

I.   "Colorado Shines Quality Rating and Improvement System (QRIS)" means the system developed by the Department pursuant to section 26.5-5-101, C.R.S., which measures the level of

---

preparedness of, and quality of services provided by, an early childhood education program to prepare children to enter elementary school.

J.     "Colorado Universal Preschool Program" or "Preschool Program" means the program established within the Department pursuant to section 26.5-4-204, C.R.S., and includes all participating preschool providers.

K.     "Colorado's Competencies for Early Childhood Educators and Professionals" means the set of content areas, or domains, that describe the knowledge and skills early childhood educators need to work effectively with children, and are updated, maintained, and published by the Department.

L.     "Congregation" means members of the community that the faith-based provider serves as the faith-based provider defines that community.

M.     "Cooperative Preschool Provider" means an eligible preschool provider which requires participating families to be meaningfully involved in the operation of the cooperative and which is at least substantially operated, maintained, or administered by participating families.

N.     "Department" means Colorado Department of Early Childhood.

O.     "ECEA" means the "Exceptional Children's Educational Act", Article 20 of Title 22, and its implementing rules.

P.     "Early childhood mental health program" means a program which supports the mental wellness of children, or promotes the knowledge, ability, and capacity of individuals who support the mental wellness of children to address and enhance the social, emotional, cognitive, or behavioral developmental needs of children, including children aged birth to six (6).

Q.     "Early learning and assessment approach" means the eligible preschool provider's chosen methods for selecting, planning, and implementing activities; observing; documenting; and monitoring designed to support children's learning and development, in alignment with the Colorado Early Learning and Development Guidelines, and includes curricula and other pedagogical methods.

R.     "Eligible child" means a child who is eligible to receive preschool services as provided in section 26.5-4-204(3), C.R.S.

S.     "Eligible preschool provider" means a preschool provider that is actively participating in the Colorado Universal Preschool Program and in good standing with the Department. As used in this context, "good standing" means that the preschool provider has either a permanent, provisional, or probationary license issued by the Department, as those terms are defined and used in 8 CCR 1402-1, rule sections 2.107, 2.108, and 2.109.

T.     "Equally qualified provider" means an employee of a family child care home that has the same required trainings and qualifications as the primary provider as specified in the "Rules Regulating Family Child Care Homes" located in 8 CCR 1402-1, rule section 2.304(A)(29).

U.     "Federal Poverty Level" (FPL) or "Federal Poverty Guidelines" (FPG) refers to figures set by the federal government annually. These figures, based on gross monthly income levels for the corresponding household size, are included in the table in rule section 4.105(A).

V.     "Foster care home" has the same meaning as provided in section 26-6-903(10), C.R.S.

W.     "Full-day" means thirty to forty (30 to 40) hours of preschool service per week.

X.      "Half-day" means fifteen to twenty (15 to 20) hours of preschool service per week.

Y.      "Head Start program" means a program operated by a local public or private nonprofit agency designated by the federal department of health and human services to operate a head start program pursuant to the provisions of Title V of the federal "Economic Opportunity Act of 1964", as amended.

Z.      "IDEA" means the federal "Individuals with Disabilities Education Act", 20 U.S.C. sections 1400 through 1491, as amended, and its implementing regulations at 34 C.F.R. Parts 300 and 303 (2023), herein incorporated by reference. No later editions or amendments are incorporated. These regulations are available at no cost from the United States Department of Education at www.ecfr.gov. These regulations are available for public inspection and copying at the Colorado Department of Early Childhood, 710 S. Ash St., Denver, CO 80246, during normal business hours.

AA.     "Individualized Education Program" or "IEP" means a written statement for a child with a disability that is developed, reviewed, and revised in accordance with part 1 of article 20 of title 22, C.R.S., and the rules promulgated by the Colorado State Board of Education. BB.          "Instructional supervisor" means the employee who is responsible for the direct supervision of an employee who is required to meet the ongoing professional development requirement of rule sections 4.114(B) and (C), and who as part of that direct supervision is responsible for overseeing the delivery of instruction or related services. For an eligible preschool provider who is a family child care home, the instructional supervisor shall mean the primary provider. For an eligible preschool provider who is a child care center (including a large child care center, small child care center, preschool, mobile part-day preschool program, or a combination thereof), the instructional supervisor shall mean the director of the child care center who is qualified and designated as the director as specified in 8 CCR 1402-1 rule sections 2.214, 2.215, 2.217 and 2.243, and also includes any other supervisory staff who meet this definition.

CC.     "Lead teacher" means the employee of an eligible preschool provider that is primarily assigned to a Preschool Program classroom and responsible for delivering instruction or leading activities. A "lead teacher" means:

        1.      The primary provider of a family child care home; or

        2.      The early childhood teacher (as specified in 8 CCR 1402-1 rule section 2.216(A)) of a large child care center, small child care center, preschool, or mobile part-day preschool program as those terms are defined in rule section 2.204(B), who is responsible for delivering instruction or leading activities in their primarily assigned Preschool Program classroom.

DD.     "Low-income" means that the child's parent or guardian's gross income must not exceed 270% of the Federal Poverty Guideline (FPG).

EE.     "Multilingual" means a child who is learning two (2) or more languages at the same time, or a child who is learning a second (2nd) language while continuing to develop their first (1st) language.

FF.     "Noncertified kinship care" means a child is being cared for by a relative or kin pursuant to 19-1-103(102), C.R.S., who has a significant relationship with the child in circumstances when there is a safety concern by a county department of human or social services and where the relative or kin has not met the foster care certification requirements for a kinship foster care home or has chosen not to pursue that certification process.

GG.     "Parent" has the same meaning as provided in section 22-20-103, C.R.S.

HH.   "Part-time or slot" means ten (10) hours of preschool service per week.

II.   "Primary provider" means the person that resides in a family child care home and provides direct care, supervision, and education to child(ren) in care for at least sixty percent (60%) of the daily hours of operation of the family child care home.

JJ.   "Preschool provider" means any of the following entities that are licensed pursuant to part 3 of article 5 of this title 26.5:

   1.   A family child care home, as defined in section 26.5-5-303, C.R.S.;

   2.   A child care center, as defined in section 26.5-5-303, C.R.S.;

   3.   A school district licensed to operate as a public preschool provider;

   4.   A charter school licensed to operate as a public preschool provider; or

   5.   A head start program.

KK.   "Provider rate formula" means the formulas for setting the per-child rates for universal preschool services, for preschool services for children with disabilities, for preschool services for eligible children who are three (3) years of age or younger and for additional preschool services.

LL.   "Preschool services" means instructional and educational services provided to an eligible child by an eligible preschool provider pursuant to the Colorado Universal Preschool Program.

MM.   "Qualifying factor" means a child or family circumstance, as identified by department rule pursuant to section 26.5-4-204(4)(a)(II), C.R.S., that may negatively impact a child's cognitive, academic, social, physical, or behavioral health or development.

NN.   "Qualified substitute" means a substitute provider of a family child care home that has all required trainings and qualifications as determined in the Department's "Rules Regulating Family Child Care Homes" located in 8 CCR 1402-1 rule section 2.304(A)(71).

OO.   "Resource Bank" means the collection of preschool curricula and other approved educational approaches, toolkits, self-assessments, templates, training, and other resources for use by participating preschool providers that is created, administered, and updated by the Department pursuant to section 26.5-4-205(3), C.R.S.

PP.   "School District" means a school district organized pursuant to article 30 of title 22, C.R.S., that provides preschool services and is licensed pursuant to part 3 of article 5 of title 26.5, C.R.S., as a preschool provider; or a board of cooperative services organized pursuant to article 5 of title 22, C.R.S., that provides preschool services and is licensed pursuant to part 3 of article 5 of title 26.5, C.R.S., as a preschool provider.

QQ.   "School year" means the full school year as defined by the local school board of education.

RR.   "Short term basis" means work performed in place of a regular staff member or volunteer who is unable to work their normally scheduled work hours due to a planned or unplanned event that requires the regular staff member or volunteer to be on leave for no more than two (2) calendar weeks and exclusively includes work performed by an assistant early childhood teacher providing substitute services under 8 CCR 1402-1 rule section 2.216(F)(2), or a public school substitute providing services under 8 CCR 1402-1 rule section 2.243(C).

SS.   "Sibling" means one (1) or more individuals having one (1) or both parents in common.

TT.   "Staff aide" means an individual who assists the primary provider in a family child care home in the care of children at the family child care home. A staff aide must never be allowed to supervise a child(ren) alone. The primary provider, applicant 2, equally qualified provider, or qualified substitute provider must be present at all times when the staff aide is providing care for a child(ren).

UU.   "Substitute" means a paid, volunteer, or contract individual of a family child care home responsible for caring for the children in the capacity of the employee, staff aide, or staff member. The primary provider, applicant 2, equally qualified provider, or qualified substitute must always be present at all times when a substitute is providing care for children.

VV.   "Universal preschool services" means ten (10) hours of preschool services per week made available, at no charge, to children in the state during the school year preceding the school year in which a child is eligible to enroll in kindergarten.

…

**4.109   GENERAL REQUIREMENTS AND PROVISIONS**

A.   Beginning July 1, 2024, and continuing thereafter, all eligible preschool providers must meet the following minimum requirements as a condition of participating in the Preschool Program:

   1.   The minimum number of planned teacher-pupil contact hours of instructional services scheduled to be delivered by an eligible preschool provider for all students enrolled in the Preschool Program shall not be less than three-hundred and sixty (360) hours per school year.

      a.   When fulfilling this requirement, eligible preschool providers may take into consideration the number of available teacher-pupil contact hours left in the school year based on when a child enrolls in the Preschool Program, and this requirement shall not be construed as requiring three-hundred and sixty (360) planned teacher-pupil contact hours of instructional services when a child is not enrolled in the Preschool Program for the entire school year.

B.   Eligible preschool providers must ensure that children receive an equal opportunity to enroll and receive universal preschool services regardless of race, ethnicity, religious affiliation, sexual orientation, gender identity, lack of housing, income level, or disability, as such characteristics and circumstances apply to the child or the child's family.

C.   Eligible preschool providers shall maintain educator-to-child ratios and group sizes in accordance with the applicable maximum staff-child ratios and group sizes determined in the "Rules Regulating Child Care Centers" located in 8 CCR 1402-1, rule section 2.217(A), or "Rules Regulating Family Child Care Homes" located in 8 CCR 1402-1, rule sections 2.305 through 2.310. Beginning on July 1, 2025, no classroom of an eligible preschool provider shall have an educator-to-child ratio that exceeds 1:11, or a maximum group size that exceeds twenty-two (22); and beginning July 1, 2026, no classroom of an eligible preschool provider shall have an educator-to-child ratio that exceeds 1:10, or a maximum group size that exceeds twenty (20). The approved maximum educator-to-child ratios and group sizes of this rule shall not supersede the maximum staff-child ratios and group sizes allowed, based on a primary provider's license type for a family child care home, as determined in 8 CCR 1402-1, rule sections 2.305 through 3.310.

   1.   Exceptions to the maximum educator-to-child ratios and group sizes in this rule may be applied if an eligible preschool provider has a quality rating of four (4) or five (5) from the Department's Colorado Shines Quality Rating and Improvement System, and will be

       allowed to serve children up to the maximum staff-child ratio and group size as determined in 8 CCR 1402-1, rule section 2.217(A).

2.     If an eligible preschool provider has a Department approved wavier pursuant to 8 CCR 1402-1, rule section 2.115, the eligible preschool provider is permitted to serve larger group sizes than allowed per rule section 4.109(C), provided the group sizes are in accordance with the terms of the waiver received, and all other requirements are met.

3.     This rule section shall not restrict an eligible preschool provider from having multiple groups that are not separated from each other by permanent or portable dividers or walls, or limit any other conduct allowed in 8 CCR 1402-1 rule sections 2.217(A)(15)(a)-(f), provided all other requirements are met.

D.    Qualifications for lead teachers.

1.     Eligible preschool providers must ensure that all teachers, educators, or other employees are qualified in accordance with their applicable requirements identified in the "Rules Regulating Child Care Centers" located in 8 CCR 1402-1, rule section 2.216; or in accordance with the primary provider's license type for a Family Child Care Home, and the "Rules Regulating Family Child Care Homes" located in 8 CCR 1402-1, rule sections 2.311 through 2.315.

2.     This rule section shall not prevent an eligible preschool provider from enacting additional requirements for their employees, provided the employee(s) meet all other qualifications as required by these rules.

E.    Pursuant to section 22-33-106.1, C.R.S., all eligible preschool providers must abide by the limitations and procedures set forth regarding suspensions and expulsions for preschool through second (2nd) grade.

F.    Educating Children with Disabilities.

1.     All eligible preschool providers educating children with disabilities shall ensure full compliance with the "Standards for Placement of Preschoolers with IEPs in Educational Programs (October 2023)", herein incorporated by reference. No later editions or amendments are incorporated. These standards are available at no cost from the Colorado Department of Education, 201 East Colfax Avenue, Denver, CO 80203; or at https://www.cde.state.co.us/cdesped/appropriateenvironments. These standards are also available for inspection and copying at the Colorado Department of Early Childhood, 710 S. Ash Street, Bldg. C, Denver, Colorado 80246, during regular business hours.

2.     Eligible preschool providers educating children with disabilities shall ensure compliance with the applicable provisions of the "Individuals with Disabilities Education Act" (IDEA), as incorporated by reference in rule section 4.103(Z).

3.     Eligible preschool providers educating children with disabilities shall ensure compliance with the "Exceptional Children's Educational Act" (ECEA) sections 22-20-101 through 22-20-206, C.R.S., and applicable provisions of the "Rules for the Administration of the Exceptional Children's Educational Act" located in 1 CCR 301-8, herein incorporated by reference. No later editions or amendments are incorporated. These standards are available at https://www.coloradosos.gov/. These standards are also available for inspection and copying at the Colorado Department of Early Childhood, 710 S. Ash Street, Bldg. C, Denver, Colorado 80246, during regular business hours.

*CODE OF COLORADO REGULATIONS*
*Colorado Universal Preschool Program*

*8 CCR 1404-1*

    a.   This includes, but is not limited to, an eligible preschool provider's obligation to ensure children with disabilities are served in a manner which conforms to the training, certification, referral, identification, licensing, authorization, and dispute resolution requirements found in 1 CCR 301-8, rule section 3.02(3).

## 4.110   PROVIDER MATCHING CRITERIA

A.   Eligible preschool providers may utilize the following programmatic preferences to the deferred acceptance algorithm component of the matching process:

   1.   Faith-based providers granting preference to members of their congregation;

   2.   Cooperative preschool providers requiring participation in the cooperative;

   3.   School districts maintaining enrollment consistent with their established boundaries;

   4.   Participating preschool providers reserving placements for a student(s) with an Individualized Education Program (IEP) to ensure conformity with obligations incurred pursuant to the Individuals with Disabilities Education Act, 20 U.S.C. section 1400 (2004), or the Exceptional Children's Education Act, Article 20 of Title 22, C.R.S.;

   5.   Head Start programs' adhering to any applicable federal law requirements including eligibility requirements;

   6.   Participating preschool providers granting preference to an eligible child of one (1) of their employees;

   7.   Participating preschool providers granting preference to an eligible child to ensure continuity-of-care for that child;

   8.   Participating preschool providers granting preference to an eligible child to keep siblings similarly located;

   9.   Participating preschool providers granting preference to an eligible child who is multilingual, to ensure proper delivery of services to that child.

   10.   Participating preschool providers may grant preference to an eligible child based: on the child and/or family being a part of a specific community; having specific competencies or interests; having a specific relationship to the provider, provider's employees, students, or their families; receiving specific public assistance benefits; or participating in a specific activity. Participating preschool providers seeking to utilize this preference, must ensure:

      a.   That the specific community, competencies or interests, relationship, public assistance benefit, or activity being required of children and/or families who attend, is a requirement of all participating children and/or families.

      b.   That implementation of requiring the specific community, competencies or interests, relationship, public assistance benefit, or activity does not conflict with any other provision of the Colorado Universal Preschool Program statutes at sections 26.5-4-201 through 26.5-4-211, C.R.S., nor with any other applicable law or regulation.

      c.   Examples of approved preferences include, but are not limited to: participating preschool providers who require a focus in a certain knowledge area (such as science, technology, engineering, and math ("STEM")); providers who serve

families with a family member who works or attends school at a specific site(s) or location(s); providers who serve families within a specific geographical catchment area; providers who require a certain amount of volunteering or participation by the participating family; providers who require certain vaccinations for the health and safety of its staff and students; and providers who serve families who are receiving a specific public assistance benefit(s) such as housing assistance.

B.      In utilizing these programmatic preferences, eligible preschool providers must still comply with rule section 4.109(B).

## 4.111   INSTRUCTIONAL PRACTICE REQUIREMENTS

A.      Learning Approaches.

1.      Beginning July 1, 2025, and continuing thereafter, all eligible preschool providers must utilize an early learning and assessment approach approved and included in the Resource Bank by the Department, and that:

a.      Aligns with the Colorado Early Learning and Development Guidelines and the Colorado Academic Standards;

b.      Uses assessment findings for instructional decision-making;

c.      Is culturally, developmentally, and linguistically appropriate; and

d.      Is inclusive of and appropriate for the diverse needs of each individual learner.

B.      On-Site Observations.

At least every three (3) years, eligible preschool providers will receive an independent on-site observation of environmental quality conducted by the Department. The Department will conduct these observations, in alignment with existing on-site observations performed pursuant to participation in Colorado Shines, the state quality rating and improvement system established pursuant to section 26.5-5-101, C.R.S. The Department shall conduct the observations only using staff who are trained in and familiar with assessing program environmental quality in the preschool setting. The Department shall ensure that observational methods and related resources that meet this requirement are included in the Resource Bank and will be considered and reviewed in accordance with sections 26.5-4-205(3)(b) and (c), C.R.S.

1.      Measurement of a preschool provider's environmental quality shall include, but not be limited to:

a.      The quality of adult-child and child-child interactions; and

b.      The quality of the overall learning environment, including student and staff supportive services.

2.      The Department shall ensure observations are conducted in an individualized and differentiated manner so that they are specific to each provider in supporting quality improvement for educators and classrooms while incorporating that provider's level of access to resources to ensure these standards are supported and implemented with fidelity.

C.      This rule section does not affect an eligible preschool provider's right to engage in privately funded, inherently religious activity or affect the independence of eligible preschool providers, including any rights protected by the Colorado and U.S. Constitutions, and applicable law.

*CODE OF COLORADO REGULATIONS*
*Colorado Universal Preschool Program*

8 CCR 1404-1

## 4.112   HEALTHY DEVELOPMENT REQUIREMENTS

A.    Beginning July 1, 2025, and continuing thereafter, eligible preschool providers must meet the following requirements as a condition of participating in the Preschool Program:

1.    Within six (6) months of participating in the Preschool Program, eligible preschool providers must create, make publicly available and to the Department (either on the provider's website or in a handbook distributed to all participating families), and implement policies and procedures to administer the following services in an individualized manner taking into account what other services the child has received:

a.    Voluntary developmental screening services (including vision, hearing, dental, and health as well as fine and gross motor, social-emotional, cognitive, and language);

b.    Referrals for children and families seeking specialized services, upon request; and

c.    Translation services for children and families to access information in their home language.

2.    The Department shall ensure that the assessments, tools, and related resources that meet the requirements of this rule section 4.112(A)(1), and are included in the Resource Bank and will be considered and reviewed in accordance with sections 26.5-4-205(3)(b) and (c), C.R.S.

3.    Eligible preschool providers will be responsible for ensuring the development of the policies and procedures as outlined in this rule section 4.112(A)(1), as well as ensuring family access to the screening services, referral processes, and translation services as described in this rule section 4.112(A)(1). The entity or individual actually conducting the screening services, referral processes, and/or translation services, are responsible for ensuring that those services are conducted using valid and reliable methods as described in this rule section 4.112(A)(4), and are included in the Resource Bank as described in this rule section 4.112(A)(2).

4.    Any screening services, referral processes, or translation services administered, when appropriate, pursuant to this rule section 4.112(A)(1), must be conducted using valid and reliable screening tools and other related resources that are developmentally, culturally, and linguistically appropriate, and must:

a.    Require, when appropriate, the screening services to be offered or coordinated within forty-five (45) calendar days of when a child first attends the eligible preschool provider;

b.    Entail the use of research-based developmental standardized screening tools;

c.    Meaningfully incorporate other information from family members, teachers, or other individuals with familiarity with the child's typical behavior;

d.    Be tailored and conducted in a manner which promotes and allows for individualized usable information;

e.    When involving a child suspected to need specialized instruction, the provider must comply with all Child Find referral procedures established by the

*CODE OF COLORADO REGULATIONS*                                              8 CCR 1404-1
*Colorado Universal Preschool Program*

---

Department of Education and refer the family to the Child Find contact in the child's administrative unit of residence; and

    f.    Ensure that participating children and families have a pathway to access early childhood mental health programs.

5.    All eligible preschool providers must notify families of the opportunity to participate in an annual survey of families' experiences in regard to screening, referral, and early childhood mental health best practices to be conducted by the Department.

## 4.113 FAMILY AND COMMUNITY ENGAGEMENT REQUIREMENTS

A.    Beginning July 1, 2024, and continuing thereafter, eligible preschool providers must meet the following requirements as a condition of participating in the Preschool Program:

    1.    Within six (6) months of participating in the Preschool Program, preschool providers must create, make available publicly (either on the provider's website or in a handbook distributed to all participating families) and for the Department, and implement policies and procedures which ensure:

        a.    The usage of interpreters or other language resources to effectively communicate with families in their home language;

        b.    Seeking input from participating families on priorities, interests, home routines, and cultural and social practices;

        c.    Engaging families around goals which inform the preschool provider's interactions and instruction with children, including multilingual learners;

        d.    Engaging families and community partners in decision-making regarding the preschool provider's operations;

        e.    Involving families in the transition of their children into and out of the Preschool Program, including between classrooms within the Preschool Program and into Kindergarten; and

        f.    The quality of program-family and program-staff interactions.

    2.    All eligible preschool providers must notify families of the opportunity to participate in an annual survey of families' experiences with meaningful and culturally appropriate involvement in the program to be conducted by the Department.

## 4.114 PROFESSIONAL DEVELOPMENT REQUIREMENTS

A.    The Department shall ensure that professional development hours required pursuant to this rule section be in alignment with Colorado's Competencies for Early Childhood Educators and Professionals, including alignment with the competency areas as defined in 8 CCR 1402-1 rule sections 2.213(M) and 2.312(R)(1).

    1.    This includes alignment with the seven (7) competency areas of:

        a.    Child growth and development, and learning;

        b.    Child observation and assessment;

---

    c.    Family and community partnerships;

    d.    Social-emotional health and development promotion;

    e.    Health, safety and nutrition;

    f.    Professional practice; and

    g.    Teaching practices.

2.    Professional development courses taken to complete the requirements of 8 CCR 1402-1, rule sections 2.213(M) or 2.312(R)(1), to meet the Child Care Licensing requirements of fifteen (15) clock hours annually, may also be used to satisfy the professional development requirements of this rule section, provided all other requirements are met.

3.    Lead teachers licensed by the Colorado Department of Education may use the professional development courses required to renew their teaching license pursuant to article 60.5 of title 22, C.R.S., to also satisfy the professional development requirements of this rule section, if applicable.

4.    Nothing in this rule section shall be construed as requiring these trainings for staff aides of a family child care home or child care center, or individuals who are employed or volunteer only on a short term basis.

5.    Verifying documentation shall be submitted demonstrating completion of the applicable professional development in accordance with policies and procedures established by the Department and published by the Department in an easily accessible manner including, but not limited to, being posted on the Department's website. These verification policies and procedures by the Department may include, but are not limited to, attestations, maintenance of an individual employee's profile within the Colorado Shines Professional Development Information System (PDIS), and the submission by employees or providers of any required information requested by the Department in a timely manner.

B.    All Staff Professional Development Requirements.

Beginning July 1, 2025, within twelve (12) months of employment at an eligible preschool provider, all staff responsible for the direct care of eligible children receiving preschool services (including primary providers, applicant 2s, equally qualified providers, equally qualified substitutes, and substitutes of a family child care home, and early childhood teachers and assistant early childhood teachers of a child care center) must complete annually, at a minimum:

1.    Four (4) hours of professional development in the competency area of social-emotional health and development promotion, with at least one (1) of those hours of training in trauma-informed practices specific to each staff member's professional role;

2.    Two (2) hours of professional development in the competency area of teaching practices; and

3.    Two (2) hours of professional development in the competency area of family and community partnerships, with at least one (1) of those hours of training in suspension and expulsion practices.

C.    Instructional Supervisor Professional Development

*CODE OF COLORADO REGULATIONS*                                                 *8 CCR 1404-1*
*Colorado Universal Preschool Program*

Beginning July 1, 2026, within twelve (12) months of employment at an eligible preschool provider, instructional supervisors must complete annually, at a minimum, at least three (3) hours of professional development in the competency areas of child observation and assessment, and teaching practices, with at least one (1) hour of training in each competency area.

1.      Any educator who is required to complete both the all-staff and instructional supervisor professional development requirements contained in rule sections 4.114(B) and (C), may use hours of professional development to fulfill both requirements concurrently, provided the applicable requirements are met.

---

**Editor's Notes**

**History**

New rule emer. rule eff. 09/29/2022.

Rules 4.101, 4.104, 4.105 emer. rules eff. 11/21/2022.

Rules 4.100-4.103 eff. 01/14/2023.

Rules 4.101, 4.104, 4.105 eff. 03/17/2023.

Rule 4.105 emer. rule eff. 06/23/2023.

Rule 4.105 eff. 09/30/2023.

Entire rule emer. rule eff. 01/22/2024.

# EXHIBIT 62



# Universal Preschool Colorado Program Service Agreement

This Universal Preschool Colorado Program ("Preschool Program") Service Agreement is entered into by and between the State of Colorado acting by and through the Department of Early Childhood (the "State" or "CDEC") and **[PROVIDER]** (the "Provider" to this "Agreement").

By this reference, the Agreement includes Exhibit A which applies to private providers - Universal Preschool Colorado Program Service Agreement Terms and Conditions, which is hereby incorporated by reference. The "Term of the Agreement," as defined in Section 2 of Exhibit A, begins July 1, 2024 (the "Effective Date") and ends June 30, 2025 (the "Expiration Date").

By this reference, the Agreement includes Exhibit B which applies to Intergovernmental Providers (School Districts, BOCES, Administrative Units, etc…) - Universal Preschool Colorado Program Service Agreement Terms and Conditions, which is hereby incorporated by reference. The "Term of the Agreement," as defined in Section 2 of Exhibit B, begins July 1, 2024 (the "Effective Date") and ends June 30, 2025 (the "Expiration Date").

Provider agrees to provide preschool services in conjunction with the Preschool Program, a program financed and governed by CDEC, during the 2024-2025 school year. Provider agrees to provide these services in compliance with the Universal Preschool Colorado Program Act, §§ 26.5-4-201 through 26.5-4-211, C.R.S. and regulations promulgated at 8 C.C.R. 1404-1 ("Universal Preschool Program").

Provider agrees to provide each eligible child for the Preschool Program and enrolled with the Provider's program with a minimum of 10 hours, tuition-free, high quality preschool programming for the Term of the Agreement. Provider shall comply with all requirements of Preschool Program, including, without limitation, the following:

**Program Requirements**

> 1. Provider must be licensed by CDEC to deliver preschool program services to eligible children. Provider shall adhere to the requirements of its license at all times.

> 2. Provider must have eligible children enrolled in its preschool program to qualify as a participating Provider.

> 3. Provider must agree to guarantee families at least the minimum number of hours defined in Rule for the rate that is provided.

> 4. Provider is encouraged to offer CDEC feedback on how CDEC and Local Coordinating Organizations (LCOs) can better support the Preschool Program.

> 5. Provider is required to sign PII Certification attached as Exhibit C when executing the Agreement.

> 6. Provider is required to cooperate with CDEC if any overpayment is made to the Provider, refunding any and all overpayment to CDEC within 30 days of the Provider being notified of the overpayment. This does not affect a Provider's rights under "Provider Rights" of this Agreement nor under §§ 5 and 13 of Exhibit A or Exhibit B.

**Attendance and Reimbursement**

DEFS_0003477

3.  App.622                **Exhibit 62**
                                **Page 1**

1. Provider shall ensure that accurate enrollment and attendance records are kept for each child enrolled in Provider's program.

2. Provider agrees to post preschool tuition, enrollment, and ancillary costs on the Provider's profile in the Universal Preschool Colorado Application Portal ("Application Portal") prior to enrollment. These costs shall include the overall out-of-pocket cost to the family inclusive of all charges and fees the provider will charge for the 2024-2025 school year. Provider is prohibited from charging a participating family a fee that is not posted on the Provider's profile in the Application Portal.

3. Provider shall not charge a family participating in Preschool Program tuition or fees for services that exceed the amount that is charged to families of preschool-aged children that do not participate in Preschool Program for the same or similar services. Provider is prohibited from charging a family to be on a waitlist for services.

4. Provider agrees to adhere to all deadlines and submit documents as required by CDEC. Documents may include but are not limited to attendance records, suspension and expulsion records, annual calendars, bell schedules, hours of operation, tuition schedules, and detailed expense reports, must be retained for verification and payment authorization, and must be provided to CDEC upon request within 5 Business Day (as defined in Exhibit A or Exhibit B)s. CDEC, at its sole discretion, may request other documentation as needed to implement the Preschool Program.

5. Should an eligible child cease enrollment or otherwise withdraw, Provider must notify CDEC within 10 Business Days of such withdrawal through the Application Portal.

6. CDEC will pay Provider in accordance with the adopted provider rate on a periodic basis as determined by CDEC for enrolled eligible children.

**Data Management**

1. Provider agrees to submit any additional information and/or documentation requested by CDEC related to Provider's participation in the Preschool Program in accordance with applicable state and federal law.

2. Provider agrees to report data to CDEC via the Application Portal or in a secure method prescribed by CDEC on a periodic basis, detailing Preschool Program enrollment and capacity.

**Provider Rights**

If the Provider contends that CDEC or its payment vendor has not made adequate payment based on program rules for educational services provided, the procedures identified in §5 of Exhibit A or Exhibit B shall govern.

**CDEC Responsibilities**

1. CDEC shall, through a payment vendor, provide payments to Provider in accordance with 8 CCR 1404-1 and §5 of Exhibit A or Exhibit B.

2. CDEC shall, through the Application Portal, after receiving a complete application packet that has been verified, determine a family's eligibility for preschool services within 20 Business Days of receiving a verified and complete application packet.

3. CDEC will pay Provider based on the information regarding the number of eligible children enrolled through the Application Portal. Providers will be paid beginning in August of each

**Agreement #**                                                                 **Page 2 of 4**

school year based upon the number of enrolled children. Subsequent payments will be made based upon actual enrollment throughout the school year. All payments will be governed by §5 of Exhibit A or Exhibit B.

4. Payments to providers will be made on a monthly basis, in accordance with the payment schedule provided by the State. Payments will be made in arrears, monthly. Providers must have children enrolled via the Application Portal to be eligible for payment.

**Additional Provisions**

1. Payments by the State shall constitute currently appropriated expenditures of the State and may be paid solely from legally available funds.  All obligations of the State shall be subject to the action of the Colorado General Assembly in annually making funds available for payments thereunder. The obligations of the State to make payments are subject to appropriation by the Colorado General Assembly, and shall not be deemed or construed as creating an indebtedness of the State within the meaning of any provision of the Colorado Constitution or the laws of the State concerning or limiting the creation of indebtedness of the State and shall not constitute a multiple fiscal year direct or indirect debt or other financial obligation of the State within the meaning of Section 20(4) of Article X of the Colorado Constitution. Any conflicts between this provision and the Exhibits attached to this Agreement shall be governed by the the order of precedence listed below

2. CDEC and the School District Provider agree that school districts in the State of Colorado are subject to state and federal laws related to serving children with disabilities. Thus, provisions of the Agreement that conflict with state and federal legal requirements related to children with disabilities are inapplicable and of no force and effect against the School District Provider.

3. The provisions of Exhibit A, attached hereto, and not Exhibit B, apply to Private Providers. Exhibit B does not apply to private providers. In the event of a conflict or inconsistency between this Agreement and any Exhibit or attachment, such conflict or inconsistency shall be resolved by reference to the documents in the following order of priority:

    A. Colorado Special Provisions in §18 of Exhibit A.

    B. Exhibit A

    C. The provisions of the Provider Agreement

    D. Exhibit C, PII Certification

4. The provisions of Exhibit B, attached hereto, and not Exhibit A, apply to Intergovernmental Providers (School Districts, BOCES, Administrative Units, etc…). Exhibit A does not apply to Intergovernmental Providers.  In the event of a conflict or inconsistency between this Agreement and any Exhibit or attachment, such conflict or inconsistency shall be resolved by reference to the documents in the following order of priority:

    A. Colorado Special Provisions in §18 of Exhibit B

    B. Exhibit B

    C. The provisions of the Provider Agreement

    D. Exhibit C-PII Certification

By signing below, Provider and CDEC agree to adhere to the terms and conditions of this Agreement and in Exhibit A or Exhibit B.

**Agreement #**                                                                 **Page 3 of 4**

DEFS_0003479

3.  App.624                    **Exhibit 62**
**Page 3**

# VENDOR ADDRESS

# LICENSE NUMBERS

# SIGNATURE PAGE

### THE PARTIES HERETO HAVE EXECUTED THIS AGREEMENT

Each person signing this Agreement represents and warrants that the signer is duly authorized to execute this Agreement and to bind the Party authorizing such signature.

| PROVIDER | STATE OF COLORADO |
|---|---|
| INSERT-Legal Name of Grantee | Jared S. Polis, Governor |
| | Colorado Department of Early Childhood |
| | Dr. Lisa Roy - Executive Director |
| _____ | _____ |
| By: Name & Title of Person Signing for Contractor | By: Dawn Odean, Universal Preschool Director |
| Date: _____ | Date: _____ |

In accordance with §24-30-202, C.R.S., this Contract is not valid until signed and dated below by the State Controller or an authorized delegate.

STATE CONTROLLER
Robert Jaros, CPA, MBA, JD

By:_____
Laura Curnow, CDEC Controller

Effective Date is the latter of the date of signature or 7/1/2024:_____

**Agreement #**                                                                 **Page 4 of 4**

DEFS_0003480

**Exhibit 62
Page 4**

# STATE OF COLORADO - EXHIBIT A
## (For Private Providers)

1. **PARTIES**

   This Agreement is entered into by and between Provider named on the signature page for this Agreement (the "Provider"), and the STATE OF COLORADO acting by and through the State agency named on the signature page for this Agreement (the "State"). Provider and the State agree to the terms and conditions in this Agreement.

2. **TERM AND EFFECTIVE DATE**

   A. Effective Date

      This Agreement shall not be valid or enforceable until the Effective Date. The State shall not be bound by any provision of this Agreement before the Effective Date, and shall have no obligation to pay Provider for any Work performed or expense incurred before the Effective Date or after the expiration or sooner termination of this Agreement.

   B. Initial Term

      The Parties' respective performances under this Agreement shall commence on the Agreement Performance Beginning Date shown on the signature page for this Agreement and shall terminate on the Initial Agreement Expiration Date shown on the signature page for this Agreement (the "Initial Term") unless sooner terminated or further extended in accordance with the terms of this Agreement.

   C. Early Termination in the Public Interest

      The State is entering into this Agreement to serve the public interest of the State of Colorado as determined by its Governor, General Assembly, or Courts. If this Agreement ceases to further the public interest of the State, the State, in its discretion, may terminate this Agreement in whole or in part. A determination that this Agreement should be terminated in the public interest shall not be equivalent to a State right to terminate for convenience. This subsection shall not apply to a termination of this Agreement by the State for Breach of Agreement by Provider, which shall be governed by **§12.A.i.**

      i. Method and Content

         The State shall notify the Provider of such termination in accordance with **§14**. The notice shall specify the effective date of the termination and whether it affects all or a portion of this Agreement, and shall include, to the extent practicable, the public interest justification for the termination.

      ii. Obligations and Rights

         Upon receipt of a termination notice for termination in the public interest, Provider shall be subject to the rights and obligations set forth in **§12.A.i.a.**

      iii. Payments

         If the State terminates the Agreement in the public interest, the State shall pay Provider an amount equal to the percentage of the total reimbursement payable under the Agreement that corresponds to the percentage of Work satisfactorily

DEFS_0003481
3.  App.626   **Exhibit 62**
**Page 5**

# STATE OF COLORADO - EXHIBIT A
# (For Private Providers)

completed and accepted, as determined by the State, less payments previously made. Additionally, if the Agreement is less than 60% completed, as determined by the State, the State may reimburse Provider for a portion of actual out-of-pocket expenses, not otherwise reimbursed under the Agreement, incurred by Provider which are directly attributable to the uncompleted portion of Provider's obligations, provided that the sum of any and all reimbursement shall not exceed the maximum amount payable to Provider hereunder.

3. **DEFINITIONS**

The following terms shall be construed and interpreted as follows:

A. "**Agreement**" means this agreement, including all attached Exhibits, all documents incorporated by reference, all referenced statutes, rules and cited authorities, and any future modifications thereto.

B. "**Agreement Funds**" means the funds that have been appropriated, designated, encumbered, or otherwise made available for payment by the State under this Agreement.

C. "**Breach of Agreement**" means the failure of a Party to perform any of its obligations in accordance with this Agreement, in whole or in part or in a timely or satisfactory manner. The institution of proceedings under any bankruptcy, insolvency, reorganization or similar law, by or against Provider, or the appointment of a receiver or similar officer for Provider or any of its property, which is not vacated or fully stayed within 30 days after the institution of such proceeding, shall also constitute a breach. If Provider is debarred or suspended under § 24-109-105, C.R.S. at any time during the term of this Agreement, then such debarment or suspension shall constitute a breach.

D. "**Business Day**" means any day in which the State is open and conducting business, but shall not include Saturday, Sunday or any day on which the State observes one of the holidays listed in §24-11-101(1), C.R.S.

E. "**Chief Procurement Officer**" means the individual to whom the Executive Director has delegated his or her authority pursuant to § 24-102-202, C.R.S. to procure or supervise the procurement of all supplies and services needed by the State.

F. "**CJI**" means criminal justice information collected by criminal justice agencies needed for the performance of their authorized functions, including, without limitation, all information defined as criminal justice information by the U.S. Department of Justice, Federal Bureau of Investigation, Criminal Justice Information Services Security Policy, as amended and all Criminal Justice Records as defined under §24-72-302, C.R.S.

G. "**CORA**" means the Colorado Open Records Act, §§24-72-200.1, *et seq.*, C.R.S.

H. "**Deliverable**" means the outcome to be achieved or output to be provided, in the form of a tangible object or software that is produced as a result of Provider's Work that is intended to be delivered to the State by Provider.

# STATE OF COLORADO - EXHIBIT A
## (For Private Providers)

I.    "**Effective Date**" means the date on which this Agreement is approved and signed by the Colorado State Controller or designee, as shown on the Signature Page for this Agreement. If this Agreement is for a Major Information Technology Project, as defined in §24-37.5-102(2.6), C.R.S., then the Effective Date of this Agreement shall be the later of the date on which this Agreement is approved and signed by the State's Chief Information Officer or authorized delegate or the date on which this Agreement is approved and signed by the State Controller or authorized delegate, as shown on the Signature Page for this Agreement.

J.    "**Exhibits**" means the exhibits and attachments included with this Agreement as shown on in the main body of the Agreement.

K.    "**Goods**" means any movable material acquired, produced, or delivered by Provider as set forth in this Agreement and shall include any movable material acquired, produced, or delivered by Provider in connection with the Services.

L.    "**Incident**" means any accidental or deliberate event that results in or constitutes an imminent threat of the unauthorized access, loss, disclosure, modification, disruption, or destruction of any communications or information resources of the State, which are included as part of the Work, as described in § 24-37.5-401, *et seq.,* C.R.S. Incidents include, without limitation, (i) successful attempts to gain unauthorized access to a State system or State Records regardless of where such information is located; (ii) unwanted disruption or denial of service; (iii) the unauthorized use of a State system for the processing or storage of data; or (iv) changes to State system hardware, firmware, or software characteristics without the State's knowledge, instruction, or consent.

M.    "**Initial Term**" means the time period defined in **§2.B**.

N.    "**Party**" means the State or Provider, and "Parties" means both the State and Provider.

O.    "**PCI**" means payment card information including any data related to credit card holders' names, credit card numbers, or other credit card information as may be protected by state or federal law.

P.    "**PHI**" means any protected health information, including, without limitation any information whether oral or recorded in any form or medium: **(i)** that relates to the past, present or future physical or mental condition of an individual; the provision of health care to an individual; or the past, present or future payment for the provision of health care to an individual; and **(ii)** that identifies the individual or with respect to which there is a reasonable basis to believe the information can be used to identify the individual. PHI includes, but is not limited to, any information defined as Individually Identifiable Health Information by the federal Health Insurance Portability and Accountability Act.

Q.    "**PII**" means personally identifiable information including, without limitation, any information maintained by the State about an individual that can be used to distinguish or trace an individual's identity, such as name, social security number, date and place of birth, mother's maiden name, or biometric records; and any other information that is linked or linkable to an individual, such as medical, educational,

DEFS_0003483

3.  App.628      **Exhibit 62**
**Page 7**

# STATE OF COLORADO - EXHIBIT A
## (For Private Providers)

financial, and employment information. PII includes, but is not limited to, all information defined as personally identifiable information in §§24-72-501 and 24-73-101, C.R.S. "PII" shall also mean "personal identifying information" as set forth at § 24-74-102, et. seq., C.R.S.

R.    "**Services**" means the services to be performed by Provider as set forth in this Agreement, and shall include any services to be rendered by Provider in connection with the Goods.

S.    "**State Confidential Information**" means any and all State Records not subject to disclosure under CORA. State Confidential Information shall includes, but is not limited to, PII, PHI, PCI, Tax Information, CJI, and State personnel records not subject to disclosure under CORA. State Confidential Information shall not include information or data concerning individuals that is not deemed confidential but nevertheless belongs to the State, which has been communicated, furnished, or disclosed by the State to Provider which (i) is subject to disclosure pursuant to CORA; (ii) is already known to Provider without restrictions at the time of its disclosure to Provider; (iii) is or subsequently becomes publicly available without breach of any obligation owed by Provider to the State; (iv) is disclosed to Provider, without confidentiality obligations, by a third party who has the right to disclose such information; or (v) was independently developed without reliance on any State Confidential Information.

T.    "**State Fiscal Rules**" means the fiscal rules promulgated by the Colorado State Controller pursuant to § 24-30-202(13)(a), C.R.S.

U.    "**State Fiscal Year**" means a 12 month period beginning on July 1 of each calendar year and ending on June 30 of the following calendar year. If a single calendar year follows the term, then it means the State Fiscal Year ending in that calendar year.

V.    "**State Records**" means any and all State data, information, and records, regardless of physical form, including, but not limited to, information subject to disclosure under CORA.

W.    "**Subcontractor**" means any third party engaged by Provider to aid in performance of the Work.

X.    "**Tax Information**" means federal and State of Colorado tax information including, without limitation, federal and State tax returns, return information, and such other tax-related information as may be protected by federal and State law and regulation. Tax Information includes, but is not limited to all information defined as federal tax information in Internal Revenue Service Publication 1075.

Y.    "**Universal Preschool Colorado Application Portal**" means the online application system that Providers will use to register with the Universal Preschool Colorado program and to match with potential eligible children..

Z.    "**Work**" means the Goods delivered and Services performed pursuant to this Agreement.

# STATE OF COLORADO - EXHIBIT A
## (For Private Providers)

AA. "**Work Product**" means the tangible and intangible results of the Work, whether finished or unfinished, including drafts. Work Product includes, but is not limited to, documents, text, software (including source code), research, reports, proposals, specifications, plans, notes, studies, data, images, photographs, negatives, pictures, drawings, designs, models, surveys, maps, materials, ideas, concepts, know-how, and any other results of the Work. "Work Product" does not include any material that was developed prior to the Effective Date that is used, without modification, in the performance of the Work.

Any other term used in this Agreement that is defined in an Exhibit shall be construed and interpreted as defined in that Exhibit.

**4.   STATEMENT OF WORK**

Provider shall complete the Work as described in this Agreement and in accordance with the provisions of the Agreement. The State shall have no liability to compensate the Provider for the delivery of any goods or the performance of any services that are not specifically set forth in this Agreement.

**5.   PAYMENTS TO PROVIDER**

A.   Maximum Amount

The maximum amount payable under the Agreement is equal to the sum of the periodic award amounts, and shall not exceed the amount of enrollees the vendor has engaged. Award amounts including any monthly periodic payments will be determined using appropriate Provider rates and enrollment data in the Application Portal. Provider will receive notification of the award amount at least twice every year, and Provider may request information from the State regarding any unpaid balance at any point during the Term of the Agreement.

Payments to Provider are limited to the unpaid balance of the award amounts based on the applicable Provider rate and enrollment data. The State shall not pay Provider any amount under the Agreement and pursuant to these Terms and Conditions that exceeds the sum of the award amounts for the Term of the Agreement.

Payments to Provider are limited to the unpaid, obligated balance of the Agreement Funds. The State shall not pay Provider any amount under this Agreement that exceeds the Agreement Maximum for that State Fiscal Year contained in this Agreement.

B.   Payment Procedures

   i.   Invoices and Payment

      a.   The State shall pay Provider in the amounts and in accordance with the schedule and other conditions set forth in the Agreement.

      b.   Provider shall initiate payment requests by invoice to the State, in a form and manner approved by the State.

      c.   The State shall pay each vendor within 45 days following the State's confirmation of enrollment figures, so long as the amount correctly

# STATE OF COLORADO - EXHIBIT A
## (For Private Providers)

represents Work completed by Provider and previously accepted by the State during the term of the Agreement.

d.   The acceptance of an invoice shall not constitute acceptance of any Work performed under this Agreement. The State shall pay each invoice within 45 days following the State's receipt of that invoice, so long as the amount invoiced correctly represents Work completed by Provider and previously accepted by the State during the term that the invoice covers. If the State determines that the amount of any invoice is not correct, then the Provider shall make all changes necessary to correct that invoice.

e.   The acceptance of an invoice shall not constitute acceptance of any Work performed or Deliverables provided under this Agreement.

ii.   Interest

Amounts not paid by the State within 45 days of the State's acceptance of the invoice shall bear interest on the unpaid balance beginning on the 45th day at the rate of 1% per month, as required by §24-30-202(24)(a), C.R.S., until paid in full; provided, however, that interest shall not accrue on unpaid amounts that the State disputes in writing. Provider shall invoice the State separately for accrued interest on delinquent amounts, and the invoice shall reference the delinquent payment, the number of day's interest to be paid and the interest rate.

iii.   Payment Disputes

If Provider disputes any calculation, determination or amount of any payment, Provider shall notify the State in writing of its dispute within 30 days following the earlier to occur of Provider's receipt of the payment or notification of the determination or calculation of the payment by the State. The State will review the information presented by the Provider and may make changes to its determination based on this review. The calculation, determination or payment amount that results from the State's review shall not be subject to additional dispute under this subsection. No payment subject to a dispute under this subsection shall be due until after the State has concluded its review, and the State shall not pay any interest on any amount during the period it is subject to dispute under this subsection.

iv.   Available Funds-Contingency-Termination

The State is prohibited by law from making commitments beyond the term of the current State Fiscal Year. Payment to Provider beyond the current State Fiscal Year is contingent on the appropriation and continuing availability of Agreement Funds in any subsequent year (as provided in the Colorado Special Provisions). If federal funds or funds from any other non-State funds constitute all or some of the Agreement Funds the State's obligation to pay Provider shall be contingent upon such non-State funding continuing to be made available for payment. Payments to be made pursuant to this Agreement shall be made only from Agreement Funds, and the State's liability for such payments shall be limited to the amount remaining of such Agreement Funds. If State, federal or

**Exhibit A**                                                                                   **Page 6 of 25**

# STATE OF COLORADO - EXHIBIT A
## (For Private Providers)

other funds are not appropriated, or otherwise become unavailable to fund this Agreement, the State may, upon written notice, terminate this Agreement, in whole or in part, without incurring further liability. The State shall, however, remain obligated to pay for Services and Goods that are delivered and accepted prior to the effective date of notice of termination, and this termination shall otherwise be treated as if this Agreement were terminated in the public interest as described in **§2.C**.

6. **REPORTING - NOTIFICATION**

   A.   Quarterly Reports.

   In addition to any reports required pursuant to **§16** or pursuant to any other Exhibit, for any Agreement having a term longer than three months, Provider shall submit, on a quarterly basis, a written report specifying progress made for each specified performance measure and standard in this Agreement. Such progress report shall be in accordance with the procedures developed and prescribed by the State. Progress reports shall be submitted to the State not later than five Business Days following the end of each calendar quarter or at such time as otherwise specified by the State.

   B.   Litigation Reporting

   If Provider is served with a pleading or other document in connection with an action before a court or other administrative decision making body, and such pleading or document relates to this Agreement or may affect Provider's ability to perform its obligations under this Agreement, Provider shall, within 10 days after being served, notify the State of such action and deliver copies of such pleading or document to the State's Principal Representative identified on the in this Agreement.

   C.   Performance Outside the State of Colorado or the United States, §24-102-206, C.R.S.

   To the extent not previously disclosed in accordance with §24-102-206, C.R.S., Provider shall provide written notice to the State, in accordance with **§14** and in a form designated by the State, within 20 days following the earlier to occur of Provider's decision to perform Services outside of the State of Colorado or the United States, or its execution of an agreement with a Subcontractor to perform, Services outside the State of Colorado or the United States. Such notice shall specify the type of Services to be performed outside the State of Colorado or the United States and the reason why it is necessary or advantageous to perform such Services at such location or locations, and such notice shall be a public record. Knowing failure by Provider to provide notice to the State under this section shall constitute a Breach of Agreement. This section shall not apply if the Agreement Funds include any federal funds.

7. **PROVIDER RECORDS**

   A.   Maintenance

   Provider shall maintain a file of all documents, records, communications, notes and other materials relating to the Work (the "Provider Records"). Provider Records shall include all documents, records, communications, notes and other materials maintained by Provider that relate to any Work performed by Subcontractors, and

DEFS_0003487

# STATE OF COLORADO - EXHIBIT A
## (For Private Providers)

Provider shall maintain all records related to the Work performed by Subcontractors required to ensure proper performance of that Work. Provider shall maintain Provider Records until the last to occur of: **(i)** the date three years after the date this Agreement expires or is terminated, **(ii)** final payment under this Agreement is made, **(iii)** the resolution of any pending Agreement matters, or **(iv)** if an audit is occurring, or Provider has received notice that an audit is pending, the date such audit is completed and its findings have been resolved (the "Record Retention Period").

B.  Inspection

Provider shall permit the State, the federal government, and any other duly authorized agent of a governmental agency to audit, inspect, examine, excerpt, copy and transcribe Provider Records during the Record Retention Period. Provider shall make Provider Records available during normal business hours at Provider's office or place of business, or at other mutually agreed upon times or locations, upon no fewer than two Business Days' notice from the State, unless the State determines that a shorter period of notice, or no notice, is necessary to protect the interests of the State.

C.  Monitoring

The State, the federal government, and any other duly authorized agent of a governmental agency, in its discretion, may monitor Provider's performance of its obligations under this Agreement using procedures as determined by the State. The State shall monitor Provider's performance in a manner that does not unduly interfere with Provider's performance of the Work.

D.  Final Audit Report

Provider shall promptly submit to the State a copy of any final audit report of an audit performed on Provider's records that relates to or affects this Agreement or the Work, whether the audit is conducted by Provider or a third party.

**8.  CONFIDENTIAL INFORMATION-STATE RECORDS**

A.  Confidentiality

Provider shall keep confidential, and cause all Subcontractors to keep confidential, all State Records, unless those State Records are publicly available. Provider shall not, without prior written approval of the State, use, publish, copy, disclose to any third party, or permit the use by any third party of any State Records, except as otherwise stated in this Agreement, permitted by law or approved in writing by the State. Provider shall provide for the security of all State Confidential Information in accordance with all policies promulgated by the Colorado Office of Information Security and all applicable laws, rules, policies, publications, and guidelines. If Provider or any of its Subcontractors will or may receive the following types of data, Provider or its Subcontractors shall provide for the security of such data according to the following: **(i)** the most recently promulgated IRS Publication 1075 for all Tax Information and in accordance with the Safeguarding Requirements for Federal Tax Information attached to this Agreement as an Exhibit, if applicable, **(ii)** the most recently updated PCI Data Security Standard from the PCI Security Standards

**Exhibit A**                                                                 **Page 8 of 25**

DEFS_0003488
**Exhibit 62
Page 12**

# STATE OF COLORADO - EXHIBIT A
## (For Private Providers)

Council for all PCI, **(iii)** the most recently issued version of the U.S. Department of Justice, Federal Bureau of Investigation, Criminal Justice Information Services Security Policy for all CJI, and **(iv)** the federal Health Insurance Portability and Accountability Act for all PHI and the HIPAA Business Associate Agreement attached to this Agreement, if applicable. Provider shall immediately forward any request or demand for State Records to the State's Principal Representative.

B.   Other Entity Access and Nondisclosure Agreements

Provider may provide State Records to its agents, employees, assigns and Subcontractors as necessary to perform the Work, but shall restrict access to State Confidential Information to those agents, employees, assigns and Subcontractors who require access to perform their obligations under this Agreement. Provider shall ensure all such agents, employees, assigns, and Subcontractors sign agreements containing nondisclosure provisions at least as protective as those in this Agreement, and that the nondisclosure provisions are in force at all times the agent, employee, assign or Subcontractor has access to any State Confidential Information. Provider shall provide copies of those signed nondisclosure provisions to the State upon execution of the nondisclosure provisions if requested by the State.

C.   Use, Security, and Retention

Provider shall use, hold, and maintain State Confidential Information in compliance with any and all applicable laws and regulations only in facilities located within the United States, and shall maintain a secure environment that ensures confidentiality of all State Confidential Information. Provider shall provide the State with access, subject to Provider's reasonable security requirements, for purposes of inspecting and monitoring access and use of State Confidential Information and evaluating security control effectiveness. Upon the expiration or termination of this Agreement, Provider shall return State Records provided to Provider or destroy such State Records and certify to the State that it has done so, as directed by the State. If Provider is prevented by law or regulation from returning or destroying State Confidential Information, Provider warrants it will guarantee the confidentiality of, and cease to use, such State Confidential Information.

D.   Incident Notice and Remediation

If Provider becomes aware of any Incident, Provider shall notify the State immediately and cooperate with the State regarding recovery, remediation, and the necessity to involve law enforcement, as determined by the State. Unless Provider can establish that Provider and its Subcontractors are not the cause or source of the Incident, Provider shall be responsible for the cost of notifying each person who may have been impacted by the Incident. After an Incident, Provider shall take steps to reduce the risk of incurring a similar type of Incident in the future as directed by the State, which may include, but is not limited to, developing and implementing a remediation plan that is approved by the State at no additional cost to the State. The State may adjust or direct modifications to this plan in its sole discretion, and Provider shall make all modifications as directed by the State. If Provider cannot produce its analysis and plan within the allotted time, the State, in its discretion, may

DEFS_0003489

3.  App.634         **Exhibit 62
Page 13**

# STATE OF COLORADO - EXHIBIT A
## (For Private Providers)

perform such analysis and produce a remediation plan, and Provider shall reimburse the State for the actual costs thereof. The State may, in its sole discretion and at Provider's sole expense, require Provider to engage the services of an independent, qualified, State-approved third party to conduct a security audit. Provider shall provide the State with the results of such audit and evidence of Provider's planned remediation in response to any negative findings.

E.   Data Protection and Handling

Provider shall ensure that all State Records and Work Product in the possession of Provider or any Subcontractors are protected and handled in accordance with the requirements of this Agreement, including the requirements of any Exhibits hereto, at all times.

F.   FERPA

Provider agrees to comply with the Family Educational Rights and Privacy Act (FERPA), if applicable, and any other federal and state data privacy laws that govern education records in the provider's possession.

G.   Safeguarding PII

If Provider or any of its Subcontractors will or may receive PII under this Agreement, Provider shall provide for the security of such PII, in a manner and form acceptable to the State, including, without limitation, State non-disclosure requirements, use of appropriate technology, security practices, computer access security, data access security, data storage encryption, data transmission encryption, security inspections, and audits. Provider shall be a "Third-Party Service Provider" as defined in §24-73-103(1)(i), C.R.S. and shall maintain security procedures and practices consistent with §§24-73-101 *et seq.*, C.R.S. In addition, as set forth in § 24-74-102, et. seq., C.R.S., Provider, including, but not limited to, Provider's employees, agents and Subcontractors, agrees not to share any PII with any third parties for the purpose of investigating for, participating in, cooperating with, or assisting with Federal immigration enforcement. If Provider is given direct access to any State databases containing PII, Provider shall execute, on behalf of itself and its employees, the certification attached hereto as Exhibit C on an annual basis Provider's duty and obligation to certify as set forth in Exhibit C shall continue as long as Provider has direct access to any State databases containing PII. If Provider uses any Subcontractors to perform services requiring direct access to State databases containing PII, the Provider shall require such Subcontractors to execute and deliver the certification to the State on an annual basis, so long as the Subcontractor has access to State databases containing PII.

**9.   CONFLICTS OF INTEREST**

A.   Actual Conflicts of Interest

Provider shall not engage in any business or activities, or maintain any relationships that conflict in any way with the full performance of the obligations of Provider under this Agreement. Such a conflict of interest would arise when a Provider or

**Exhibit A**                                                                                   **Page 10 of 25**

# STATE OF COLORADO - EXHIBIT A
## (For Private Providers)

Subcontractor's employee, officer or agent were to offer or provide any tangible personal benefit to an employee of the State, or any member of his or her immediate family or his or her partner, related to the award of, entry into or management or oversight of this Agreement.

B. Apparent Conflicts of Interest

Provider acknowledges that, with respect to this Agreement, even the appearance of a conflict of interest shall be harmful to the State's interests. Absent the State's prior written approval, Provider shall refrain from any practices, activities or relationships that reasonably appear to be in conflict with the full performance of Provider's obligations under this Agreement.

C. Disclosure to the State

If a conflict or the appearance of a conflict arises, or if Provider is uncertain whether a conflict or the appearance of a conflict has arisen, Provider shall submit to the State a disclosure statement setting forth the relevant details for the State's consideration. Failure to promptly submit a disclosure statement or to follow the State's direction in regard to the actual or apparent conflict constitutes a Breach of Agreement.

D. Provider acknowledges that all State employees are subject to the ethical principles described in §24-18-105, C.R.S. Provider further acknowledges that State employees may be subject to the requirements of §24-18-105, C.R.S. with regard to this Agreement.

**10. INSURANCE**

Provider shall obtain and maintain, and ensure that each Subcontractor shall obtain and maintain, insurance as specified in this section at all times during the term of this Agreement. All insurance policies required by this Agreement shall be issued by insurance companies as approved by the State.

A. Workers' Compensation

Workers' compensation insurance as required by state statute, and employers' liability insurance covering all Provider or Subcontractor employees acting within the course and scope of their employment.

B. General Liability

Commercial general liability insurance covering premises operations, fire damage, Independent Contractors, products and completed operations, blanket contractual liability, personal injury, and advertising liability with minimum limits as follows:

i. $1,000,000 each occurrence;

ii. $1,000,000 general aggregate;

iii. $1,000,000 products and completed operations aggregate; and

iv. $50,000 any one fire.

C. Automobile Liability

DEFS_0003491
**Exhibit 62
Page 15**

3.  App.636

# STATE OF COLORADO - EXHIBIT A
## (For Private Providers)

Automobile liability insurance covering any auto (including owned, hired and non-owned autos) with a minimum limit of $1,000,000 each accident combined single limit.

D.   Protected Information

Liability insurance covering all civil, regulatory, and statutory damages, contractual damages, data breach management exposure, and all loss income or extra expense as a result of actual or alleged breach, violation or infringement of a right to privacy, consumer data protection law, confidentiality or other legal protection for personal information as well as State Confidential Information with minimum limits as follows:

i.   $1,000,000 each occurrence; and

ii.   $2,000,000 general aggregate.

E.   Professional Liability Insurance

Professional liability insurance covering any damages caused by an error, omission or any negligent act with minimum limits as follows:

i.   $1,000,000 each occurrence; and

ii.   $1,000,000 general aggregate.

F.   Crime Insurance

Crime insurance including employee dishonesty coverage with minimum limits as follows:

i.   $1,000,000 each occurrence; and

ii.   $1,000,000 general aggregate.

G.   Additional Insured

The State shall be named as additional insured on all commercial general liability policies (leases and construction contracts require additional insured coverage for completed operations) required of Provider and Subcontractors.

H.   Primacy of Coverage

Coverage required of Provider and each Subcontractor shall be primary and noncontributory over any insurance or self-insurance program carried by Provider or the State.

I.   Cancellation

The above insurance policies shall include provisions preventing cancellation or non-renewal, except for cancellation based on non-payment of premiums, without at least 30 days prior notice to Provider and Provider shall forward such notice to the State in accordance with §14 within seven days of Provider's receipt of such notice.

J.   Subrogation Waiver

DEFS_0003492

3.  App.637      **Exhibit 62
Page 16**

# STATE OF COLORADO - EXHIBIT A
## (For Private Providers)

All insurance policies secured or maintained by Provider or its Subcontractors in relation to this Agreement shall include clauses stating that each carrier shall waive all rights of recovery under subrogation or otherwise against Provider or the State, its agencies, institutions, organizations, officers, agents, employees, and volunteers.

K.  Public Entities

If Provider is a "public entity" within the meaning of the Colorado Governmental Immunity Act, §§24-10-101, *et seq.*, C.R.S. (the "GIA"), Provider shall maintain, in lieu of the liability insurance requirements stated above, at all times during the term of this Agreement such liability insurance, by commercial policy or self-insurance, as is necessary to meet its liabilities under the GIA. If a Subcontractor is a public entity within the meaning of the GIA, Provider shall ensure that the Subcontractor maintains at all times during the terms of this Agreement, in lieu of the liability insurance requirements stated above, such liability insurance, by commercial policy or self-insurance, as is necessary to meet the Subcontractor's obligations under the GIA.

L.  Certificates

Provider shall provide to the State certificates evidencing Provider's insurance coverage required in this Agreement within seven Business Days following the Effective Date. Provider shall provide to the State certificates evidencing Subcontractor insurance coverage required under this Agreement within seven Business Days following the Effective Date, except that, if Provider's subcontract is not in effect as of the Effective Date, Provider shall provide to the State certificates showing Subcontractor insurance coverage required under this Agreement within seven Business Days following Provider's execution of the subcontract. No later than 15 days before the expiration date of Provider's or any Subcontractor's coverage, Provider shall deliver to the State certificates of insurance evidencing renewals of coverage. At any other time during the term of this Agreement, upon request by the State, Provider shall, within seven Business Days following the request by the State, supply to the State evidence satisfactory to the State of compliance with the provisions of this section.

11.  **BREACH OF AGREEMENT**

In the event of a Breach of Agreement, the aggrieved Party shall give written notice of breach to the other Party. If the notified Party does not cure the Breach of Agreement, at its sole expense, within 30 days after the delivery of written notice, the Party may exercise any of the remedies as described in **§12** for that Party. Notwithstanding any provision of this Agreement to the contrary, the State, in its discretion, need not provide notice or a cure period and may immediately terminate this Agreement in whole or in part or institute any other remedy in this Agreement in order to protect the public interest of the State; or if Provider is debarred or suspended under §24-109-105, C.R.S., the State, in its discretion, need not provide notice or cure period and may terminate this Agreement in whole or in part or institute any other remedy in this Agreement as of the date that the debarment or suspension takes effect.

12.  **REMEDIES**

Exhibit A                                                                                          Page 13 of 25

DEFS_0003493

**Exhibit 62
Page 17**

# STATE OF COLORADO - EXHIBIT A
## (For Private Providers)

A.    State's Remedies

If Provider is in breach under any provision of this Agreement and fails to cure such breach, the State, following the notice and cure period set forth in **§11,** shall have all of the remedies listed in this section in addition to all other remedies set forth in this Agreement or at law. The State may exercise any or all of the remedies available to it, in its discretion, concurrently or consecutively.

i.    Termination for Breach of Agreement

In the event of Provider's uncured breach, the State may terminate this entire Agreement or any part of this Agreement. Provider shall continue performance of this Agreement to the extent not terminated, if any. Notwithstanding any of the foregoing, Provider license revocation is grounds for immediate termination for Breach of Agreement. In the event of termination of the Agreement for Breach of Agreement, Provider shall be  required to reimburse to the State any advance payments received for Services on or after the  date of termination.

a.    Obligations and Rights

To the extent specified in any termination notice, Provider shall not incur further obligations or render further performance past the effective date of such notice, and shall terminate outstanding orders and subcontracts with third parties. However, Provider shall complete and deliver to the State all Work not canceled by the termination notice, and may incur obligations as necessary to do so within this Agreement's terms. At the request of the State, Provider shall assign to the State all of Provider's rights, title, and interest in and to such terminated orders or subcontracts. Upon termination, Provider shall take timely, reasonable and necessary action to protect and preserve property in the possession of Provider but in which the State has an interest. At the State's request, Provider shall return materials owned by the State in Provider's possession at the time of any termination. Provider shall deliver all completed Work Product and all Work Product that was in the process of completion to the State at the State's request.

b.    Payments

Notwithstanding anything to the contrary, the State shall only pay Provider for accepted Work received as of the date of termination. If, after termination by the State, the State agrees that Provider was not in breach or that Provider's action or inaction was excusable, such termination shall be treated as a termination in the public interest, and the rights and obligations of the Parties shall be as if this Agreement had been terminated in the public interest under **§2.C**.

c.    Damages and Withholding

Notwithstanding any other remedial action by the State, Provider shall remain liable to the State for any damages sustained by the State in

**Exhibit A**                                                                          **Page 14 of 25**

DEFS_0003494
**Exhibit 62
Page 18**

# STATE OF COLORADO - EXHIBIT A
## (For Private Providers)

connection with any breach by Provider, and the State may withhold payment to Provider for the purpose of mitigating the State's damages until such time as the exact amount of damages due to the State from Provider is determined. The State may withhold any amount that may be due Provider as the State deems necessary to protect the State against loss including, without limitation, loss as a result of outstanding liens and excess costs incurred by the State in procuring from third parties replacement Work as cover.

ii. Remedies Not Involving Termination

The State, in its discretion, may exercise one or more of the following additional remedies:

a. Suspend Performance

Suspend Provider's performance with respect to all or any portion of the Work pending corrective action as specified by the State without entitling Provider to an adjustment in price or cost or an adjustment in the performance schedule. Provider shall promptly cease performing Work and incurring costs in accordance with the State's directive, and the State shall not be liable for costs incurred by Provider after the suspension of performance.

b. Withhold Payment

Withhold payment to Provider until Provider corrects its Work.

c. Deny Payment

Deny payment for Work not performed, or that due to Provider's actions or inactions, cannot be performed or if they were performed are reasonably of no value to the State; provided, that any denial of payment shall be equal to the value of the obligations not performed.

d. Removal

Demand immediate removal of any of Provider's employees, agents, or Subcontractors from the Work whom the State deems incompetent, careless, insubordinate, unsuitable, or otherwise unacceptable or whose continued relation to this Agreement is deemed by the State to be contrary to the public interest or the State's best interest.

e. Intellectual Property

If any Work infringes, or if the State in its sole discretion determines that any Work is likely to infringe, a patent, copyright, trademark, trade secret or other intellectual property right, Provider shall, as approved by the State **(i)** secure that right to use such Work for the State and Provider; **(ii)** replace the Work with non-infringing Work or modify the Work so that it becomes noninfringing; or, **(iii)** remove any infringing Work and refund the amount paid for such Work to the State.

**Exhibit A**                                    **Page 15 of 25**

# STATE OF COLORADO - EXHIBIT A
## (For Private Providers)

B.   Provider's Remedies

If the State is in breach of any provision of this Agreement and does not cure such breach, Provider, following the notice and cure period in **§11** and the dispute resolution process in **§13** shall have all remedies available at law and equity.

### 13.   DISPUTE RESOLUTION

A.   Initial Resolution

Except as herein specifically provided otherwise, disputes concerning the performance of this Agreement which cannot be resolved by the designated Agreement representatives shall be referred in writing to a senior departmental management staff member designated by the State and a senior manager designated by Provider for resolution.

B.   Resolution of Controversies

If the initial resolution described in **§13.A** fails to resolve the dispute within 10 Business Days, Provider shall submit any alleged breach of this Agreement by the State to the Procurement Official of the State Agency as described in §24-102-202(3), C.R.S. for resolution in accordance with the provisions of §24-106-109, C.R.S., and §§24-109-101.1 through 24-109-505, C.R.S., (the "Resolution Statutes"), except that if Provider wishes to challenge any decision rendered by the Procurement Official, Provider's challenge shall be an appeal to the Executive Director of the Department of Personnel and Administration, or their delegate, under the Resolution Statutes before Provider pursues any further action as permitted by such statutes. Except as otherwise stated in this Section, all requirements of the Resolution Statutes shall apply including, without limitation, time limitations.

### 14.   NOTICES AND REPRESENTATIVES

Each individual identified as a Principal Representative in this Agreement shall be the principal representative of the designating Party. All notices required or permitted to be given under this Agreement shall be in writing, and shall be delivered **(A)** by hand with receipt required, **(B)** by certified or registered mail to such Party's principal representative at the address set forth below or **(C)** as an email with read receipt requested to the principal representative at the email address, if any, set forth in this Agreement. If a Party delivers a notice to another through email and the email is undeliverable, then, unless the Party has been provided with an alternate email contact, the Party delivering the notice shall deliver the notice by hand with receipt required or by certified or registered mail to such Party's principal representative at the address set forth in this Agreement. Either Party may change its principal representative or principal representative contact information, or may designate specific other individuals to receive certain types of notices in addition to or in lieu of a principal representative by notice submitted in accordance with this section without a formal amendment to this Agreement. Unless otherwise provided in this Agreement, notices shall be effective upon delivery of the written notice.

### 15.   RIGHTS IN WORK PRODUCT AND OTHER INFORMATION

A.   Work Product

**Exhibit A**                                                                                      **Page 16 of 25**

# STATE OF COLORADO - EXHIBIT A
## (For Private Providers)

i. Copyrights

To the extent that the Work Product (or any portion of the Work Product) would not be considered works made for hire under applicable law, Provider hereby assigns to the State, the entire right, title, and interest in and to copyrights in all Work Product and all works based upon, derived from, or incorporating the Work Product; all copyright applications, registrations, extensions, or renewals relating to all Work Product and all works based upon, derived from, or incorporating the Work Product; and all moral rights or similar rights with respect to the Work Product throughout the world. To the extent that Provider cannot make any of the assignments required by this section, Provider hereby grants to the State a perpetual, irrevocable, royalty-free license to use, modify, copy, publish, display, perform, transfer, distribute, sell, and create derivative works of the Work Product and all works based upon, derived from, or incorporating the Work Product by all means and methods and in any format now known or invented in the future. The State may assign and license its rights under this license.

ii. Patents

In addition, Provider grants to the State (and to recipients of Work Product distributed by or on behalf of the State) a perpetual, worldwide, no-charge, royalty-free, irrevocable patent license to make, have made, use, distribute, sell, offer for sale, import, transfer, and otherwise utilize, operate, modify and propagate the contents of the Work Product. Such license applies only to those patent claims licensable by Provider that are necessarily infringed by the Work Product alone, or by the combination of the Work Product with anything else used by the State.

iii. Assignments and Assistance

Whether or not Provider is under Agreement with the State at the time, Provider shall execute applications, assignments, and other documents, and shall render all other reasonable assistance requested by the State, to enable the State to secure patents, copyrights, licenses and other intellectual property rights related to the Work Product. To the extent that Work Product would fall under the definition of "works made for hire" under 17 U.S.C.S. §101, the Parties intend the Work Product to be a work made for hire. Provider assigns to the State and its successors and assigns, the entire right, title, and interest in and to all causes of action, either in law or in equity, for past, present, or future infringement of intellectual property rights related to the Work Product and all works based on, derived from, or incorporating the Work Product.

B. Exclusive Property of the State

Except to the extent specifically provided elsewhere in this Agreement, all State Records, documents, text, software (including source code), research, reports, proposals, specifications, plans, notes, studies, data, images, photographs, negatives, pictures, drawings, designs, models, surveys, maps, materials, ideas, concepts,

**Exhibit A**                                                                 **Page 17 of 25**

# STATE OF COLORADO - EXHIBIT A
## (For Private Providers)

know-how, and information provided by or on behalf of the State to Provider are the exclusive property of the State (collectively, "State Materials"). Provider shall not use, willingly allow, cause or permit Work Product or State Materials to be used for any purpose other than the performance of Provider's obligations in this Agreement without the prior written consent of the State.   Upon termination of this Agreement for any reason, Provider shall provide all Work Product and State Materials to the State in a form and manner as directed by the State.

C.   Exclusive Property of Provider

Provider retains the exclusive rights, title, and ownership to any and all pre-existing materials owned or licensed to Provider including, but not limited to, all pre-existing software, licensed products, associated source code, machine code, text images, audio and/or video, and third-party materials, delivered by Provider under the Agreement, whether incorporated in a Deliverable or necessary to use a Deliverable (collectively, "Provider Property"). Provider Property shall be licensed to the State as set forth in this Agreement or a State approved license agreement: **(i)** entered into as exhibits to this Agreement; **(ii)** obtained by the State from the applicable third-party vendor; or **(iii)** in the case of open source software, the license terms set forth in the applicable open source license agreement.

16. **STATEWIDE CONTRACT MANAGEMENT SYSTEM**

If the maximum amount payable to Provider under this Agreement is $100,000 or greater, either on the Effective Date or at any time thereafter, this section shall apply. Provider agrees to be governed by and comply with the provisions of §§24-106-103, 24-102-206, 24-106-106, and 24-106-107, C.R.S. regarding the monitoring of vendor performance and the reporting of Agreement performance information in the State's Agreement management system ("Contract Management System" or "CMS"). Provider's performance shall be subject to evaluation and review in accordance with the terms and conditions of this Agreement, Colorado statutes governing CMS, and State Fiscal Rules and State Controller Policies.

17. **GENERAL PROVISIONS**

A.   Assignment

Provider's rights and obligations under this Agreement are personal and may not be transferred or assigned without the prior, written consent of the State. Any attempt at assignment or transfer without such consent shall be void. Any assignment or transfer of Provider's rights and obligations approved by the State shall be subject to the provisions of this Agreement.

B.   Subcontracts

Provider shall not enter into any subcontract in connection with its obligations under this Agreement without the prior, written approval of the State. Provider shall submit to the State a copy of each such subcontract upon request by the State. All subcontracts entered into by Provider in connection with this Agreement shall comply with all applicable federal and state laws and regulations, shall provide that they are

**Exhibit A**                                                           **Page 18 of 25**

# STATE OF COLORADO - EXHIBIT A
## (For Private Providers)

governed by the laws of the State of Colorado, and shall be subject to all provisions of this Agreement.

C.   Binding Effect

Except as otherwise provided in **§17.A**, all provisions of this Agreement, including the benefits and burdens, shall extend to and be binding upon the Parties' respective successors and assigns.

D.   Authority

Each Party represents and warrants to the other that the execution and delivery of this Agreement and the performance of such Party's obligations have been duly authorized.

E.   Captions and References

The captions and headings in this Agreement are for convenience of reference only, and shall not be used to interpret, define, or limit its provisions. All references in this Agreement to sections (whether spelled out or using the § symbol), subsections, exhibits or other attachments, are references to sections, subsections, exhibits or other attachments contained herein or incorporated as a part hereof, unless otherwise noted.

F.   Counterparts

This Agreement may be executed in multiple, identical, original counterparts, each of which shall be deemed to be an original, but all of which, taken together, shall constitute one and the same agreement.

G.   Entire Understanding

This Agreement represents the complete integration of all understandings between the Parties related to the Work, and all prior representations and understandings related to the Work, oral or written, are merged into this Agreement. Prior or contemporaneous additions, deletions, or other changes to this Agreement shall not have any force or effect whatsoever, unless embodied herein.

H.   Digital Signatures

If any signatory signs this Agreement using a digital signature in accordance with the "Colorado State Controller Contract, Grant and Purchase Order Policies" regarding the use of digital signatures issued under the State Fiscal Rules, then any agreement or consent to use digital signatures within the electronic system through which that signatory signed shall be incorporated into this Agreement by reference.

I.   Modification

Except as otherwise provided in this Agreement, any modification to this Agreement shall only be effective if agreed to in a formal amendment to this Agreement, properly executed and approved in accordance with applicable Colorado State law and State Fiscal Rules. Modifications permitted under this Agreement, other than Agreement amendments, shall conform to the policies issued by the Colorado State Controller.

J.   Statutes, Regulations, Fiscal Rules, and Other Authority

# STATE OF COLORADO - EXHIBIT A
## (For Private Providers)

Any reference in this Agreement to a statute, regulation, State Fiscal Rule, fiscal policy or other authority shall be interpreted to refer to such authority then current, as may have been changed or amended since the Effective Date of this Agreement.

K.   External Terms and Conditions

Notwithstanding anything to the contrary herein, the State shall not be subject to any provision included in any terms, conditions, or agreements appearing on Provider's or a Subcontractor's website or any provision incorporated into any click-through or online agreements related to the Work unless that provision is specifically referenced in this Agreement.

L.   Severability

The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provision of this Agreement, which shall remain in full force and effect, provided that the Parties can continue to perform their obligations under this Agreement in accordance with the intent of this Agreement.

M.   Survival of Certain Agreement Terms

Any provision of this Agreement that imposes an obligation on a Party after termination or expiration of this Agreement shall survive the termination or expiration of this Agreement and shall be enforceable by the other Party.

N.   Taxes

The State is exempt from federal excise taxes under I.R.C. Chapter 32 (26 U.S.C., Subtitle D, Ch. 32) (Federal Excise Tax Exemption Certificate of Registry No. 84-730123K) and from State and local government sales and use taxes under §§39-26-704(1), *et seq.,* C.R.S. (Colorado Sales Tax Exemption Identification Number 98-02565). The State shall not be liable for the payment of any excise, sales, or use taxes, regardless of whether any political subdivision of the state imposes such taxes on Provider. Provider shall be solely responsible for any exemptions from the collection of excise, sales or use taxes that Provider may wish to have in place in connection with this Agreement.

O.   Third Party Beneficiaries

Except for the Parties' respective successors and assigns described in **§ 17.A,** this Agreement does not and is not intended to confer any rights or remedies upon any person or entity other than the Parties. Enforcement of this Agreement and all rights and obligations hereunder are reserved solely to the Parties. Any services or benefits which third parties receive as a result of this Agreement are incidental to this Agreement, and do not create any rights for such third parties.

P.   Waiver

A Party's failure or delay in exercising any right, power, or privilege under this Agreement, whether explicit or by lack of enforcement, shall not operate as a waiver, nor shall any single or partial exercise of any right, power, or privilege preclude any other or further exercise of such right, power, or privilege.

# STATE OF COLORADO - EXHIBIT A
## (For Private Providers)

Q.   CORA Disclosure

To the extent not prohibited by federal law, this Agreement and the performance measures and standards required under §24-106-107, C.R.S., if any, are subject to public release through the CORA.

R.   Standard and Manner of Performance

Provider shall perform its obligations under this Agreement in accordance with the highest standards of care, skill and diligence in Provider's industry, trade, or profession.

S.   Licenses, Permits, and Other Authorizations

Provider shall secure, prior to the Effective Date, and maintain at all times during the term of this Agreement, at its sole expense, all licenses, certifications, permits, and other authorizations required to perform its obligations under this Agreement, and shall ensure that all employees, agents and Subcontractors secure and maintain at all times during the term of their employment, agency or subcontract, all license, certifications, permits and other authorizations required to perform their obligations in relation to this Agreement.

T.   Indemnification

    i.   General Indemnification

Provider shall indemnify, save, and hold harmless the State, its employees, agents and assignees (the "Indemnified Parties"), against any and all costs, expenses, claims, damages, liabilities, court awards and other amounts (including attorneys' fees and related costs) incurred by any of the Indemnified Parties in relation to any act or omission by Provider, or its employees, agents, Subcontractors, or assignees in connection with this Agreement.

    ii.   Confidential Information Indemnification

Disclosure or use of State Confidential Information by Provider in violation of **§8** may be cause for legal action by third parties against Provider, the State, or their respective agents. Provider shall indemnify, save, and hold harmless the Indemnified Parties, against any and all claims, damages, liabilities, losses, costs, expenses (including attorneys' fees and costs) incurred by the State in relation to any act or omission by Provider, or its employees, agents, assigns, or Subcontractors in violation of **§8**.

    iii.   Intellectual Property Indemnification

Provider shall indemnify, save, and hold harmless the Indemnified Parties, against any and all costs, expenses, claims, damages, liabilities, and other amounts (including attorneys' fees and costs) incurred by the Indemnified Parties in relation to any claim that any Deliverable, Good or Service, software, or Work Product provided by Provider under this Agreement (collectively, "IP Deliverables"), or the use thereof, infringes a patent, copyright, trademark, trade secret, or any other intellectual property right. Provider's obligations hereunder

**Exhibit A**                                                                                   **Page 21 of 25**

# STATE OF COLORADO - EXHIBIT A
# (For Private Providers)

shall not extend to the combination of any IP Deliverables provided by Provider with any other product, system, or method, unless the other product, system, or method is **(a)** provided by Provider or Provider's subsidiaries or affiliates; **(b)** specified by Provider to work with the IP Deliverables; **(c)** reasonably required in order to use the IP Deliverables in its intended manner and the infringement could not have been avoided by substituting another reasonably available product, system, or method capable of performing the same function; or **(d)** is reasonably expected to be used in combination with the IP Deliverables.

    iv.    Accessibility Indemnification

Provider shall indemnify, save, and hold harmless the state, its employees, agents and assignees (collectively, the "Indemnified Parties"), against any and all costs, expenses, claims, damages, liabilities, court awards and other amounts (including attorneys' fees and related costs) incurred by any of the Indemnified Parties in relation to Provider's failure to comply with §§24-85-101, et seq., C.R.S., or the Accessibility Standards for Individuals with a Disability as established by the Office of Information Technology pursuant to Section §24-85-103 (2.5), C.R.S.

U.    Accessibility

    i.    Provider shall comply with and the Work Product provided under this Agreement shall be in compliance with all applicable provisions of §§24-85-101, *et seq.*, C.R.S., and the *Accessibility Standards for Individuals with a Disability,* as established by the Governor's Office Of Information Technology (OIT), pursuant to Section §24-85-103 (2.5), C.R.S. Provider shall also comply with all State of Colorado technology standards related to technology accessibility and with Level AA of the most current version of the Web Content Accessibility Guidelines (WCAG), incorporated in the State of Colorado technology standards.

    ii.    The State may require Provider's compliance to the State's Accessibility Standards to be determined by a third party selected by the State to attest to Provider's Work Product and software is in compliance with §§24-85-101, *et seq.*, C.R.S., and the *Accessibility Standards for Individuals with a Disability* as established by the Office of Information Technology pursuant to Section §24-85-103 (2.5), C.R.S.

**18.    COLORADO SPECIAL PROVISIONS (COLORADO FISCAL RULE 3-3)**

These Special Provisions apply to all contracts except where noted in italics. For this section "Contract" or "contract" shall mean "Agreement."

A.    **STATUTORY APPROVAL. §24-30-202(1), C.R.S.**

This Contract shall not be valid until it has been approved by the Colorado State Controller or designee. If this Agreement is for a Major Information Technology Project, as defined in §24-37.5-102(2.6), C.R.S., then this Contract shall not be valid until it has been approved by the State's Chief Information Officer or designee.

**Exhibit A**                             **Page 22 of 25**

# STATE OF COLORADO - EXHIBIT A
## (For Private Providers)

B. **FUND AVAILABILITY. §24-30-202(5.5), C.R.S.**

Financial obligations of the State payable after the current State Fiscal Year are contingent upon funds for that purpose being appropriated, budgeted, and otherwise made available.

C. **GOVERNMENTAL IMMUNITY.**

Liability for claims for injuries to persons or property arising from the negligence of the State, its departments, boards, commissions committees, bureaus, offices, employees and officials shall be controlled and limited by the provisions of the Colorado Governmental Immunity Act, §24-10-101, et seq., C.R.S.; the Federal Tort Claims Act, 28 U.S.C. Pt. VI, Ch. 171 and 28 U.S.C. 1346(b), and the State's risk management statutes, §§24-30-1501, *et seq.* C.R.S. No term or condition of this Agreement shall be construed or interpreted as a waiver, express or implied, of any of the immunities, rights, benefits, protections, or other provisions, contained in these statutes.

D. **INDEPENDENT CONTRACTOR.**

Provider shall perform its duties hereunder as an Independent Contractor and not as an employee. Neither Provider nor any agent or employee of Provider shall be deemed to be an agent or employee of the State. Provider shall not have authorization, express or implied, to bind the State to any agreement, liability or understanding, except as expressly set forth herein. Provider and its employees and agents are not entitled to unemployment insurance or workers compensation benefits through the State and the State shall not pay for or otherwise provide such coverage for Provider or any of its agents or employees. Provider shall pay when due all applicable employment taxes and income taxes and local head taxes incurred pursuant to this Contract. Provider shall (i) provide and keep in force workers' compensation and unemployment compensation insurance in the amounts required by law, (ii) provide proof thereof when requested by the State, and (iii) be solely responsible for its acts and those of its employees and agents.

E. **COMPLIANCE WITH LAW.**

Provider shall comply with all applicable federal and State laws, rules, and regulations in effect or hereafter established, including, without limitation, laws applicable to discrimination and unfair employment practices.

F. **CHOICE OF LAW, JURISDICTION, AND VENUE.**

Colorado law, and rules and regulations issued pursuant thereto, shall be applied in the interpretation, execution, and enforcement of this Contract. Any provision included or incorporated herein by reference which conflicts with said laws, rules, and regulations shall be null and void. All suits or actions related to this Agreement shall be filed and proceedings held in the State of Colorado and exclusive venue shall be in the City and County of Denver.

G. **PROHIBITED TERMS.**

DEFS_0003503

3.  App.648      **Exhibit 62
Page 27**

# STATE OF COLORADO - EXHIBIT A
## (For Private Providers)

Any term included in this Agreement that requires the State to indemnify or hold Provider harmless; requires the State to agree to binding arbitration; limits Provider's liability for damages resulting from death, bodily injury, or damage to tangible property; or that conflicts with this provision in any way shall be void ab initio. Nothing in this Agreement shall be construed as a waiver of any provision of §24-106-109, C.R.S.

H. **SOFTWARE PIRACY PROHIBITION.**

State or other public funds payable under this Agreement shall not be used for the acquisition, operation, or maintenance of computer software in violation of federal copyright laws or applicable licensing restrictions. Provider hereby certifies and warrants that, during the term of this Agreement and any extensions, Provider has and shall maintain in place appropriate systems and controls to prevent such improper use of public funds. If the State determines that Provider is in violation of this provision, the State may exercise any remedy available at law or in equity or under this Contract, including, without limitation, immediate termination of this Agreement and any remedy consistent with federal copyright laws or applicable licensing restrictions.

I. **EMPLOYEE FINANCIAL INTEREST/CONFLICT OF INTEREST. §§24-18-201 and 24-50-507, C.R.S.**

The signatories aver that to their knowledge, no employee of the State has any personal or beneficial interest whatsoever in the service or property described in this Contract. Provider has no interest and shall not acquire any interest, direct or indirect, that would conflict in any manner or degree with the performance of Provider's services and Provider shall not employ any person having such known interests.

J. **VENDOR OFFSET AND ERRONEOUS PAYMENTS. §§24-30-202(1) and 24-30-202.4, C.R.S.**

[*Not applicable to intergovernmental agreements*] Subject to §24-30-202.4(3.5), C.R.S., the State Controller may withhold payment under the State's vendor offset intercept system for debts owed to State agencies for: **(i)** unpaid child support debts or child support arrearages; **(ii)** unpaid balances of tax, accrued interest, or other charges specified in §§39-21-101, *et seq.*, C.R.S.; **(iii)** unpaid loans due to the Student Loan Division of the Department of Higher Education; **(iv)** amounts required to be paid to the Unemployment Compensation Fund; and **(v)** other unpaid debts owing to the State as a result of final agency determination or judicial action. The State may also recover, at the State's discretion, payments made to Provider in error for any reason, including, but not limited to, overpayments or improper payments, and unexpended or excess funds received by Provider by deduction from subsequent payments under this Contract, deduction from any payment due under any other contracts, grants or agreements between the State and Provider, or by any other appropriate method for collecting debts owed to the State.

### 19. DEPARTMENT OF EARLY CHILDHOOD PROVISIONS

A. Restrictions on Public Benefits

DEFS_0003504

# STATE OF COLORADO - EXHIBIT A
## (For Private Providers)

If applicable, Provider shall comply with C.R.S. §§ 24-76.5-101 – 103 exactly as the State is required to comply with C.R.S. §§ 24-76.5-101 – 103.

**20. THIRD PARTY CERTIFICATION FOR ACCESS TO PII THROUGH A DATABASE OR AUTOMATED NETWORK**

Pursuant to § 24-74-105, C.R.S, if Provider is to be granted access to Personal Identifying Information through a database or automated network that is not publicly available information, Provider certifies, and will certify annually, under penalty of perjury that Provider has not and will not use or disclose any Personal Identifying Information, as defined by § 24-74-102(1), C.R.S., for the purpose of investigating for, participating in, cooperating with, or assisting Federal Immigration Enforcement, including the enforcement of civil immigration laws, and the Illegal Immigration and Immigrant Responsibility Act, which is codified at 8 U.S.C. §§ 1325 and 1326, unless required to do so to comply with Federal or State law, or to comply with a court-issued subpoena, warrant or order.

If Provider's agents, employees, assigns or Subcontractors require certification pursuant to § 24- 74-105, C.R.S., Provider shall require annually that its agents, employees, assigns or Subcontractors. PII Certification is attached as **Exhibit C.**

**Exhibit A**                                                                 **Page 25 of 25**

# STATE OF COLORADO - EXHIBIT B (For Intergovernmental Entities)

1. **PARTIES**

This Agreement is entered into by and between Provider named on the signature page for this Agreement (the "Provider"), and the STATE OF COLORADO acting by and through the State agency named on the signature page for this Agreement (the "State"). Provider and the State agree to the terms and conditions in this Agreement.

2. **TERM AND EFFECTIVE DATE**

A.   Effective Date

This Agreement shall not be valid or enforceable until the Effective Date. The State shall not be bound by any provision of this Agreement before the Effective Date, and shall have no obligation to pay Provider for any Work performed or expense incurred before the Effective Date or after the expiration or sooner termination of this Agreement.

B.   Initial Term

The Parties' respective performances under this Agreement shall commence on the Agreement Performance Beginning Date shown on the signature page  of this Agreement and shall terminate on the Initial Agreement Expiration Date shown on in this Agreement (the "Initial Term") unless sooner terminated or further extended in accordance with the terms of this Agreement.

C.   Early Termination in the Public Interest

The State is entering into this Agreement to serve the public interest of the State of Colorado as determined by its Governor, General Assembly, or Courts. If this Agreement ceases to further the public interest of the State, the State, in its discretion, may terminate this Agreement in whole or in part. A determination that this Agreement should be terminated in the public interest shall not be equivalent to a State right to terminate for convenience. This subsection shall not apply to a termination of this Agreement by the State for breach by Provider, which shall be governed by **§12.A.i**.

   i.   Method and Content

      The State shall notify Provider of such termination in accordance with **§14**. The notice shall specify the effective date of the termination and whether it affects all or a portion of this Agreement, and shall include, to the extent practicable, the public interest justification for the termination.

   ii.   Obligations and Rights

      Upon receipt of a termination notice for termination in the public interest, Provider shall be subject to the rights and obligations set forth in **§12.A.i.a**.

   iii.   Payments

**Exhibit B**                                                                 **Page 1 of 22**

DEFS_0003506
**Exhibit 62
Page 30**

# STATE OF COLORADO - EXHIBIT B (For Intergovernmental Entities)

If the State terminates this Agreement in the public interest, the State shall pay Provider an amount equal to the percentage of the total reimbursement payable under this Agreement that corresponds to the percentage of Work satisfactorily completed and accepted, as determined by the State, less payments previously made. Additionally, if this Agreement is less than 60% completed, as determined by the State, the State may reimburse Provider for a portion of actual out-of-pocket expenses, not otherwise reimbursed under this Agreement, incurred by Provider which are directly attributable to the uncompleted portion of Provider's obligations, provided that the sum of any and all reimbursement shall not exceed the maximum amount payable to Provider hereunder.

3. **DEFINITIONS**

The following terms shall be construed and interpreted as follows:

A. "**Agreement**" means this agreement, including all attached Exhibits, all documents incorporated by reference, all referenced statutes, rules and cited authorities, and any future modifications thereto.

B. "**Agreement Funds**" means the funds that have been appropriated, designated, encumbered, or otherwise made available for payment by the State under this Agreement.

C. "**Breach of Agreement**" means the failure of a Party to perform any of its obligations in accordance with this Agreement, in whole or in part or in a timely or satisfactory manner. If Provider is debarred or suspended under §24-109-105, C.R.S. at any time during the term of this Agreement, then such debarment or suspension shall constitute a breach.

D. "**Business Day**" means any day in which the State is open and conducting business, but shall not include Saturday, Sunday or any day on which the State observes one of the holidays listed in §24-11-101(1), C.R.S.

E. "**Chief Procurement Officer**" means the individual to whom the Executive Director has delegated his or her authority pursuant to §24-102-202 to procure or supervise the procurement of all supplies and services needed by the State.

F. "**CJI**" means criminal justice information collected by criminal justice agencies needed for the performance of their authorized functions, including, without limitation, all information defined as criminal justice information by the U.S. Department of Justice, Federal Bureau of Investigation, Criminal Justice Information Services Security Policy, as amended and all Criminal Justice Records as defined under §24-72-302, C.R.S.

G. "**CORA**" means the Colorado Open Records Act, §§24-72-200.1, *et. seq.*, C.R.S.

H. "**Effective Date**" means the date on which this Agreement is approved and signed by the Colorado State Controller or designee, as shown on the Signature Page for this Agreement. If this Agreement is for a Major Information Technology Project, as defined in §24-37.5-102(2.6), C.R.S., then the Effective Date of this Agreement shall be the later of the date on which this Agreement is approved and signed by the State's Chief Information Officer or authorized delegate or the date on which this Agreement is approved and signed by the State Controller or authorized delegate, as shown on the Signature Page for this Agreement.

I. "**Exhibits**" means the exhibits and attachments included with this Agreement as contained in this Agreement.

# STATE OF COLORADO - EXHIBIT B (For Intergovernmental Entities)

J.   "Extension Term" means the time period defined in §**2.C**.

K.   "**Goods**" means any movable material acquired, produced, or delivered by Provider as set forth in this Agreement and shall include any movable material acquired, produced, or delivered by Provider in connection with the Services.

L.   "**Incident**" means any accidental or deliberate event that results in or constitutes an imminent threat of the unauthorized access, loss, disclosure, modification, disruption, or destruction of any communications or information resources of the State, which are included as part of the Work, as described in §§24-37.5-401 et. seq. C.R.S. Incidents include, without limitation (i) successful attempts to gain unauthorized access to a State system or State Information regardless of where such information is located; (ii) unwanted disruption or denial of service; (iii) the unauthorized use of a State system for the processing or storage of data; or (iv) changes to State system hardware, firmware, or software characteristics without the State's knowledge, instruction, or consent."

M.   "**Initial Term**" means the time period defined in §**2.B**.

N.   "**Party**" means the State or Provider, and "Parties" means both the State and Provider.

O.   "**PCI**" means payment card information including any data related to credit card holders' names, credit card numbers, or the other credit card information as may be protected by state or federal law.

P.   "**PII**" means personally identifiable information including, without limitation, any information maintained by the State about an individual that can be used to distinguish or trace an individual's identity, such as name, social security number, date and place of birth, mother's maiden name, or biometric records; and any other information that is linked or linkable to an individual, such as medical, educational, financial, and employment information. PII includes, but is not limited to, all information defined as personally identifiable information in §§24-72-501 and 24-73-101, C.R.S."PII" shall also mean "personal identifying information" as set forth at § 24-74-102, et. seq., C.R.S.

Q.   "**PHI**" means protected health information, including, without limitation any information whether oral or recorded in any form or medium: **(i)** that relates to the past, present or future physical or mental condition of an individual; the provision of health care to an individual; or the past, present or future payment for the provision of health care to an individual; and **(ii)** that identifies the individual or with respect to which there is a reasonable basis to believe the information can be used to identify the individual. PHI includes, but is not limited to, any information defined as Individually Identifiable Health Information by the federal Health Insurance Portability and Accountability Act.

R.   "**Services**" means the services to be performed by Provider as set forth in this Agreement, and shall include any services to be rendered by Provider in connection with the Goods.

S.   "**State Confidential Information**" means any and all State Records not subject to disclosure under CORA. State Confidential Information shall include, but is not limited to, PII, PHI, PCI, Tax Information, CJI, and State personnel records not subject to disclosure under CORA. State Confidential Information shall not include information or data concerning individuals that is not deemed confidential but nevertheless belongs to the State, which has been communicated, furnished, or disclosed by the State to Provider which (i) is subject to disclosure pursuant to CORA; (ii) is already known to Provider without restrictions at the time of its disclosure to Provider; (iii) is or subsequently becomes publicly available without breach of any obligation owed by Provider to the

**Exhibit B**                                                                                          **Page 3 of 22**

DEFS_0003508
**Exhibit 62
Page 32**

# STATE OF COLORADO - EXHIBIT B (For Intergovernmental Entities)

State; (iv) is disclosed to Provider, without confidentiality obligations, by a third party who has the right to disclose such information; or (v) was independently developed without reliance on any State Confidential Information.

T.   "**State Fiscal Rules**" means that fiscal rules promulgated by the Colorado State Controller pursuant to §24-30-202(13)(a), C.R.S.

U.   "**State Fiscal Year**" means a 12 month period beginning on July 1 of each calendar year and ending on June 30 of the following calendar year. If a single calendar year follows the term, then it means the State Fiscal Year ending in that calendar year.

V.   "**State Records**" means any and all State data, information, and records, regardless of physical form, including, but not limited to, information subject to disclosure under CORA.

W.   "**Subcontractor**" means third-parties, if any, engaged by Provider to aid in performance of the Work.

X.   "**Tax Information**" means federal and State of Colorado tax information including, without limitation, federal and State tax returns, return information, and such other tax-related information as may be protected by federal and State law and regulation. Tax Information includes, but is not limited to all information defined as federal tax information in Internal Revenue Service Publication 1075.

Y.   "**Work**" means the Goods delivered and Services performed pursuant to this Agreement.

Z.   -**Universal Preschool Colorado Application Portal**" means the online application system that Providers will use to register with the Universal Preschool Colorado program and to match with potential eligible children.

AA.   "**Work Product**" means the tangible and intangible results of the Work, whether finished or unfinished, including drafts.  Work Product includes, but is not limited to, documents, text, software (including source code), research, reports, proposals, specifications, plans, notes, studies, data, images, photographs, negatives, pictures, drawings, designs, models, surveys, maps, materials, ideas, concepts, know-how, and any other results of the Work.  "Work Product" does not include any material that was developed prior to the Effective Date that is used, without modification, in the performance of the Work.

BB.   Any other term used in this Agreement that is defined in an Exhibit shall be construed and interpreted as defined in that Exhibit.

4.   **STATEMENT OF WORK**

Provider shall complete the Work as described in this Agreement and in accordance with the provisions of this Agreement. The State shall have no liability to compensate the Provider for the delivery of any goods or the performance of any services that are not specifically set forth in this Agreement.

5.   **PAYMENTS TO PROVIDER**

A.   Maximum Amount

Payments to Provider are limited to the unpaid, obligated balance of the Agreement Funds. The State shall not pay Provider any amount under this Agreement that exceeds the Agreement

DEFS_0003509
3. App.654                 **Exhibit 62**
**Page 33**

# STATE OF COLORADO - EXHIBIT B (For Intergovernmental Entities)

Maximum for that State Fiscal Year in this Agreement.

B.    Payment Procedures

iv.    Invoices and Payment

a.    The State shall pay Provider in the amounts and in accordance with the schedule and other conditions set forth in the Agreement.

b.    Provider shall initiate payment requests by invoice to the State, in a form and manner approved by the State.

c.    The State shall pay each invoice within 45 days following the State's receipt of that invoice, so long as the amount invoiced correctly represents Work completed by Provider and previously accepted by the State during the term that the invoice covers. If the State determines that the amount of any invoice is not correct, then the Provider shall make all changes necessary to correct that invoice.

d.    The acceptance of an invoice shall not constitute acceptance of any Work performed or deliverables provided under this Agreement.

v.    Interest

Amounts not paid by the State within 45 days after the State's acceptance of the invoice shall bear interest on the unpaid balance beginning on the 45th day at the rate of 1% per month, as required by §24-30-202(24)(a), C.R.S., until paid in full; provided, however, that interest shall not accrue on unpaid amounts that the State disputes in writing. Provider shall invoice the State separately for accrued interest on delinquent amounts, and the invoice shall reference the delinquent payment, the number of day's interest to be paid and the interest rate.

vi.    Payment Disputes

If Provider disputes any calculation, determination or amount of any payment, Provider shall notify the State in writing of its dispute within 30 days following the earlier to occur of Provider's receipt of the payment or notification of the determination or calculation of the payment by the State. The State will review the information presented by the Provider and may make changes to its determination based on this review. The calculation, determination or payment amount that results from the State's review shall not be subject to additional dispute under this subsection. No payment subject to a dispute under this subsection shall be due until after the State has concluded its review, and the State shall not pay any interest on any amount during the period it is subject to dispute under this subsection.

vii.    Available Funds-Contingency-Termination

The State is prohibited by law from making commitments beyond the term of the current

**Exhibit B**                                                                                      **Page 5 of 22**

# STATE OF COLORADO - EXHIBIT B (For Intergovernmental Entities)

State Fiscal Year. Payment to Provider beyond the current State Fiscal Year is contingent on the appropriation and continuing availability of Agreement Funds in any subsequent year (as provided in the Colorado Special Provisions). If federal funds or funds from any other non-State funds constitute all or some of the Agreement Funds the State's obligation to pay Provider shall be contingent upon such non-State funding continuing to be made available for payment. Payments to be made pursuant to this Agreement shall be made only from Agreement Funds, and the State's liability for such payments shall be limited to the amount remaining of such Agreement Funds. If State, federal or other funds are not appropriated, or otherwise become unavailable to fund this Agreement, the State may, upon written notice, terminate this Agreement, in whole or in part, without incurring further liability. The State shall, however, remain obligated to pay for Services and Goods that are delivered and accepted prior to the effective date of notice of termination, and this termination shall otherwise be treated as if this Agreement were terminated in the public interest as described in **§2.C**.

6.    **REPORTING - NOTIFICATION**

A.    Quarterly Reports.

In addition to any reports required pursuant to **§16** or pursuant to any other Exhibit, for any Agreement having a term longer than three months, Provider shall submit, on a quarterly basis, a written report specifying progress measure for each specified performance measure and standard in this Agreement. Such progress reports shall be in accordance with the procedures developed and prescribed by the State. Progress reports shall be submitted to the State not later than five Business Days following the end of each calendar quarter or at such time as otherwise specified by the State.

B.    Litigation Reporting

If Provider is served with a pleading or other document in connection with an action before a court or other administrative decision making body, and such pleading or document relates to this Agreement or may affect Provider's ability to perform its obligations under this Agreement, Provider shall, within 10 days after being served, notify the State of such action and deliver copies of such pleading or document to the State's principal representative identified on the signature page for this Agreement.

C.    Performance Outside the State of Colorado or the United States, §24-102-206, C.R.S.

To the extent not previously disclosed in accordance with §24-102-206, C.R.S., Provider shall provide written notice to the State, in accordance with **§14** and in a form designated by the State, within 20 days following the earlier to occur of Provider's decision to perform Services outside of the State of Colorado or the United States, or its execution of an agreement with a Subcontractor to perform, Services outside the State of Colorado or the United States. Such notice shall specify the type of Services to be performed outside the State of Colorado or the United States and the reason why it is necessary or advantageous to perform such Services at such location or locations, and such notice shall be a public record.  Knowing failure by the Provider to provide notice to the State under this section shall constitute a breach of this

DEFS_0003511

3.  App.656

**Exhibit 62
Page 35**

# STATE OF COLORADO - EXHIBIT B (For Intergovernmental Entities)

Agreement. This section shall not apply if the Agreement Funds include any federal funds.

7.  **PROVIDER RECORDS**

A.  Maintenance

Provider shall maintain a file of all documents, records, communications, notes and other materials relating to the Work (the "Provider Records"). Provider Records shall include all documents, records, communications, notes and other materials maintained by Provider that relate to any Work performed by Subcontractors, and Provider shall maintain all records related to the Work performed by Subcontractors required to ensure proper performance of that Work. Provider shall maintain Provider Records until the last to occur of: **(i)** the date three years after the date this Agreement expires or is terminated, **(ii)** final payment under this Agreement is made, **(iii)** the resolution of any pending Agreement matters, or **(iv)** if an audit is occurring, or Provider has received notice that an audit is pending, the date such audit is completed and its findings have been resolved (the "Record Retention Period").

B.  Inspection

Provider shall permit the State to audit, inspect, examine, excerpt, copy and transcribe Provider Records during the Record Retention Period. Provider shall make Provider Records available during normal business hours at Provider's office or place of business, or at other mutually agreed upon times or locations, upon no fewer than two Business Days' notice from the State, unless the State determines that a shorter period of notice, or no notice, is necessary to protect the interests of the State.

C.  Monitoring

The State, in its discretion, may monitor Provider's performance of its obligations under this Agreement using procedures as determined by the State. The State shall monitor Provider's performance in a manner that does not unduly interfere with Provider's performance of the Work.

D.  Final Audit Report

Provider shall promptly submit to the State a copy of any final audit report of an audit performed on Provider's records that relates to or affects this Agreement or the Work, whether the audit is conducted by Provider or a third party.

8.  **CONFIDENTIAL INFORMATION-STATE RECORDS**

A.  Confidentiality

Provider shall keep confidential, and cause all Subcontractors to keep confidential, all State Records, unless those State Records are publicly available. Provider shall not, without prior written approval of the State, use, publish, copy, disclose to any third party, or permit the use by any third party of any State Records, except as otherwise stated in this Agreement, permitted by

# STATE OF COLORADO - EXHIBIT B (For Intergovernmental Entities)

law or approved in Writing by the State. Provider shall provide for the security of all State Confidential Information in accordance with all policies promulgated by the Colorado Office of Information Security and all applicable laws, rules, policies, publications, and guidelines. If Provider or any of its Subcontractors will or may receive the following types of data, Provider or its Subcontractors shall provide for the security of such data according to the following: **(i)** the most recently promulgated IRS Publication 1075 for all Tax Information and in accordance with the Safeguarding Requirements for Federal Tax Information attached to this Agreement as an Exhibit, if applicable, **(ii)** the most recently updated PCI Data Security Standard from the PCI Security Standards Council for all PCI, **(iii)** the most recently issued version of the U.S. Department of Justice, Federal Bureau of Investigation, Criminal Justice Information Services Security Policy for all CJI, and **(iv)** the federal Health Insurance Portability and Accountability Act for all PHI and the HIPAA Business Associate Agreement attached to this Agreement, if applicable. Provider shall immediately forward any request or demand for State Records to the State's principal representative.

B.    Other Entity Access and Nondisclosure Agreements

Provider may provide State Records to its agents, employees, assigns and Subcontractors as necessary to perform the Work, but shall restrict access to State Confidential Information to those agents, employees, assigns and Subcontractors who require access to perform their obligations under this Agreement. Provider shall ensure all such agents, employees, assigns, and Subcontractors sign agreements containing nondisclosure provisions at least as protective as those in this Agreement, and that the nondisclosure provisions are in force at all times the agent, employee, assign or Subcontractor has access to any State Confidential Information. Provider shall provide copies of those signed nondisclosure provisions to the State upon execution of the nondisclosure provisions.

C.    Use, Security, and Retention

Provider shall use, hold and maintain State Confidential Information in compliance with any and all applicable laws and regulations in facilities located within the United States, and shall maintain a secure environment that ensures confidentiality of all State Confidential Information wherever located. Provider shall provide the State with access, subject to Provider's reasonable security requirements, for purposes of inspecting and monitoring access and use of State Confidential Information and evaluating security control effectiveness. Upon the expiration or termination of this Agreement, Provider shall return State Records provided to Provider or destroy such State Records and certify to the State that it has done so, as directed by the State. If Provider is prevented by law or regulation from returning or destroying State Confidential Information, Provider warrants it will guarantee the confidentiality of, and cease to use, such State Confidential Information.

D.    Incident Notice and Remediation

If the Provider becomes aware of any Incident, it shall notify the State immediately and cooperate with the State regarding recovery, remediation, and the necessity to involve law enforcement, as determined by the State. Unless Provider can establish that none of Provider or

**Exhibit B**                                                                                   **Page 8 of 22**

DEFS_0003513
**Exhibit 62
Page 37**

# STATE OF COLORADO - EXHIBIT B (For Intergovernmental Entities)

any of its agents, employees, assigns or Subcontractors are the cause or source of the Incident, Provider shall be responsible for the cost of notifying each person who may have been impacted by the Incident.  After an Incident, Provider shall take steps to reduce the risk of incurring a similar type of Incident in the future as directed by the State, which may include, but is not limited to, developing and implementing a remediation plan that is approved by the State at no additional cost to the State. The State may, in its sole discretion and at Provider's sole expense, require Provider to engage the services of an independent, qualified, State-approved third party to conduct a security audit.  Provider shall provide the State with the results of such audit and evidence of Provider's planned remediation in response to any negative findings.

E.    Data Protection and Handling

Provider shall ensure that all State Records and Work Product in the possession of Provider or any Subcontractors are protected and handled in accordance with the requirements of this Agreement, including the requirements of any Exhibits hereto, at all times.

F.    FERPA

Provider agrees to comply with the Family Educational Rights and Privacy Act (FERPA), if applicable, and any other federal and state data privacy laws that govern education records in the provider's possession.

G.    Safeguarding PII

If Provider or any of its Subcontractors will or may receive PII under this Agreement, Provider shall provide for the security of such PII, in a manner and form acceptable to the State, including, without limitation, State non-disclosure requirements, use of appropriate technology, security practices, computer access security, data access security, data storage encryption, data transmission encryption, security inspections, and audits. Provider shall be a "Third-Party Service Provider" as defined in §24-73-103(1)(i), C.R.S. and shall maintain security procedures and practices consistent with §§24-73-101 *et seq.*, C.R.S.  In addition, as set forth in § 24-74-102, et. seq., C.R.S., Provider, including, but not limited to, Provider's employees, agents and Subcontractors, agrees not to share any PII with any third parties for the purpose of investigating for, participating in, cooperating with, or assisting with Federal immigration enforcement. If Provider is given direct access to any State databases containing PII, Provider shall execute, on behalf of itself and its employees, the certification attached hereto as Exhibit C on an annual basis Provider's duty and obligation to certify as set forth in Exhibit C shall continue as long as Provider has direct access to any State databases containing PII. If Provider uses any Subcontractors to perform services requiring direct access to State databases containing PII, the Provider shall require such Subcontractors to execute and deliver the certification to the State on an annual basis, so long as the Subcontractor has access to State databases containing PII.

9.    **CONFLICTS OF INTEREST**

A.    Actual Conflicts of Interest

# STATE OF COLORADO - EXHIBIT B (For Intergovernmental Entities)

Provider shall not engage in any business or activities, or maintain any relationships that conflict in any way with the full performance of the obligations of Provider under this Agreement. Such a conflict of interest would arise when a Provider or Subcontractor's employee, officer or agent were to offer or provide any tangible personal benefit to an employee of the State, or any member of his or her immediate family or his or her partner, related to the award of, entry into or management or oversight of this Agreement.

B.    Apparent Conflicts of Interest

Provider acknowledges that, with respect to this Agreement, even the appearance of a conflict of interest shall be harmful to the State's interests. Absent the State's prior written approval, Provider shall refrain from any practices, activities or relationships that reasonably appear to be in conflict with the full performance of Provider's obligations under this Agreement.

C.    Disclosure to the State

If a conflict or the appearance of a conflict arises, or if Provider is uncertain whether a conflict or the appearance of a conflict has arisen, Provider shall submit to the State a disclosure statement setting forth the relevant details for the State's consideration. Failure to promptly submit a disclosure statement or to follow the State's direction in regard to the actual or apparent conflict constitutes a breach of this Agreement.

D.    Provider acknowledges that all State employees are subject to the ethical principles described in §24-18-105, C.R.S.  Provider further acknowledges that State employees may be subject to the requirements of §24-18-105, C.R.S. with regard to this Agreement.

10.   **INSURANCE**

Provider shall obtain and maintain, and ensure that each Subcontractor shall obtain and maintain, insurance as specified in this section at all times during the term of this Agreement. All insurance policies required by this Agreement that are not provided through self-insurance shall be issued by insurance companies as approved by the State.

A.    Provider Insurance

The Provider is a "public entity" within the meaning of the Colorado Governmental Immunity Act, §24-10-101, *et seq.*, C.R.S. (the "GIA") and shall maintain at all times during the term of this Agreement such liability insurance, by commercial policy or self-insurance, as is necessary to meet its liabilities under the GIA.

B.    Subcontractor Requirements

Provider shall ensure that each Subcontractor that is a public entity within the meaning of the GIA,  maintains at all times during the terms of this Agreement, such liability insurance, by commercial policy or self-insurance, as is necessary to meet the Subcontractor's obligations under the GIA.  Provider shall ensure that each Subcontractor that is not a public entity within the meaning of the GIA, maintains at all times during the terms of this Agreement all of the

DEFS_0003515

3.  App.660         **Exhibit 62
Page 39**

# STATE OF COLORADO - EXHIBIT B (For Intergovernmental Entities)

following insurance policies:

viii.   Workers' Compensation

Workers' compensation insurance as required by state statute, and employers' liability insurance covering all Provider or Subcontractor employees acting within the course and scope of their employment.

ix.   General Liability

Commercial general liability insurance covering premises operations, fire damage, Independent Contractors, products and completed operations, blanket contractual liability, personal injury, and advertising liability with minimum limits as follows:

    a.   $1,000,000 each occurrence;
    b.   $1,000,000 general aggregate;
    c.   $1,000,000 products and completed operations aggregate; and
    d.   $50,000 any one fire.

x.   Automobile Liability

Automobile liability insurance covering any auto (including owned, hired and non-owned autos) with a minimum limit of $1,000,000 each accident combined single limit.

xi.   Protected Information

Liability insurance covering all loss of State Confidential Information, such as PII, PHI, PCI, Tax Information, and CJI, and claims based on alleged violations of privacy rights through improper use or disclosure of protected information with minimum limits as follows:

    a.   $1,000,000 each occurrence; and
    b.   $2,000,000 general aggregate.

xii.   Professional Liability Insurance

Professional liability insurance covering any damages caused by an error, omission or any negligent act with minimum limits as follows:

    a.   $1,000,000 each occurrence; and
    b.   $1,000,000 general aggregate.

xiii.   Crime Insurance

Crime insurance including employee dishonesty coverage with minimum limits as follows:

    a.   $1,000,000 each occurrence; and

# STATE OF COLORADO - EXHIBIT B (For Intergovernmental Entities)

b.   $1,000,000 general aggregate.

C.   Additional Insured

The State shall be named as additional insured on all commercial general liability policies (leases and construction contracts require additional insured coverage for completed operations) required of Provider and Subcontractors.

D.   Primacy of Coverage

Coverage required of Provider and each Subcontractor shall be primary over any insurance or self-insurance program carried by Provider or the State.

E.   Cancellation

All commercial insurance policies shall include provisions preventing cancellation or non-renewal, except for cancellation based on non-payment of premiums, without at least 30 days prior notice to Provider and Provider shall forward such notice to the State in accordance with **§14** within seven days of Provider's receipt of such notice.

F.   Subrogation Waiver

All commercial insurance policies secured or maintained by Provider or its Subcontractors in relation to this Agreement shall include clauses stating that each carrier shall waive all rights of recovery under subrogation or otherwise against Provider or the State, its agencies, institutions, organizations, officers, agents, employees, and volunteers.

G.   Certificates

For each commercial insurance plan provided by Provider under this Agreement, Provider shall provide to the State certificates evidencing Provider's insurance coverage required in this Agreement within seven Business Days following the Effective Date. Provider shall provide to the State certificates evidencing Subcontractor insurance coverage required under this Agreement within seven Business Days following the Effective Date, except that, if Provider's subcontract is not in effect as of the Effective Date, Provider shall provide to the State certificates showing Subcontractor insurance coverage required under this Agreement within seven Business Days following Provider's execution of the subcontract. No later than 15 days before the expiration date of Provider's or any Subcontractor's coverage, Provider shall deliver to the State certificates of insurance evidencing renewals of coverage. At any other time during the term of this Agreement, upon request by the State, Provider shall, within seven Business Days following the request by the State, supply to the State evidence satisfactory to the State of compliance with the provisions of this **§10**.

11.   **BREACH OF AGREEMENT**

In the event of a Breach of Agreement, the aggrieved Party shall give written notice of breach to the other Party. If the notified Party does not cure the Breach of Agreement, at its sole expense,

# STATE OF COLORADO - EXHIBIT B (For Intergovernmental Entities)

within 30 days after the delivery of written notice, the Party may exercise any of the remedies as described in **§12** for that Party. Notwithstanding any provision of this Agreement to the contrary, the State, in its discretion, need not provide notice or a cure period and may immediately terminate this Agreement in whole or in part or institute any other remedy in this Agreement in order to protect the public interest of the State; or if Provider is debarred or suspended under §24-109-105, C.R.S., the State, in its discretion, need not provide notice or cure period and may terminate this Agreement in whole or in part or institute any other remedy in this Agreement as of the date that the debarment or suspension takes effect.

12.  **REMEDIES**

A.    State's Remedies

If Provider is in breach under any provision of this Agreement and fails to cure such breach, the State, following the notice and cure period set forth in **§11,** shall have all of the remedies listed in this section in addition to all other remedies set forth in this Agreement or at law. The State may exercise any or all of the remedies available to it, in its discretion, concurrently or consecutively.

xiv.    Termination for Breach

In the event of Provider's uncured breach, the State may terminate this entire Agreement or any part of this Agreement. Provider shall continue performance of this Agreement to the extent not terminated, if any.

a.    Obligations and Rights

To the extent specified in any termination notice, Provider shall not incur further obligations or render further performance past the effective date of such notice, and shall terminate outstanding orders and subcontracts with third parties. However, Provider shall complete and deliver to the State all Work not canceled by the termination notice, and may incur obligations as necessary to do so within this Agreement's terms. At the request of the State, Provider shall assign to the State all of Provider's rights, title, and interest in and to such terminated orders or subcontracts. Upon termination, Provider shall take timely, reasonable and necessary action to protect and preserve property in the possession of Provider but in which the State has an interest. At the State's request, Provider shall return materials owned by the State in Provider's possession at the time of any termination. Provider shall deliver all completed Work Product and all Work Product that was in the process of completion to the State at the State's request.

b.    Payments

Notwithstanding anything to the contrary, the State shall only pay Provider for accepted Work received as of the date of termination. If, after termination by the State, the State agrees that Provider was not in breach or that Provider's action or inaction was excusable, such termination shall be treated as a termination in the public interest, and the rights and obligations of the Parties shall be as if this Agreement had been terminated in the public interest under **§2.C.**

# STATE OF COLORADO - EXHIBIT B (For Intergovernmental Entities)

c.    Damages and Withholding

Notwithstanding any other remedial action by the State, Provider shall remain liable to the State for any damages sustained by the State in connection with any breach by Provider, and the State may withhold payment to Provider for the purpose of mitigating the State's damages until such time as the exact amount of damages due to the State from Provider is determined. The State may withhold any amount that may be due Provider as the State deems necessary to protect the State against loss including, without limitation, loss as a result of outstanding liens and excess costs incurred by the State in procuring from third parties replacement Work as cover.

xv.    Remedies Not Involving Termination

The State, in its discretion, may exercise one or more of the following additional remedies:

a.    Suspend Performance

Suspend Provider's performance with respect to all or any portion of the Work pending corrective action as specified by the State without entitling Provider to an adjustment in price or cost or an adjustment in the performance schedule. Provider shall promptly cease performing Work and incurring costs in accordance with the State's directive, and the State shall not be liable for costs incurred by Provider after the suspension of performance.

b.    Withhold Payment

Withhold payment to Provider until Provider corrects its Work.

c.    Deny Payment

Deny payment for Work not performed, or that due to Provider's actions or inactions, cannot be performed or if they were performed are reasonably of no value to the state; provided, that any denial of payment shall be equal to the value of the obligations not performed.

d.    Removal

Demand immediate removal of any of Provider's employees, agents, or Subcontractors from the Work whom the State deems incompetent, careless, insubordinate, unsuitable, or otherwise unacceptable or whose continued relation to this Agreement is deemed by the State to be contrary to the public interest or the State's best interest.

e.    Intellectual Property

If any Work infringes, or if the State in its sole discretion determines that any Work is likely to infringe, a patent, copyright, trademark, trade secret or other intellectual

Exhibit B                                                                      Page 14 of 22

DEFS_0003519
3.  App.664   **Exhibit 62
Page 43**

# STATE OF COLORADO - EXHIBIT B (For Intergovernmental Entities)

property right, Provider shall, as approved by the State **(i)** secure that right to use such Work for the State and Provider; **(ii)** replace the Work with non infringing Work or modify the Work so that it becomes noninfringing; or, **(iii)** remove any infringing Work and refund the amount paid for such Work to the State.

B.    Provider's Remedies

If the State is in breach of any provision of this Agreement and does not cure such breach, Provider, following the notice and cure period in **§11** and the dispute resolution process in **§13** shall have all remedies available at law and equity.

## 13.   DISPUTE RESOLUTION

A.    Initial Resolution

Except as herein specifically provided otherwise, disputes concerning the performance of this Agreement which cannot be resolved by the designated Agreement representatives shall be referred in writing to a senior departmental management staff member designated by the State and a senior manager designated by Provider for resolution.

B.    Resolution of Controversies

If the initial resolution described in **§13.A** fails to resolve the dispute within 10 Business Days, Provider shall submit any alleged breach of this Agreement by the State to the Procurement Official of the State Agency named in this Agreement as described in §24-102-202(3), C.R.S. for resolution in accordance with the provisions of §§24-106-109, and 24-109-101.1 through 24-109-505, C.R.S., (the "Resolution Statutes"), except that if Provider wishes to challenge any decision rendered by the Procurement Official, Provider's challenge shall be an appeal to the executive director of the Department of Personnel and Administration, or their delegate, under the Resolution Statutes before Provider pursues any further action as permitted by such statutes. Except as otherwise stated in this Section, all requirements of the Resolution Statutes shall apply including, without limitation, time limitations.

## 14.   NOTICES AND REPRESENTATIVES

Each individual identified as a Principal Representative in this Agreement shall be the principal representative of the designating Party. All notices required or permitted to be given under this Agreement shall be in writing, and shall be delivered **(A)** by hand with receipt required, **(B)** by certified or registered mail to such Party's principal representative at the address set forth below or **(C)** as an email with read receipt requested to the principal representative at the email address, if any, in this Agreement. If a Party delivers a notice to another through email and the email is undeliverable, then, unless the Party has been provided with an alternate email contact, the Party delivering the notice shall deliver the notice by hand with receipt required or by certified or registered mail to such Party's principal representative at the address set forth inr this Agreement. Either Party may change its principal representative or principal representative contact information, or may designate specific other individuals to receive certain types of notices in addition to or in lieu of a principal representative by notice submitted in accordance

**Exhibit B**                                                                                      **Page 15 of 22**

DEFS_0003520

3.  App.665        **Exhibit 62**
**Page 44**

# STATE OF COLORADO - EXHIBIT B (For Intergovernmental Entities)

with this section without a formal amendment to this Agreement.

## 15.   RIGHTS IN WORK PRODUCT AND OTHER INFORMATION

A.   Work Product

Provider assigns to the State and its successors and assigns, the entire right, title, and interest in and to all causes of action, either in law or in equity, for past, present, or future infringement of intellectual property rights related to the Work Product and all works based on, derived from, or incorporating the Work Product. Whether or not Provider is under Agreement with the State at the time, Provider shall execute applications, assignments, and other documents, and shall render all other reasonable assistance requested by the State, to enable the State to secure patents, copyrights, licenses and other intellectual property rights related to the Work Product. To the extent that Work Product would fall under the definition of "works made for hire" under 17 U.S.C.S. §101, the Parties intend the Work Product to be a work made for hire.

i.   Copyrights

To the extent that the Work Product (or any portion of the Work Product) would not be considered works made for hire under applicable law, Provider hereby assigns to the State, the entire right, title, and interest in and to copyrights in all Work Product and all works based upon, derived from, or incorporating the Work Product; all copyright applications, registrations, extensions, or renewals relating to all Work Product and all works based upon, derived from, or incorporating the Work Product; and all moral rights or similar rights with respect to the Work Product throughout the world. To the extent that Provider cannot make any of the assignments required by this section, Provider hereby grants to the State a perpetual, irrevocable, royalty-free license to use, modify, copy, publish, display, perform, transfer, distribute, sell, and create derivative works of the Work Product and all works based upon, derived from, or incorporating the Work Product by all means and methods and in any format now known or invented in the future. The State may assign and license its rights under this license.

ii.   Patents

In addition, Provider grants to the State (and to recipients of Work Product distributed by or on behalf of the State) a perpetual, worldwide, no-charge, royalty-free, irrevocable patent license to make, have made, use, distribute, sell, offer for sale, import, transfer, and otherwise utilize, operate, modify and propagate the contents of the Work Product.  Such license applies only to those patent claims licensable by Provider that are necessarily infringed by the Work Product alone, or by the combination of the Work Product with anything else used by the State.

B.   Exclusive Property of the State

Except to the extent specifically provided elsewhere in this Agreement, any pre-existing State Records, State software, research, reports, studies, photographs, negatives or other documents, drawings, models, materials, data and information shall be the exclusive property of the State (collectively, "State Materials"). Provider shall not use, willingly allow, cause or permit Work Product or State Materials to be used for any purpose other than the performance of Provider's

DEFS_0003521

3.  App.666         **Exhibit 62
Page 45**

# STATE OF COLORADO - EXHIBIT B (For Intergovernmental Entities)

obligations in this Agreement without the prior written consent of the State.   Upon termination of this Agreement for any reason, Provider shall provide all Work Product and State Materials to the State in a form and manner as directed by the State.

C.   Exclusive Property of Provider

Provider retains the exclusive rights, title, and ownership to any and all pre-existing materials owned or licensed to Provider including, but not limited to, all pre-existing software, licensed products, associated source code, machine code, text images, audio and/or video, and third-party materials, delivered by Provider under the Agreement, whether incorporated in a Deliverable or necessary to use a Deliverable (collectively, "Provider Property"). Provider Property shall be licensed to the State as set forth in this Agreement or a State approved license agreement: **(i)** entered into as exhibits to this Agreement; **(ii)** obtained by the State from the applicable third-party vendor; or **(iii)** in the case of open source software, the license terms set forth in the applicable open source license agreement.

## 16.   STATEWIDE CONTRACT MANAGEMENT SYSTEM

If the maximum amount payable to Provider under this Agreement is $100,000 or greater, either on the Effective Date or at any time thereafter, this **§16** shall apply. Provider agrees to be governed by and comply with the provisions of §24-106-103, §24-102-206, §24-106-106, and §24-106-107, C.R.S. regarding the monitoring of vendor performance and the reporting of Agreement performance information in the State's Agreement management system ("Contract Management System" or "CMS"). Provider's performance shall be subject to evaluation and review in accordance with the terms and conditions of this Agreement, Colorado statutes governing CMS, and State Fiscal Rules and State Controller policies.

## 17.   GENERAL PROVISIONS

A.   Assignment
Provider's rights and obligations under this Agreement are personal and may not be transferred or assigned without the prior, written consent of the State. Any attempt at assignment or transfer without such consent shall be void. Any assignment or transfer of Provider's rights and obligations approved by the State shall be subject to the provisions of this Agreement.

B.   Subcontracts
Provider shall not enter into any subcontract in connection with its obligations under this Agreement without the prior, written approval of the State. Provider shall submit to the State a copy of each such subcontract upon request by the State. All subcontracts entered into by Provider in connection with this Agreement shall comply with all applicable federal and state laws and regulations, shall provide that they are governed by the laws of the State of Colorado, and shall be subject to all provisions of this Agreement.

C.   Binding Effect
Except as otherwise provided in **§17.A**, all provisions of this Agreement, including the benefits and burdens, shall extend to and be binding upon the Parties' respective successors and assigns.

DEFS_0003522

3.  App.667          **Exhibit 62 Page 46**

# STATE OF COLORADO - EXHIBIT B (For Intergovernmental Entities)

D. Authority
Each Party represents and warrants to the other that the execution and delivery of this Agreement and the performance of such Party's obligations have been duly authorized.

E. Captions and References
The captions and headings in this Agreement are for convenience of reference only, and shall not be used to interpret, define, or limit its provisions. All references in this Agreement to sections (whether spelled out or using the § symbol), subsections, exhibits or other attachments, are references to sections, subsections, exhibits or other attachments contained herein or incorporated as a part hereof, unless otherwise noted.

F. Counterparts
This Agreement may be executed in multiple, identical, original counterparts, each of which shall be deemed to be an original, but all of which, taken together, shall constitute one and the same agreement.

G. Entire Understanding
This Agreement represents the complete integration of all understandings between the Parties related to the Work, and all prior representations and understandings related to the Work, oral or written, are merged into this Agreement. Prior or contemporaneous additions, deletions, or other changes to this Agreement shall not have any force or effect whatsoever, unless embodied herein.

H. Digital Signatures
If any signatory signs this agreement using a digital signature in accordance with the "Colorado State Controller Contract, Grant and Purchase Order Policies" regarding the use of digital signatures issued under the State Fiscal Rules, then any agreement or consent to use digital signatures within the electronic system through which that signatory signed shall be incorporated into this Agreement by reference.

I. Modification
Except as otherwise provided in this Agreement, any modification to this Agreement shall only be effective if agreed to in a formal amendment to this Agreement, properly executed and approved in accordance with applicable Colorado State law and State Fiscal Rules.  Modifications permitted under this Agreement, other than Agreement amendments, shall conform to the policies issued by the Colorado State Controller.

J. Statutes, Regulations, Fiscal Rules, and Other Authority.
Any reference in this Agreement to a statute, regulation, State Fiscal Rule, fiscal policy or other authority shall be interpreted to refer to such authority then current, as may have been changed or amended since the Effective Date of this Agreement.

K. Severability
The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provision of this Agreement, which shall remain in full force and effect, provided that the Parties can continue to perform their obligations under this Agreement in accordance with the intent of this Agreement.

L. Survival of Certain Agreement Terms
Any provision of this Agreement that imposes an obligation on a Party after termination or expiration of the Agreement shall survive the termination or expiration of this Agreement and shall be enforceable by the other Party.

M. Taxes
The State is exempt from federal excise taxes under I.R.C. Chapter 32 (26 U.S.C.,

DEFS_0003523

3. App.668   **Exhibit 62
Page 47**

# STATE OF COLORADO - EXHIBIT B (For Intergovernmental Entities)

Subtitle D, Ch. 32) (Federal Excise Tax Exemption Certificate of Registry No. 84-730123K) and from State and local government sales and use taxes under §§39-26-704(1), *et seq.,* C.R.S. (Colorado Sales Tax Exemption Identification Number 98-02565). The State shall not be liable for the payment of any excise, sales, or use taxes, regardless of whether any political subdivision of the state imposes such taxes on Provider. Provider shall be solely responsible for any exemptions from the collection of excise, sales or use taxes that Provider may wish to have in place in connection with this Agreement.

N.  Third Party Beneficiaries

Except for the Parties' respective successors and assigns described in **§17.A**, this Agreement does not and is not intended to confer any rights or remedies upon any person or entity other than the Parties. Enforcement of this Agreement and all rights and obligations hereunder are reserved solely to the Parties. Any services or benefits which third parties receive as a result of this Agreement are incidental to this Agreement, and do not create any rights for such third parties.

O.  Waiver

A Party's failure or delay in exercising any right, power, or privilege under this Agreement, whether explicit or by lack of enforcement, shall not operate as a waiver, nor shall any single or partial exercise of any right, power, or privilege preclude any other or further exercise of such right, power, or privilege.

P.  CORA Disclosure

To the extent not prohibited by federal law, this Agreement and the performance measures and standards required under §24-106-107, C.R.S., if any, are subject to public release through the CORA.

Q.  Standard and Manner of Performance

Provider shall perform its obligations under this Agreement in accordance with the highest standards of care, skill and diligence in Provider's industry, trade, or profession.

R.  Licenses, Permits, and Other Authorizations.

Provider shall secure, prior to the Effective Date, and maintain at all times during the term of this Agreement, at its sole expense, all licenses, certifications, permits, and other authorizations required to perform its obligations under this Agreement, and shall ensure that all employees, agents and Subcontractors secure and maintain at all times during the term of their employment, agency or subcontract, all license, certifications, permits and other authorizations required to perform their obligations in relation to this Agreement.

S.  Indemnification

i.  General Indemnification

Provider shall indemnify, save, and hold harmless the State, its employees, agents and assignees (the "Indemnified Parties"), against any and all costs, expenses, claims, damages, liabilities, court awards and other amounts (including attorneys' fees and related costs) incurred by any of the Indemnified Parties in relation to any act or omission by Provider, or its employees, agents, Subcontractors, or assignees in connection with this Agreement.

ii.  Confidential Information Indemnification

Disclosure or use of State Confidential Information by Provider in violation of **§8** may be cause for legal action by third parties against Provider, the State, or their respective agents. Provider shall indemnify, save, and hold harmless the Indemnified Parties, against

**Exhibit B**                                                                                      **Page 19 of 22**

DEFS_0003524
**Exhibit 62
Page 48**

# STATE OF COLORADO - EXHIBIT B (For Intergovernmental Entities)

any and all claims, damages, liabilities, losses, costs, expenses (including attorneys' fees and costs) incurred by the State in relation to any act or omission by Provider, or its employees, agents, assigns, or Subcontractors in violation of **§8**.

iii.  Intellectual Property Indemnification
Provider shall indemnify, save, and hold harmless the Indemnified Parties, against any and all costs, expenses, claims, damages, liabilities, and other amounts (including attorneys' fees and costs) incurred by the Indemnified Parties in relation to any claim that any Work infringes a patent, copyright, trademark, trade secret, or any other intellectual property right.

iv.  Accessibility Indemnification
Provider shall indemnify, save, and hold harmless the Indemnified Parties, against any and all costs, expenses, claims, damages, liabilities, court awards and other amounts (including attorneys' fees and related costs) incurred by any of the Indemnified Parties in relation to Provider's failure to comply with §§24-85-101, et seq., C.R.S., or the Accessibility Standards for Individuals with a Disability as established by OIT pursuant to Section §24-85-103 (2.5), C.R.S.

T.  Accessibility

i.  Provider shall comply with and the Work Product provided under this Agreement shall be in compliance with all applicable provisions of §§24-85-101, et seq., C.R.S., and the Accessibility Standards for Individuals with a Disability, as established by OIT pursuant to Section §24-85-103 (2.5), C.R.S. Provider shall also comply with all State of Colorado technology standards related to technology accessibility and with Level AA of the most current version of the Web Content Accessibility Guidelines (WCAG), incorporated in the State of Colorado technology standards.

ii.  The State may require Provider's compliance to the State's Accessibility Standards to be determined by a third party selected by the State to attest to Provider's Work Product and software is in compliance with §§24-85-101, et seq., C.R.S., and the Accessibility Standards for Individuals with a Disability as established by OIT pursuant to Section §24-85-103 (2.5), C.R.S.

## 18.  COLORADO SPECIAL PROVISIONS (COLORADO FISCAL RULE 3-3)

These Special Provisions apply to all contracts except where noted in italics. For this section "contract' or "Contract" shall mean "Agreement."

### A.  STATUTORY APPROVAL. §24-30-202(1), C.R.S.

This Agreement shall not be valid until it has been approved by the Colorado State Controller or designee.  If this Agreement is for a Major Information Technology Project, as defined in §24-37.5-102(2.6), C.R.S.; then this Agreement shall not be valid until it has been approved by the State's Chief Information Officer or designee.

### B.  FUND AVAILABILITY. §24-30-202(5.5), C.R.S.

Financial obligations of the State payable after the current State Fiscal Year are contingent upon

DEFS_0003525

3.  App.670            **Exhibit 62
Page 49**

# STATE OF COLORADO - EXHIBIT B (For Intergovernmental Entities)

funds for that purpose being appropriated, budgeted, and otherwise made available.

### C. GOVERNMENTAL IMMUNITY.

Liability for claims for injuries to persons or property arising from the negligence of the State, its departments, boards, commissions committees, bureaus, offices, employees and officials shall be controlled and limited by the provisions of the Colorado Governmental Immunity Act, §24-10-101, et seq., C.R.S.; the Federal Tort Claims Act, 28 U.S.C. Pt. VI, Ch. 171 and 28 U.S.C. 1346(b), and the State's risk management statutes, §§24-30-1501, et seq. C.R.S.  No term or condition of this Agreement shall be construed or interpreted as a waiver, express or implied, of any of the immunities, rights, benefits, protections, or other provisions, contained in these statutes.

### D. INDEPENDENT CONTRACTOR.

Provider shall perform its duties hereunder as an Independent Contractor and not as an employee. Neither Provider nor any agent or employee of Provider shall be deemed to be an agent or employee of the State. Provider shall not have authorization, express or implied, to bind the State to any agreement, liability or understanding, except as expressly set forth herein. Provider and its employees and agents are not entitled to unemployment insurance or workers compensation benefits through the State and the State shall not pay for or otherwise provide such coverage for Provider or any of its agents or employees. Provider shall pay when due all applicable employment taxes and income taxes and local head taxes incurred pursuant to this Agreement. Provider shall (i) provide and keep in force workers' compensation and unemployment compensation insurance in the amounts required by law, (ii) provide proof thereof when requested by the State, and (iii) be solely responsible for its acts and those of its employees and agents.

### E. COMPLIANCE WITH LAW.

Provider shall comply with all applicable federal and State laws, rules, and regulations in effect or hereafter established, including, without limitation, laws applicable to discrimination and unfair employment practices.

### F. CHOICE OF LAW, JURISDICTION, AND VENUE.

Colorado law, and rules and regulations issued pursuant thereto, shall be applied in the interpretation, execution, and enforcement of this Agreement. Any provision included or incorporated herein by reference which conflicts with said laws, rules, and regulations shall be null and void. All suits or actions related to this Agreement shall be filed and proceedings held in the State of Colorado and exclusive venue shall be in the City and County of Denver.

### G. PROHIBITED TERMS.

Any term included in this Agreement that requires the State to indemnify or hold Provider harmless; requires the State to agree to binding arbitration; limits Provider's liability for damages resulting from death, bodily injury, or damage to tangible property; or that conflicts with this

**Exhibit B**                                                          **Page 21 of 22**

DEFS_0003526
**Exhibit 62
Page 50**

# STATE OF COLORADO - EXHIBIT B (For Intergovernmental Entities)

provision in any way shall be void ab initio.  Nothing in this Agreement shall be construed as a waiver of any provision of §24-106-109 C.R.S.

**H.    SOFTWARE PIRACY PROHIBITION.**

State or other public funds payable under this Agreement shall not be used for the acquisition, operation, or maintenance of computer software in violation of federal copyright laws or applicable licensing restrictions. Provider hereby certifies and warrants that, during the term of this Agreement and any extensions, Provider has and shall maintain in place appropriate systems and controls to prevent such improper use of public funds. If the State determines that Provider is in violation of this provision, the State may exercise any remedy available at law or in equity or under this Agreement, including, without limitation, immediate termination of this Agreement and any remedy consistent with federal copyright laws or applicable licensing restrictions.

**I.    EMPLOYEE FINANCIAL INTEREST/CONFLICT OF INTEREST. §§24-18-201 and 24-50-507, C.R.S.**

The signatories aver that to their knowledge, no employee of the State has any personal or beneficial interest whatsoever in the service or property described in this Agreement. Provider has no interest and shall not acquire any interest, direct or indirect, that would conflict in any manner or degree with the performance of Provider's services and Provider shall not employ any person having such known interests.

DEFS_0003527

3.  App.672        **Exhibit 62
Page 51**

# STATE OF COLORADO - EXHIBIT C PII Certification

### EXHIBIT C-PII CERTIFICATION

### STATE OF COLORADO

**Third Party <u>INDIVIDUAL</u> Certification for Access TO PII through a Database or Automated Network**

Pursuant to § 24-74-105, C.R.S., I hereby certify under the penalty of perjury that I have not and will not use or disclose any Personal Identifying Information, as defined by § 24-74-102(1), C.R.S., for the purpose of investigating for, participating in, cooperating with, or assisting Federal Immigration Enforcement, including the enforcement of civil immigration laws, and the Illegal Immigration and Immigrant Responsibility Act, which is codified at 8 U.S.C. §§ 1325 and 1326, unless required to do so to comply with Federal or State law, or to comply with a court-issued subpoena, warrant or order.

Signature: _____

Printed Name: _____

Date: _____

**Exhibit C**                                                                 **Page 1 of 2**

DEFS_0003528

**Exhibit 62
Page 52**

# STATE OF COLORADO - EXHIBIT C PII Certification

## EXHIBIT C-PII CERTIFICATION

### STATE OF COLORADO

**Third Party <u>ENTITY / ORGANIZATION</u> Certification for Access TO PII through a Database or Automated Network**

Pursuant to § 24-74-105, C.R.S., I, _____, on behalf of _____ (legal name of entity / organization) (the "Organization"), hereby certify under the penalty of perjury that the Organization has not and will not use or disclose any Personal Identifying Information, as defined by § 24-74-102(1), C.R.S., for the purpose of investigating for, participating in, cooperating with, or assisting Federal Immigration Enforcement, including the enforcement of civil immigration laws, and the Illegal Immigration and Immigrant Responsibility Act, which is codified at 8 U.S.C. §§ 1325 and 1326, unless required to do so to comply with Federal or State law, or to comply with a court-issued subpoena, warrant or order.

I hereby represent and certify that I have full legal authority to execute this certification on behalf of the Organization.


Signature: _____

Printed Name: _____

Title: _____

Date: _____


**Exhibit C**                                                                 **Page 2 of 2**

DEFS_0003529

**Exhibit 62
Page 53**

# EXHIBIT 63



**CDEC Approved Decline Process**

The following information outlines the Colorado Department of Early Childhood's (CDEC) Approved Decline process for Universal Preschool (UPK) Colorado.

Providers may only decline a match for reasons that the providers attested to in the UPK Registration and Seats Verification Form, within the UPK application system. We recognize that certain providers may have specific requirements of families in order to participate in their program that are not outlined in the UPK Registration and Seats Verification Form.

UPK Colorado providers may submit a request for a CDEC Approved Exception if the decline reasons listed in the UPK Registration and Seats Verification Form do not provide the flexibility needed for a provider to meet their organizational requirements, or other unique situations.

Providers must submit the Approved Exception Criteria form to be considered for a CDEC Approved Exception.

CDEC will approve the following types of exceptions:

- Location only serves a specific subgroup of the population. (e.g. teen moms, refugees)
- Employer-based program that only serves employees.
- Family is matched with a provider who has failed to previously comply with provider's policies and procedures (e.g. failure to pay tuition, failure to comply with behavioral policies, etc.)

CDEC will deny the following types of exceptions:

- Exception submitted that has already been built into the program. (e.g. maintaining proper ratios of children with and without special needs)
- Exception was not the intent of the program. (e.g. wanting to honor a private waitlist, child not yet potty trained, tour of school, preference for Montessori model)
- Exception to *prioritize* continuity of care, siblings, or children of employees.
  - Priority points are already available to support these preferences

If you have any questions, please contact your Local Coordinating Organization (LCO). After reviewing your request, an email will be sent to the providers from CDEC to inform them of the decision to approve or deny the request. Please allow 5 business days for your response to be reviewed. Thank you for your involvement in the UPK process as we greatly increase the health, prosperity and opportunities of children throughout our state.

DEFS_0003405

**Exhibit 63
Page 1**

# EXHIBIT 65

**TIMOTHY DEROCHER - April 10, 2024**

```
          THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF COLORADO

Civil Action No:  1:23-cv-1557
_____

Plaintiff:

DARREN PATTERSON CHRISTIAN ACADEMY,

v.

Defendant:

LISA ROY, et al.
_____


     VIDEOTAPED DEPOSITION OF TIMOTHY DEROCHER

_____

          PURSUANT TO NOTICE, the above-titled

videotaped deposition was taken on behalf of the Plaintiffs,

on April 10, 2024, at 8:35 a.m., at the Colorado Department

of Early Childhood, 710 S. Ash Street, Building C, Denver,

Colorado 80246, before Sandra Schramm, Registered

Professional Reporter, Certified Realtime Reporter, and

Notary Public.
```

**TIMOTHY DEROCHER - April 10, 2024**

```
 1  APPEARANCES:

 2  Attorneys for Plaintiff:

 3  JEREMIAH GALUS, ESQ.
    BRYAN NEIHART, ESQ.
 4     ALLIANCE DEFENDING FREEDOM
       15100 N. 90th Street
 5     Scottsdale, Arizona 85260
       Telephone:  480-444-0020
 6     E-mail:  Jgalus@ADFlegal.org

 7  Attorneys For Defendant:

 8  JAMES GREGORY WHITEHAIR, ESQ.
    MICHELE MULHAUSEN, ESQ.
 9  JANNA FISCHER, ESQ.
    VIRGINIA CARRENO, ESQ.
10     COLORADO ATTORNEY GENERAL'S OFFICE
       1300 Broadway, 6th Floor
11     Denver, CO 80203
       Telephone:  720-508-6000
12     E-mail:  Greg.whitehair@coag.gov

13
    Also Present: Walter Mathern, Videographer
14                Bonnie Smith
                  Dawn Odean
15

16

17

18

19

20

21

22

23

24

25
```

TIMOTHY DEROCHER - April 10, 2024

```
 1                    EXAMINATION INDEX

 2                                            PAGE

 3  By Mr. Galus                               5

 4                     EXHIBIT INDEX

 5                                          INITIAL
    FOR IDENTIFICATION                      REFERENCE
 6

 7  14 - Plaintiff's Amended Notice of          8
         Rule 30(b)(6) Deposition
 8
    15 - Westlaw Printout of Colorado Revised  15
 9       Statutes Section 26.5-4-205

10  16 - Colorado Universal Preschool Program  18
         Fact Sheet
11
    17 - Standard Operating Procedure for      30
12       UPK Program Service Agreement,
         Investigations, Disputes, and Enforcement
13
    18 - E-mail string referring to Adams      58
14       County Head Start

15  19 - Agreement Addendum #1                 60

16  PREVIOUSLY MARKED EXHIBITS

17  6 - UPK Provider Service Agreement for     43
        the '23-'24 school year
18

19

20

21

22

23

24

25
```

TIMOTHY DEROCHER - April 10, 2024

```
1              P R O C E E D I N G S

2              *     *     *     *     *

3              THE VIDEOGRAPHER:  Good morning.  We are on the

4    record.  The time now is 8:35 a.m.  Today is April 10th,

5    2024.  We're located at 710 South Ash Street, Denver,

6    Colorado.

7              We're here for the videotaped deposition of

8    Colorado Department of Early Childhood's 30(b)(6)

9    representative, Tim Derocher, in the matter of Darren

10   Patterson Christian Academy v. Lisa Roy, et al., filed in the

11   United States District Court for the District of Colorado.

12   Civil Action No. 1:23-CV-1557.

13             The videographer is Walt Mathern, the court

14   reporter is Sandy Schramm.

15             Will counsel please state their appearances

16   beginning with the plaintiff's counsel.

17             MR. GALUS:  Jeremiah Galus for plaintiff.

18             MR. NEIHART:  Brian Neihart for plaintiff.

19             MR. WHITEHAIR:  Good morning.  Greg Whitehair on

20   behalf of the defendants.

21             MS. MULHAUSEN:  Michelle Mulhausen on behalf of the

22   defendants.

23             MS. FISCHER:  Janna Fischer on behalf of the

24   defendants.

25             MS. CARRENO:  Virginia Correno on behalf of the
```

**TIMOTHY DEROCHER - April 10, 2024**

1  defendants.

2                         TIMOTHY DEROCHER,

3  having been first duly sworn to state the whole truth,

4  testified as follows:

5                         EXAMINATION

6  BY MR. GALUS:

7      Q    Mr. Derocher, my name is Jeremiah Galus, and as you

8  heard, I represent the plaintiff Darren Patterson Christian

9  Academy in this case.

10              If you wouldn't mind just stating and spelling

11  your name for the record.

12     A    Sure.  My full name is Timothy Derocher.  And

13  Derocher is spelled D-e-r-o-c-h-e-r.

14     Q    Okay.  And have you been deposed before?

15     A    No.

16     Q    Have you testified in court before?

17     A    No.

18     Q    All right.  Do you understand you are under the

19  same oath today as if you were testifying in a court of law?

20     A    Yes.

21     Q    Is there anything today that would prevent you from

22  thinking clearly or testifying truthfully?

23     A    No.

24     Q    There's a few differences between a deposition and

25  just a typical conversation you should be aware of.  The

**TIMOTHY DEROCHER - April 10, 2024**

1  first is that obviously we have a court reporter here who is

2  trying to transcribe everything we say, so it's important

3  that we do our best not to interrupt each other or talk over

4  one another; do you understand that?

5      A    Yep.

6      Q    The second is that because the court reporter is

7  trying to transcribe, it's important that we refrain from

8  head nods, or shaking heads, or other gestures that the court

9  reporter wouldn't be able to transcribe.  So we want clear

10  verbal answers; does that make sense?

11      A    Yep.

12      Q    All right.  And of course we can take a break at

13  any time, you just let me know.  The only thing I would ask

14  is that if we're in the middle of a question or line of

15  questions, that we finish those before taking a break; does

16  that sound fair?

17      A    Yes.

18      Q    Mr. Derocher, what did you do to prepare for

19  today's deposition?

20      A    So I met with counsel, our counsel, a couple of

21  times, I reviewed some of the files that were sent over in

22  discovery, and I took a couple notes for myself on a notepad

23  that I read a couple of times.  And that's probably the

24  whole -- yeah.

25      Q    Okay.  And do you have those notes with you here

**TIMOTHY DEROCHER - April 10, 2024**

1  today?

2  　　　A　　No.

3  　　　Q　　Is there anyone that you spoke to besides legal

4  counsel?

5  　　　A　　Just the other, you know, Dawn Odean as well

6  because she was part of our preparation, as well as Dr. Roy

7  and anyone else that I would be forgetting from CDEC that was

8  on those meetings, but I don't think there's anyone else.

9  　　　Q　　Okay.  And what did you talk about?

10 　　　A　　We just talked about, you know, how the deposition

11 works, some of the questions that could come up, looking at

12 the specific topics that I'm in charge of, yeah, and just how

13 to respond.

14 　　　Q　　Are there any specific questions that you discussed

15 that come to mind?

16 　　　A　　Not in particular, no.

17 　　　Q　　None?

18 　　　A　　I guess I'm not understanding your question then.

19 　　　Q　　What questions did you discuss with Ms. Odean and

20 Ms. Roy?

21 　　　A　　Oh, I didn't discuss with them specifically, they

22 were just part of the conversation that we were having with

23 our counsel.

24 　　　Q　　Okay.  Counsel was in the room?

25 　　　A　　Yes.

**TIMOTHY DEROCHER - April 10, 2024**

1      Q    Okay.

2      A    Yes.  I did not have a separate conversation with

3  Dr. Roy and Ms. Odean on this.

4      Q    Okay.  Just to be clear, at any point I'm not

5  asking you to disclose any conversations that you would have

6  had with counsel.

7      A    Yes.

8      Q    Okay.

9           MR. GALUS:  Sandy, if you could mark this, we're

10  actually going to start at Exhibit 14, we have a running

11  exhibit numbers here.

12           (Whereupon, Exhibit No. 14 was marked for

13  identification.)

14      Q    (By Mr. Galus) Mr. Derocher, I'm going to hand you

15  what's been marked as Exhibit 14.

16           MR. WHITEHAIR:  Counsel, could I ask a question?

17  You're starting on 14?

18           MR. GALUS:  Yes.

19           MR. WHITEHAIR:  Tell me about that.

20           MR. GALUS:  So we have a running exhibit list per

21  Judge Dominico's --

22           MR. WHITEHAIR:  Yes.

23           MR. GALUS:  -- rules.  And so plaintiff's exhibit,

24  we're up to 13 from --

25           MR. WHITEHAIR:  From the hearing?

**TIMOTHY DEROCHER - April 10, 2024**

1          MR. GALUS:  From the hearing.

2          MR. WHITEHAIR:  Oh, I wasn't involved then.

3          MR. GALUS:  Yes.

4          MR. WHITEHAIR:  Okay.  Thank you.

5     Q    (By Mr. Galus) Mr. Derocher, have you seen

6   Exhibit 14 before?

7     A    I think so.  I've looked at, I mean, a bunch of

8   these.  I believe I know which document this is.

9     Q    So it's Plaintiff's --

10    A    It's the list, yes.

11    Q    -- Amended Notice of Deposition?

12    A    Yep.

13    Q    And you've been designated to cover topics 1

14  through 6, 11 through 14 and 22; does that sound right?

15    A    That sounds right.  Yes, that sounds right.  Yep.

16    Q    Okay.  And you're knowledgeable about those topics?

17    A    Yes.

18    Q    And prepared to testify about them today?

19    A    Yes.

20    Q    Could you describe your current position at the

21  Department?

22    A    Sure.  So I started with the Department in

23  September of '22.  I did not have the position that I have

24  now then.  I was simply -- I think I was policy and

25  legislative manager, something like that.  And so that's how

**TIMOTHY DEROCHER - April 10, 2024**

1  I started at CDEC.

2                    And then sometime around the winter to spring

3  of '23, I took on more legal responsibilities for the

4  Department and my title was changed to policy legislative and

5  legal advisor, so my portfolio includes all of those

6  different things.

7                    I sit on our policy and legislative unit and

8  so I help with legislative items such as our bills that we

9  put forward, helping sponsors of various bills, put together

10  technical language, and just tracking legislature generally.

11                    From a policy perspective I just help with

12  brainstorming and researching what other, you know, states

13  and areas are doing with all sorts of different areas.

14                    And with legal work, I'm more kind of first

15  stop, you know, I'm not counsel for CDEC, but rather our

16  internal in-house first stop for legal.

17                    I also help administer our CORA, our Colorado

18  Open Records Act requests, our administrative appeals, as

19  well as helping administer our litigation holds.

20       Q    And that applies to the Universal Preschool Program

21  as well, this is all divisions of the Department?

22       A    Right.  So my work is over all of the different

23  divisions.  And so we have our Division of Community and

24  Family Services, we have our licensing division, we have our

25  workforce, as well as our early learning and access to

**TIMOTHY DEROCHER - April 10, 2024**

1  DELLA-Q, CCAP and then Universal Preschool, yes.

2      MR. WHITEHAIR:  Make sure he finishes his question.

3      THE DEPONENT:  I'm sorry.

4      MR. WHITEHAIR:  We're good.

5  Q    (By Mr. Galus) Who do you report to?

6  A    I report directly to Grace Eckel who is the policy

7  and legislative unit manager.  And then above that would be

8  Stephanie Beasley, who is the director of the Office of

9  Administrative Solutions.

10 Q    Okay.  And does Ms. Beasley ultimately report to

11 the executive director Lisa Roy?

12 A    Yes.

13 Q    And you have a law degree or J.D degree?

14 A    Yes.

15 Q    All right.  You talked a little bit about this, but

16 if you could maybe provide some more detail as to the general

17 structure and the organization and operations of the

18 Department of Early Childhood?

19 A    Sure.  So the Department of Early Childhood was the

20 Office of Early Childhood under the Department of Human

21 Services, CDHS, and we have essentially those multiple

22 different program divisions.  So we have our Universal

23 Preschool Program, and if I say preschool program, that's

24 what I'm referring to.  So we have that division, and that's

25 all there over.

**TIMOTHY DEROCHER - April 10, 2024**

1          We have our early learning access and quality,

2 which does our Colorado Childcare Assistance Program, CCAP,

3 which is our CCDF childcare program.  And that division also

4 does quality so, you know, ratings and working with our early

5 childhood counsels, ECCs.

6          And then there's our, as I said, DCFS,

7 Division of Community Family Services.  They do home-visiting

8 programs, early intervention, early childhood mental health,

9 more of those programs that, you know, they often have some

10 overlap with more of the child welfare space.

11          And then we our Division of Early Childhood

12 Workforce, which is just all workforce across all of these

13 different areas whether it's preschool program, EI, early

14 invention, the CCAP program, but they are supporting our

15 workforce across all of these first through six areas.  And

16 they run our registries for the workforce.

17          And then -- which one did I forget?  I did

18 workforce.  Oh, licensing, of course.  DELLA, they are in

19 charge of licensing all licensed childcare facilities.  So

20 centers, preschools, family childcare homes, qualified exempt

21 providers for CCAP, all of them.

22          So we've got all of our different program

23 areas and then the Office of Administrative Solutions is kind

24 of our centralized support staff.  It has our fiscal, policy,

25 legal, accounting, audit.  And then also our PACT, which is

**TIMOTHY DEROCHER - April 10, 2024**

1  our partnerships and collaboration team and so they work with

2  our various stakeholders.  We have a lot of boards and

3  commissions that we work with.

4          So that Office of Administrative Solutions is

5  again kind of our centralized staff that supports all the

6  different program areas.

7          And then we have, you know, more of the

8  leadership with Dr. Roy as executive director, Stephanie as

9  deputy, our COMS team and chief public information officer,

10  and HR as well.  I think was the only one I forgot.

11     Q   Okay.  Thank you.  You mentioned that the

12  Department's responsible for licensing of childcare centers?

13     A   Yes.

14     Q   And that includes preschools?

15     A   Correct.  So preschools are one kind.  It's kind of

16  a type of license.  It's a subcategory, I think is the best

17  way to put it.  We have childcare centers, and a childcare

18  center can be a preschool if it serves a certain age range,

19  preschool.  So that's kind of how that works.

20          You could have a childcare center that is

21  multiple different designations.  So it could be a small

22  childcare center and also a preschool, but yes, so a

23  preschool is that kind of that sub category of the licenses

24  we issue.

25     Q   Okay.  Is the Department -- let me ask it this way.

**TIMOTHY DEROCHER - April 10, 2024**

1          Does the Department regulate and license all

2  preschools or just some preschools?

3     A     If a preschool has to be licensed in the state, we

4  license them.   If we're going by the strict definition of

5  what is a preschool in licensing regulation, then yes, we

6  license all of them.

7          The only thing I would not be including would

8  be entities that are exempt from licensing per the statute,

9  but those are typically family childcare homes, they're not

10  preschools.

11     Q     So there's some preschools that would be exempt

12  from the licensing requirements?

13     A     No.   No.   Again, it's that the preschool -- the

14  preschool designation is exclusively within childcare centers

15  and those all have to be licensed.

16     Q     Okay.   So there's certain -- if it's designated a

17  preschool, it's licensed by the Department?

18     A     Yes.

19     Q     So setting aside kind of the technical/legal

20  definition of preschools, are there any preschools that would

21  not be subject to the licensing requirements?

22     A     It depends how you're defining preschool in that

23  context.

24     Q     What I'm thinking about, I recall there's like

25  religious preschools or religious instruction that may be

**TIMOTHY DEROCHER - April 10, 2024**

1   exempt; are you familiar with that?

2       A    I'm not sure what you're talking about now.

3       Q    Okay.  You said the Department is also responsible

4   for developing and administering the Colorado Universal

5   Preschool program?

6       A    Yes.

7       Q    And that includes creating and enforcing program

8   rules and requirements?

9       A    Yes.

10          MR. GALUS:  Mark that as Exhibit 15, please.

11          (Whereupon, Exhibit No. 15 was marked for

12   identification.)

13      Q    (By Mr. Galus) So what's in front of you there is

14   marked Exhibit 15 is a Westlaw printout of Colorado Revised

15   Statutes Section 26.5-4-205; is that accurate?

16      A    Yes.

17      Q    Okay.  Are you familiar with this statute?

18      A    Yes.

19      Q    All right.  Section 1(a) says that the Department

20   shall develop, and the executive director shall establish by

21   rule, the quality standards that each preschool provider must

22   meet to receive funding through the Colorado Universal

23   Preschool Program.

24          The Department recently established a quality

25   standards by rule; is that right?

**TIMOTHY DEROCHER - April 10, 2024**

1    A    It was recently adopted.  The effective date hasn't

2  passed, yet but, yes.

3    Q    Okay.  It was adopted March 28th, 2024?

4    A    That sounds correct.

5    Q    Okay.  And it becomes effective July 1, 2024?

6    A    I would have to double-check the exact -- I just

7  don't want to get the exact wrong date.

8    Q    Sure.  Does it sound wrong or --

9    A    Again it sounds about right, but I would have to

10  double-check with the exact date, yeah.

11    Q    Okay.  But they weren't established in time for the

12  current 2023, 2024 school year?

13    A    Year one of the preschool program?

14    Q    Yes.

15    A    Correct.  Right.  Those rules were not passed in

16  time for that school year.

17    Q    So they're going to go into effect for the upcoming

18  '24, '25 school year?

19    A    Yes.

20    Q    Did the Department impose any quality standards on

21  UPK providers for the current '23-'24 school year?

22    A    So what was done for year one, '23-'24, was all

23  done via the '23-'24 provider agreement, the contract that

24  providers signed.  And there was a provision in that contract

25  which referred to some of these statutory requirements.

**TIMOTHY DEROCHER - April 10, 2024**

1    Q    The quality standards?

2    A    Yes.

3    Q    Would all of the quality standards that applied for

4  the '23-'24 school year be found in the program services

5  agreement for that year?

6    A    You're asking that all of the quality standard

7  requirements for '23-'24 were in the provider agreement just

8  for that year?

9    Q    Yes.

10    A    Yes.

11    Q    And that included the equal opportunity or

12  non-discrimination provision that this case has been about?

13    A    Yeah.  As long as we're referring to the language

14  from, I believe it's 2(b), yes.

15    Q    Those quality standards that were in the 23, '24,

16  agreement, they weren't established by rule?

17    A    No.

18    Q    How were they established then?

19    A    They were portions -- so as you can see from the

20  way 4205 is set up, there are components of this,

21  particularly under subsection 2, where certain of the

22  legislatively mandated components are clear black and white,

23  for lack of a better term, strict do this or don't do this

24  requirements.  Meanwhile, a number of them were left up to

25  the discretion of the Department.

**TIMOTHY DEROCHER - April 10, 2024**

1        For example, one is around screening services

2   as well as teacher qualifications, professional development.

3        And so some of these were incorporated -- or

4   205 generally was incorporated into the '23-'24 agreement in

5   order to have them be applicable for providers who sign that

6   agreement.  Yeah.

7        Q    But it wasn't done by any rule making?

8        A    No.

9        Q    And the statute says that this quality standard

10   shall be established by rule; is that right?

11       A    Correct.

12            MR. GALUS:  If you can mark that as Exhibit 16.

13            (Whereupon, Exhibit No. 16 was marked for

14   identification.)

15       Q    (By Mr. Galus) What's been placed in front of you

16   is Exhibit 16 is a fact sheet that was published by the

17   Department; does that look right?

18       A    I believe so, yes.

19       Q    Okay.  Are you familiar with this document?

20       A    Generally.  I did not write it.

21       Q    But you've seen it before?

22       A    Yes.

23       Q    Okay.  Do you know when the Department published

24   this document?

25       A    I don't have the exact time frame.  I'd be able to

**TIMOTHY DEROCHER - April 10, 2024**

1  get that, but I don't have that off the top of my head.

2      Q    Do you have a general time frame?

3      A    It was definitely a little while ago because this

4  was for the '23-'24 school year.  But yeah, I would have to

5  -- I don't, you know, remember exactly, or I don't have

6  exactly when it came out.

7      Q    It would have been before the '23-'24 school year

8  began?

9      A    Before or at or towards the very beginning of it.

10      Q    The beginning of the school year?

11      A    Yes.

12      Q    Okay.  If I could direct your attention to the

13  section that says UPK is a mixed delivery system; do you see

14  that?

15      A    Uh-huh.

16      Q    Okay.  And then the last bullet point in that

17  section reads, Licensed faith-based preschools can

18  participate in UPK with the condition that approved curricula

19  will be utilized and State funds cannot be applied during

20  hours of religious programming.

21          Did the Department have statutory authority

22  for including this as a condition of participation?

23          MR. WHITEHAIR:  Object to the extent it calls for a

24  legal conclusion.  You can respond.

25          THE DEPONENT:  Could you ask that question again?

**TIMOTHY DEROCHER - April 10, 2024**

1      MR. GALUS:  Would you be able to read that question

2   back.

3      THE COURT REPORTER:  (Reading the last question

4   back.) Did the Department have statutory authority for

5   including this as a condition of participation?

6      MR. WHITEHAIR:  Same objection.

7      THE DEPONENT:  I'm struggling a little bit with the

8   compound nature.  I think there's two questions in there.

9      I think purely hypothetically that if the

10  Department had wanted to make this a condition, if we had

11  wanted to make, you know, this a condition to participation,

12  I think it's plausible that we -- that it would be in our

13  realm, but again, that's presuming a few different things.

14  Q   (By Mr. Galus) Well, it's in writing on the

15  document that the Department published.  It says, With the

16  condition that approved curricula will be utilized and State

17  funds cannot be applied during hours of religious

18  programming.

19      So my question is, what basis did the

20  Department have for including this in this document?

21      MR. WHITEHAIR:  Same objection.

22  Q   (By Mr. Galus) Are you aware of any statute?

23  A   Yes, I am aware of multiple statutes that authorize

24  the Department to have authority over enrollment as well as

25  the mechanics and operations of the Universal Preschool

**TIMOTHY DEROCHER - April 10, 2024**

1  Program.  Those could be found in multiple places, in 26.5,

2  Title 26.5 in C.R.S., there's a statutory provision in our

3  general chapter 1, 26.5-1 that speaks to authorizing

4  enrollment, and then there's multiple within 26.5- 2-201

5  through 211, which speak to the Department's authority

6  overall in administering the Universal Preschool Program.

7      Q    So the Department was able to include that pursuant

8  to its general authority?

9          MR. WHITEHAIR:  Same objection.

10          THE DEPONENT:  I'm not quite sure what you mean by

11  include that.  Include in what?  Just this paper or --

12      Q    (By Mr. Galus) Yes.

13      A    -- something else?

14      Q    This statement in the fact sheet the Department

15  published.

16      A    Yes.

17      Q    Are you aware of any statute that would require

18  this as a condition to participation?

19      A    No.  No.

20      Q    Any regulation that would require it?

21      A    No.

22      Q    All right.  Is this statement accurate?

23      A    No.

24      Q    So it was not a condition?

25      A    Correct.

**TIMOTHY DEROCHER - April 10, 2024**

1    Q    Did the Department ever publish any written

2  document or written guidance clarifying that this statement

3  was inaccurate?

4    A    We have via the quality standards.

5    Q    That were just published in March 28, 2024?

6    A    Yes.

7    Q    And that would be by omission, the fact that the

8  religious instruction requirement is not in the enacted rules

9  and regulations?

10    A    In that instance, yes.  There have also been

11  multiple occasions where as the Department was working

12  through the quality standards and was having various drafts

13  that we were working on, our -- and I believe that these are

14  in, you know, from discovery e-mails as well that can be

15  referenced, but we did make it clear in correspondence with a

16  couple of different members of the media as well as

17  interested stakeholder groups that no, that there was not a

18  statutory or regulatory authority to limit -- to limit

19  preschool provider conduct the way that this bullet would

20  seem to indicate.

21         So it was by omission with the quality

22  standards, but there was also outreach done by the Department

23  as well.

24    Q    But no public-facing document or guidance?

25    A    Directly refuting this by itself, no.

**TIMOTHY DEROCHER - April 10, 2024**

1    Q    As the Department was going through the proposed

2    rule-making process, it did propose a rule that would have

3    prohibited faith-based providers for using funds to pay for

4    religious instruction, worship or proselytization and would

5    have required them to ensure that those activities remain

6    separate from the preschool program-funded services.  Does

7    that sound accurate?

8         MR. WHITEHAIR:  Object to the form.

9         THE DEPONENT:  I would not use the word "propose."

10   It was included in an internal draft at one point, yes.

11   Q    (By Mr. Galus) Okay.  What's the distinction you're

12   making between proposed -- why do you not want to use the

13   word "proposed"?

14   A    One is an official position of the Department; the

15   other was just language that was on a draft that was never

16   ratified or approved or put into effect.

17   Q    Who would have put the language into the draft?

18   A    For the quality standards?

19   Q    Specifically relating to this religious instruction

20   requirement.

21   A    The provision within the quality standards related

22   to the -- right, not this document, but the quality standards

23   or --

24   Q    Well, I use the word "proposed rules," you've

25   resisted the word proposed, but I think we know what we're

**TIMOTHY DEROCHER - April 10, 2024**

1 | talking about.

2 |          So the proposed regulations that reference

3 | religious instruction, worship, proselytization, how did that

4 | get into those earlier documents that were not finalized?

5 |          MR. WHITEHAIR:  Object to the form.

6 |          THE DEPONENT:  Yes.  I was actually the one who put

7 | together the quality standards and so I am intimately

8 | familiar with all the different drafts and versions of them.

9 |          But the reason that that provision ended up in a

10 | draft was because it was part of a survey of existing program

11 | quality standards, and that type of provision is actually

12 | fairly common and fairly standard and it was -- and to give

13 | specific examples, the Denver preschool program, there's a

14 | section of the Colorado Constitution, various federal grant

15 | programs have that kind of language in it, and so it was not

16 | originally put in for any specific intent other than we were

17 | putting together, you know, typical what looks like more

18 | boilerplate language into the quality standards based on

19 | similar kind of programs.

20 |          And then after further review, stakeholder

21 | discussions and discussions with our counsel, we just

22 | ultimately decided to remove it and didn't think it was

23 | appropriate.

24 |     Q    (By Mr. Galus) Okay.  Why did you decide to remove

25 | it and didn't think it was appropriate?

**TIMOTHY DEROCHER - April 10, 2024**

```
 1            MR. WHITEHAIR:  Objection.  Caution whether your

 2   response is based on advice of counsel.

 3            THE DEPONENT:  We had a few different angles, as we

 4   do with everything, one being discussions with counsel,

 5   another being stakeholder discussions.

 6            We very, very, very clearly, through statute, have

 7   a mandate to enact a mixed delivery system.  And that means

 8   creating a system that is as inclusive as far reaching as

 9   open to as many different providers as we can.

10            And part of that is creating a space where

11   faith-based and religious-based providers feel comfortable

12   participating.

13            And so anything we could do to be more inclusive

14   and to make them feel more comfortable, that was part of the

15   discussion.  And then yeah, also items that that we discussed

16   with counsel.

17       Q    (By Mr. Galus) So it wasn't included in the final

18   rules and regulations?

19       A    Correct.

20       Q    So faith-based provider that is participating in

21   the UPK program can teach students about its religious

22   beliefs even during time that's being funded by the Universal

23   Preschool Program?

24            MR. WHITEHAIR:  Object to the extent it calls for a

25   legal conclusion.  You can respond.
```

**TIMOTHY DEROCHER - April 10, 2024**

```
 1        THE DEPONENT:  Yeah, that's a little bit in a
 2   vacuum and, you know, we would want -- there could be other
 3   things going on which could cause -- that could be
 4   non-compliant with something else, but I think generally
 5   speaking, yes.
 6     Q   (By Mr. Galus) Okay.  And what are some of the
 7   things that you would consider that would cause it to not be
 8   non-compliant?
 9     A   I mean, there's a variety of factors.  What are the
10   costs, what are the actual costs being used for.  You know,
11   we have specific costs that, you know, all funding from the
12   preschool program cash fund that has to abide by 2085's
13   allowable costs, for example.
14        We would have to make sure that whatever is,
15   you know, whatever is being done just like, you know, it's
16   religious instruction time is no different from any other
17   instruction time in that, you know, we wouldn't -- if UPK
18   funds are be utilized, you know, we have to make sure their
19   costs are correct, we have to make sure that, you know, all
20   those health and safety minimum requirements in the quality
21   standards are being met, minimum contact hours, equal
22   opportunity, you know, just ancillary factors.
23     Q   Okay.  So I'm not concerned about costs, I just
24   want to focus on the actual instruction.
25        So my question was, could a faith-based
```

**TIMOTHY DEROCHER - April 10, 2024**

1  provider teach students about its religious beliefs even

2  during time that's being funded by the UPK program?

3      A    So long as they're doing it within the bounds of

4  applicable -- like already existing federal/state law, yes,

5  we're not adding anything further.

6      Q    Okay.  Let me be more specific then.  So if you had

7  a faith-based provider that was teaching UPK students that

8  only people who share the school's faith can go to heaven,

9  would that be allowed?

10         MR. WHITEHAIR:  Object to the extent it calls for a

11 legal conclusion.  You can respond.

12         THE DEPONENT:  Yeah, again, I mean, we are not the

13 entity knowledgeable or responsible for enforcing other, you

14 know, other potentially applicable or federal or state laws,

15 so I can't speak to that.

16         And then also, with anything that any provider

17 does, we have to make sure that children are being treated

18 equally and it's all about just how a child is treated.

19         And so if it didn't run afoul of either of those

20 two things, I think so.

21     Q    (By Mr. Galus) So it's possible teaching religious

22 beliefs could run afoul of UPK requirements?

23         MR. WHITEHAIR:  Object to the form of the question,

24 and to the extent it calls for a legal conclusion.

25         THE DEPONENT:  I am not saying that that is

**TIMOTHY DEROCHER - April 10, 2024**

1  applicable specific to religious.  It's anyone.  No one is

2  allowed to treat children inequitably and, you know, no one

3  is allowed to be non-compliant with the 2052-B provision in

4  anything that they're doing.  You know, there's nothing that

5  like removes that requirement.

6       Q     (By Mr. Galus) When you say 202-B (sic) provision,

7  what are you referring to?

8       A     2052-B, what do you call it, the non-discrimination

9  equal opportunity clause that's found at 205-2B.

10      Q     Could a faith-based preschool teach UPK students

11 that same sex marriage is wrong?

12            MR. WHITEHAIR:  Object to the extent it calls for a

13 legal conclusion.

14            THE DEPONENT:  Again, our evaluation of a situation

15 like that is going to be on how the children are treated.

16 What effect does that have on a preschool program child.

17            Because our responsibility, our duty, is to create

18 a safe, healthy, thriving or learning environment where

19 children can thrive.  And so that's just going to be how

20 we're going to evaluate, you know, all of those kinds of

21 situations to see what is the effect on an actual child.  And

22 we just don't know that without it being, you know, real, in

23 person.

24      Q     (By Mr. Galus) So is it possible that there could

25 be situations where it would be prohibited?

**TIMOTHY DEROCHER - April 10, 2024**

1          MR. WHITEHAIR:  Object to the form and legal

2   conclusion.

3          THE DEPONENT:  Where what would be prohibited?

4   Sorry.

5      Q    (By Mr. Galus) A faith-based school teaching UPK

6   students that same sex marriage is wrong.

7          MR. WHITEHAIR:  Same objection.

8          THE DEPONENT:  Again, it depends on the impact on

9   the child and the children in that classroom.  Because that's

10  what the equal opportunity clause covers, is impact on

11  children.

12     Q    (By Mr. Galus) So you'd look into it as a

13  Department?

14     A    I mean, it -- I don't -- I'm not -- look into what,

15  a complaint or what?

16     Q    Yes, a complaint.  If someone complained about

17  that.

18     A    If someone complained about anything, we would look

19  into any complaint, yeah.

20     Q    So we've talked a little bit about the equal

21  opportunity provision where it states that program providers

22  are required to provide eligible children an equal

23  opportunity to enroll and receive preschool services

24  regardless of certain protected characteristics like race,

25  religion, sexual orientation and gender identify.

**TIMOTHY DEROCHER - April 10, 2024**

1          Does the Department understand that this --

2    let me rephrase that.

3          Does the Department understand this

4    requirement to be statutorily mandated?

5          MR. WHITEHAIR:  Object to the extent it calls for a

6    legal conclusion.

7          THE DEPONENT:  If you're asking whether or not that

8    provision is included in the statute and we're specifically

9    directed to include it in our quality standards, yes, that is

10   the plain language of the statute.

11      Q    (By Mr. Galus) Okay.  So the Department's legally

12   obligated to enforce it?

13      A    By enforce it you mean abide by the statute and

14   include that in our quality standards?

15      Q    And to apply it to participating providers?

16      A    Yes.

17      Q    How are you doing, would you like a break?

18      A    I can do a little more before I break, yeah.

19      Q    Mark that as 17, please.

20          (Whereupon, Exhibit No. 17 was marked for

21   identification.)

22      Q    Okay.  Do you recognize Exhibit 17?

23      A    Yes.

24      Q    Okay.  Could you describe what it is for me?

25      A    Yes.  So what this document is is the standard

**TIMOTHY DEROCHER - April 10, 2024**

1  operating procedure, or SOP for short, for investigations,

2  disputes, and potential resolutions.  And then if it comes to

3  it, enforcement of UPK or preschool program service

4  agreement, you know, disputes or investigations caused by

5  someone giving a complaint.

6           And this is the document that is designed for

7  the preschool program team so that they can properly intake,

8  track, record, and then initially investigate, follow up on

9  any complaint that we get.

10           And it was written in a manner to utilize kind

11  of the existing and very productive processes that we already

12  have with licensing.  And so we took what licensing does as

13  well, we took what we're required to do under the preschool

14  program and crafted a complaint SOP specifically for the

15  preschool program.

16     Q    Okay.  Who created the document?

17     A    It was a joint effort between myself, our counsel,

18  as well as our preschool program team.

19     Q    Who is part of that team?

20     A    So the preschool program team broadly is led by

21  Dawn, Dawn Odean, and they have -- oh, Dawn can answer even

22  better than I can, but probably 10 to 12 staffers depending

23  on vacancies.

24           In this instance, for the SOP, the preschool

25  program team really consisted of Dawn.  The team is obviously

**TIMOTHY DEROCHER - April 10, 2024**

1  larger, but for this document.

2      Q    Okay.  So Ms. Odean was involved in the creation of

3  this document?

4      A    Yes.

5      Q    The standard operating procedures?

6      A    Yes.

7      Q    When was it created?

8      A    So this was created over a little bit -- so like

9  everything that we do at CDEC, and like everything we do at

10 the preschool program, we are, as the metaphor goes, building

11 the plane as we fly it.  And so this was something that was

12 worked on over time a little bit -- I think it was a little

13 bit after year one started, that we started working on this,

14 and then we did start getting some complaints.

15          And so once those were going into the

16 preschool program team, we made sure to finish this and have

17 it be a very tight and solid document that we could use for

18 all complaints going forward.

19     Q    Okay.  And when was it finalized?

20     A    A couple of months ago.  A few months ago.  I would

21 have to look up the file history to figure out exactly.

22     Q    So February, March?

23     A    That's what I'm not quite sure about.

24 Approximately then.  It's been in its completed form for a

25 few months now, but I would have to look at the document

**TIMOTHY DEROCHER - April 10, 2024**

1  history to figure out exactly when it was finalized.

2       Q    All right.  You referenced receiving some

3  complaints, what were those complaints about?

4       A    So the complaints that we received for the

5  preschool program, as indicated by our topics, Dawn's really

6  equipped and designated to speak to the specific complaints,

7  but generally they were usually -- there wasn't a lot, there

8  was a very small number, and they were in regards to provider

9  behavior that folks found unfair somehow.

10      Q    Okay.  So this standard operating procedure, this

11 would apply to complaints that allege violations of the

12 program's non-discrimination rules?

13      A    Yes, because that would be covered under the

14 service agreement, yeah.

15      Q    All right.  Have all the complaints that the

16 Department's received to date been processed according to

17 these -- to the operating procedure outlined in this

18 document?

19      A    They are all currently being like in progress.  So

20 very haven't completed any.  We haven't gotten to the very,

21 very end for any, but all of them are utilizing this process,

22 hence us crafting it.

23      Q    But there aren't any other written policies or

24 procedures for investigating complaints besides what's in

25 this document?

TIMOTHY DEROCHER - April 10, 2024

1    A    Specific to the preschool program, no.

2    Q    Any unwritten policies or procedures?

3    A    I don't believe so.

4    Q    Is that a no?

5    A    They were -- they're all written into here now, but

6    we have not -- we did not take any concrete action with, you

7    know, unwritten policies, no.

8              I'm only referring to the fact that we started

9    -- when we started this document, we were just coming up with

10   the policy, that's all.

11   Q    You received complaints before you had this

12   procedure, written procedure in place?

13   A    Before it was finalized, yes.

14   Q    But you didn't take any actions until this document

15   was finalized?

16   A    Finalized, yes, correct.

17   Q    How does the Department find out about potential

18   violations of the service agreement?

19   A    Usually it's brought to us.  Again, very new

20   program, very small number of disputes, so we don't have a

21   large sample size here, but typically we've noticed that

22   folks like to use their LCOs, which is the Local Coordinating

23   Organization, which is what they're there for, to pass

24   forward complaints and then they know that the LCO passes it

25   to us.

**TIMOTHY DEROCHER - April 10, 2024**

1    Q    You said usually it's brought to the Department,

2    are there situations where the Department's learned on its

3    own?

4    A    I don't believe so.  But again, Dawn is designated

5    as the specific -- for the -- all of the specific preschool

6    program complaints, so she'd be able to confirm that.

7    Q    And complaints could be submitted either in writing

8    or verbally?

9    A    Yes.

10    Q    So it could be done through a phone call?

11    A    The complaint being given to us, yes.

12    Q    E-mail?

13    A    Yes.

14    Q    Does the Department accept complaints by anonymous

15    individuals?

16    A    Yes.

17    Q    I think you answered this.  You'll investigate any

18    complaint that's made, correct?

19    A    Yes, if we are given a complaint, we will

20    investigate it.

21    Q    And that has to be done immediately?

22    A    The very first steps, yes, are done immediately,

23    yes.

24    Q    What are the very first steps?

25    A    To make sure that there's not any allegations of

**TIMOTHY DEROCHER - April 10, 2024**

1  suspected child abuse or neglect, because that -- we're

2  mandated reporters, we have a huge commitment and

3  responsibility to safety, and so whenever we get something

4  that's been very, you know, that's pat of our SOPs, that we

5  immediately review it for child abuse or neglect, but that is

6  really the very time-sensitive element to that initial part.

7      Q    Okay.  If you could turn to the second page of the

8  standard operating procedure and look at section 2 that says,

9  Initial investigation, you see that?

10     A    Uh-huh.

11     Q    And the first subsection 1 it says, Immediately

12 investigate the complaint.  This comes after the child abuse

13 or neglect piece that you were discussing.  Is this section 2

14 with respect to the initial investigation, is that expected

15 to be immediate?

16     A    Yes.  Yes.

17     Q    Okay.  Is there a time frame by which the

18 Department has to conclude an investigation?

19     A    No.

20     Q    Can the Department initiate an investigation on its

21 own?

22     A    Yes.

23     Q    So if the Department had information to suggest a

24 provider was violating the program agreement, it could

25 initiate an investigation?

**TIMOTHY DEROCHER - April 10, 2024**

1    A    If -- yes.

2    Q    If you could look at section 3, this would be on

3  page 3 that's entitled Dispute Resolution; do you see that?

4    A    Yep.

5    Q    That paragraph, the start of it says that CDC shall

6  determine, based upon the investigation, whether response

7  period is necessary.

8              Is this referring to whether the provider will

9  be given an opportunity to respond after the initial

10  investigation?

11    A    So they always have the ability to send us, you

12  know, countervailing or, you know, we'll always receive and

13  review information from the provider in question, but

14  generally, yes, this is referring to the portion where we've

15  done an investigation, we've determined that -- not

16  necessarily that it's founded, but that it might be able to

17  be founded.  And so at that point, reaching out to the

18  provider and getting their side of the story is what we would

19  do next, yes.

20    Q    All right.  If you go a little farther down, looks

21  like the first clear bullet point, it says a response

22  period --

23    A    Yes.

24    Q    -- shall only be considered unnecessary and not

25  performed if, and if you go to subsection 2, says the alleged

**TIMOTHY DEROCHER - April 10, 2024**

1  breach is of such nature and character that when combined

2  with the facts of the specific circumstance at hand,

3  immediate intervention is warranted to protect the safety or

4  well-being of a child.

5            Would that include alleged breaches of the

6  agreement's non-discrimination provisions?

7       A    It would really -- it's not something that's

8  applied to a specific provision of the agreement, but more

9  about the facts at hand and more about whether, whatever the

10 breach of the agreement is, is it resulting in a child

11 immediately being placed in imminent harm.  And if that's

12 true, then this would apply.

13      Q    Okay.  So is that a sometimes yes, sometimes no?

14      A    I mean, I would definitely say that it is plausible

15 that conduct which also constituted a breach under the equal

16 opportunity clause could also constitute conduct that would

17 meet this threshold.

18      Q    Okay.  Is it plausible the other way, that conduct

19 that violates the equal opportunity provision may not meet

20 the threshold of this subsection 2?

21      A    Yes.

22      Q    What happens if the Department determines a

23 provider violated a program agreement's terms?

24      A    So if we've determined that an allegation is

25 founded and that we do believe that the provider agreement

**TIMOTHY DEROCHER - April 10, 2024**

1   was breached, first of all, the provider agreement has

2   various dispute resolution provisions, which are the

3   authority in the back of this document, and so that's part of

4   what this SOP is based on, but generally speaking, we would

5   do the formal outreach to that provider letting them know

6   this is what we're investigating, please provide us with any

7   information that you would have that would be countervailing

8   to this.

9              Based on that, or lack of response, but mostly

10  the investigation facts, if after all of that it's like yes,

11  this is founded, this is a breach of the agreement, we would

12  then move to try and cure it and have it be resolved.

13             At the end of the day, we don't want any

14  providers to not be participating, we want every provider to

15  be able to participate.  And that's included in this process

16  as well.

17             And so that's what the curing portions of it

18  speak to, and providing -- hopefully we can reach some kind

19  of resolution with that provider.

20             But if we go through all of that and the time

21  frames for curing expire, per the service agreement, and we

22  just can't reach a resolution with the provider, then we

23  would move forward with enforcement under the terms of the

24  agreement which typically would be a breach of contract in

25  District Court.

**TIMOTHY DEROCHER - April 10, 2024**

1    Q    You mentioned -- you used the term founded or

2  unfounded, what's kind of the burden of proof for

3  establishing whether a complaint is founded or unfounded?

4    A    It's relatively high.  We tend to eschew typically

5  very legal language with our program staff because that

6  doesn't really mean anything to them.

7              And so if something is founded, that means

8  that based on our investigation, we believe that there is a

9  very, you know, that -- yeah.  Did we use -- yeah, it means

10 that -- if it's founded, it means that we have demonstrable

11 proof that whatever it was alleged occurred.

12   Q    Is that --

13   A    Sorry.

14   Q    Sorry.  Go ahead, you can finish.

15   A    Just that there is some kind of, we have tangible

16 evidence, for lack of a better term, that this breach of the

17 agreement actually occurred and is not simply what someone

18 said or someone felt.

19   Q    Is that more likely than not, standard 51 percent?

20   A    I think generally with these kind of reports we use

21 a little bit of a higher standard.

22   Q    Is that in writing anywhere?

23   A    I don't know that we put the exact writing, like in

24 exact percentage number for a standard in this agreement, no.

25 Or not, agreement, but SOP.  Sorry.

**TIMOTHY DEROCHER - April 10, 2024**

1    Q    So are you basing your answer just kind of on your

2  experience of handling these complaints so far?

3    A    Yes.

4    Q    Have you had conversations with Ms. Odean or anyone

5  else on the team as to what standard you all should be

6  applying?

7    A    A little bit and mildly, yes.  And again, that's --

8  we take a lot of cue from our -- from the licensing folks,

9  and that's where that terminology comes from as well.

10    Q    Who is the final decision-maker about whether a

11  provider has violated the agreement?

12    A    I think it's a -- not I think, for our Department

13  it's a combination decision between the executive director

14  and the preschool program director in conjunction with our

15  counsel.

16    Q    Who has the final say?

17    A    Ultimately under our current organizational

18  structure, the executive director.

19    Q    And I see the standard operating procedure does

20  address enforcement and potential penalties.  Is there any --

21  are there any penalties available beyond what's in this

22  agreement?  Excuse me, what's beyond identified in this

23  standard operating procedure?

24    A    So it's all of -- the available remedies would be

25  those spelled out in the contract.  In terms of our specific

**TIMOTHY DEROCHER - April 10, 2024**

1  enforcement of this -- of the provider agreements, we are --

2  no, we're not -- we're not looking at enforcement options

3  besides termination of the contract.

4      Q    All right.  Can complaints made about a UPK

5  provider be referred to the Department's licensing division

6  since all UPK providers are also licensed?

7      A    So this is touched upon a little bit in the

8  beginning of the SOP.  So it's under complaint intake 1(b),

9  yes.

10            So if the allegations involve what appears to

11  be a license -- a specific licensing violation, we would then

12  forward the information to licensing to allow them to conduct

13  their own investigation since they're the ones in charge of

14  that licensing.

15      Q    Okay.  Would that include complaints alleging

16  violations of the non-discrimination rules?

17      A    I don't believe so, no, because that's not covered

18  under licensing.

19            MR. WHITEHAIR:  We've been going about an hour, do

20  you want to take a break?

21            MR. GALUS:  One second.  One more question.

22            MR. WHITEHAIR:  Sure.

23      Q    (By Mr. Galus) Are you aware of any instances where

24  a complaint alleging violations of the UPK agreement were

25  referred to the licensing division?

**TIMOTHY DEROCHER - April 10, 2024**

```
 1      A    No.

 2           MR. GALUS:  We can take a break.

 3           MR. WHITEHAIR:  Thank you.

 4           THE VIDEOGRAPHER:  The time now is 9:35.  We're off

 5  the record.

 6           (Whereupon, a break was taken from 9:35 a.m. to

 7  9:50 a.m.)

 8           THE VIDEOGRAPHER:  The time now is 9:50.  We're

 9  back on the record.

10                EXAMINATION (Cont'd)

11  BY MR. GALUS:

12      Q    Thank you.  Mr. Derocher, we just took a break, did

13  you talk to counsel at all about your testimony you gave

14  earlier?

15      A    A little bit, yes.

16      Q    Okay.  We have an exhibit here, Exhibit 6, it's

17  already previously been marked at a hearing in this case.

18           So Exhibit 6 is the UPK Provider Service

19  Agreement for the '23-'24 school year; does that -- is that

20  accurate?

21      A    Yes.

22      Q    Okay.  And you're familiar with this document?

23      A    Yes.

24      Q    And this particular agreement is in place until

25  June 30th, 2024?
```

**TIMOTHY DEROCHER - April 10, 2024**

1     A     Yes.

2     Q     The Department reviewed this agreement before it

3  was approved?

4     A     Not really, no.

5     Q     What do you mean by that?

6     A     Yes.  So we as a Department, we were not created as

7  a Department until July 1st of 2022; however, even then I

8  would not classify us as a truly autonomous, standalone

9  Department at that point.

10          This is due to the fact that we had multiple

11  significant areas of our Department centralized operations

12  still being run under CDHS.  Our contracts and procurement

13  team at CDEC was not fully established until the fall of '23.

14          So this contract, the year-one agreement, was

15  more of an effort between the -- what leadership did exist at

16  CDEC at that time, but also the governor's office, as well as

17  the CDHS, the Human Services contract unit, as well as DPA,

18  the Department of Personnel Administration, who helps

19  oversees -- they have a State contract unit that helps

20  oversee all contracts.  So that's what I mean.

21     Q     Were you at any point involved in the review of

22  this agreement?

23     A     No.

24     Q     Do you know if Ms. Odean reviewed and approved the

25  agreement?

**TIMOTHY DEROCHER - April 10, 2024**

1    A   I know that she looked at it, but as I was saying

2  for those other reasons, I don't believe she was, you know,

3  was not intimately involved in crafting it.

4    Q   But she would have reviewed it before it was

5  finalized?

6    A   I believe so, but she would obviously be able to

7  answer for herself better.

8    Q   Okay.  What about Ms. Roy, do you know if she

9  reviewed and approved the agreement before it was issued?

10    A   I believe so, yes.

11    Q   And there's a new program service agreement for the

12  upcoming '24, '25 school year?

13    A   Yes.

14    Q   Were you involved with the creating of that service

15  agreement?

16    A   Yes.

17    Q   Okay.  Were Ms. Odean and Ms. Roy involved in the

18  creation of that agreement?

19    A   Yes.

20    Q   And the '24, '25 agreement takes effect on July 1,

21  2024?

22    A   Yes.

23    Q   Under both agreements, the Department is able to

24  terminate its relationship with the provider if the provider

25  violates the terms of the agreement?

**TIMOTHY DEROCHER - April 10, 2024**

```
 1            MR. WHITEHAIR:  Objection, calls for a legal
 2   conclusion.  You can answer.
 3            THE DEPONENT:  So under the State contract template
 4   that are used, there's a couple of different avenues of
 5   termination, but generally, yes, there are avenues of
 6   termination for breach of an agreement within the agreement.
 7        Q    (By Mr. Galus) Okay.  All right.  If you could turn
 8   to page 6 of Exhibit 6, this would be Exhibit A of the
 9   agreement, the terms and conditions.  Let me know when you're
10   there.
11        A    Yes.
12        Q    You see where it says early termination in the
13   public interest?  It's subsection C of section 2.
14        A    Which page are we on then?
15        Q    So if you look at the bottom right-hand corner, it
16   says Exhibit 6 and then there's some pagination.
17        A    I see.
18        Q    If you could turn to the one that says page 6.
19        A    Yes.
20        Q    And this is the first page of Exhibit A, the terms
21   and conditions of the agreement.
22        A    Yes.
23        Q    And there's a section that says, Early termination
24   in the public interest, but it states, If the agreement
25   ceases to further the public agreement or the State, the
```

**TIMOTHY DEROCHER - April 10, 2024**

1  State, in its discretion, may terminate the agreement in

2  whole or part.  Do you see that?

3      A    Yes.

4      Q    What does the phrase "public interest" mean in this

5  provision or this clause?

6           MR. WHITEHAIR:  Object to the extent it calls for a

7  legal conclusion.

8           THE DEPONENT:  So I believe that there are --

9  there's a provision somewhere in here that speaks that more

10  specifically; however, this provision, as well as the terms

11  and conditions generally, are centralized, all State

12  contracts, and they're governed by State fiscal rules.

13           And as I was alluding to earlier, DPA reviews all

14  these various contracts, but yes, again, I believe that there

15  is a provision which speaks more specifically to it and

16  that's what we would adhere to, but I would have to find it.

17      Q    (By Mr. Galus) So you think within the agreement

18  there's something that defines public interest?

19      A    I believe so, but I'm not positive.  I know that

20  there's other language somewhere that I'm remembering, but

21  generally speaking, it's again more -- this is, you know, our

22  understanding is that this is a high bar, this is not -- this

23  is -- yeah, I think I spoke to it in the SOP --

24      Q    Okay.

25      A    -- the language.  But anyway, sorry.  To answer the

**TIMOTHY DEROCHER - April 10, 2024**

1  question, it's a very high bar and it speaks more towards

2  health and safety.

3      Q      All right.  So public interest refers to health and

4  safety?

5      A      Generally, yes.

6      Q      And what are you basing that on?

7      A      Again, there is something, I can't remember it off

8  the top of my head, but this is -- this concept of in the

9  public interest is something that's defined and explained

10 elsewhere.

11     Q      But you can't -- as you sit here today, you don't

12 know where that would be found?

13     A      Right now I can't remember that, no.

14     Q      Are you sure that there's some sort of written

15 guidance on how to interpret public interest?

16     A      I'm not positive.

17     Q      So it's possible there might not be?

18     A      Correct.

19     Q      Would you be involved in any decision about whether

20 the agreement ceases to further the public interest?

21     A      I would not be a decision-maker in that discussion.

22 I might be involved in helping us get to an answer, but as I

23 was alluding to, this is not a CDEC specific provision, but a

24 State contractual provision, and so we would seek guidance

25 from our counsel at the Attorney General's Office on that.

**TIMOTHY DEROCHER - April 10, 2024**

1    Q    Would violation of the non-discrimination rules, is

2    it possible that violation of the non-discrimination rules

3    would be deemed to not further the public interest of the

4    State?

5         MR. WHITEHAIR:  Object to form, object to the

6    extent it calls for a legal conclusion.  You can respond.

7         THE DEPONENT:  It would depend on the conduct in

8    question and its impact on the children.

9         Again, you know, similar to the previous question,

10   it is -- it's a sometimes, yes; sometimes, no in that it is

11   possible that conduct could -- that a provider could engage

12   in conduct that simultaneously violated the public interest

13   section and violated the equal opportunity provision, but

14   it's also plausible that one could be in violation of the

15   equal opportunity provision and not be in violation of the

16   public interest.

17   Q    (By Mr. Galus) So it would depend on the facts?

18   A    Correct.

19   Q    If you could look at page 17, and again I'm

20   referring to the page numbering in the bottom right-hand

21   corner of the document.  Section 11 of the agreement, Terms

22   and Conditions is entitled Breach of Agreement; do you see

23   that?

24   A    Yes.

25   Q    Okay.  And do you see, within that section, the

**TIMOTHY DEROCHER - April 10, 2024**

1   sentence starting, Notwithstanding any provision of the

2   agreement?  It's the third sentence.

3       A    Yes.

4       Q    Okay.  And it reads, Notwithstanding any provision

5   of the agreement to the contrary, the State, in its

6   discretion, need not provide notice or a cure period and may

7   immediately terminate the agreement in whole or in part or

8   institute any other remedy in the agreement in order to

9   protect the public interest of the State.

10          The use of the phrase "public interest" in

11  this sentence, is it the same as the use of "public interest"

12  in the prior section we just talked about?

13          MR. WHITEHAIR:  Object to the extent it calls for a

14  legal conclusion.

15          THE DEPONENT:  We believe so, yes.

16      Q    (By Mr. Galus) And section 12 on the same page

17  lists the remedies that are available to the State; do you

18  see that?

19      A    Yes.

20      Q    Has the Department ever exercised any of these

21  remedies against a provider?

22      A    No.  We have had providers that we've mutually

23  terminated the agreement with, but we have not enacted

24  remedies for breach of an agreement.

25      Q    Okay.  What were the situations where there was a

**TIMOTHY DEROCHER - April 10, 2024**

```
 1  mutual termination?

 2      A    Again, on specific interactions with providers,

 3  Dawn is best designated; however, generally to answer it,

 4  there was -- I believe it's because there was some kind of

 5  misunderstanding in the program.

 6              Typically it's -- it would be because they

 7  misunderstood, the provider misunderstand how the slots

 8  worked or how the reimbursement worked.  And after learning

 9  about the misunderstanding, they said, we don't really want

10  to participate anymore and, you know, it's voluntary, we said

11  absolutely, you know, you're right.

12      Q    Were there any -- were any of those

13  misunderstandings related to the non-discrimination rules?

14      A    Again, Dawn I think would be able to answer

15  specifically, but I do not believe that we had instances

16  where we were under contract, they had signed the agreement,

17  and we then mutually terminated for concerns about the equal

18  opportunity, no.

19      Q    Are you aware of situations where a provider signed

20  the agreement and informed the Department that it was no

21  longer going to continue in the program because of concerns

22  over the non-discrimination provision?

23              MR. WHITEHAIR:  Can you tell me what section that

24  he's designated to respond to?

25              MR. GALUS:  Well, he brought it up with respect to
```

Case No. 1:23-cv-01557-DDD-STV   Document 78-20   filed 06/21/24   USDC Colorado   pg 53 of 68
Appellate Case: 25-1187   Document: 28-3   Date Filed: 09/08/2025   Page: 163

Page 52

**TIMOTHY DEROCHER - April 10, 2024**

1    the remedies.  He mentioned that there were situations where

2    they were mutually terminated, so I'm asking him about that.

3              MR. WHITEHAIR:  And I'm not sure if he's designated

4    to give you that level of detail.

5              MR. GALUS:  Are you instructing him not to answer?

6              MR. WHITEHAIR:  I don't instruct anyone not to

7    answer unless it's privileged, no.  What I'm saying is if

8    it's beyond his designation, then he's speaking in his

9    personal capacity and it's not going to be binding for your

10   use as an entity admission.

11             MR. GALUS:  That's fine.  It's my last question on

12   the topic.

13             MR. WHITEHAIR:  I just want to be sure -- Ms. Odean

14   will be happy to sit in and answer questions and I just don't

15   want us to be at cross-purposes if it's beyond the scope of

16   his designation.

17             THE DEPONENT:  I don't recall the question at this

18   point.

19             MR. GALUS:  Are you able to read back the question.

20             THE COURT REPORTER:  (Reading back the last

21   question.)

22             Are you aware of situations where a provider signed

23   the agreement and informed the Department that it was no

24   longer going to continue in the program because of concerns

25   over the non-discrimination provision?

**TIMOTHY DEROCHER - April 10, 2024**

1    THE DEPONENT:  I am not personally aware of any

2  situation where they signed the agreement and -- but that

3  doesn't mean it's not true.  Just because there's also -- and

4  Dawn can speak well to this -- there's a distinction between

5  signing and the agreement and actually accepting and

6  enrolling children.

7    Q    (By Mr. Galus) Okay.  So Ms. Odean would be the

8  better person to address those questions?

9    A    Yes.

10    Q    To the extent the new agreement for the '24, '25

11  school year includes the same provisions and uses the same

12  language with respect to the public interest as the '23-'24

13  agreement, are the answers the same?

14    MR. WHITEHAIR:  Same objections.

15    THE DEPONENT:  If what we're referring to are the

16  provisions that come down from the State contracts, State

17  contracts team, yes.

18    Q    (By Mr. Galus) I'm just trying to avoid having to

19  go through the agreement.

20    So it's -- if I ask questions about the term

21  "public interest" and asked how the Department defines it or

22  understands it, would your answers be the same for the '24,

23  '25 agreement, or is there a different understanding for the

24  new agreement?

25    MR. WHITEHAIR:  Same objection.  You can answer.

**TIMOTHY DEROCHER - April 10, 2024**

1      THE DEPONENT:  Yes.

2      Q    (By Mr. Galus) I think I messed up that question by

3  adding -- it's the same understanding for both the '23-'24

4  and the '24-'25 agreement?

5      MR. WHITEHAIR:  Same objection.

6      THE DEPONENT:  Yes.

7      Q    (By Mr. Galus) Okay.  If you could turn to page 27,

8  please.  This is section 18 of the terms and conditions

9  entitled Department of Early Childhood Provisions.  Do you

10  see that?

11     A    Uh-huh.

12     Q    And then subsection B --

13     A    Yep.

14     Q    -- titled Discrimination.  And that provision says,

15  A provider shall not discriminate against any person on the

16  basis of gender, race, ethnicity, religion, national origin,

17  age, sexual orientation, gender identity, citizenship status,

18  education, disability, socioeconomic status, or any other

19  identity.

20          Did the Department have the legal authority to

21  include this provision as a term and condition?

22     MR. WHITEHAIR:  Object to the extent it calls for a

23  legal conclusion.

24     THE DEPONENT:  So as I alluded to earlier, the

25  Department, as an entity, did not have a lot of involvement

**TIMOTHY DEROCHER - April 10, 2024**

1   in writing this; however, if it's a State contract

2   procurement provision, we would, as an entity, presume that

3   the State has that authority.

4           However, having said that, with this specific

5   provision, 18(b), our Department is under, you know, we

6   believe that it was a mistake to have included it.

7       Q    (By Mr. Galus) Is that the same -- you said

8   mistake, is that the same thing as not having the legal

9   authority?

10      A    No, two different things.

11      Q    Okay.  So the Department's view is that it did have

12   the legal authority to include this?

13          MR. WHITEHAIR:  Object to the extent it calls for a

14   legal conclusion.

15          THE DEPONENT:  We -- again, we take our cue from

16   the Central State contracts team, and if they include

17   something, then yes, we presume that there's authority for

18   its inclusion.

19      Q    (By Mr. Galus) Why was it a mistake to include it

20   then?

21      A    It was a mistake because, as I was saying, our --

22   we did not have our own contracts and procurement team, so

23   unfortunately the folks who are putting this document

24   together were not operating with the specialized knowledge

25   that our team has.

**TIMOTHY DEROCHER - April 10, 2024**

```
 1              And, furthermore, it came from a very, very
 2  old template.  So our understanding, as a Department, of the
 3  situation, is that when this was put together, there were
 4  various boilerplate provisions that were used by the
 5  individuals who put it together, and that unfortunately
 6  included some very old provisions which included this 18(b)1.
 7      Q    And my understanding is that this provision has not
 8  been included in the '24, '25 agreement; is that your
 9  understanding as well?
10      A    Correct.
11      Q    Okay.  If the Department wanted to add the
12  provision back into the agreement, would it have the legal
13  authority to do so?
14              MR. WHITEHAIR:  Object to the form, seeks a legal
15  conclusion and a hypothetical.  You can answer.
16              THE DEPONENT:  We, as a Department, honestly are
17  not sure of that answer and that's why we have counsel and we
18  talked to them about it.
19      Q    (By Mr. Galus) Before you said you presumed that
20  you had the legal authority, are you saying now you're not
21  sure if you have the legal authority?
22      A    I think that's the same thing.  Presuming means
23  that we think, but we don't know.
24      Q    And this is -- this agreement is in place for the
25  '23-'24 --
```

**TIMOTHY DEROCHER - April 10, 2024**

```
1       A    Yes.

2       Q    -- school year?

3       A    Yes.

4       Q    So it's currently in effect?

5       A    This agreement is, yes.

6       Q    And this provision is in effect?

7       A    I -- in effect, you mean it's --

8       Q    It's a term and condition that applies to

9  participation for the '23-'24 school year?

10           MR. WHITEHAIR:  Object to the extent it calls for a

11 legal conclusion.

12           THE DEPONENT:  It's in the agreement, yes.

13      Q    (By Mr. Galus) Do you have any, or does the

14 Department have any rule or policy that would prohibit it

15 from adding this provision back into future agreements?

16           MR. WHITEHAIR:  Object to the extent it calls for a

17 legal conclusion.

18           THE DEPONENT:  We do not have a specific statute or

19 rule which explicitly prohibits it, no.

20      Q    (By Mr. Galus) What about an internal policy?

21           MR. WHITEHAIR:  What's your topic question?

22           MR. GALUS:  The creation of the agreements.

23           MR. WHITEHAIR:  So, and you're talking now about

24 the enforcement of the agreement?  I believe that's

25 Ms. Odean's.  I don't believe this witness is designated to
```

**TIMOTHY DEROCHER - April 10, 2024**

```
 1  answer any question of operationalization of the agreement.
 2          MR. GALUS:  Okay.
 3          MR. WHITEHAIR:  You ask him in his personal
 4  capacity.
 5          MR. GALUS:  I'm asking about the creation of the
 6  '24-'25 agreement --
 7          MR. WHITEHAIR:  He answered that.
 8          MR. GALUS:  -- and I'm asking whether they have the
 9  authority to add it into the agreement, whether that's
10  '24-'25, or '23-'24.
11          MR. WHITEHAIR:  How are you reading your topic?
12          MR. GALUS:  The creation of those agreements.
13          MR. WHITEHAIR:  Are you asking a hypothetical about
14  a future creation, not the creation of the agreement?
15      Q   (By Mr. Galus) Okay.  Well, what about the '24, '25
16  agreement -- I'll ask this question.
17              Mr. Derocher, is there any internal policy
18  that would prohibit the Department from adding this provision
19  into the '24, '25 agreement?
20      A   We do not have an explicit policy explicitly
21  prohibiting it, no.
22          MR. GALUS:  Mark that as Exhibit 18, please.
23          (Whereupon, Exhibit No. 18 was marked for
24  identification.)
25      Q   (By Mr. Galus) Do you recognize Exhibit 18?
```

**TIMOTHY DEROCHER - April 10, 2024**

1    A    Yes.

2    Q    Okay.  What is it?

3    A    This entire exhibit is a string of e-mails

4  referring to Adams County Head Starts concerns about some of

5  the contract language.

6    Q    And that's your e-mail address at the top of the

7  document?

8    A    Yes.

9    Q    So you were involved in these communications?

10   A    Yes.

11   Q    And in this -- these e-mail exchanges, the

12  Department was responding to concerns that were raised by

13  certain Head Start providers?

14   A    Specifically Adams County, yes.

15   Q    Okay.  And Adams County was concerned because the

16  UPK program service agreement asked them to agree not to deny

17  enrollment based on a child's or his family's income level?

18   A    I wouldn't characterize it as that.  All it did was

19  say that they had to abide by 25 -- 26.5-4-205(2)(b), the

20  equal opportunity clause.

21   Q    They were concerned with their ability to do so?

22   A    They were.

23   Q    And the problem, from their perspective, was that

24  Head Start providers consider income level in determining

25  eligibility?

**TIMOTHY DEROCHER - April 10, 2024**

1      A      Among a lot of other things that they consider,

2  yes.

3      Q      But the non-discrimination rule prohibited

4  discrimination based on income level?

5      A      The -- it says that you have to provide an equal

6  opportunity regardless of income level, yes, that's what that

7  language says.

8      Q      How was this issue ultimately resolved?

9      A      So we engaged in some back-and-forth with them

10  explaining, for the reasons as you can see in the e-mail,

11  that while we understood where they were coming from,

12  ultimately their concerns were unnecessary due to the fact

13  that the legislature very, very clearly contemplated Head

14  Start programs inclusion into the preschool program.

15              And while the program staff at Adams County

16  felt better about that, they still wanted -- their legal

17  still wanted some kind of written assurance.

18              And so the resolution that we came to was an

19  addendum that in no way -- it didn't substantially alter or

20  change the agreement, but just explicitly stated why the

21  concern is not a concern.

22              MR. GALUS:  Please mark that as 19.

23              (Whereupon, Exhibit No. 19 was marked for

24  identification.)

25      Q      (By Mr. Galus) Is Exhibit 19 the addendum you were

**CALDERWOOD-MACKELPRANG, INC.**
**(303) 477-3500**

3. App.737      **Exhibit 65**
**Page 60**

**TIMOTHY DEROCHER - April 10, 2024**

1  just referring to?

2      A    Yes.

3      Q    Who was involved in making the decision to respond

4  to Adams County Head Start in this way?

5      A    That would be myself, Ms. Odean, Dr. Roy, our

6  counsel we corresponded with on the issue, and then my

7  supervisor Grace Eckel was also helpful in effectuating the

8  actual amendment being sent through Docusign and executed.

9      Q    Okay.  Were there any addendums or changes made to

10 program service agreements for other Head Start providers?

11     A    I don't believe so.  But again, on the specifics of

12 providers, Dawn would be able to answer that better as well.

13     Q    Are you aware of any other UPK providers who

14 requested changes to the program service agreement and its

15 terms and conditions?

16     A    I'll be honest, that's sufficiently open-ended that

17 I could grab a lot of different stuff.  I mean, when we first

18 did the agreement, yeah, people -- we got unsolicited red

19 lines throughout the entire process.

20     Q    Okay.  Were there any changes made besides what

21 happened with the Adams County Head Start?

22     A    Regarding '23-'24 agreement?

23     Q    Yes.

24     A    The only other changes that were made during the --

25 actually, depends how we're defining change.  We did not --

**TIMOTHY DEROCHER - April 10, 2024**

1  after we finalized it, we didn't do any other changes;

2  however, when creating the '23-'24 agreement, there were a

3  lot of concerns by school districts about the indemnification

4  and purview over students with disabilities.

5              And so in the '23-'24 agreement, there was a

6  separate school district addendum to address those concerns,

7  but other than that, I don't believe so, no.

8      Q    What were the school district's concerns with

9  respect to disability?

10     A    They were merely concerned about making sure that

11 it was explicitly stated, their obligations under IDA and the

12 obligations of administrative units under the IDA.

13     Q    Help me understand, what did they say the agreement

14 didn't properly address?

15     A    They just wanted to make sure that it had explicit

16 language pointing out what's already law, which is that they

17 have the authority and obligation under IDA.  They were

18 concerned, I believe, about toes being stepped on, but that's

19 not what CFR says, that's not how educating students with

20 disabilities works, and so we just put in that explicit

21 language to assuage.

22     Q    And did their concern relate to the

23 non-discrimination provision?

24     A    No.

25     Q    Okay.  You mentioned the '23-'24 agreement, are you

**TIMOTHY DEROCHER - April 10, 2024**

1  aware of any requested changes for the '24, '25 agreement?

2      A    So when we did the '24, '25 agreement, we did send

3  it around to a few stakeholders and there were some minor

4  changes that were requested that we made, but nothing

5  regarding the non-discrimination provision.

6      Q    Okay.  What were some of those changes?

7      A    They were -- a lot of them I believe were technical

8  in terms of like page numbering.  And then I could find an

9  exhaustive list, but I can't remember it off the top of my

10  head, but they were as I, you know, said and recall, they

11  were more technical in nature and did not relate to the

12  non-discrimination clause.

13      Q    If you could go back to Exhibit 19, that's the

14  Adams County Head Start addendum, and I believe it's dated in

15  October of '23; is that right?

16      A    Yes.

17      Q    Okay.  The school year, though, would have begun

18  before this addendum was finalized?

19      A    Yes.

20      Q    Was Adams County Head Start participating in the

21  UPK program before the addendum was finalized?

22      A    Yes.

23      Q    So it would have received UPK payments before the

24  addendum was finalized?

25      A    Yes.

**TIMOTHY DEROCHER - April 10, 2024**

1          MR. GALUS:  If we could just, maybe five minutes, I

2    think I'm done, but let me go over my notes.

3          MR. WHITEHAIR:  Sure.

4          MR. GALUS:  We can go off the record.

5          THE VIDEOGRAPHER:  The time now is 10:23.  We're

6    off the record.

7          (Whereupon, a break was taken from 10:23 a.m. to

8    10:25 a.m.)

9          THE VIDEOGRAPHER:  The time now is 10:25.  We're

10   back on the record.

11         MR. GALUS:  Thank you, Mr. Derocher.  I don't have

12   any more questions.  I appreciate you making the time today.

13         MR. WHITEHAIR:  No questions.

14         THE VIDEOGRAPHER:  The time now is 10:25, we're

15   going off the record.  This concludes today's portion of the

16   videotaped deposition.

17         THE COURT REPORTER:  Can I get counsel's transcript

18   orders on the record, please?

19         MR. WHITEHAIR:  What is your order, Mr. Galus?  I

20   know I want a mini-script, E-Tran, with exhibits.

21         MR. GALUS:  The same.

22         THE COURT REPORTER:  Will you handle signature for

23   this deponent?

24         MR. WHITEHAIR:  My team will handle signature.

25         (The deposition concluded at 10:25 a.m.)

**TIMOTHY DEROCHER - April 10, 2024**

```
 1                        AMENDMENT SHEET

 2   DEPONENT NAME:                    DATE OF DEPOSITION:
     TIMOTHY DEROCHER                  April 10, 2024
 3

 4   The Deponent wishes to make the following changes in the
     testimony as originally given:
 5

 6   PAGE LINE                 CHANGE                    REASON

 7   _____

 8   _____

 9   _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16

17   Signature of Deponent:

18   _____

19   Subscribed and sworn to before me this _____ day of

20   _____, 2024.

21                    Notary's signature _____

22                    Notary's address _____

23                    My commission expires _____

24

25
```

**TIMOTHY DEROCHER - April 10, 2024**

```
 1              DEPONENT'S AFFIDAVIT
 2          I have read my deposition and the same is true and
 3  accurate, save and except for changes and/or corrections, if
 4  any, as indicated by me on the amendment sheet(s) attached
 5  hereto as indicated.
 6
 7  Amendment sheet(s) attached [ ]
 8  No changes; no amendment sheet attached [ ]
 9
10                           _____
11                                   Deponent
12
13  SUBSCRIBED AND SWORN TO before me this
14  _____day of _____, 2024.
15  My commission expires _____.
16
17                           _____
18                               NOTARY PUBLIC
19  in and for the State of _____.
20
21
22
23
24
25
```

**TIMOTHY DEROCHER - April 10, 2024**

```
 1                    CERTIFICATE

 2   STATE OF COLORADO        )
                              )ss.
 3   CITY AND COUNTY OF DENVER)

 4          I, SANDRA SCHRAMM, Registered Professional
     Reporter, Certified Realtime Reporter, and Notary Public for
 5   the State of Colorado, do hereby certify that previous to the
     commencement of the examination, TIMOTHY DEROCHER, was duly
 6   sworn by me to testify to the truth in relation to the
     matters in controversy between the said parties.

 7
            I further certify that said deposition was taken in
 8   shorthand by me and was reduced to typewritten form by
     computer-aided transcription, that the foregoing is a true
 9   transcript of the questions asked, testimony given, and
     proceedings had.

10
            I further certify that I am not an attorney, nor
11   counsel, nor in any way connected with any attorney or
     counsel for any of the parties to said action or otherwise
12   interested in its event.

13          IN WITNESS WHEREOF, I have affixed my signature
     this 22nd of April, 2024.
14

15

16
                         /s/ Sandra Schramm
17                       _____

18                       Sandra Schramm
                         Registered Professional Reporter
19                       Certified Realtime Reporter
                         Notary Public
20

21

22

23

24

25
```

# EXHIBIT 66

### DAWN ODEAN - April 10, 2024

```
            THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF COLORADO

Civil Action No:  1:23-cv-1557
_____

Plaintiff:

DARREN PATTERSON CHRISTIAN ACADEMY,

v.

Defendant:

LISA ROY, et al.
_____


        VIDEOTAPED DEPOSITION OF DAWN ODEAN

_____

        PURSUANT TO NOTICE, the above-titled

videotaped deposition was taken on behalf of the Plaintiffs,

on April 10, 2024, at 10:42 a.m., at the Colorado Department

of Early Childhood, 710 S. Ash Street, Building C, Denver,

Colorado 80246, before Sandra Schramm, Registered

Professional Reporter, Certified Realtime Reporter, and

Notary Public.
```

### DAWN ODEAN - April 10, 2024

```
 1   APPEARANCES:

 2   Attorneys for Plaintiff:

 3   JEREMIAH GALUS, ESQ.
     BRYAN NEIHART, ESQ.
 4      ALLIANCE DEFENDING FREEDOM
        15100 N. 90th Street
 5      Scottsdale, Arizona 85260
        Telephone:  480-444-0020
 6      E-mail:  Jgalus@ADFlegal.org

 7   Attorneys For Defendant:

 8   JAMES GREGORY WHITEHAIR, ESQ.
     MICHELE MULHAUSEN, ESQ.
 9   JANNA FISCHER, ESQ.
     VIRGINIA CARRENO, ESQ.
10      COLORADO ATTORNEY GENERAL'S OFFICE
        1300 Broadway, 6th Floor
11      Denver, CO 80203
        Telephone:  720-508-6000
12      E-mail:  Greg.whitehair@coag.gov

13
     Also Present: Walter Mathern, Videographer
14                 Bonnie Smith
                   Timothy Derocher
15

16

17

18

19

20

21

22

23

24

25
```

**DAWN ODEAN - April 10, 2024**

```
 1                    EXAMINATION INDEX

 2                                             PAGE

 3  By Mr. Galus                                 4

 4                     EXHIBIT INDEX

 5                                           INITIAL
    FOR IDENTIFICATION                       REFERENCE
 6

 7  20 - Universal Preschool Program Rules       14
         and Regulations
 8
    21 - Colorado Department of Early Childhood:  44
 9       Universal Preschool Program Complaint
         Report, Intake date 6/12/23
10
    24 - Defendant's Supplemental Responses to    76
11       Plaintiff's First Set of Interrogatories
         to Defendants
12
    25 - E-mail chain from Michael Cooke dated 2/8/23  80
13
    26 - Declaration                             86
14

15  PREVIOUSLY MARKED EXHIBITS

16  14 - Plaintiff's Amended Notice of 30(b)(6)    6
         Deposition
17
    6 - UPK Provider Service Agreement for         8
18      the '23, '24 school year

19

20

21

22

23

24

25
```

CALDERWOOD-MACKELPRANG, INC.
(303) 477-3500

3. App.748     Exhibit 66
Page 3

**DAWN ODEAN - April 10, 2024**

| | |
|---|---|
| 1 | P R O C E E D I N G S |
| 2 | *      *      *      *      * |
| 3 | THE VIDEOGRAPHER:  We are back on the record.  The |
| 4 | time now is 10:42.  It is April 10th, 2024.  We're proceeding |
| 5 | with the videotaped deposition of Colorado Department of |
| 6 | Early Childhood's 30(b)(6) representative, Dawn Odean. |
| 7 | Please swear in the witness. |
| 8 | DAWN ODEAN, |
| 9 | having been first duly sworn to state the whole truth, |
| 10 | testified as follows: |
| 11 | EXAMINATION |
| 12 | BY MR. GALUS: |
| 13 | Q    Hi, Ms. Odean, my name is Jeremiah Galus, I'm the |
| 14 | attorney for plaintiff, Darren Patterson Christian Academy. |
| 15 | If you wouldn't mind just stating your name |
| 16 | and spelling it for the record. |
| 17 | A    Dawn Odean.  D-a-w-n, O-d-e-a-n. |
| 18 | Q    Ms. Odean, have you been deposed before? |
| 19 | A    I have. |
| 20 | Q    How many times? |
| 21 | A    One other time. |
| 22 | Q    And would that have been for the St. Mary's case? |
| 23 | A    Yes. |
| 24 | Q    Have you testified in court before? |
| 25 | A    I have. |

DAWN ODEAN - April 10, 2024

```
 1      Q    And just one time?

 2      A    I had testified in court in a previous role before

 3 I worked for the Department of Education.

 4      Q    Okay.  And what did that pertain to?

 5      A    That was in administrative -- when I was a

 6 principal of an elementary school and it was in

 7 Administrative court regarding an employee's performance.

 8      Q    All right.  You've also testified in court related

 9 to the St. Mary litigation?

10      A    Yes.

11      Q    And that would have been this past January?

12      A    Yes.

13      Q    So you understand you're under the same oath today

14 as if you were testifying in a courtroom?

15      A    I do.

16      Q    Is there anything that would prevent you from

17 thinking clearly or testifying truthfully today?

18      A    No.

19      Q    All right.  So I know you've done this, but just a

20 few kind of reminders, ground rules.

21           The court reporter is trying to transcribe

22 everything, so let's do our best to not interrupt one

23 another, talk over each other; do you understand that?

24      A    Yes.

25      Q    And then the second thing, the reporter is not able
```

CALDERWOOD-MACKELPRANG, INC.
(303) 477-3500

**DAWN ODEAN - April 10, 2024**

1  to indicate of indicate the head nods or hand gestures or

2  uh-huh, huh-uh, so I'd ask that you provide clear, verbal

3  answers to the questions; do you understand that?

4       A    Yes.

5       Q    Of course we'll take a break any time you'd like

6  to, the only thing I would just ask is if we're in the middle

7  of a question or line of questions, that we finish those

8  before taking a break; is that fair?

9       A    Yes.

10      Q    Ms. Odean, what did you do to prepare for today's

11  deposition?

12      A    I worked with our attorneys on reviewing exhibit

13  documents, submitted documents, my declaration, and reviewing

14  those again and again to ensure that I had clarity on the

15  work that's been done and that I was able to answer

16  accurately.

17      Q    Did you talk to anyone besides legal counsel?

18      A    I did not.

19      Q    And I just want to be clear, at any point if I ask

20  you a question that seems to be suggesting you disclose

21  conversations with counsel, that is not my intent.  So I just

22  want to make that clear.

23           If we could start with what's already been

24  marked as Exhibit 14.  Exhibit 14 is Plaintiff's Amended

25  Notice of 30(b)(6) Deposition.

**DAWN ODEAN - April 10, 2024**

```
 1              Have you seen this document before?

 2       A     Yes.

 3       Q     Okay.  And you've been -- my understanding is

 4   you've been designated to cover topics 7 through 10, 15

 5   through 22, I believe, or is it 21 and 23; is that accurate?

 6       A     As I recall, yes.

 7       Q     And you're knowledgeable about those topics?

 8       A     Yes.

 9       Q     And prepared to testify about them today?

10       A     Yes.

11       Q     All right.  Ms. Odean, could you describe your

12   current position at the Department?

13       A     I'm the director of the Universal Preschool.

14       Q     And how long have you been in that position?

15       A     About a year and a half.

16       Q     And you're the inaugural director --

17       A     I am.

18       Q     -- of the Universal Preschool Program?

19       A     Yes.

20       Q     Could you describe your job duties and

21   responsibilities as the director?

22       A     My role is to implement Universal Preschool as set

23   forth for us in statute.  Universal Preschool is the program

24   that is defined as a minimum of ten hours of preschool

25   services for all children in the year before their
```

DAWN ODEAN - April 10, 2024

1  eligibility for kindergarten.  And to define the program as

2  set forth for us in law and to work with families, providers,

3  stakeholders on the implementation of the program.

4      Q    And is Dr. Lisa Roy your direct report?  Do you

5  report to her?

6      A    Yes, she is my direct supervisor.

7      Q    And is Ms. Roy the ultimate decision-maker for the

8  department?

9      A    She is.

10     Q    And that would include decisions for the Universal

11  Preschool Program as well?

12     A    Yes.

13     Q    I'm handing you what's already been marked as

14  Exhibit 6, and this is the UPK program service agreement for

15  the '23, '24 school year; is that accurate?

16     A    Yes.

17     Q    Okay.  And to participate in the Universal

18  Preschool Program for the '23, '24 school year, a provider

19  would have had to sign this agreement and agree to its terms

20  and conditions?

21     A    Yes.

22     Q    And you're familiar with this document?

23     A    I am, yes.

24     Q    All right.  If we could turn to page 2 of the

25  exhibit, you see there's a section entitled Quality

DAWN ODEAN - April 10, 2024

 1  Assurance?

 2      A    Yes.

 3      Q    And this section of the agreement requires

 4  participating providers to agree to certain quality

 5  standards?

 6      A    It does.

 7      Q    All right.  Now, the agreement says that those

 8  quality standards will be developed with UPK Colorado

 9  providers and adopted into CDEC's rules prior to the '23-'24

10  launch of UPK Colorado.  Do you see that language?

11      A    I do.

12      Q    The Department didn't adopt any rules or

13  regulations before the '23-'24 school year, did it?

14      A    It didn't.

15      Q    When did the Department realize it wasn't going to

16  be able to adopt those rules and regulations?

17      A    I don't recall a specific date that was determined,

18  but fairly quickly as we began to have conversations with

19  providers around the statutory expectations of what the

20  quality standard rule would be.

21           There wasn't a specific date set forth for

22  that in statute, so there wasn't a specific timeline tied to

23  quality standards.  And certainly recognized through those

24  conversations with providers that we wanted to have a very

25  inclusive process in the development of those where we had

**DAWN ODEAN - April 10, 2024**

1  authentic stakeholder feedback and input so that we could

2  ensure that we could be consistent and continue to work

3  together in that inclusive culture of the quality standards.

4           So we knew we had things set forth for us in

5  statute that were already in place, but that for the rule we

6  needed to slow down.  We had been starting, as you know, the

7  development of the program on a fairly compressed timeline

8  and this was a place that because there wasn't a specific

9  date tied to it, was an opportunity for us to go through that

10  authentic process to determine the standard draft, have

11  conversations, review what's happened in Colorado so far

12  around quality review, other national frameworks, and really

13  dig in together to develop the initial rule set.

14     Q    So you said you realized pretty early on you

15  weren't going to be able to do it, and I understand you can't

16  give a specific date, but can you give a general time frame

17  when you realized this?

18     A    I could look back.  I would say prior to the start

19  of the program here.  So it was probably in the spring ahead

20  of the fall start of the program year.

21     Q    Spring of 2023?

22     A    Uh-huh.

23     Q    All right.  So as you know, there's a requirement

24  there, it's the fourth kind of sub-bullet point down.  It

25  says the requirement that each preschool provider provide

DAWN ODEAN - April 10, 2024

1  eligible children an equal opportunity to enroll and receive

2  preschool services regardless of race, ethnicity, religious

3  affiliation, sexual orientation, gender identity, lack of

4  housing, income level, or disability as such characteristics

5  and circumstances apply to the child or the child's family.

6            Are you aware that throughout this litigation

7  the parties have sometimes referred to this provision as the

8  quality assurance provision?

9     A    I haven't heard it called that, but yeah.

10    Q    If I slip into that and call it the quality

11 assurance provision, that's what I'm referring to.  If you

12 have questions as to what I'm referring to, please ask.

13    A    I will.

14    Q    So even though the Department didn't adopt quality

15 standard rules for the '23-'24 school year, the start -- the

16 Department still expected compliance with this quality

17 assurance provision, correct?

18    A    Yes, as it ties to statute.  So a rule isn't

19 intended to change the law, which is why that's cited here,

20 so any language that's pulled directly from statute, any rule

21 wouldn't change that either way.  It might reiterate what's

22 in statute, but if I recall correctly, that is language that

23 was written from the law.

24    Q    I'm going to hand you what's been marked as

25 Exhibit 15.  Take a second to look at that.

## DAWN ODEAN - April 10, 2024

1          So this is an -- Exhibit 15 is a printout of

2   Colorado Statute 26.5-4-205; do you recognize this statute?

3      A    Yes.

4      Q    Okay.  And if you could turn to the second page,

5   and at the top of the second page, it's subsection 2, this

6   starts, At a minimum.  Do you see that?

7      A    I do.

8      Q    Says, at a minimum, the quality standards

9   established in rule must include.  And then if you go down to

10  subsection B, it says, a requirement that each preschool

11  provider provide eligible children an equal opportunity.  Is

12  that what you were referring to previously?

13     A    Yes.

14     Q    Okay.  What was the Department's understanding of

15  the statute language, say quality standards established in

16  rule?

17          MR. WHITEHAIR:  Object to the extent it calls for a

18  legal conclusion.  You can answer.

19          THE DEPONENT:  The Department's understanding was

20  that we create a quality standards rule through our rule

21  process that was inclusive of at least these things that are

22  listed.

23     Q    (By Mr. Galus) Was it the Department's view that it

24  could establish quality standards in the absence of rule

25  making?

**DAWN ODEAN - April 10, 2024**

1      MR. WHITEHAIR:  Object to the extent it calls for a

2  legal conclusion.  You can answer.

3      THE DEPONENT:  As I recall, there wasn't a

4  Department understanding of creating expectations around any

5  quality standards outside of what was set forth in statute

6  until the rule was established.

7      Q     (By Mr. Galus) Okay.  If we could go back to the

8  program services agreement, Exhibit 6.

9          If a participating preschool or an applicant

10 preschool did not agree to comply with the quality assurance

11 provision, would it have been allowed to participate in the

12 Universal Preschool Program?

13     A     They would have had to sign the agreement.

14     Q     And agree to comply with that provision?

15     A     Uh-huh.

16     Q     Is that a yes?

17     A     Yes.

18     Q     All right.  The Department has since included this

19 particular provision in the annual adopted rules and

20 regulations; is that right?

21     A     Yes.

22     Q     And that was finalized on March 28th, 2024?

23     A     Yes.

24     Q     And those new rules and regulations will go into

25 effect July 1, 2024?

DAWN ODEAN - April 10, 2024

1     A    I believe that's the date the rule officially goes

2   in -- if you review the rule, there's a phased approach to

3   implementation for different parts of the quality standards,

4   but the rule is in effect I believe on July 1.

5          MR. GALUS:  If you could mark that as 20, please.

6          (Whereupon, Exhibit No. 20 was marked for

7   identification.)

8     Q    (By Mr. Galus) Do you recognize Exhibit 20?

9     A    Yes.

10    Q    Are these the new rules and regulations that we

11  were just discussing?

12    A    Yes.

13    Q    If I could direct your attention to Rule 4.109-B

14  that would be on page 5 of the exhibit.  Are you there?

15    A    Yes.

16    Q    Okay.  Do you see Subsection B?  It says, Eligible

17  preschool providers must ensure that children receive an

18  equal opportunity to enroll and receive Universal Preschool

19  services.  Do you see that provision?

20    A    Yes.

21    Q    And that's the same as the quality assurance

22  provision that we just discussed and was included in the

23  '23-'24 agreement?

24    A    Yes.

25    Q    Is the Department legally obligated to enforce this

**DAWN ODEAN - April 10, 2024**

1   provision?

2          MR. WHITEHAIR:  Object to the extent it calls for a

3   legal conclusion.  You can answer.

4          THE DEPONENT:  Yes.

5      Q    (By Mr. Galus) Okay.  This provision lists certain

6   protected characteristics, do you see that?  Race, ethnicity,

7   religious affiliation, sexual orientation.  Do you see the

8   list of protected characteristics?

9      A    Yes.

10     Q    Does the Department view some those characteristics

11  as being more important than others?

12     A    No.

13     Q    So discrimination based on religion is just as bad

14  as discrimination based on race?

15         MR. WHITEHAIR:  Object to the form of the question.

16         THE DEPONENT:  I don't know what you define as bad,

17  but we would review any complaints in regards to any of those

18  in the same -- with the same procedure.

19     Q    (By Mr. Galus) How would you define the word

20  "bad"?

21     A    It would depend on how it's being used.  So I would

22  say we would address this particular -- with any concerns

23  that were elevated regarding any of those on the list, in the

24  same manner.

25     Q    One wouldn't be treated more favorably or less

DAWN ODEAN - April 10, 2024

 1   favorably than the other listed protected characteristics?

 2       A    That's the intention of the standard operating

 3   procedure, yes.

 4       Q    So discrimination based on disability is just as

 5   bad as discrimination based on sexual orientation?

 6            MR. WHITEHAIR:  Object to form.

 7            THE DEPONENT:  Again, those on the list would be

 8   treated with the same process.

 9       Q    (By Mr. Galus) Okay.  The Department has the same

10   interests in prohibiting discrimination based on disability

11   as it does in -- prohibiting discrimination based on sexual

12   orientation?

13       A    The Department has concern over the treatment of

14   the children in the program.

15       Q    Is the interest the same?

16       A    It is the same.

17       Q    Do you think this provision is clear about what is

18   expected of participating providers?

19            MR. WHITEHAIR:  Object to form.

20            THE DEPONENT:  I can't speak for all providers.

21   It's clear.  We also intend to, with providers, create an

22   administrative guide to implementation of the standard.

23       Q    (By Mr. Galus) Do you agree that a provider needs

24   to know what they can and cannot do in order to comply with

25   this agreement?

DAWN ODEAN - April 10, 2024

```
 1        A     I believe it's fairly clear, but yes.

 2        Q     Are you responsible, in your position as director,

 3   for interpreting what this requirement means?

 4        A     Not in isolation.  So it's not only the director,

 5   it's with the work of our Department team, of our senior

 6   leadership team, and if counsel is needed, counsel.

 7        Q     But you're part of that conversation?

 8        A     Absolutely, yes.

 9        Q     And Ms. Roy as well?

10        A     Yes.

11        Q     And Ms. Roy, would she have the final say?

12        A     Dr. Roy would, yes.

13        Q     Dr. Roy.  And that includes interpreting what equal

14   opportunity means?

15        A     Yes.

16        Q     And that would include interpreting what race,

17   ethnicity, and the other characteristics mean?

18        A     That would be with legal counsel and in alignment

19   with the expectation of the law.

20        Q     Does the Department have any written guidance on

21   how to interpret this provision?

22        A     No.

23        Q     Any informal guidance?

24        A     The guidance would be to follow the procedure.

25   This is what's in statute for us to follow, and so if we had
```

CALDERWOOD-MACKELPRANG, INC.
(303) 477-3500

**DAWN ODEAN - April 10, 2024**

1  any question about how to interpret that, we would seek

2  counsel to ensure that we were within the law.

3      Q    I have some questions related to the reference to

4  gender identity in the provision.

5           How does the Department go about deciding if a

6  child is not receiving an equal opportunity to enroll or

7  receive services based on gender identity?

8      A    We would address any concerns or allegations around

9  actual treatment of a child or of a family.  There's no

10 presumption of what that might be until there's an actual

11 mistreatment.

12     Q    Are there any particular things the Department

13 would look for?

14     A    We would follow the standard operating procedure

15 that Mr. Derocher shared with you to investigate any concerns

16 or allegations and determine what steps would be taken.

17     Q    Okay.  And again, there's not any written guidance

18 on -- that the Department would consult beyond the standard

19 operating procedure?

20     A    There is no written guidance outside of that.

21     Q    Are you familiar with the Colorado

22 Antidiscrimination Act?

23     A    A little bit.

24     Q    Would that inform some of the Department's

25 decisions about gender identity discrimination?

**DAWN ODEAN - April 10, 2024**

1          MR. WHITEHAIR:  Question -- object to the form.

2  Object to the extent it calls for legal conclusion and not

3  clear what topic you're describing.

4          MR. GALUS:  The enforcement and interpretation of

5  the non-discrimination provisions.

6          MR. WHITEHAIR:  Rules?

7          MR. GALUS:  Yeah.

8          MR. WHITEHAIR:  Rules?

9          MR. GALUS:  Rules.

10         MR. WHITEHAIR:  You're talking about statute?

11         MR. GALUS:  I'm asking whether the statute would

12  inform how they interpret and apply the non-discrimination

13  rules.

14         MR. WHITEHAIR:  I don't think she's designated or

15  prepared to answer that other than her personal capacity.

16         MR. GALUS:  Okay.

17         MR. WHITEHAIR:  Subject to my other objections, you

18  may answer.

19         THE DEPONENT:  I'm -- as I'm not a lawyer and I'm

20  not -- I don't intimately understand that statute to the

21  letter of the law, I would seek counsel to use that or not

22  use that if it's appropriate or not appropriate to use in our

23  process.

24    Q   (By Mr. Galus) So you'd consult with your

25  attorneys?

DAWN ODEAN - April 10, 2024

1      A      I would.

2      Q      Okay.  And the Department's attorneys are the

3  attorneys in the Attorney General's Office?

4      A      Yes.

5      Q      If we can go back to Rule 4.109 Subsection B.  That

6  rule says that eligible preschool providers must ensure the

7  children receive an equal opportunity to enroll regardless of

8  those listed characteristics.

9              Does that cover the provider's admissions and

10 enrollment policies?

11     A      It might.  So again, we wouldn't -- we're not

12 reviewing the policies of all of our participating providers

13 unless there's an allegation or a complaint filed with the

14 Department to review.

15     Q      If you learned of an admissions or enrollment

16 policy that appear to violate that provision or rule, would

17 the Department look into that?

18     A      If a complaint was filed, we would follow the

19 standard operating procedure to review.

20     Q      What if you learned of it outside of a complaint?

21     A      I can't speculate how I would learn of it outside

22 of a complaint.  So we're not reviewing every participating

23 provider's policies.

24     Q      So let's say if a news report reported on a

25 participating UPK provider that appeared to have admissions

CALDERWOOD-MACKELPRANG, INC.
(303) 477-3500

3. App.765    Exhibit 66
Page 20

**DAWN ODEAN - April 10, 2024**

1  in enrollment policies that violated this provision, would

2  the Department investigate that?

3      A    Since it's hypothetical, I can't say for sure how

4  we would react.  It would depend on the actual situation and

5  the facts.

6           We certainly could review policies and

7  procedures, and there are some expectations of policies and

8  procedures in the new quality standards, but really what our

9  focus would be primarily on is treatment in a situation.

10          So the actions were taken would be our

11 priority to ensure that these were being met.  And in that

12 case we would follow the outlined standard operating

13 procedure.

14     Q    Okay.  So could a preschool have a policy of not

15 admitting children of a certain race and still participate in

16 the program?

17     A    If that was elevated to us, we would follow those

18 procedures to determine what exactly is said and what

19 situation and how that pertains to the Universal Preschool

20 Program and follow that process to determine whether they

21 were able to participate or not.

22     Q    If a provider came up to you and asked the same

23 question, can our school have a policy of not admitting

24 children of a certain race, what would your answer be?

25          MR. WHITEHAIR:  Object to the form.  You can

**DAWN ODEAN - April 10, 2024**

 1  answer.

 2          THE DEPONENT:  If a provider said this is our

 3  policy, can we participate?  We would -- as the director, I

 4  would follow the same standard operating procedures to ensure

 5  that as a director I'm not not including a provider that

 6  wasn't -- so I would bring that to our senior leadership team

 7  and to counsel if necessary to determine what the next steps

 8  might be for that provider to participate or not.

 9      Q    (By Mr. Galus) So it's possible a school with that

10  policy could participate in UPK?

11      A    Well, a lot of things are possible.  That could be

12  possible.

13      Q    All right.  Rule 4.109-B also says that eligible

14  providers must ensure that children receive Universal

15  Preschool services regardless of the listed characteristics.

16          Preschool services covers more than admissions

17  and enrollment, correct?

18      A    Yes.

19      Q    What all does it cover?

20      A    It covers the time frame that is Universal

21  Preschool and the delivery of preschool services.  That's

22  inclusive of the expectations that are in licensing for

23  safety and that is inclusive of the newly implemented quality

24  standards and the phased approach we have outlined there.

25      Q    That would include everything that occurs within

3.  App.767        Exhibit 66
Page 22

DAWN ODEAN - April 10, 2024

 1  the UPK preschool hours?

 2      A    Yes.

 3      Q    Do you understand that in this case the plaintiff

 4  has raised concerns about its pronoun usage, bathroom usage,

 5  and dress code policies potentially violating the

 6  non-discrimination rules?

 7      A    Yes.

 8      Q    And you received an e-mail from Darren Patterson

 9  Christian Academy in May 2023 asking about those provisions;

10  do you recall that?

11      A    Do you have that as an exhibit I can refer to?

12      Q    I do, I'm just asking generally, do you recall it?

13      A    I can't recall if it was directly to me or if it

14  was to someone in the Department.

15      Q    Were you included on it?

16      A    I believe I was.

17      Q    Okay.  And do you remember that being in May of

18  2023?

19      A    I don't remember, that's why I asked to see it.

20      Q    All right.  I'm just trying to save us time here.

21      A    Sure.

22      Q    You mentioned that you were deposed in the St. Mary

23  Catholic Parish case?

24      A    Yes.

25      Q    And that happened in November 2023; does that sound

DAWN ODEAN - April 10, 2024

 1  right?

 2       A    That sounds right.

 3       Q    And you testified at the trial in that case?

 4       A    Yes.

 5       Q    And that would have been in January 2024?

 6       A    Yes.

 7       Q    Have you thought about those cases, this one and

 8  the St. Mary case since then?

 9       A    Yes.

10       Q    Okay.  After having thought about those cases, does

11  it violate the non-discrimination provision for a school to

12  only refer to children by pronouns that correspond to the

13  child's biological sex?

14            MR. WHITEHAIR:  Object to the extent it calls for a

15  legal conclusion.  You can answer.

16            THE DEPONENT:  Could you state that again?

17       Q    (By Mr. Galus) Sure.  Does it violate the

18  non-discrimination provision for a school to only refer to

19  children by pronouns that correspond to the child's

20  biological sex?

21            MR. WHITEHAIR:  Same objection.

22            THE DEPONENT:  It depends on the treatment of the

23  child.  And so as the director of the program, and for the

24  program, it's our charge to ensure that children are treated

25  equitably in the program, that they're in a safe environment

**DAWN ODEAN - April 10, 2024**

1  so that they can learn and thrive.

2          And so the -- just the statement of that, I

3  wouldn't presume that those things have occurred, but would

4  have to follow the procedures to ensure that children do have

5  that access to preschool services in a safe way so that they

6  can learn and thrive.  And that's the priority of the

7  program.

8      Q    (By Mr. Galus) So is that a yes or a maybe?  What's

9  the answer?

10     A    It depends.  It depends, I think.  We -- it's hard

11  to speculate the impact that that might have on a child's

12  feelings of safety or how that treatment plays out in a

13  specific scenario.  So we would have to be able to address a

14  specific treatment of a child to say yes or no.

15     Q    If the Department learned that a participating

16  provider had a policy of only referring to children by

17  pronouns that correspond to the child's biological sex, would

18  the Department investigate that?

19     A    If a complaint was filed, we would investigate

20  that.

21     Q    Same question, if the school has a policy of

22  maintaining sex-separated bathrooms and requires students to

23  use the bathroom that aligns with their biological sex, would

24  the Department investigate that?

25          MR. WHITEHAIR:  Object to the extent it calls for a

### DAWN ODEAN - April 10, 2024

1  legal conclusion.  You can answer.

2          THE DEPONENT:  If a complaint was filed in regards

3  to equitable treatment of the child in the program, the

4  Department would investigate that.

5     Q    (By Mr. Galus) Same question with respect to dress

6  code.  If the school had a dress code that was enforced based

7  on student's biological sex rather than gender identity,

8  would the Department look into that?

9          MR. WHITEHAIR:  Same objection.

10          THE DEPONENT:  Yes.

11     Q    (By Mr. Galus) If we go back to the pronoun

12  question, is it the Department's position that using pronouns

13  based on biological sex would not be harmful to a transgender

14  student?

15     A    I want to make sure I'm answering the question that

16  you're asking.  Could you say it again?

17     Q    Yes.  So my question, because you said you'd look

18  into it and it depends, is it the Department's position that

19  a participating preschool could use a transgender child's

20  pronouns based on biological sex in a way that's not harmful

21  to the child?

22          MR. WHITEHAIR:  Object to the form of the question.

23  You can answer it.

24          THE DEPONENT:  Can you restate it?  I think I'm

25  having a hard time on the double-negative on the not harmful.

### DAWN ODEAN - April 10, 2024

```
 1   I want to make sure I'm answer what you're intending to ask.
 2       Q    (By Mr. Galus) Is it harmful for a preschool to use
 3   pronouns based on the child's biological sex if the child
 4   identifies as transgender?
 5       A    It's incumbent upon the Department to investigate
 6   that child's treatment.  I'm -- it's not the Department's
 7   expectation to determine how that treatment might impact a
 8   particular child for any of the things listed here.
 9              Our priority is to ensure that child feels
10   safe and can equitably access learning and develop as any
11   child in the preschool program does.  And so that's what we
12   would be investigating.
13       Q    I think that's -- the question that I'm trying to
14   ask is, would the Department's position be that violates this
15   non-discrimination provision for a participating school to
16   insist on using pronouns based on a child's biological sex
17   when the child identifies as transgender and requests
18   different pronouns?
19       A    And what I'm -- I'm not trying to be evasive.  What
20   I'm trying to say is that the Department's position is that
21   our priority is the treatment, equitable treatment of
22   children.  How that may or may not be violated would have to
23   occur for us to investigate the impact or the how or why or
24   what next steps might be.
25       Q    But you would investigate a situation like that?
```

**DAWN ODEAN - April 10, 2024**

1    A    We would investigate any concern or complaint that

2 was elevated in that regard.

3    Q    So it's possible a determination could be made that

4 it violates the non-discrimination provision?

5    A    Again, there are a lot of possibilities of how that

6 might play out depending on the actual -- how the

7 investigation plays out, but yes, that is possible.

8    Q    How are you doing?  Would you like a break?  I have

9 a few more questions along this line, but are you okay?

10   A    I am okay.  Thank you.

11   Q    Okay.  So if we could go back to the same rule,

12 4.109 Subsection B, that provision doesn't prohibit

13 discrimination based on sex, does it?

14        MR. WHITEHAIR:  Object to the extent it calls for a

15 legal conclusion.

16        THE DEPONENT:  I'm not a lawyer, I don't see that

17 called out specifically, but if there was a complaint that

18 was elevated in regards to the treatment of a child, we would

19 follow the same standard operating procedure there and

20 include counsel if necessary.

21   Q    (By Mr. Galus) So you would investigate a complaint

22 alleging that a provider discriminates based on sex?

23   A    We'll investigate complaints that are elevated to

24 the Department.

25   Q    Even if the complaint is about sex discrimination?

DAWN ODEAN - April 10, 2024

```
 1      A    It could be -- I can't anticipate what all of the

 2   complaints may or may not be, but if that was elevated, we

 3   would investigate it.

 4      Q    But there's nowhere in that provision that

 5   specifically references sex, is there?

 6           MR. WHITEHAIR:  Object to the extent it calls for a

 7   legal conclusion.  You can answer.

 8           THE DEPONENT:  I'm not an attorney, but I would --

 9   I don't see sexual discrimination called out in that

10   statement.

11      Q    (By Mr. Galus) Can a preschool provider participate

12   in the UPK program if it's an all-boys or all-girls

13   preschool?

14      A    Again, I think we would have to understand the

15   particular provider or what their -- what they may or may not

16   have in place, and then we would have the conversation about

17   whether that fits within the expectations of the agreement

18   and the statute.

19      Q    Are you aware of anything in the UPK program rules

20   and regulations that would prohibit that?

21           MR. WHITEHAIR:  Object to the extent it calls for a

22   legal conclusion.  You can answer.

23           THE DEPONENT:  Not that I'm aware of.

24      Q    (By Mr. Galus) All right.  This provision also

25   doesn't prohibit discrimination based on marital status or
```

CALDERWOOD-MACKELPRANG, INC.
(303) 477-3500

Exhibit 66
Page 29

**DAWN ODEAN - April 10, 2024**

1 familial status, does it?

2          MR. WHITEHAIR:  Object to the extent it calls for a

3 legal conclusion.

4          THE DEPONENT:  No.

5     Q    (By Mr. Galus) Okay.  So a provider could

6 participate in the preschool program even if it requires a

7 child's parents to be married?

8          MR. WHITEHAIR:  Same objection.

9          THE DEPONENT:  There -- they may participate.

10 Again, we're not reviewing all of the policies of all of our

11 providers ahead of participation.  Certainly they would need

12 to sign the agreement to participate and agree to follow the

13 rules that are put in place.  And if there was any

14 mistreatment of children that was elevated to us, we would

15 investigate.

16     Q    (By Mr. Galus) Is there anything in the

17 non-discrimination provision that we're discussing that would

18 prohibit a school from limiting enrollment to children who

19 have parents who are married?

20     A    Not as I understand it.

21     Q    All right.  Some UPK providers provide more than

22 preschool, right?  They might have an elementary school or

23 middle school as well?

24     A    Yes.

25     Q    Okay.  The non-discrimination provision we're

**DAWN ODEAN - April 10, 2024**

1  discussing at 4.109 Subsection B, that applies only to

2  preschool services?

3       A    Yes.

4       Q    So it doesn't apply to kindergarten services or

5  elementary services?

6       A    If a complaint was elevated to us, again, I think I

7  would ask attorneys, counsel to ensure that I have that

8  understanding.  I haven't had that question yet as the

9  director.

10           What I'm responsible for is the Universal

11  Preschool Program, but if this extended outside of that, I

12  would have to seek counsel.

13      Q    So you don't know whether the non-discrimination

14  provision applies to a school's -- elementary school's

15  decisions?

16      A    I know what I'm charged with, which is Universal

17  Preschool.  I would ask our attorneys if that fell outside of

18  the program age group for our authority.

19      Q    Would this provision prohibit a provider from

20  denying enrollment to let's say a first grader based on

21  religion?

22           MR. WHITEHAIR:  Object to the extent it calls for a

23  legal conclusion.

24           THE DEPONENT:  Again, as the director of Universal

25  Preschool, that's -- that's my current purview.  If that was

**DAWN ODEAN - April 10, 2024**

 1  elevated as a concern, I would seek counsel.

 2      Q    (By Mr. Galus) So help me understand this, because

 3  it says right there in the rule that it references Universal

 4  Preschool services.

 5              And so my question is, if there's a complaint

 6  of discrimination occurring outside of the preschool, is it

 7  governed by this provision?

 8              MR. WHITEHAIR:  Object to the extent it calls for a

 9  legal conclusion.

10              THE DEPONENT:  I don't believe so, but I would seek

11  counsel and make a determination with our senior leadership

12  team of whether we had any authority or if there were any

13  next steps we needed to take.

14      Q    (By Mr. Galus) So sitting here today, you can't say

15  one way or the other whether the Department would investigate

16  a complaint that alleges a UPK provider did something

17  discriminatory with let's say a first grader?

18      A    I don't believe that we have that authority, but I

19  would have to confirm that.

20      Q    So you can't confirm today that there would be no

21  investigation?

22      A    I can't.

23      Q    So it's possible there might be?

24      A    It's possible.

25              MR. GALUS:  Why don't we take a break.

DAWN ODEAN - April 10, 2024

```
 1           THE VIDEOGRAPHER:  The time now is 11:28.  We're
 2   off the record.
 3           (Whereupon, a break was taken from 11:28 a.m. to
 4   11:34.)
 5           THE VIDEOGRAPHER:  The time now is 11:34.  We're
 6   back on the record.
 7                    EXAMINATION (Cont'd)
 8   BY MR. GALUS:
 9       Q    Ms. Odean, we just took a break, did you speak with
10   your attorneys about the testimony you just gave?
11       A    I did.
12       Q    All right.  I think you have Exhibit 6 still in
13   front of you.  It's the UPK provider agreement.
14       A    Yes.
15       Q    If you could turn to page 27.  The numbers I'm
16   referencing are on the bottom right-hand corner of the
17   document.  And we're going to section 18 that's entitled
18   Department of Early Childhood Provision.  Do you see that?
19       A    Yes.
20       Q    All right.  And Section 18-B of the agreement,
21   terms and conditions, states that the provider shall not
22   discriminate against any person on the basis of gender, race,
23   ethnicity, religion, national origin, age, sexual
24   orientation, gender identity, citizenship status, education,
25   disability, socioeconomic status or any other identity.
```

DAWN ODEAN - April 10, 2024

```
1              Does the Department have an interest in

2    ensuring the preschool's participating in the UPK program not

3    discriminate based on any of those listed categories?

4              MR. WHITEHAIR:  Object to the extent it calls for a

5    legal conclusion, and object to the form.

6              THE DEPONENT:  Yes.

7        Q    (By Mr. Galus) So it's important that providers

8    don't discriminate based on race?

9        A    Yes.

10       Q    Gender?

11       A    Yes.

12       Q    National origin?

13       A    Yes.

14       Q    Religion?

15       A    Yes.

16       Q    Age?

17       A    Yes.

18       Q    Sexual orientation?

19       A    Yes.

20       Q    All of the characteristics listed in section 18-B?

21       A    Yes.

22       Q    Did the Department have the authority to include

23   this section in the program service agreement?

24             MR. WHITEHAIR:  Object to the extent it calls for a

25   legal conclusion.
```

DAWN ODEAN - April 10, 2024

```
 1          THE DEPONENT:  This was part of -- as Mr. Derocher
 2   described, part of the standard contract language that the
 3   program was operating under to write the agreement.
 4          What the program's purview is or authority is, is
 5   around ensuring that children have equitable access to
 6   Universal Preschool, and then once they're enrolled in a
 7   program, have equitable access and a safe environment to
 8   preschool services.
 9      Q    (By Mr. Galus) So is it the Department's position
10   that this was -- it was lawful to include this provision?
11          MR. WHITEHAIR:  Object to the extent it calls for a
12   legal conclusion.
13          THE DEPONENT:  Yes.
14      Q    (By Mr. Galus) Similar question, but coming from
15   kind of a different direction here.
16          Was the Department legally obligated by any
17   statute or regulation to include section 18-B in the
18   agreement?
19          MR. WHITEHAIR:  Same objection.
20          THE DEPONENT:  As it's written differently than the
21   Universal Preschool statute, I believe it was through the
22   contracts -- the State contracts office to ensure that this
23   was included.  It wasn't -- it wasn't consideration of the
24   director at the time that it wasn't legally founded.
25      Q    (By Mr. Galus) So is it legally required?
```

## DAWN ODEAN - April 10, 2024

```
 1          MR. WHITEHAIR:  Same objection.

 2          THE DEPONENT:  My understanding in working with the

 3   contracts team and their attorneys is that it was required.

 4      Q    (By Mr. Galus) All right.  If you could go back to

 5   the statute, Colorado Revised Statute 26.5-4-205, which I

 6   believe has been marked Exhibit 15.  Do you have that in

 7   front of you?

 8      A    Yes.

 9      Q    All right.  Could I direct you to the last section?

10   It's B -- excuse me, it's subsection 1-B-2 that starts, If

11   necessary.  Do you see that on the first page?  It's at the

12   very bottom.

13      A    Yes.

14      Q    Okay.  And that reads, If necessary to ensure the

15   availability of a mix delivery system within a community, the

16   Department may allow a preschool provider that does not meet

17   the quality standards to participate in the preschool program

18   for a limited time while working toward compliance with the

19   quality standards, except that each preschool provider must

20   meet all quality standards relating to health and safety as a

21   condition of participating in the preschool program.

22          How does the Department decide whether quality

23   standard relates to health and safety?

24          MR. WHITEHAIR:  Object to the extent it calls for a

25   legal conclusion.
```

DAWN ODEAN - April 10, 2024

1          THE DEPONENT:  Safety is clearly defined in the

2  alignment with licensing expectations as far as the

3  environmental safety of the program.  The program and the

4  Department also considers safety where a child feels safe in

5  a setting to be able to learn and thrive.

6      Q    (By Mr. Galus) How does the Department determine

7  whether a child feels safe?

8      A    That they're able to typically develop, that

9  they're able to learn and grow.

10          We certainly aren't creating a program to

11 hinder a child's development, we want to ensure that we're

12 supporting providers and educators in that growth and

13 development of a child and that we have positive child

14 outcomes.

15     Q    Are there any written guidelines the Department has

16 for determining this health and safety standard?

17     A    Through the quality standards rule is the first

18 step, and then we will continue to provide resources that --

19 resources, materials, educator expectations to ensure that

20 providers have what they need for child development and

21 positive child outcomes.

22     Q    All right.  So my question more relates to how the

23 Department goes about determining whether a standard relates

24 to health and safety that you reference to include whether a

25 child feels safe, I'm wondering whether there are any written

**DAWN ODEAN - April 10, 2024**

1  guidelines to help the Department determine that?

2      A    Only at this point in time we absolutely have the

3  regulations in place with licensing, and then the quality

4  standards begin to build out that safe environment for child

5  outcomes.  And that's a phased approach to ensure we're

6  supporting providers and educators in creating that safe

7  environment and optimizing child development.

8            So there will be, now that the rule has been

9  established, additional guidelines set forth in support of

10  providers being able to meet those expectations as well as a

11  resource bank to be able to meet those child's expectations

12  not inclusive of materials, professional learning, coaching

13  opportunities and so forth.

14      Q    Okay.  So you would look to the rules and

15  regulations that were recently enacted?

16      A    As the foundation, uh-huh, yes.

17      Q    And do those rules and regulations specify which

18  quality standards relate to health and safety?

19      A    I think they're all encompassing.  I don't know

20  that each particular expectation is defined specifically in

21  that regard.

22      Q    So which quality standards do relate to health and

23  safety that you're aware of?

24      A    Let's go to the standards.

25            MR. WHITEHAIR:  Object to the extent it calls for a

DAWN ODEAN - April 10, 2024

1  legal conclusion.

2          THE DEPONENT:  I haven't gone through and defined

3  them in this specific way that you're requesting, but I

4  certainly would refer back to what's expected for us in the

5  statute and then review with our team the expectations if

6  there was a request for that.

7      Q   (By Mr. Galus) So you're referring to Section 2 in

8  the Statute 26.5-4-205 that sets out the minimum quality

9  standards; is that what you're referring to?

10     A   Yes, that and as well as the section for healthy

11 development requirements and the quality standards rule.

12     Q   Are all of the quality standards that are listed in

13 this minimum provision considered health and safety

14 standards?

15          MR. WHITEHAIR:  Object to the extent it calls for a

16 legal conclusion.

17          THE DEPONENT:  It's not as simple as a yes and no,

18 it's complex.  So I appreciate the question.

19          What I would say is when we're talking about a safe

20 environment for children to access quality preschool

21 programs, health and safety covers -- is covered to some

22 extent in all of the minimum expectations set in the statute.

23     Q   (By Mr. Galus) Whether -- is it fair to say whether

24 quality standard relates to health and safety is going to be

25 like a fact-intensive analysis?

DAWN ODEAN - April 10, 2024

```
 1            MR. WHITEHAIR:  Object to the extent it calls for a
 2   legal conclusion.
 3            THE DEPONENT:  Could you say it again?
 4       Q    (By Mr. Galus) What I'm trying to understand is,
 5   how does the Department determine whether a quality standard
 6   relates to health and safety?  Does that depend on -- is that
 7   case-by-case based on the facts?
 8            MR. WHITEHAIR:  Same objection.
 9            THE DEPONENT:  So the quality standards -- all of
10   the quality standards have an impact on health and safety and
11   child outcomes.  To, you know, what level each component of
12   the standards is considered health and safety, may vary.  Are
13   you speaking to a specific incident?
14       Q    (By Mr. Galus) No, just generally how the
15   Department approaches it.
16       A    Yes.  So I would say generally we approach it that
17   health and safety can be elevated or impacted based on the
18   total quality standards or anything within that.
19            So we want to ensure that we have a safe and
20   healthy environment where preschool services are delivered
21   for children to be able to equitably develop and grow and
22   learn.
23       Q    Who is responsible for making that determination?
24       A    Which determination?
25       Q    Whether a quality standard relates to health and
```

**DAWN ODEAN - April 10, 2024**

 1  safety.

 2          MR. WHITEHAIR:  Object to the form.

 3          THE DEPONENT:  That would be the program team and

 4  executive director.

 5      Q    (By Mr. Galus) And that would include you?

 6      A    Yes.

 7          MR. GALUS:  Greg, I'm going to use an exhibit here

 8  that's been marked Attorneys' Eyes Only.  This relates to the

 9  -- on one of the discrimination complaints, so I don't know

10  if you want to --

11          MR. WHITEHAIR:  Yeah.  So, for the record, we have

12  some documents that are designated "Attorneys' Eyes Only."

13  We have some documents that are designated "Confidential,"

14  and then the remainder to the public.

15          We haven't spoken before, I haven't spoken to the

16  court reporter, we haven't spoken before, but it is my

17  understanding and practice in the past that we would close

18  the folio on the present deposition, because it is public and

19  available for public review, that we would begin a new folio

20  that would be designated Attorneys' Eyes Only on each page,

21  and that it would be separately bound and separately signed.

22          We haven't had a chance, Counsel, to talk through

23  that.  I'm always interested in, if it's possible, to combine

24  all -- anything that would be outside of the primary folio so

25  that we did it just once and we only had essentially an

DAWN ODEAN - April 10, 2024

1  uninterrupted folio that was Attorneys' Eyes Only, an

2  uninterrupted folio that was confidential and then the master

3  folio that would show, you know, testimony now is offline and

4  in a different transcript, in a different folio.

5       So I'm open to sort of how you want to proceed.

6  It's possible that the questions you ask wouldn't necessarily

7  go AEO, based on our protective order, there's no one present

8  in the room that would be violative of the protective order

9  so that everybody hear can see it, I just want to make sure,

10 A, that we need to go through all that; and B, that it is

11 most -- it's segregated to the extent we can.  And we can

12 talk more over lunch if you want, but if that makes sense, do

13 you see this as just a single portion?

14      MR. GALUS:  Yes, I think this will be very isolated

15 and I'm going to try to ask questions so that it's doesn't

16 get into AEO, but I wanted to alert you that I was going into

17 this area, but I think it would be a very limited period of

18 time and then we could proceed the rest of the deposition

19 without separating it.

20      MR. WHITEHAIR:  Okay.  So would it make sense for

21 us to go off and start a new folio, or are you wanting to

22 test how far it's going to go?

23      I mean, I'm happy to take a break and even have you

24 and me talk about whether we need to break the folio.

25      MR. GALUS:  What if we do this, what if we have one

**DAWN ODEAN - April 10, 2024**

1  question that is not confidential, AEO, one line of

2  questions, we can continue there, and then I want to get into

3  the topic that might bring in AEO stuff, so we can do a

4  separate folio there until lunch time, and then when we come

5  back after lunch, is that okay?

6          MR. WHITEHAIR:  That sounds good.  I do want to

7  make the official break so we don't have to keep the entire

8  transcript trapped inside an AEO review.

9          MR. GALUS:  Sure.

10          MR. WHITEHAIR:  So if we can break the folio, then

11  we can have different binders.

12          And regarding the tape, I think you'll need to roll

13  a different tape.

14          THE VIDEOGRAPHER:  I concur.

15          MR. WHITEHAIR:  So we'll need to go to that extent.

16          And just for people who don't do this for a living,

17  AEO is Attorneys' Eyes Only and it's a designation that's

18  been made at this point in the discovery that we believe --

19  and I'll just speak on behalf of the Department -- we believe

20  contains information that either is from a third party, and

21  thus we don't want to redistribute it if it's perhaps false,

22  but also it could be all the way to personal identifying

23  information, which is mostly redacted, but also information

24  around investigations that could identify a child simply by

25  describing them in some detail.

**DAWN ODEAN - April 10, 2024**

```
 1          So we have made those designations.  Counsel has
 2   the right at some later point to move to remove those
 3   designations or modify those designations, but we've agreed
 4   for now that we will go with these protections, keep them
 5   sort of out of the public view until it's decided how they'll
 6   be used at trial.  Is that a fair recapitulation?
 7          MR. GALUS:  Yes.
 8          MR. WHITEHAIR:  So with that in mind, if you've got
 9   a couple of questions that you think are still in the old
10   folio?
11          MR. GALUS:  Yes.
12          MR. WHITEHAIR:  Let's go ahead and do those, then
13   we'll take a break, we'll start a new tape, transcript and
14   testimony.
15          I don't think we'll need to re-swear the witness,
16   but that's a conversation -- can we simply say this is a new
17   folio, you remain under oath?
18          MR. GALUS:  Yes, that's fine.  Good?
19          MR. WHITEHAIR:  Yes.
20          MR. GALUS:  Okay.  Can you mark that as Exhibit 21,
21   please?
22          (Whereupon, Exhibit No. 21 was marked for
23   identification.)
24     Q     (By Mr. Galus) Exhibit 21 is a complaint report for
25   Castle Rock Christian Learning Center.
```

**DAWN ODEAN - April 10, 2024**

1          Are you familiar with this complaint report,

2    Ms. Odean?

3          A    Yes.

4          Q    Okay.  And as I understand the report, it indicates

5    that the Department received this complaint in June of 2023;

6    is that right?

7          A    Yes.

8          Q    Okay.  And if you look down to the section that

9    says, Reporting party and persons involved, says that the

10   reporter name wishes to remain anonymous.  So this was an

11   anonymous complaint?

12         A    Yes.

13         Q    If you can turn to the second page of this

14   document, you'll see at the top it says, The reporter had

15   brought her three-year-old child.  Do you see that?

16         A    Yes.

17         Q    And it reads, The reporter had brought her

18   three-year-old child to tour the school upon being matched,

19   and before accepting the match.  The mother was assured by

20   the school's director that they wouldn't find any books

21   teaching same sex marriage concepts and that students with

22   different gender identities would not be welcome as they do

23   not accommodate different bathroom usage needs.

24              So these were allegations that were made

25   against a preschool that was participating in the Universal

DAWN ODEAN - April 10, 2024

```
 1  Preschool Program; is that right?

 2      A    Yes.

 3      Q    And the Department investigated this complaint?

 4      A    Yes.

 5      Q    And it investigated the complaint because the

 6  allegations could allege violations of non-discrimination

 7  rules we were discussing?

 8      A    Yes.

 9      Q    Is that investigation complete or ongoing?

10      A    That investigation was determined unfounded.

11      Q    What does that mean, unfounded?

12      A    That further investigation wasn't needed.

13      Q    And why did the Department determine that?

14      A    If I recall, for this specific complaint, there was

15  a question of the family who reported the age eligibility of

16  their child to participate and their understanding of what

17  providers might be available and who they might work with our

18  Local Coordinating Organization to determine.

19      Q    So was a determination made that these allegations

20  were inaccurate?

21      A    It was determined that they were unfounded.

22      Q    Did the Department speak with the complainants,

23  those who reported this?

24      A    The Department didn't.  It was through, as noted,

25  the Local Coordinating Organization, so Local Coordinating
```

Exhibit 66
Page 46

DAWN ODEAN - April 10, 2024

```
 1   Organization works directly with families and providers to
 2   navigate the system.
 3              The complaint was brought to them and then
 4   they had asked the family and the provider further questions
 5   to determine what the extent of the complaint was.
 6       Q    Did the Department reach out to the provider?
 7       A    No.
 8       Q    And why not?
 9       A    Because it was determined that there was
10   misunderstanding or miscommunication of the process or the
11   selection of providers and what the provider -- what the
12   provider was -- what the conversation or the interaction
13   between the family and the provider.
14       Q    Help me understand how you could determine that
15   without speaking with the provider?
16       A    So our Local Coordinating Organizations are our
17   partners in implementing Universal Preschool, and so
18   typically they are, you know, locally more engaged directly
19   with providers and with families to help support the
20   navigation, as that's their role.
21              And so we work in partnership with them around
22   the state where they have those relationships in their local
23   communities to implement Universal Preschool including
24   complaints that may arise.
25       Q    So you mentioned age, was a determination made that
```

DAWN ODEAN - April 10, 2024

 1  this child wasn't eligible for the Universal Preschool

 2  Program?

 3      A    That's what I recall.

 4      Q    And is that the basis on which the unfounded

 5  determination was made?

 6      A    That was part of it.

 7      Q    And what was the other part?

 8      A    I think the other part was that the -- there

 9  weren't any specific expectations around the curriculum or

10  instruction components and there was no mistreatment of the

11  family or the child.

12      Q    What about the reference to different bathroom

13  usage needs, was that relevant to the determination?

14      A    I would have to look back.  My recollection is

15  that -- I'd -- I'd have to look back at that specifically.

16           I do know we have providers who have one

17  bathroom per classroom, for example, is not a gender-specific

18  bathroom.  I can't recall if that was particularly aligned

19  with this question, but there was no -- there was no

20  mistreatment of the child.  And my understanding in

21  conversations with our LCO is that this family had other

22  choices that they were making in the system for providers and

23  for care related to the age of the child and their family's

24  choice.

25      Q    Were those other providers, was that outside the

**DAWN ODEAN - April 10, 2024**

 1  context of the UPK program?  Because I'm trying to

 2  understand, I thought this child wasn't eligible for the UPK

 3  program?

 4      A    Yeah.  So there is some State funding for -- that's

 5  not Universal Preschool, that is for children two years

 6  before kindergarten, that's distributed through the school

 7  district setting.  School districts manage those funds.  They

 8  do come through our Department to a school district to

 9  manage.

10           And this particular LCO serves their community

11  outside of their Universal Preschool charge in birth through

12  school-age licensed childcare, navigation in their community.

13      Q    All right.  But at no point did the Department

14  reach out to the provider and ask questions about what was

15  submitted in this report?

16      A    No, this was determined unfounded and no action was

17  needed further by the Department at this time.

18      Q    Okay.  And would that determination have been made

19  on July 26?  Do you see the date at the bottom?

20      A    Yes.

21           MR. GALUS:  I think we can stop here and then open

22  up the new folio.

23           MR. WHITEHAIR:  Does it make sense to do lunch now?

24           MR. GALUS:  It's going to be like probably 15

25  minutes.

**DAWN ODEAN - April 10, 2024**

```
 1              MR. WHITEHAIR:  Okay.

 2              MR. GALUS:  It's not going to be long.

 3              MR. WHITEHAIR:  Sure.

 4              THE VIDEOGRAPHER:  The time now is 12:02.  We're

 5   off the record.

 6              (Whereupon, further testimony was given and

 7   designated as Attorneys' Eyes Only and is contained within a

 8   separate transcript.)

 9              THE VIDEOGRAPHER:  The time now is 12:17.  We're

10   off the record.

11              (Whereupon, a lunch break was taken from 12:17 p.m.

12   to 1:30 p.m.)

13              THE VIDEOGRAPHER:  The time now is 1:30.  We're

14   back on the record.

15              (Whereupon, the Attorneys' Eyes Only portion was

16   concluded and the testimony continued.)

17                   EXAMINATION (Cont'd)

18   BY MR. GALUS:

19      Q    Ms. Odean, I had some questions I wanted to ask you

20   about the process by which children are matched to schools

21   through the UPK program.  Would you be able to describe that

22   process generally for me?

23      A    Yes.  So a family can go to our online application

24   and they can search participating providers, complete the

25   application, and make selections of providers that they're
```

### DAWN ODEAN - April 10, 2024

```
 1  interested in attending from one to ten providers and rank

 2  them.

 3       Q    You said one to ten, did it used to be just five?

 4       A    It was.  It did start out as five.

 5       Q    And when did it change to ten?

 6       A    I don't recall.  But as the seats started to get

 7  limited through the process of enrollment leading up to the

 8  program year, we increased the number of providers they might

 9  be able to choose from.

10       Q    Okay.  So the placement ultimately, though, is

11  based on the family's choice?

12       A    Yes.

13       Q    So a child will be placed with a provider only when

14  their family agrees to accept the match?

15       A    Yes.  So once the families have submitted it and we

16  do what's called a round, and all of the applications that

17  are submitted during that round go through matching.  They --

18  the system only matches them to one of their choices, it

19  doesn't match them to any other provider.

20       Q    Okay.  So there wouldn't be a situation where a

21  child was matched with a provider that the family didn't

22  select?

23       A    Correct.

24       Q    Are you aware of any situations where a child

25  didn't get one of the selections, meaning there weren't any
```

**DAWN ODEAN - April 10, 2024**

1  available?

2      A    Yes.  So as the programs filled up and families

3  continued to apply, there were situations where they may have

4  only selected one provider or one program within that

5  provider that was full.

6      Q    And in that situation they would have to

7  reselect --

8      A    Correct.

9      Q    -- for a new round?

10     A    Yes.  So if they had only selected one provider and

11  it was full, they would have to -- we would alert them to

12  that and then ask them to choose -- revise their application

13  and choose any other providers.

14          If they had multiple providers, and let's say

15  their first choice was full, the system, during that round,

16  would try to match to the next available provider that they

17  chose.

18     Q    All right.  So the parent or the family, they're

19  notified of the match?

20     A    Yes.

21     Q    Is the school also notified of the match?

22     A    Yes.

23     Q    All right.  Who learns of it first?

24     A    The provider.

25     Q    Why is that?

DAWN ODEAN - April 10, 2024

1    A    Just to confirm that they have the availability to

2  serve, and because the algorithm is industry standard

3  algorithm for matching, but it doesn't take into account a

4  mixed delivery system.  And so we have a process in place

5  where the provider may decline the match based on preferences

6  to that algorithm.

7    Q    Okay.  And when that happens, when a school

8  declines a match, what information is provided to the family?

9    A    No information yet.  So again, it's -- if they have

10 another choice that they can be matched to, then that would

11 occur.  If not, and the provider declines, then the family

12 would know that they didn't get a match.  They'd be notified

13 that they didn't get a match and that the provider declined.

14   Q    They would be told the provider declined?

15   A    Yes.

16   Q    Would they be given the reason for the decline?

17   A    No.

18   Q    If you could go back to Exhibit 20, this is the

19 finalized UPK rules and regulations.

20   A    Okay.

21   Q    All right.  If you could turn to Rule 4.110, that

22 would be on page 7 of the exhibit.  It's entitled Provider

23 Matching Criteria.  Do you see that?

24   A    Yes.

25   Q    And then in Subsection A it says, Eligible

DAWN ODEAN - April 10, 2024

1   preschool providers may utilize the following programmatic

2   preferences to the deferred acceptance algorithm component of

3   the matching process.  Is this what you were just referring

4   to?

5        A    Yes.

6        Q    Are you aware the Department previously referred to

7   these as exception criteria?

8        A    Yes.

9        Q    Now, I understand that these were adopted in the

10  rules and regulations, but these listed preferences or

11  exceptions, they're not new, are they?

12       A    For the most part, yes.

13       Q    Are there some that are new?

14       A    I think we just defined it further.

15       Q    But they were already being used for the current

16  '23-'24 school year?

17       A    Yes, that's correct.

18       Q    Okay.  The rules and regulations here just

19  memorialized what was already taking place in practice?

20       A    Yes, and further defined.

21       Q    Okay.  My understanding is that for the '23-'24

22  school year, there's over 1,000 providers that have used one

23  or more of these preferences or exceptions; is that

24  consistent with your understanding?

25       A    Yes.  And I would say that's predominantly school

**DAWN ODEAN - April 10, 2024**

1  districts because of their boundary expectations.

2      Q    Okay.  So I do want to talk about some of these in

3  a little bit more detail.

4            So if we could start with Subsection 2, which

5  is the cooperative preschool providers requiring

6  participation in the cooperative; do you see that?

7      A    Yes.

8      Q    And is this for preschools that have a specific

9  model that requires a certain level of family participation?

10     A    Yes.

11     Q    And the level and type of participation varies by

12  school?

13     A    Yes.

14     Q    Some preschools, for instance, could require the

15  parents to teach a course or to lead field trips; is that the

16  types of examples?

17     A    They vary.

18     Q    It varies?

19     A    Yes.

20     Q    Okay.  Is the preschool able to define the

21  participation that they're looking for and then if the family

22  is not able to provide that level of participation, the

23  provider can decline the match?

24     A    Yes.

25     Q    Does the Department inquire into the type of family

DAWN ODEAN - April 10, 2024

1  participation being required by the provider before allowing

2  the provider to use this reference?

3       A    Not to review specific policy.

4       Q    It doesn't look into it?

5       A    Huh-uh.

6       Q    Does the Department consider whether a particular

7  preference might disparately impact certain children or

8  families?

9            MR. WHITEHAIR:  Object to the extent it calls for

10 legal conclusion.  You can answer.

11           THE DEPONENT:  The Department understands that in

12 mixed delivery, we want to be able to provide these

13 programmatic preferences to be able to support family's

14 choice of the just-right provider.

15           Our approach has been to be inclusive first.  If

16 there were any concerns that were elevated regarding lack of

17 access for something specific that might go against the law

18 that's set forth for us, then we would investigate that.

19      Q    (By Mr. Galus) But the Department is not inquiring

20 into that beforehand?

21      A    No, it's an attestation by the provider.

22      Q    You mentioned the school district boundaries?

23      A    Uh-huh.

24      Q    And I think this is outlined in Subsection A-3 of

25 Rule 4.110.  Could you explain why the Department allows for

DAWN ODEAN - April 10, 2024

1   this preference or exception?

2        A     School districts have mandate from their local

3   school board in regards to serving within their boundaries

4   and the capacity they have to serve as well as with the

5   Colorado Department of Education.  So there are designated

6   boundaries are established and their expectation is to serve

7   those within their boundaries first.

8                Some school districts have capacity to open

9   enroll, if you will, outside of those boundaries and some

10  districts do not have that capacity.

11       Q     Okay.  So could a school district participate in

12  the UPK program if it requires a student to reside within the

13  district's boundaries?

14       A     Yes.

15       Q     And it would do so through this preference?

16       A     Uh-huh.

17       Q     Similar question to the co-op, does the Department

18  evaluate or look into the school district's enrollment

19  criteria before allowing it to use the preference?

20       A     No.

21       Q     If you could look at Subsection 5, it references

22  Head Start programs; do you see that?

23       A     I do.

24       Q     And this is a preference that -- well, let me just

25  ask you generally.  Why is this preference included in the

DAWN ODEAN - April 10, 2024

```
 1  rule?

 2       A    It's included because the deferred acceptance

 3  algorithm doesn't consider that Head Start has federal

 4  obligations to meet.  And so they have specific requirements

 5  for enrollment that allows for the grantee to serve the

 6  intended families that those funds are set aside for.

 7       Q    And this is because Head Start providers serve

 8  children who are families from -- with incomes below poverty

 9  guidelines?

10       A    Yes.

11       Q    Are Head Start providers required to participate in

12  UPK?

13       A    They are not.

14       Q    It's voluntary?

15       A    Yes.

16       Q    So by using this preference, could a Head Start

17  provider prioritize the placement of low-income children into

18  the preschool?

19       A    Yes.

20       Q    And still participate in UPK?

21       A    Yes.

22       Q    What if there's a preschool provider that doesn't

23  participate in Head Start, could they prioritize the

24  placement of low-income children?

25            MR. WHITEHAIR:  Object to the extent it calls for a
```

**DAWN ODEAN - April 10, 2024**

1  legal conclusion.  You can answer.

2          THE DEPONENT:  They -- some preschool providers may

3  have priorities in place for serving low-income children, but

4  that would not exclude them from also serving families who

5  may choose and be matched to them that weren't low income.

6      Q   (By Mr. Galus) So even if they're not a Head Start

7  provider, what I'm wondering is, could they prioritize the

8  placement of low-income children?

9          MR. WHITEHAIR:  Same objection.

10         THE DEPONENT:  They may have a policy in place to

11 prioritize, but that wouldn't allow them to decline a family

12 who is not living within poverty.

13     Q   (By Mr. Galus) Could they reserve all of their

14 seats for low income?

15     A   No, there's no way for them to do that.

16     Q   Why not?

17     A   Because they may be matched to a family who isn't

18 low income.

19     Q   And what would be the problem with that?

20     A   It's again that equitable access to a participating

21 provider.  If they had federal law mandating the program

22 measures as a Head Start, that would be different.

23     Q   When you're referring to equitable access, are you

24 referring to the non-discrimination provisions we've been

25 discussing today?

## DAWN ODEAN - April 10, 2024

1    A    Yes.

2    Q    Would you agree that low-income families have

3  historically been discriminated against?

4         MR. WHITEHAIR:  Object to the form of the question.

5         THE DEPONENT:  My -- what I understand is --

6    Q    (By Mr. Galus) Just to be clear, I'm asking you as

7  the 30(b)(6) deponent representing the Department.

8    A    Sure.

9    Q    Does the Department believe that low-income

10  families have historically been discriminated again?

11    A    The Department recognizes that as a protected

12  class.

13    Q    Okay.  So why couldn't a non-Head Start provider

14  prioritize the placement?

15    A    It would be to ensure that all families have access

16  and equitable treatment.  And again, it would be speculative

17  of me to speak to any one specific situation without knowing,

18  you know, a little more detail about the family and the

19  provider and the scenario.  And then if there was a question

20  or a concern, that would go through the process that we've

21  outlined.

22    Q    Okay.  If you could look at Subsection 6, and this

23  is a preference that says participating preschool providers

24  granting preference to an eligible child of one of their

25  employees.  So this is a preference for employers?

DAWN ODEAN - April 10, 2024

```
 1        A     For an employee's child, yes.

 2        Q     Okay.  So the participating preschool as the

 3   employer can use this preference to prioritize placement of

 4   an employee's child?

 5        A     Yes.

 6        Q     Why did the Department agree to include this

 7   preference or exception?

 8        A     We heard very early on from families and providers

 9   that this was a common practice and that this was critical to

10   ensuring workforce.

11              So many of our providers had employees who

12   would only be able to work if their child had service --

13   services as well, or supervision as well.

14              And then we have employer-based providers.

15   For example, an organization has a childcare for their

16   employees, a licensed childcare for their employees.  And

17   again that's just to ensure workforce, have that benefit, and

18   that's not -- that's not a detriment to them being able to be

19   employed.

20        Q     Can this preference be used by any type of

21   preschool provider?

22        A     Yes.

23        Q     Okay.  So any preschool could limit some or all of

24   their seats to children of employees?

25        A     Yes.
```

**DAWN ODEAN - April 10, 2024**

1  Q    Could a church-run preschool limit its UPK seats to

2  children of employees.

3  A    Yes, who are eligible.  Yes, age-eligible, yep.

4  Q    All right.  If we could look at the preference set

5  forth in Subsection 9, it says participating preschool

6  providers granting preference to an eligible child who is

7  multilingual to ensure proper delivery of services to that

8  child.

9        Would you be able to explain why the

10  Department allowed for this preference or exception?

11  A    Sure.  So again, this came specifically from

12  providers as a request because particular providers might

13  have expectations of delivery for multilingual in a native

14  language in a dual-language program, specific staff, specific

15  expectations.  Specifically school districts have very clear

16  expectations on how those classrooms are set up and

17  instruction is delivered.

18  Q    Okay.  So the Department learned that some

19  dual-language programs require children to be at a certain

20  level in their language to enroll?

21  A    It might be a certain English language acquisition

22  level, it might be a balance of the classroom of

23  native-language speakers other than English or native

24  speakers who are English.  There's a variety that we heard

25  from providers about.

DAWN ODEAN - April 10, 2024

1    Q    Would this allow a provider to decline a match if a

2   student did not adequately speak a specific language?

3    A    Yes.

4    Q    If we could look at the preference outlined in

5   Subsection 4, say participating preschool providers reserving

6   placements for students with individualized education

7   program, IEP, to ensure conformity with obligations incurred

8   pursuant to the Individuals with Disability Education Act.

9         Could you explain the reason for this

10  preference or exception?

11   A    Sure.  So administrative units have federal

12  expectations on how an individualized education program is

13  delivered, including the determination of location, including

14  determination of aligned specialized services, including

15  hours that are appropriate for a child with an IEP ratios of

16  those classrooms as outlined in IDA.

17   Q    Are there some UPK providers who are not equipped

18  to handle students with certain disabilities?

19   A    Likely there may be, yeah.

20   Q    And in those situations would the provider be able

21  to decline the match because it's not able to accommodate the

22  child's disability?

23   A    No, they wouldn't be able to decline the match, but

24  we have guidelines in place for how a child can be referred,

25  how a child can be connected with their administrative unit

**DAWN ODEAN - April 10, 2024**

1  or school district to determine the need or next steps that

2  might be in place.  And that's also in alignment with IDA.

3        Q    So a preschool could refer a child to a different

4  preschool?

5        A    The child (sic) could refer the family to a process

6  to determine if they have a need for an individualized

7  education program or not.  And that's -- that language is

8  very specific to IDA.

9        Q    And if it was determined that the child did have

10  that need, would the Department require the provider to

11  accept the match or would it be allowed to decline it?

12        A    To -- if a child has an IEP?

13        Q    Yes.

14        A    If a child as an IEP, then IDA is very clear on the

15  expectations of the placement of that child.  And that's not

16  for the Department to question.

17        Q    Okay.  And if a provider couldn't meet those

18  expectations, they could decline the match?

19        A    The only providers who are able to administer the

20  IEP are designated by the administrative unit.

21              So what that means is in order to have an IEP,

22  the services or the placement of that child where the

23  location is, is determined with the family and the

24  administrative unit.  The Department doesn't stand between

25  that.  It isn't any given program, it's where the IEP can be

**DAWN ODEAN - April 10, 2024**

```
 1  delivered.

 2       Q     Okay.  I guess my question is, if you had a

 3  provider who came to the Department and said, we were matched

 4  with a child who has a disability that we're not able to

 5  accommodate, would the Department require the preschool to

 6  accept that match?

 7       A     If a child has an IEP, they can only be matched

 8  when verified by the administrative unit.  So they wouldn't

 9  be placed in a provider that can't accommodate the IEP.

10       Q     Okay.  What about a situation where there's not an

11  IEP, but the provider comes and says the child that was

12  matched to me has a disability that I'm not able to

13  accommodate, would the Department require the provider to

14  accept the match?

15       A     We would have a conversation with the provider to

16  determine if that child does need to follow through with the

17  referral.

18             Referrals can be given at any time to execute

19  the IEP, but the expectation is that we're working together

20  to ensure the best program for that child and not decline

21  services based on what might or might not be a diagnosis of a

22  disability.

23             And we are not -- Universal Preschool Program

24  doesn't diagnose disabilities and nor do most providers.

25       Q     So when you reference referral, you're talking a
```

DAWN ODEAN - April 10, 2024

1    referral to a preschool that could accommodate that?

2         A    A referral to an evaluation process that may or may

3    not lead to an IEP.

4         Q    The objective, though, would be to get the child in

5    the preschool environment that meets his or her needs?

6         A    Yes.

7         Q    And if the provider that was initially a match was

8    determined to be unable to meet that child's needs, would

9    they be in violation of program rules and requirements?

10        A    If the -- if they were determined not to be able to

11   meet that child's needs through the evaluation process, they

12   would be -- they would -- the administrative unit and the

13   family would go through a process to determine the best

14   placement for that child, which likely wouldn't be a provider

15   who couldn't meet their needs.

16        Q    Right.  So what I'm wondering is what then about

17   the provider who couldn't meet the needs, are they in

18   violation of the --

19        A    They are not.

20        Q    Okay.  If we could look at the first preference

21   listed, the faith-based providers granting preference to

22   members of their congregation.  Do you see that?

23        A    I do.

24        Q    Could you describe the reason for this preference

25   or exception?

## DAWN ODEAN - April 10, 2024

1    A    Yes.  So again, as we operationalize the program

2 very early on, we heard from many providers that a priority

3 for those who are part of their community would be critical

4 to them being able to participate or not.  And so in an

5 effort to be inclusive and mixed delivery, this preference

6 was given.

7    Q    Okay.  And these newly adopted rules and

8 regulations, they define congregation?

9    A    Yes.

10    Q    Okay.  And I believe that can be found 4. -- Rule

11 4.103 Subsection L, should be page 2 of the regulations.  Do

12 you see it?

13    A    Yes.

14    Q    And it's defined, congregation means members of the

15 community that the faith-based provider serve as the

16 faith-based provider defines that community.

17         Are you aware that some religious groups

18 believe they have a religious duty to care for the poor?

19    A    Yes.

20    Q    Could a church-run preschool define its

21 congregation to include individuals or families who are below

22 a certain income level?

23         MR. WHITEHAIR:  Object to the extent it calls for a

24 legal conclusion.  You can answer.

25         THE DEPONENT:  That may be the case.  I certainly

DAWN ODEAN - April 10, 2024

1  am not an expert on all different faith-based providers and

2  the communities that they serve, so this is an attestation.

3  We haven't had that one questioned or asked about by any

4  particular provider, but --

5      Q    (By Mr. Galus) My question, looking at the

6  definition of congregation, it says, congregation means

7  members of the community that the faith-based provider serves

8  as the faith-based provider defines that community.

9          My question is whether faith-based preschool

10  could define its congregation to include individuals or

11  families who are below a certain income level?

12     A    We don't tell faith-based providers how to define

13  their community.  So a faith-based community may have that as

14  part of their definition of community.

15          What I'm saying is that hasn't been an

16  experience that we've had.

17     Q    But they would be allowed to define it in that way?

18     A    It's the provider attests to serving their

19  community, so our intention with this specific definition and

20  preference is to be inclusive of those communities and not --

21  not put providers in a situation where they are unable to

22  serve the community that they are set forth to serve.

23     Q    Okay.  So same question, would they be able to

24  define the community in the way I described, individuals and

25  families below a certain income level?

**DAWN ODEAN - April 10, 2024**

```
 1          MR. WHITEHAIR:  Same objection.

 2          THE DEPONENT:  They may be.  I -- again, we haven't

 3   heard of anything faith-based, typically it's aligned to the

 4   faith that they're community believes in, which isn't

 5   specific to income level.  It's -- we haven't had that

 6   situation.  So I would ask more questions, is what I'm

 7   saying.

 8      Q    (By Mr. Galus) Could you give me an example of a

 9   situation that you have encountered with how they define the

10   community?

11      A    I don't have anything specific that I recall.  It

12   was an understanding that, for example, a provider might have

13   a group of families that they're in regular community with

14   around their faith-based activities, but nothing specific to

15   a specific religion other than the cases that we have before

16   us.

17      Q    All right.  If you could go back to Rule 4.110, and

18   go down to the preference listed in subsection 10.  Do you

19   see that?

20      A    Uh-huh.  Yes.

21      Q    And this refers to preschool providers granting

22   preference to an eligible child based on the child and/or

23   family being part of a specific community.  And it goes on

24   and lists other things.

25          Could you describe why the Department allowed
```

**DAWN ODEAN - April 10, 2024**

 1   for this preference or exception?

 2        A    Yes.  So again, as we started to register with

 3   providers and providers work and considering participating in

 4   Universal Preschool, we heard from some providers who have

 5   specific communities that they serve.  Some of those are

 6   listed here under number 10.

 7                  One comes to mind of high school that offered

 8   preschool for their high school students who have children,

 9   offered childcare inclusive of kids who might be eligible for

10   preschool in the year before kindergarten.

11        Q    How does the Department define the term "specific

12   community"?

13        A    It follows there, after being a part of a specific

14   community, having specific competencies or interests, having

15   a specific relationship to the provider, provider's

16   employees, students or their families, receiving specific

17   public assistant benefits or participating in a specific

18   activity.

19        Q    Okay.  So the clauses that follow provide

20   definition to a specific community?

21        A    Yes.

22        Q    Are there any other written definitions or

23   guidelines beyond what's set forth in this rule?

24        A    No.

25        Q    So there's nothing else that the Department would

**DAWN ODEAN - April 10, 2024**

1   look to?

2       A       Not at this time.

3       Q       I just want to get a better understanding, if I

4   can, of how this preference could be used.

5               Would a preschool provider that's

6   participating in UPK be able to use this preference to limit

7   enrollment to children who are from families that are

8   registered as Republicans or Democrats?

9               MR. WHITEHAIR:  Object to the extent it calls for a

10  legal conclusion.  You can answer.

11              THE DEPONENT:  Yes.  So again, this is put into

12  rule to be inclusive first.  So we certainly want families to

13  have access in their communities where they have participated

14  with providers previously.  We want providers to be able to

15  participate to the best of their ability so that families

16  have choice.

17              So the intent of this is to ensure that we have as

18  much inclusivity as possible without making presumptions.

19              And so any scenario that might come forth where a

20  provider is asking, does this count for this particular

21  preference or criteria, would be determined not just by the

22  director of the program, but with senior leadership and if

23  counsel is needed to do so.

24      Q       (By Mr. Galus) And that would be determined as they

25  came case-by-case?

**DAWN ODEAN - April 10, 2024**

1    A    Potentially, yes.

2    Q    Is that a yes?

3    A    That's a yes.

4    Q    You mentioned as an example high school that had

5  preschool for their students; am I characterizing that

6  correctly?

7    A    Yes, they had childcare available for the students

8  attending -- the high school students attending.

9    Q    And they used the preference outlined in

10  subparagraph 10 for that?

11    A    Well, that's new.  That's new.  So that was a

12  request to be able to serve their students first so that they

13  could attend school and have supervision of their children.

14            So 10 was not in place for year one, but we

15  had a process for providers to ask for a particular

16  preference and that was one.

17    Q    Okay.

18    A    And that led to 10.

19    Q    Okay.  What about the reference to specific public

20  assistance benefits, can you describe a little bit more what

21  is meant by that?

22    A    Sure.  So that's similar to Head Start.  So there

23  are different federal public assistance benefits that

24  families might receive and that providers might prioritize.

25            And so again, it doesn't conflict with any

DAWN ODEAN - April 10, 2024

1   other provisions that we have in statute, but it is to ensure

2   that we aren't stepping between what those federal supports

3   might be or the expectations of supports aligned to those

4   benefits.

5        Q    All right.  So kind of an example, would a provider

6   be able to prefer or prioritize families that receive say a

7   housing assistance?

8        A    That might be a criteria like, for example, that a

9   Head Start might use to determine.  There's also the Colorado

10  Childcare Assistance Program.  So they have different federal

11  expectations on providing access and qualifying families for

12  those.

13       Q    I just want to be clear, though, this is different

14  than the Head Start preference, correct?

15       A    The Head Start preference is also stated, yes.

16       Q    Right, but number 10 --

17       A    I'm just trying to explain it further.

18       Q    Sure.  But number 10 is different.  So the provider

19  doesn't need to be a Head Start provider to define the

20  community as families that receive specific public

21  assistance?

22       A    That's right.  Head Start can meet their federal

23  obligation with their own preference.

24       Q    Right.  So a non-Head Start program could say,

25  well, we're going to prioritize preferred families who

DAWN ODEAN - April 10, 2024

```
 1  receive a specific public assistance benefit?

 2      A    Can you restate the question?

 3      Q    Well, so I'm looking at 10 --

 4      A    Yes.

 5      Q    -- and it says, participating preschool providers

 6  may grant preference to an eligible child based on the child

 7  and/or family being a part of a specific community.  And you

 8  said the clauses that follow specific community give

 9  definition to it?

10      A    Uh-huh.

11      Q    And one of those is receiving specific public

12  assistance benefits?

13      A    Uh-huh.

14      Q    So talking about non-Head Start providers that are

15  participating in UPK, could they grant preference to an

16  eligibility child based on the child's family receiving a

17  specific public assistance benefit?

18      A    Yes.

19      Q    And are you aware of -- you've already mentioned

20  one, I guess, so do you have an estimate as to how many

21  providers might be using this preference?

22      A    No.

23      Q    All right.  You mentioned -- we talked a little bit

24  about the high school that is providing preschool for the

25  children, and you said that number 10 wasn't in place before
```

DAWN ODEAN - April 10, 2024

1   the Department approved that; did I understand that testimony

2   correctly?

3         A     Yes.

4         Q     Okay.  So there is a process by which the

5   Department would consider preferences or exceptions that

6   weren't outlined in rule and regulation?

7         A     Yes.

8         Q     And would consider that, based on the nature of the

9   request, the facts on a -- take it case by case?

10        A     Yes.

11        Q     Are there any other preferences or exceptions that

12  you're aware of that the Department has allowed that aren't

13  reflected in this Rule 4.110?

14        A     Not that I recall.

15        Q     If the need arises in the future, does the

16  Department have the authority to allow for additional

17  preferences that aren't outlined in 4.110?

18        A     The rule would have to be revised to consider

19  anything outside of these criteria stated.

20        Q     Okay.  Well, there wasn't a rule before this and

21  the Department was considering them before --

22        A     Yes.

23        Q     -- is it the position the Department will no longer

24  consider any request outside of what's set forth in 4.110?

25        A     Yes, I think that's the evolution of a brand-new

**DAWN ODEAN - April 10, 2024**

1  department.  So we didn't have this rule in place and we were

2  working again to ensure access for providers and for families

3  until the rule was in place.  Now it is.

4      Q    So if a provider came to you and said there's a

5  problem with your matching algorithm, I don't have a

6  preference that I can point to in 4.110 that addresses that

7  concern, the Department's answer is there's no solution?

8      A    The Department would refer back to these that we do

9  have set forth in rule, in writing, and consider whether they

10  fit within any of the existing.  And if they didn't, there

11  wouldn't be any other preferences defined unless the rule was

12  revised and rewritten.

13      Q    So they -- the provider in that case would have to

14  accept the match?

15      A    Correct.

16          MR. GALUS:  What are we on, 24?

17          THE COURT REPORTER:  24.

18          (Whereupon, Exhibit No. 24 was marked for

19  identification.)

20      Q    (By Mr. Galus) Okay.  Exhibit 24 is Defendant's

21  Supplemental Responses to Plaintiff's First Set of

22  Interrogatories to Defendants.

23              Have you seen this document before --

24      A    Yes.

25      Q    -- Ms. Odean?  I think -- and if you look at the --

DAWN ODEAN - April 10, 2024

1   page 13 of the supplemental responses, I have a verification

2   page; do you recall signing the verification for these

3   responses?

4        A    Yes.

5        Q    If you could look at Interrogatory Number 8, this

6   would be found on page 8 of the document.  And Interrogatory

7   8 asks the Department to identify all licensed Colorado

8   Preschool providers that requested an exemption from any law,

9   rule, or terms and conditions governing the UPK program or

10  from any other aspect of the UPK program.

11            If you go down to the Department's response,

12  it identifies some schools who have made those requests,

13  Darren Patterson Christian Academy, Hillel Academy,

14  St. Mary Parish of Littleton, Castle Kids Early Learning

15  Center, and St. Bernadette Catholic Parish in Lakewood.

16            To your knowledge, as we sit here today, are

17  those the only licensed preschool providers that have

18  requested an exemption?

19       A    Yes.

20       Q    There's no other providers or schools that have

21  requested an exemption?

22       A    Correct.

23       Q    If we could look -- talk about the request made by

24  St. Mary first and St. Bernadette, these are the two schools

25  that have also filed a lawsuit challenging the

DAWN ODEAN - April 10, 2024

 1  non-discrimination rules; is that right?

 2      A    Yes.

 3      Q    And did they request an exemption before filing the

 4  lawsuit or is the exemption request referring to the lawsuit

 5  exemption?

 6      A    I don't recall the timing of each.  They had

 7  inquired about participating, but hadn't signed the provider

 8  agreement when they made the request.

 9           I apologize, I don't recall if that was

10  outside of the lawsuit prior.

11      Q    Do you recall if the request was made in writing?

12      A    I do believe the request was made in writing.

13           MR. GALUS:  Okay.  And Greg, do you know if that

14  was produced to us?

15           MS. CARRENO:  I think it would have been in the

16  coalition letter.

17           MR. GALUS:  That's what this is referring to?

18           MS. CARRENO:  Yeah, the coalition letter that the

19  Archdioceses signed off on.

20      Q    (By Mr. Galus) Okay.  And the Department's response

21  to that request was no exemption could be made, correct?

22      A    Correct.

23      Q    And those two schools are not currently

24  participating in the UPK program?

25      A    Correct.

**DAWN ODEAN - April 10, 2024**

```
 1      Q    All right.  Could you describe the nature of
 2   Hillel's request, Hillel Academy?
 3      A    I believe that one is a co-op.  I would have to
 4   look at the request specifically to not mix it up with the
 5   other.
 6      Q    Do you remember if that request came in writing as
 7   well?
 8      A    I do believe it came in writing.
 9      Q    And would that have been the coalition letter too
10   or was that separate?
11      A    No, that may have been separate.  I apologize, I'm
12   not recalling that --
13      Q    Okay.
14      A    -- specifically.
15           MR. GALUS:  Virginia, do you know if that was
16   produced?
17           MS. CARRENO:  Yes, they were one of the parties
18   that signed off on the coalition letter, Hillel Academy.
19           MR. GALUS:  Okay.  All right.
20      Q    (By Mr. Galus) So I'll ask the question again.
21      A    Okay.
22      Q    And I understand --
23      A    I apologize, I didn't memorize everyone who signed
24   the letter.
25      Q    I understand interrogatories, even though you're
```

DAWN ODEAN - April 10, 2024

```
 1  signing them, you are doing it in consultation with counsel.
 2       A    And I likely had it in front of me when I was doing
 3  this, but it was in February.
 4       Q    Is it your understanding that the written request
 5  would have been one in the same as the coalition letter?
 6       A    Yes.
 7       Q    And the response to that was the same, no exemption
 8  can be given?
 9       A    Yes.
10       Q    And is Hillel Academy currently participating in
11  the UPK program?
12       A    Not that I'm aware.
13            MR. GALUS:  Can mark that 25, please?
14            (Whereupon, Exhibit No. 25 was marked for
15  identification.)
16       Q    (By Mr. Galus) Exhibit 25 appears to be an e-mail
17  chain related to Castle Kids and the exemption request
18  referenced in the interrogatory response.  Do you recall
19  seeing this -- these e-mails?
20       A    I wasn't on the e-mails, but I do recall reviewing
21  this e-mail string.
22       Q    You reviewed them in preparation for this
23  deposition?
24       A    Yes.
25       Q    Okay.  Were you personally, as UPK director, aware
```

**DAWN ODEAN - April 10, 2024**

1  that Castle Kids had asked for an exception from the

2  non-discrimination rules?

3      A    At some point I was likely made aware.  You'll see

4  that Michael Cooke, who is on this e-mail correspondence, she

5  was a transition director in place and we divided tasks

6  between us to be able to operationalize Universal Preschool

7  in the compressed timeline that we had set before us.  So

8  this was a process.  This particular one she managed.

9      Q    And if you look at the second page it has Bates

10  numbering at the bottom of 1743, there's the e-mail from the

11  director at Castle Kids and there's -- it's raising concerns

12  about the quality assurance provision, which is

13  non-discrimination provision, and it says, my questions to

14  you are, and the first question is, do you make exception to

15  these requirements if this is against our religious beliefs

16  allowing us to be open and honest with any families that we

17  enroll.

18          Did anyone from the Department ever follow up

19  on this request or answer this request?

20      A    I can't speak on behalf of Michael, but it sounds

21  like opportunities were given to engage regarding the

22  questions that she had.

23      Q    So based on the e-mail chain, you think that

24  Michael Cooke may have responded, but you don't know for

25  sure?

### DAWN ODEAN - April 10, 2024

1    A    I don't know for sure.

2    Q    Do you know what -- well, I guess if you don't know

3  if there was a response, do you know what the response would

4  have been if there was one?

5    A    I don't.  Certainly Michael would know, but I don't

6  specifically recall anything other than what I see here.

7    Q    Okay.  So you don't have any additional knowledge

8  outside of --

9    A    I don't.

10    Q    -- what's in this e-mail chain?

11    A    I don't.  Not that I recall.

12    Q    Do you know if Castle Kids is currently

13  participating in the UPK program?

14    A    I don't.  I can look it up.

15    Q    You don't know as you sit here today?

16    A    No, I don't.  We have about 2,000 providers, so I'd

17  have to confirm that.

18    Q    All right.  Are you aware of any other requests for

19  exemptions from UPK's non-discrimination requirements either

20  for the '23-'24 school year or this upcoming '24-'25 school

21  year?

22    A    I'm not aware of any other requests for an

23  exemption.

24    Q    And you would be the person who would know,

25  correct?

**DAWN ODEAN - April 10, 2024**

```
 1      A    Yeah, I would expect that per our operating
 2 procedures, that it would be elevated to me as the director
 3 of the program.
 4      Q    You said there's over 2,000 providers participating
 5 in UPK?
 6      A    For year one currently in process, I believe it's
 7 just under 2,000.  I don't know the exact number.  I could
 8 get that for you as well.  I know for year two we've
 9 increased to 2,300 at this particular point in time.
10      Q    Okay.  Do you know the total number of seats that
11 would be offered by those providers?
12      A    I could look it up.  I could find out.  I don't
13 have it memorized.
14      Q    Do you have a ballpark?
15      A    I wouldn't want to -- I wouldn't want to
16 misrepresent the actual number, so I'd want to look that up
17 and confirm it for you.
18      Q    All right.  Do you have a sense for how -- the
19 number of UPK seats that are available compares to the number
20 of four-year-olds or eligible children in the state?
21      A    Yes.  So the state demographer says there's about
22 63,000 eligible children and we have about 38,000
23 participating in year one in seats in programs.
24      Q    And are those seats maxed out or are there still
25 available seats?
```

**DAWN ODEAN - April 10, 2024**

1    A    No, there's still available seats.  The application

2  is still open.

3    Q    So as far as you know, every child who sought to

4  participate in UPK, there was a seat available for that

5  child?

6    A    Yes.

7    Q    Is there a fixed number of providers that can

8  participate in the UPK program?

9    A    No.

10    Q    So if a new provider starts, that doesn't knock an

11  old provider out?

12    A    Correct.

13    Q    Couple of questions going back to the matching

14  process.

15    A    Sure.

16    Q    The situations where a provider may decline a

17  match, does the Department look into every one of the

18  situations where a provider has declined a match?

19    A    In year one we have a process in place where the

20  Local Coordinating Organization reviews the declines to make

21  sure they're in alignment with the agreed-upon preferences

22  and then elevates any questions or concerns to the provider

23  about how it might be used or why.

24        If there was a specific concern from a family,

25  that would go through that standard operating procedure

DAWN ODEAN - April 10, 2024

1   process for us to review.

2        Q    So LCOs are responsible for reviewing the declines?

3        A    Yes.

4        Q    Are they required to review every decline?

5        A    The expectation is they review them all.

6        Q    Where does that expectation come from?  Is it in

7   writing, part of their agreement?

8        A    It wasn't a part of their originally contemplated

9   agreement.  The agreement was written with LCOs prior to the

10  Department, but it's part of the practices that we agreed to

11  as the system and the processes evolved.

12            So we have certain things that we do at the

13  State level, we have certain things that our vendor does, we

14  have certain things that our Local Coordinating Organization

15  as partners do to ensure that we can be responsive and timely

16  in the process.

17       Q    Has the Department ever overridden a provider's

18  decline decision?

19       A    The Department has had conversations with providers

20  where things were not aligned to the preferences that a

21  provider was connected to, and typically those are mistakes

22  that have been made, because the process for the provider is

23  also new and the portal, and how they use the portal is new,

24  and so we did have several that I'm aware of that were

25  mistakenly used.  And so those declines might be reversed,

### DAWN ODEAN - April 10, 2024

```
 1  for example.
 2              In that process is when we had providers
 3  elevate to us, hey, does this fit for that or does this fit
 4  for that, and the conversation is had about whether it may or
 5  may not be appropriate to use.
 6      Q    Okay.  And do those situations come to you through
 7  the LCOs?
 8      A    Yes.  We had a help desk as well.  The e-mail that
 9  you -- Exhibit 25 is an example of that.  Says Istonish
10  Service Desk, so there may be some that came directly where
11  providers engaged or families engaged with the help desk.
12      Q    Okay.
13              MR. GALUS:  26, please.
14              (Whereupon, Exhibit No. 26 was marked for
15  identification.)
16      Q    (By Mr. Galus) Okay.  Do you recognize Exhibit 26?
17      A    Yes.
18      Q    Okay.  And this is your -- one of your declarations
19  that you submitted in this case?
20      A    Yes.
21      Q    If you could look at paragraph 26 of the
22  declaration, it's on page 3, says the Department interprets
23  contractual provision 18(B) in accordance with federal law
24  which allows for the disorganizations to prefer
25  co-religionists and to afford religious organization wide
```

DAWN ODEAN - April 10, 2024

1  discretion to make employment decisions about its ministerial

2  employees in accordance with federal law.

3          And contractual provision 18(B) was one of the

4  non-discrimination provisions that we discussed earlier that

5  was in the '23-'24 agreement?

6      A    Uh-huh.

7      Q    Do you remember that?

8      A    Yes.

9      Q    Okay.  Could you tell me what reference to federal

10  law -- what the reference to federal law means?

11          MR. WHITEHAIR:  Object to the form of the question.

12  Object to the extent it calls for a legal conclusion.  And

13  caution the witness to be careful about disclosing

14  attorney-client communications.

15          THE DEPONENT:  When we were speaking about 18(B)

16  earlier, I was referring to children and families.  What I

17  understand the in accordance with federal law to mean is that

18  the Universal Preschool Program wouldn't tell religious

19  organizations who or how or what their policies might be for

20  hiring workforce.

21      Q    (By Mr. Galus) And what federal law would give them

22  that freedom?

23          MR. WHITEHAIR:  Same objections.  You can answer.

24          THE DEPONENT:  I don't recall the specific citation

25  to a specific law.

DAWN ODEAN - April 10, 2024

1    Q    (By Mr. Galus) Was there a specific citation to a

2  specific law when you signed this declaration that you were

3  aware of?

4            MR. WHITEHAIR:  Same objections.

5            THE DEPONENT:  I don't recall.

6    Q    (By Mr. Galus) So you don't know, sitting here

7  today, which specific federal law this is referencing?

8    A    I don't recall, huh-uh.

9    Q    Today you don't know which federal law it refers

10 to?

11   A    The -- I don't -- I don't know the -- my

12 understanding is that the program isn't -- doesn't have the

13 authority to tell religious organizations who or how to hire.

14 And that as the program we're required to abide by that

15 expectation that's already set forth in federal law.

16            Do I know the specific citation of that

17 federal law?  I do not.

18   Q    When did you come to that understanding?

19   A    I came to that understanding in conversations with

20 our senior leadership team and our counsel.

21   Q    Would it have been after this lawsuit was

22 identified?

23   A    I don't -- I don't recall the timing of that.

24 Certainly the statement was written after, but I believe we

25 had conversations as we were operationalizing about the 18(B)

DAWN ODEAN - April 10, 2024

1  and what that meant.

2      Q    Do you remember prior discussions about whether

3  18(B) applied to employment practices or decisions?

4      A    I don't recall outside of the conversations about

5  the cases we're involved in.

6          MR. GALUS:  All right.  Take maybe a five-minute

7  break and I might be done.  So does that work for everybody?

8          MR. WHITEHAIR:  Yes.

9          MS. CARRENO:  When you say done, you mean with the

10  30(b)(6)?

11          MR. GALUS:  I might be done done.

12          MR. WHITEHAIR:  Give you six minutes if that would

13  help.

14          THE VIDEOGRAPHER:  The time is 2:31.  We're off the

15  record.

16          (Whereupon, a break was taken from 2:31 p.m. to

17  2:37 p.m.)

18          THE VIDEOGRAPHER:  The time now is 2:37.  We're

19  back on the record.

20      Q    (By Mr. Galus) Ms. Odean, just a few more questions

21  for you.

22              You were in the room when Mr. Derocher was

23  testifying about situations or being asked questions about

24  situations where there were mutual terminations of the

25  program services agreement; do you recall those questions?

DAWN ODEAN - April 10, 2024

```
 1      A     Yes.

 2      Q     Okay.  And Mr. Derocher said that you'd be a better

 3  person to ask about those.

 4                  And my question to him was, are you -- he

 5  referenced mutual terminations and my question was, what

 6  situations have there been where the Department and a

 7  provider have mutually terminated the program services

 8  agreement?

 9      A     I'm not aware of a specific termination of the

10  agreement once it was signed.

11                  And so we did have providers, providers were

12  allowed in year one to register in the system prior to the

13  provider agreement being signed because of the compressed

14  timeline we were in, really are still in, but so we do have

15  providers who register in the system, but never participated

16  in the enrollment process, if that makes sense.  But I don't

17  recall any who signed the agreement who then said, we're not

18  -- we want to shred the agreement or no longer abide by the

19  agreement.

20      Q     Okay.  So some preschools registered to participate

21  in the UPK program --

22      A     Right.

23      Q     -- had not yet signed the agreement, and ultimately

24  decided that they weren't going to proceed in the Universal

25  Preschool Program?
```

CALDERWOOD-MACKELPRANG, INC.
(303) 477-3500

Exhibit 66
Page 90

DAWN ODEAN - April 10, 2024

1      A     Yes.

2      Q     Did any of those providers do so over concerns

3  related to the non-discrimination provisions?

4      A     The -- I believe there were some in relation to the

5  Archdiocese.  I'd have to look specifically at who is listed

6  in the system as registering and not enrolling.  I could

7  confirm that.

8      Q     Are there any outside or beyond the Archdiocese

9  schools that you can recall?

10     A     No, not that I'm aware of.

11     Q     Did those providers have any conversations or

12  communications with the Department related to those concerns?

13     A     No, just through the coalition letter and then as

14  the case was filed.

15     Q     Okay.  So how did you learn that those providers --

16  the reason those providers decided not to continue?

17     A     I'm trying to recall.  I believe they never signed

18  the agreement and never went beyond the initial phases of

19  registration in the system.

20            And so in the system a provider can register.

21  We have all of the licensed providers that are able to

22  participate, and they may have chosen to register, but then

23  there's specific steps they have to take in the system to put

24  in the number of seats, for example, or participate in the

25  process.  And it didn't go further than that initial

DAWN ODEAN - April 10, 2024

1   registration.

2        Q    Right.  But so how did the Department learn as to

3   the reasons those providers, the Archdiocese, chose to not

4   continue?

5        A    We learned through the coalition letter and then

6   through the case that was filed.

7        Q    Okay.  So you pieced it together after the fact?

8        A    Yeah.  I don't recall any specific conversation.  I

9   certainly didn't have any direct conversations with any of

10  those providers directly, not aware of any that might have

11  happened with the LCO, with the Local Coordinating

12  Organization, or that Michael may have had, but I didn't have

13  specific conversations with those providers because it is

14  voluntary.

15       Q    Okay.  Mr. Derocher, in answering some of these

16  questions, said there's a difference between signing the

17  agreement and enrolling children --

18       A    Uh-huh.

19       Q    -- could you speak to that?  Is that the same thing

20  we're talking about here or is that different?

21       A    I think that's a little different.  If I understand

22  what you're asking, a provider could sign the agreement,

23  register in the system, define their program and their seats

24  in the system, but families may not choose them.

25       Q    And have you had situations where that has

DAWN ODEAN - April 10, 2024

1  occurred?

2       A    Yes, we have.

3       Q    And that's what you understood Mr. Derocher to be

4  referring to?

5       A    I -- that's what I understood.

6       Q    Okay.

7            MR. GALUS:  I have no further questions from me.

8  Thank you very much, Ms. Odean, for your time today.

9            THE DEPONENT:  Thank you.

10                         EXAMINATION

11  BY MR. WHITEHAIR:

12      Q    Ms. Odean, I'm going to be asking you a few

13  questions and then counsel may ask you some follow-up

14  questions.

15      A    Okay.

16      Q    Just for the record, I introduced myself earlier,

17  I'm Greg Whitehair and I am, as you know, one of your counsel

18  in this lawsuit.

19            I want to direct your attention, as long as

20  it's up, to the very last Exhibit 26 that you were asked

21  about by counsel.  Will you take a look at that?

22            You were directed to paragraph 26 on page 3.

23  Will you look at the paragraph below that, and I'll just put

24  it in the record, the Department disavows enforcement of

25  contractual provision 18(B) against religious providers who

DAWN ODEAN - April 10, 2024

1  hire co-religionists in accordance with federal law and

2  against religious providers employment decisions involving

3  their ministerial employees as protected by federal law.  Do

4  you see that preference?

5       A    Yes.

6       Q    Just for backup and for the jury, when did you

7  prepare this declaration?

8       A    I believe it was in August of 2023.

9       Q    August of '23?

10      A    Yes.

11      Q    And was it to be used as a complement to the

12  Department's motion to dismiss the complaint filed by the

13  plaintiff in this case?

14      A    Yes.

15      Q    And that is your sworn testimony?  This is your

16  signature on the last page?

17      A    Yes.

18      Q    And what did you mean by the Department disavows

19  enforcement of 18(B)?

20      A    It was ensuring that the program wasn't doing

21  anything that might impact expectations set forth by federal

22  law in regards to hiring practice, practices of a religious

23  provider.

24      Q    And is that the same of a faith-based provider?

25      A    Yes.

DAWN ODEAN - April 10, 2024

```
1        Q    Is this contractual provision 18(B) found in the
2   present provider agreement that circulated at the -- for the
3   next calendar year, school year?
4        A    No, that was omitted.
5        Q    Did you ever express that this is -- this disavowed
6   position, have you ever expressed that position in any court
7   testimony?
8        A    I did for the St. Mary's case.
9        Q    So just give us a little context.  That was the
10  case that was tried to the bench in front of Judge Cane, you
11  were a witness in that case?
12       A    Yes.
13       Q    And did you at that time disavow the use of this
14  provision?
15       A    Yes.
16       Q    Do you recall the scope at which you described
17  whether this provision could come back?
18       A    It -- that's why it was omitted, because it was --
19  this disavow in writing that statement, the reason it was
20  omitted is so that it doesn't come back.
21       Q    Do you recall answering counsel's questions, there
22  were several that he used the phrase "case by case"; do you
23  recall that?
24       A    Yes.
25       Q    And what was the case-by-case review for?  Was it
```

DAWN ODEAN - April 10, 2024

1  about these preferences or exceptions, both terms were used,

2  how did the case-by-case -- what was the context in which you

3  were making a case-by-case review?

4      A    That I believe was in reference to our quality

5  standards where we define preferences to the deferred

6  acceptance algorithm.

7            Again, the deferred acceptance algorithm is a

8  standard -- industry standard for matching, but it doesn't

9  necessarily contemplate an inclusive mixed delivery program.

10 And so these programmatic preferences are to the algorithm.

11     Q    Was there, in the course of your analysis as you

12 were describing that, is there a case-by-case assessment of

13 whether or not any permitted provider -- let me say it a

14 different way.

15           So if you get a provider requesting, either

16 through the LCO or possibly more directly, a request to move

17 outside of the algorithm, is that what this matching -- this

18 provider matching program is designed to address, people

19 wanting outside of the standard match?

20     A    It's to -- yes.  These preferences are specific to

21 that algorithm and that process that's built within the

22 system.

23           This isn't a preference or an exception to the

24 law, this is specific to the application system process where

25 there is that deferred acceptance algorithm.

DAWN ODEAN - April 10, 2024

1    Q    And so you anticipated my question.  Is this in any
2    way a case-by-case assessment of whether a provider can evade
3    or in any way become non-compliant with the
4    anti-discrimination rules?
5    A    No.  No.  This is a preference to the algorithm.
6    It is not -- any rule we have in place doesn't allow for the
7    law not to be followed.
8              The rules are to help define how we implement
9    the law.  That particular preference was because of the
10   matching algorithm and in the spirit of inclusivity for mixed
11   delivery.
12   Q    And just for the record, we've been looking at and
13   talking about Exhibit 20; is that right?
14   A    Yes.
15   Q    Do you recall counsel's questions regarding a
16   provider coming to you and asking if they could impose a
17   race-based admission policy?  Do you recall that question?
18   A    Yes.
19   Q    And you said that there was a possibility you could
20   work with such a provider.  Could you tell us about what the
21   possibilities were that you had in your mind when you shared
22   that?
23   A    I didn't have specific possibilities in mind.  I
24   was not wanting to speculate what, why, how that program
25   defines what the actual policy states.  It would definitely

## DAWN ODEAN - April 10, 2024

1  start with a conversation with the provider, but again,

2  wouldn't allow for any preference in that regard to allow for

3  non-compliance of the law.

4      Q    Is that -- are you say saying it's a preference of

5  the algorithm or are you saying that it's an overarching or

6  some other rule?

7              I'm trying to get a distinction here, right.

8  So the hypothetical was offered to you was I come in and I'm

9  very baldly telling you I intend to violate your

10  non-discrimination clause.  And you request -- you said that

11  it was possible that you could work with such a provider.

12  I'm trying to understand what is it that would be the work

13  that you would do together in the face of their promise to

14  violate the non-discrimination rule?

15      A    If there was a promise to violate and not allow

16  equitable access to a child or their family, that does go

17  against the law, that would not be allowed.

18              MR. WHITEHAIR:  I have no further questions.

19              MR. GALUS:  None from me.

20              THE VIDEOGRAPHER:  The time now is 2:50.  We're

21  going off the record.  This concludes today's deposition.

22              MR. WHITEHAIR:  We didn't really make a record

23  about the personal deposition.  Do you want to go into the

24  personal?

25              MR. GALUS:  No, we can end it.  No personal

**DAWN ODEAN - April 10, 2024**

```
 1  deposition needed.

 2           MR. WHITEHAIR:  I'm good with that.

 3           THE COURT REPORTER:  Same orders, Counsel?

 4           MR. GALUS:  Yes, please.

 5           MR. WHITEHAIR:  Yes.

 6       (The deposition concluded at 2:50 p.m.)

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**DAWN ODEAN - April 10, 2024**

```
 1                    AMENDMENT SHEET

 2   DEPONENT NAME:                   DATE OF DEPOSITION:
     DAWN ODEAN                       April 10, 2024
 3

 4   The Deponent wishes to make the following changes in the
     testimony as originally given:
 5

 6   PAGE LINE               CHANGE                REASON

 7   _____

 8   _____

 9   _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16

17   Signature of Deponent:

18   _____

19   Subscribed and sworn to before me this _____ day of

20   _____, 2024.

21                   Notary's signature _____

22                   Notary's address _____

23                   My commission expires _____

24

25
```

**DAWN ODEAN - April 10, 2024**

```
1              DEPONENT'S AFFIDAVIT

2          I have read my deposition and the same is true and

3  accurate, save and except for changes and/or corrections, if

4  any, as indicated by me on the amendment sheet(s) attached

5  hereto as indicated.

6

7  Amendment sheet(s) attached [ ]

8  No changes; no amendment sheet attached [ ]

9

10                          _____

11                                  Deponent

12

13  SUBSCRIBED AND SWORN TO before me this

14  _____day of _____, 2024.

15  My commission expires _____.

16

17                          _____

18                                NOTARY PUBLIC

19  in and for the State of _____.

20

21

22

23

24

25
```

**DAWN ODEAN - April 10, 2024**

| | |
|---|---|
| 1 | CERTIFICATE |
| 2 | STATE OF COLORADO          ) |
| | )ss. |
| 3 | CITY AND COUNTY OF DENVER) |

4          I, SANDRA SCHRAMM, Registered Professional
Reporter, Certified Realtime Reporter, and Notary Public for
5    the State of Colorado, do hereby certify that previous to the
commencement of the examination, DAWN ODEAN, was duly sworn
6    by me to testify to the truth in relation to the matters in
controversy between the said parties.

7

8          I further certify that said deposition was taken in
shorthand by me and was reduced to typewritten form by
computer-aided transcription, that the foregoing is a true
9    transcript of the questions asked, testimony given, and
proceedings had.

10

11          I further certify that I am not an attorney, nor
counsel, nor in any way connected with any attorney or
counsel for any of the parties to said action or otherwise
12    interested in its event.

13          IN WITNESS WHEREOF, I have affixed my signature
this 23rd of April, 2024.

14

15

16

17                              /s/ Sandra Schramm
                        _____

18                              Sandra Schramm
                        Registered Professional Reporter
19                              Certified Realtime Reporter
                        Notary Public

20

21

22

23

24

25