IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

| | |
|---|---|
| LISA ROY, IN HER OFFICIAL CAPACITY AS EXECUTIVE DIRECTOR OF THE COLORADO DEPARTMENT OF EARLY CHILDHOOD; AND DAWN ODEAN, IN HER OFFICIAL CAPACITY AS DIRECTOR OF COLORADO'S UNIVERSAL PRESCHOOL PROGRAM, | Case No. 25-1187 |
| Defendants-Appellants, | |
| v. | |
| DARREN PATTERSON CHRISTIAN ACADEMY, | |
| Plaintiff-Appellee. | |

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
THE HONORABLE JUDGE DANIEL D. DOMENICO
DISTRICT JUDGE
D.C. No. 1:23-CV-01557-DDD-STV

---

**DEFENDANTS-APPELLANTS' OPENING BRIEF**

PHILIP J. WEISER
Attorney General
HELEN NORTON*
Deputy Solicitor General
VIRGINIA R. CARRENO*
Second Assistant Attorney General
JANNA K. FISCHER*
Senior Assistant Attorney General II
*Counsel for Defendants-Appellants

1300 Broadway 10th Fl.
Denver, CO 80203
Tel.: (720) 508-6513
Tel.: (720) 508-6601
Tel.: (720) 508-6374
Email: helen.norton@coag.gov
Email: virginia.carreno@coag.gov
Email: janna.fischer@coag.gov

ORAL ARGUMENT REQUESTED

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................. i

TABLE OF AUTHORITIES ...................................................................iv

STATEMENT OF RELATED CASES AND APPEALS .........................ix

GLOSSARY ............................................................................................. x

INTRODUCTION................................................................................... 1

JURISDICTIONAL STATEMENT ........................................................ 4

QUESTIONS PRESENTED ................................................................... 6

STATEMENT OF THE CASE ................................................................ 6

    A. UPK Offers Free, High-Quality Preschool To All Four-Year-Old Coloradans Regardless of Protected Class Status. .................. 6

    B. The UPK Statute's Temporary Waiver Provision Is Not An Exception from the Equal-Opportunity Requirements As It Only Allows Preschool Providers to Temporarily Waive Quality Standards That are Not Health or Safety Standards........ 8

    C. UPK's Preferences Permit Departures From UPK's Matching Algorithm to Enable Providers To Serve Their Communities—But The Preferences Do Not Allow Exceptions from the Equal-Opportunity Requirements. ................ 9

    D. DPCA Has Participated In, and Received Public Funding from, UPK Since The Program's Inception.................................... 13

    E. The Proceedings Below ................................................................ 14

SUMMARY OF THE ARGUMENT ...................................................... 17

STANDARD OF REVIEW...................................................................... 21

ARGUMENT ......................................................................................... 22

I. The district court violated Rule 56 by resolving disputed issues of material fact without trial, including those necessary to establish this dispute's justiciability. ........................ 22

  A. Determining whether DPCA can establish standing requires resolution of material issues of disputed facts. .......... 23

  B. Determining whether DPCA's claims are ripe for adjudication requires resolution of material issues of disputed fact. ............................................................................... 28

    1. The claims raised by DPCA are not fit for judicial resolution. ............................................................................... 28

    2. Withholding judicial consideration will not cause undue hardship to DPCA. ..................................................... 30

II. UPK is neutral and generally applicable. ..................................... 31

  A. The statute's "temporary waiver" provision doesn't permit individualized exceptions from the equal-opportunity requirements. ................................................................................ 32

  B. Because the congregation preference has been repealed, it does not create an exception from the equal-opportunity requirements. ................................................................................ 38

III. CDEC satisfied rational-basis—indeed, any level of scrutiny—in declining to grant DPCA permission to deny equal opportunity based on gender identity. .................................. 44

  A. The district court erred in its application of strict scrutiny that turned on its earlier mistakes in finding exceptions to the equal-opportunity requirements. ..................................... 45

  B. The district court also disregarded disputed issues of material fact in failing to recognize that the congregation preference wouldn't have triggered strict scrutiny even if it were still in effect. ................................................................. 46

IV. None of DPCA's other Free Exercise Clause arguments
support the district court's grant of summary judgment. ............. 51

    A. The UPK statute's text makes clear that permitting
providers to prioritize families with low income does not
create an exception from UPK's equal-opportunity
requirements. .............................................................................. 51

    B. Nor does CDEC permit exceptions from any other equal-
opportunity requirement. ........................................................ 53

    C. UPK does not exclude any provider because of its religious
character or exercise. ............................................................... 58

    D. The equal-opportunity provisions are neutral. ........................ 61

    E. The equal-opportunity requirements are narrowly tailored
to achieve Colorado's compelling interests. .............................. 64

CONCLUSION ........................................................................................ 67

STATEMENT CONCERNING ORAL ARGUMENT ............................ 67

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT .... 68

ADDENDUM 1 Dkt. 97, February 24, 2025, Order Granting Motions
For Summary Judgment (10.App.2193-2207) ........................…..ADD 1

ADDENDUM 2 Dkt. 98, February 24, 2025, Final Judgment
(10.App.2208-2209) …………………………………………….... ADD 16

ADDENDUM 3 Dkt.105, April 7, 2025, Amended Final Judgment
(10.App.2223-2224) …………………………..…………………….ADD 18

# TABLE OF AUTHORITIES

## CASES

*Abbott Laboratories v. Gardner,*
   387 U.S. 136 (1967)................................................................28

*Aetna Life Ins., Co. of Hartford, Conn. v. Haworth,*
   300 U.S. 227 (1937)................................................................30

*Anderson v. Liberty Lobby, Inc.,*
   477 U.S. 242 (1986)................................................................22

*Carson v. Makin,*
   596 U.S. 767 (2022)................................................59, 60, 61

*Church v. Polis,*
   2022 WL 200661 (10th Cir. Jan. 24, 2022) (unpublished)................57

*Citizens for Peace in Space v. City of Colo. Springs,*
   477 F.3d 1212 (10th Cir. 2007).................................................22

*Does 1-11 v. Bd. of Regents of Univ. of Colo.,*
   100 F.4th 1251 (10th Cir. 2024) ...........................................32, 43

*El Dia, Inc. v. Hernandez Colon,*
   963 F.2d 488 (1st Cir. 1992) ..................................................30

*Emp. Div., Dep't of Hum. Res. of Oregon v. Smith,*
   494 U.S. 872 (1990)...........................................................31, 60

*Foote v. Ludlow Sch. Comm.,*
   128 F.4th 336 (1st Cir. 2025)...................................................65

*Fulton v. City of Phila.,*
   593 U.S. 522 (2021)..................................20, 32, 37, 42, 43, 46, 48, 50

*Grace United Methodist Church v. City of Cheyenne,*
   451 F.3d 643 (10th Cir. 2006)..................................................62

iv

*Kennedy v. Bremerton Sch. Dist.*,
    597 U.S. 507 (2022) ............................................................32

*Mahmoud v. Taylor*,
    145 S. Ct. 2332 (2025) ...........................24, 25, 27, 31, 60

*Martinez v. Mafchir*,
    35 F.3d 1486 (10th Cir. 1994) .........................................65

*New Mexicans for Bill Richardson v. Gonzales*,
    64 F.3d 1495 (10th Cir. 1995) ....................................28, 30

*Norvell v. Sangre de Cristo Dev. Co., Inc.*,
    519 F.2d 370 (10th Cir. 1975) .........................................30

*Rio Grande Foundation v. Oliver*,
    57 F.4th 1147 (10th Cir. 2023). .......................................21

*Sierra Club v. Yeutter*,
    911 F.2d 1405 (10th Cir. 1990) .......................................29

*St. Mary Catholic Parish in Littleton et al. v. Roy et al.*,
    No. 24-1267 (10th Cir. filed June 21, 2024) .. viii, ix, 13, 35, 37, 39, 40,
    47, 49, 57, 58

*Susan B. Anthony List v. Driehaus*,
    573 U.S. 149 (2014) ............................................23, 24, 27

*Tandon v. Newsom*,
    593 U.S. 61 (2021) ..............................20, 42, 43, 46, 48, 50

*Tolan v. Cotton*,
    572 U.S. 650 (2014) .................................................22, 42

*Trujillo v. Taos Mun. Schs.*,
    1996 WL 366214 (10th Cir., July 1, 1994) .......................65

*United States v. Sup. Ct. of N.M.*,
    839 F.3d 888 (10th Cir. 2016) ....................................21, 22

*Youth 71Five Ministries v. Williams*,
    No. 24-4101, 2025 WL 2385151 (9th Cir. August 18, 2025) ............. 61

**REGULATIONS**

8 Colo. Code Reg. 1404-1 § 4.109(A) .................................................... 11

8 Colo. Code Reg. 1404-1 § 4.109(A)(4) ............................................... 52

8 Colo. Code Reg. 1404-1 § 4.109(A)(9) ......................................... 12, 56

8 Colo. Code Reg. 1404-1 § 4.109(B) ........................ 11, 12, 40, 54, 56, 57

8 Colo. Code Reg. 1404-1 § 4.110(B) .................................................... 11

8 Colo. Code Reg. 1404-1, § 4.114 ....................................................... 36

8 Colo. Code Reg. 1404-1, § 4.114(C) .................................................... 9

8 Colo. Code Reg. 1404-1, § 4.114(B) .................................................... 9

**STATUTES**

7 U.S.C. § 2011 (2024) ........................................................................ 52

15 U.S.C. § 1691(a)(2) (2024) .............................................................. 52

28 U.S.C. § 1291 (2024) ......................................................................... 5

28 U.S.C. § 1331 (2024) ......................................................................... 4

28 U.S.C. § 1343 (2024) ......................................................................... 4

Colo. Rev. Stat. § 2-4-201(1)(b) (2024) ............................................... 53

Colo. Rev. Stat. § 26.5-1-101 (2024)...................................................... 6

Colo. Rev. Stat. § 26.5-1-104 (2024)...................................................... 6

Colo. Rev. Stat. § 26.5-1-109(1)(a) (2024) ............................................. 7

Colo. Rev. Stat. § 26.5-1-113(1)(a) (2024) ........................................ 7, 35

Colo. Rev. Stat. § 26.5-4-202 (2024)……………………………………52

Colo. Rev. Stat. § 26.5-4-202(1)(a)(V) (2024) ...................................... 6

Colo. Rev. Stat. § 26.5-4-202(1)(b) (2024) .................................... 7, 35

Colo. Rev. Stat. § 26.5-4-203(12) (2024)..............................xii, 7, 35

Colo. Rev. Stat. § 26.5-4-203(14)(e) (2024)............................................52

Colo. Rev. Stat. § 26.5-4-204(1) (2024)....................................................65

Colo. Rev. Stat. § 26.5-4-204(1)(b) (2024) ............................................52

Colo. Rev. Stat. § 26.5-4-204(2) (2024)............................................ 7, 9, 35

Colo. Rev. Stat. § 26.5-4-204(3)(a)(III) (2024).....................................52

Colo. Rev. Stat. § 26.5-4-205 (2024)…………………………………….7

Colo. Rev. Stat. § 26.5-4-205(1) (2024).....................................................52

Colo. Rev. Stat. § 26.5-4-205(1)(a) (2024) ........................................ 7, 35

Colo. Rev. Stat. § 26.5-4-205(1)(b)(II) (2024) .................... 9, 33, 34, 36, 37

Colo. Rev. Stat. § 26.5-4-205(2) (2024)....................................................65

Colo. Rev. Stat. § 26.5-4-205(2)(b) (2024) ............................. 8, 35, 47, 54

Colo. Rev. Stat. § 26.5-4-206 (2024) .......................................................52

Equal Credit Opportunity Act ...............................................................52

H.B. 21-1304, 73rd Gen. Assemb. (Colo. 2021) .......................................6

## OTHER AUTHORITIES

13A Wright, Miller & Cooper,
*Federal Practice & Procedure*, § 3532 (3d Ed.)....................................28

Colo. Sec'y of State, Notice of Proposed Rulemaking 2024-00528 (Oct. 11, 2024) available at https://www.sos.state.co.us/CCR/eDocketDetails.do?trackingNum=2024-00528 ........................................................................ 40

## STATEMENT OF RELATED CASES AND APPEALS

At issue in this appeal is whether the Universal Preschool Program's (UPK's) equal-opportunity requirements violate a religious preschool's Free Exercise rights. This is among the questions currently before this Court in *St. Mary Catholic Parish in Littleton et al. v. Roy et al.*, No. 24-1267 (10th Cir. filed June 21, 2024) (*St. Mary*). The *St. Mary* plaintiffs' claims include Free Exercise arguments substantially similar to those made by Plaintiff-Appellee Darren Patterson Christian Academy (DPCA) in this case—i.e., that UPK's equal-opportunity requirements are not neutral and not generally applicable and thus trigger (and fail) strict scrutiny. And in both cases, Colorado offers the same Free Exercise defenses: UPK's equal-opportunity requirements are neutral and generally applicable such that rational-basis review applies—and the equal-opportunity requirements satisfy that (and indeed any level of) review. More specifically, *St. Mary* will require this Court to resolve, among other issues, the two issues addressed by the district court in this case: (1) whether the UPK statute's temporary waiver provision creates an exception from the statute's equal-

opportunity requirements, thus rendering those requirements not generally applicable and triggering strict scrutiny; and (2) whether the congregation preference creates an exception from the statute's equal-opportunity requirements, thus rendering them not generally applicable and triggering strict scrutiny.

The district court in *St. Mary* issued a 101-page Order after a three-day bench trial with testimony from ten witnesses. 2.App.475-575. The plaintiffs in that case appealed that decision, and that appeal is fully briefed and was argued (on March 18, 2025). It remains pending before this Court.

Defendants-Appellants Colorado Department of Early Childhood (CDEC) filed a Motion for Abeyance of Appeal in this case requesting abeyance until a mandate issues in *St. Mary*. Dkt. 4. This Court referred that Motion to the merits panel, pending full briefing. Dkt. 20.

## GLOSSARY

CDEC provides the Court with the following definitions of various acronyms and terms used in this brief:

- ACEs – Adverse Childhood Experiences or experiences that are often traumatic and have the potential to cause significant harm to a child's mental, emotional, or physical well-being.

- CDEC – Colorado Department of Early Childhood.

- Cisgender – of, relating to, or being a person whose gender identity corresponds with the sex the person was assigned at birth.

- Gender-diverse – the extent to which a person's gender, identity, role, or expression differs from the cultural norms prescribed for people of a particular sex.

- Gender identity – a person's internal sense of being male, female, some combination of male and female, or neither male nor female.

- Head Start Program – federally-funded preschool providers that prioritize young children and their families who are low income or living in poverty, or have children with disabilities.

- IEP – Individualized Education Plan, which identifies and supports specific services for children with disabilities.

- LGBTQ+ – An umbrella term, broadly referring to people of all sexualities, romantic orientations, and gender identities that are not heterosexual or cisgender, including sex-trait variant people.

- Mixed-Delivery System – A system for delivering preschool services through a combination of both public and private providers, including school- and community-based preschools, family care homes, child care centers, faith-based preschools, and Head Start agencies. C.R.S. § 26.5-4-203(12) (2024).

- Transgender – of, relating to, or being a person whose gender identity differs from the sex the person was assigned at birth.

- UPK – Universal Preschool Program, the "Program."

# INTRODUCTION

Colorado became a national leader in 2023 by launching a universal preschool program (UPK) that provides free preschool to every four-year-old Coloradan whose family wants it. UPK does so through a "mixed-delivery" system that welcomes both public and private providers, including faith-based providers. To ensure that every preschooler in UPK-funded preschools has access to a safe, healthy, and high-quality learning environment, the UPK statute requires publicly-funded providers to satisfy certain quality assurance standards. These standards require providers to ensure, among other things, that all children have equal opportunity to enroll in and receive publicly-funded preschool services regardless of their, or their parents', race, ethnicity, religious affiliation, sexual orientation, gender identity, lack of housing, income level, or disability.

DPCA asks this Court to create a First Amendment right for publicly-funded schools to deny equal opportunity to children and families based on their protected class status—specifically, based on their gender identity. But the First Amendment poses no bar to

Colorado's ability to ensure that every Colorado preschooler has an equal opportunity, regardless of protected class status, to receive the high-quality, publicly-funded preschool services that best fit their family's needs. Because UPK's equal-opportunity requirements are neutral and generally applicable, they do not trigger strict scrutiny under the Free Exercise Clause. Rational-basis instead applies, and CDEC's actions satisfy this—and any other level of—review.

In granting summary judgment to DPCA, however, the district court impermissibly resolved disputed material facts by disregarding the evidence developed through discovery. Among other things, this evidence revealed disputed issues of material fact that must be resolved to determine whether DCPA has established its standing or the existence of any ripe dispute. For example, DCPA alleges that it may be excluded from the UPK program for enforcing policies that discriminate based on gender identity, but the evidence confirmed that no family has ever requested an exception from DPCA's alleged policies, and no evidence suggested that a family ever will. This evidence further revealed disputed issues of material fact about whether DPCA actually

has policies that require it to deny equal opportunity to preschoolers based on gender identity. Moreover, DPCA has participated in UPK and received payments for the preschool services it has provided since the Program's inception, and at no point since it began participating in UPK has DPCA changed any of its alleged policies or their application to preschoolers, and at no point has CDEC requested that it do so.

Furthermore, the district court's brief discussion of the merits of DPCA's free exercise claims not only failed to address numerous issues of disputed material fact but also made several errors of law. First, the district court erred in interpreting the statute's temporary waiver provision to permit exceptions from the equal-opportunity requirements when that statutory provision's express language makes clear that it cannot be used to create such exceptions. Second, the district court erred in finding the congregation preference to be an exception to the equal-opportunity requirements when that preference has been repealed and thus does not create an exception from the equal-opportunity requirements.

The district court then doubled down on these errors to conclude that CDEC does not have a compelling interest in declining to grant DPCA permission to deny equal opportunity to children and families based on the court's mistaken conclusion that Colorado had granted such permission to others.

For these reasons, the district court's order warrants reversal and remand.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1343. Final Judgment entered February 24, 2025. 10.App.2208-09. Amended Final Judgment entered April 7, 2025. 10.App.2223-24. CDEC filed a timely notice of appeal on May 7, 2025. Dkt. 106.

Footnote 5 of the district court's February 24, 2025, Order stated: "[b]ecause a permanent injunction is justified on Free Exercise grounds alone, there is no need to address Plaintiff's additional contentions that Defendants' rules violate its rights under the Free Speech and Equal Protection Clauses." 10.App.2206 at n.5 (citing to Pls.' Mot. for Summ. J., Dkt. 78 at 24-32 [3.App.599-607]). The district court's final judgment

stated, however, that "all" claims have been resolved. 10.App.2208-09. Seeking to clarify that court's ruling, CDEC filed a Motion to Alter or Amend a Judgment Pursuant to Rule 59(e). 10.App.2210-15.

The district court then issued an Amended Final Judgment stating that the only claim decided was the Free Exercise claim— leaving the two other claims unaddressed—and also that "this case is closed." 10.App.2224. Although CDEC believes that ambiguity remains over whether the district court entered final judgment on Plaintiff's Free Speech and Equal Protection Clause claims, it urges this Court's jurisdiction under 28 U.S.C. § 1291 for the reasons described in Dkt. 19 Ex. A.

# QUESTIONS PRESENTED

1.     Should the district court's ruling be reversed and remanded in light of the multiple disputed issues of material fact exposed through discovery that must be resolved to establish this case's justiciability?

2.     Did the district court err, as a matter of law and in ignoring numerous issues of disputed material fact, when it held that the temporary waiver provision and the congregation preference permit exceptions from UPK's equal-opportunity requirements—when neither creates an exception from those requirements?

3.     Is reversal of summary judgment proper when none of Plaintiff's Free Exercise arguments support summary judgment, including those the district court did not address?

# STATEMENT OF THE CASE

## A.     UPK Offers Free, High-Quality Preschool To All Four-Year-Old Coloradans Regardless of Protected Class Status.

In 2020, the Colorado electorate voted overwhelmingly to offer free preschool to all four-year-old Coloradans. Colo. Rev. Stat. ("C.R.S.") § 26.5-4-202(1)(a)(V). In 2021, the General Assembly passed the "Early Childhood Act" that created CDEC to implement this ground-breaking program. H.B. 21-1304, 73rd Gen. Assemb. (Colo. 2021) (enacted); C.R.S. §§ 26.5-1-101, 26.5-1-104. The Act seeks to expand access to high-quality preschool that ensures the health and safety of the "whole child," and requires CDEC to implement a "mixed-delivery" program

that includes public, private, faith-based, and in-home preschool providers. C.R.S. §§ 26.5-4-202(1)(b); 26.5-4-203(12); 26.5-4-204(2).

The "very robust stakeholder process" that informed UPK's development emphasized that ensuring children's health and safety requires a learning environment that is "inclusive and safe and nurturing for children," and underscored the importance of quality standards that included the equal-opportunity requirements—not just licensure requirements—to ensure that publicly-funded learning environments set children up for success. 2.App.341, 343, 347. The General Assembly determined that safeguarding children's health and safety requires protecting them from adverse experiences that could affect their physical, emotional, cognitive, and behavioral health. *See* C.R.S. §§ 26.5-1-113(1)(a); 26.5-1-109(1)(a); 26.5-4-205.

The statute thus directs CDEC to establish quality standards that reflect "national and community-informed best practices with regard to school readiness, academic and cognitive development, healthy environments, social-emotional learning, and child and family outcomes." C.R.S. § 26.5-4-205(1)(a). These standards include

requirements that publicly-funded providers ensure that all eligible children receive "an equal opportunity to enroll and receive preschool services regardless of race, ethnicity, religious affiliation, sexual orientation, gender identity, lack of housing, income level, or disability, as such characteristics and circumstances apply to the child or the child's family[.]" C.R.S. § 26.5-4-205(2)(b).

> **B. The UPK Statute's Temporary Waiver Provision Is Not An Exception from the Equal-Opportunity Requirements As It Only Allows Preschool Providers to Temporarily Waive Quality Standards That are Not Health or Safety Standards**

While the UPK statute has a temporary waiver provision that authorizes CDEC to "allow a preschool provider that does not meet the quality standards to participate in the preschool program for a limited time while working toward compliance with the quality standards . . . .," the provision is consistent with the legislative intent of focusing on health and safety. This provision seeks to provide time for small providers, in-home providers, and other providers new to preschool education to come into compliance with a variety of requirements that enhance quality preschool education. *See* 8 Colo. Code Reg. ("C.C.R.")

1404-1, § 4.114(B), (C). At the same time, however, this provision includes two express limitations. First, it makes clear that temporary waivers are not available for those "quality standards relating to health and safety as a condition of participating in the preschool program." C.R.S. § 26.5-4-205(1)(b)(II). Second, temporary waivers are available only to providers that are "working toward compliance" with all other quality standards. *Id.*

### C. UPK's Preferences Permit Departures From UPK's Matching Algorithm to Enable Providers To Serve Their Communities—But The Preferences Do Not Allow Exceptions from the Equal-Opportunity Requirements.

CDEC was created on July 1, 2022, and Dawn Odean started as UPK Director on August 15, 2022. 1.App.176¶¶3-4. The statute directed CDEC to immediately begin administering UPK for its inaugural year in 2023-24. *See* C.R.S. § 26.5-4-204(2). Providers began signing up in the Program's online portal in November 2022, and CDEC matched students with participating providers over the spring and summer of 2023. *See* 2.App.345 p.27:14-17; 9.App.2006¶¶10-12, cf. 2.App.439 (matching timeline for the 2024-2025 school year).

UPK's first year (AY23-24) was a resounding success, recruiting nearly 2,000 providers and serving over 43,000 children—more than doubling the number of children served by its predecessor program. 9.App.2008. In year one, at least 41 faith-based providers, including DPCA, participated in UPK and provided publicly-funded preschool to at least 1,026 children. 9.App.2008¶30(iii).

Families choosing to participate in UPK select and rank up to five providers on an online application. 1.App.177¶15. The UPK matching software then uses an algorithm to match a family with one of their choices. 2.App.379.

Because this algorithm can't account for providers' pre-existing relationships and commitments, providers expressed concern during the stakeholder feedback process that this matching process wouldn't permit them to serve the families and communities they had already been serving. 2.App.352, 354; 9.App.2081. In response, CDEC developed a series of specific matching "preferences" that enable providers to maintain ongoing relationships with their communities and maintain specialized areas of focus—so long as providers do not violate the equal-

opportunity requirements or any other statutory provision. 9.App.2081; 8 C.C.R. 1404-1 §§ 4.109, 4.110(B).[1]

These specific preferences enable cooperative preschools to reserve space for children of families participating in the cooperative; enable school districts to reserve space for children residing within district boundaries; enable providers to reserve space for their employees' children; enable providers to reserve space for continuing students (and siblings of those students) to ensure continuity-of-care; enable dual-language providers to reserve space for children with the requisite language abilities; and enable providers to reserve space for children with disabilities and for children of families with low-income. 8 C.C.R. 1404-1 § 4.109(A). None of these matching preferences permit exceptions from UPK's equal-opportunity requirements. *Id.* at § 4.109(B); 2.App.380.

Because nearly 2,000 providers participate in UPK, CDEC couldn't anticipate each provider's individualized needs, and thus

---

[1] In April 2025, CDEC amended (and renumbered) its rules—as a result, this brief's citations to sections in those rules may differ from those in prior pleadings.

created an additional "programmatic preference" to enable providers with needs not addressed by the specific preferences to request a preference that addressed those needs. 2.App.373; 8 C.C.R. 1404-1 § 4.109(A)(9). CDEC approved providers' requests to utilize this preference in UPK's inaugural year to permit providers, for example, to reserve space for families within a specific neighborhood, for families interested in STEM curriculum, and for families with parents employed by a specific employer like a hospital or college. *See id.* The programmatic preference permits departures from the algorithm—but does <u>not</u> permit exceptions from the equal-opportunity requirements. 2.App.352; 8 C.C.R. 1404-1 § 4.109(B).

Finally, to facilitate faith-based providers' participation in UPK, CDEC initially also developed a "congregation preference" to enable all faith-based providers—and only faith-based providers—to reserve space for their congregation members. 2.App.353-54, 372. In developing this preference, CDEC never intended to create an exception to the equal-opportunity requirements, and it consistently made clear that it would investigate allegations that a provider was using any preference,

including the congregation preference, to violate any of the equal-opportunity requirements. 9.App.2082-83. As discussed *infra* Argument Section II.B, CDEC repealed this preference after the district court in *St. Mary* held that it created an exception from the equal-opportunity requirements.

### D. DPCA Has Participated In, and Received Public Funding from, UPK Since The Program's Inception.

DPCA registered to participate in UPK and, in January 2023, signed the 2023-2024 UPK Provider Agreement. 1.App.30¶98. Several months later, DPCA emailed its UPK Local Coordinating Organization "requesting a religious exemption" from the equal-opportunity requirements. 1.App.124-25. In response, CDEC Executive Director Dr. Lisa Roy explained that the statute did not give her authority to grant exemptions from the equal-opportunity requirements, but encouraged DPCA to continue participating. 1.App.123. CDEC then matched 21 children with DPCA through UPK. 9.App.2008¶33.

CDEC began paying DPCA for the UPK students matched to it on August 1, 2023, and continued those payments without interruption. 1.App.180, 9.App.2009¶36. CDEC never asked DPCA to change any of

its practices or policies and DPCA has not in fact changed them.

9.App.2009¶35; 10.App.2256¶¶20-22.

### E. The Proceedings Below

DPCA filed this lawsuit on June 20, 2023. 1.App.42. It later filed a

motion that requested a preliminary injunction barring CDEC from

enforcing, against DPCA, the UPK statute's equal-opportunity

provisions that require equal opportunity for children and families

regardless of gender identity. 1.App.126-50.[2]

---

[2] That motion also requested a preliminary injunction barring CDEC from enforcing, against DPCA, the provision of the UPK Provider Agreement known as Provision 18(B) that required equal opportunity in providers' employment practices regardless of religious affiliation, sexual orientation, and gender identity. 1.App.137-42. In its briefing, at the preliminary injunction hearing, and thereafter, CDEC disavowed enforcement of Provision 18(B). 1.App.178¶27; 9.App.2009-10¶¶41-46, 10.App.2170¶¶9-22. Starting with AY24-25, that provision no longer appears in the UPK contract. 9.App.2010¶¶45-46; 10.App.2170¶¶16-22. The district court granted CDEC's motion for partial summary judgment that argued that DPCA's claims involving 18(B) were moot. 10.App.2206. It thus dismissed DPCA's employment-related claims regarding Provision 18(B) (Claims 1 and 4 in their entirety, and portions of Claims 2, 3, 5, and 6). DPCA did not appeal the district court's dismissal of those employment-related claims. For this reason, the only remaining claims in this case are those where DPCA seeks an exemption from UPK's equal-opportunity provision that requires

CDEC opposed the motion based only on standing and ripeness grounds, and filed a motion to dismiss on those grounds. 1.App.152-75. The district court granted DPCA's motion for preliminary injunction and denied CDEC's motion to dismiss. 1.App.251.

Following the grant of the preliminary injunction motion, both parties conducted discovery over a seven-month period. This included depositions of thirteen witnesses, production of 7,024 pages of documents, and a site visit to DPCA's preschool. Both parties filed summary judgment briefing that included numerous exhibits. 2.App.315-338; 3.App.576-607.

The district court granted DPCA's request, on free exercise grounds only, for a permanent injunction exempting it from the equal-opportunity provisions to permit it to deny equal opportunity to

---

publicly-funded providers to ensure equal opportunity to children and families regardless of their gender identity. 10.App.2202.

children and families based on gender identity.[3] 10.App.2209. Its order

relied on its preliminary injunction findings, *see* 10.App.2201-06, even

though the standards for preliminary and permanent injunctions differ,

and even though CDEC did not present a merits defense when opposing

DPCA's motion for a preliminary injunction. More specifically, the

district court described the temporary waiver provision and the

congregation preference as creating exceptions to UPK's equal-

opportunity requirements such that those requirements were no longer

generally applicable. The district court then found that CDEC's refusal

to grant DPCA permission to deny equal opportunity based on gender

identity failed strict scrutiny—resting its determination that Colorado

does not have a compelling interest in declining to grant DPCA

permission to deny equal opportunity to children and families on its

earlier conclusion that the temporary waiver provision and

congregation preference granted such permission to others.

---

[3] As explained above in the Jurisdictional Statement, the district court
did not address DPCA's Free Speech and Equal Protection claims.

## SUMMARY OF THE ARGUMENT

The First Amendment does not preclude Colorado from ensuring that every four-year-old Coloradan has an equal opportunity, free from statutorily-prohibited discrimination, to enroll in and receive the high-quality, publicly-funded preschool services that contribute to lifelong learning.

Nothing in UPK's enactment or implementation indicates hostility to religious providers: to the contrary, it actively includes them. Indeed, DPCA itself has participated in UPK since the Program's inception.

Lacking any evidence that UPK's equal opportunity requirements are not generally applicable, DPCA attempted to identify possible exceptions from UPK's equal-opportunity requirements. It asked the district court to interpret the statute—including, but not limited to, the temporary waiver provision—in ways that ignore its text and undermine its objectives. And it mischaracterized UPK's preferences as exceptions from the equal-opportunity requirements—when those preferences instead cure the matching algorithm's unintended

consequences while allowing no exceptions from the equal-opportunity requirements.

The statute permits no exceptions from its equal-opportunity requirements and CDEC has granted no secular exceptions from those requirements. And although CDEC's ambitions to respond to faith-based providers' feedback through the congregation preference inadvertently and temporarily drew distinctions based on religious affiliation that favored all religious providers (and only religious providers), that preference has since been repealed and is thus out of the case. Even when it was in effect, the congregation preference didn't trigger Free Exercise Clause suspicion because it *favored* religious entities over secular entities (not vice versa), and because it didn't undermine the interests underlying the other equal-opportunity requirements.

CDEC's requirement that DPCA provide equal opportunity to all children without regard to their or their parent's gender identity triggers, and satisfies, rational-basis review—indeed, any level of scrutiny. Requiring publicly-funded preschools to provide equal

opportunity to gender-diverse children is rationally related (indeed, narrowly tailored) to achieving Colorado's legitimate (indeed, compelling) interests in ensuring children have equal access to enroll in and continue to receive high-quality publicly-funded preschool services that are safe, healthy, and free from discrimination.

In granting summary judgment to DPCA, however, the district court impermissibly resolved disputed material facts by disregarding the evidence developed through discovery. Among other things, the discovery undertaken since the district court's preliminary injunction ruling exposed disputed issues of material fact that must be resolved to establish this case's justiciability. The evidence shows that DPCA has no transgender students, does not have policies that require different treatment of such students, and has never been excluded from the UPK program or asked to change any policy.

Furthermore, in addressing the merits of DPCA's free exercise claims, 10.App.2203-06, the district court not only failed to acknowledge the numerous issues of disputed material fact but also made several errors of law. First, the district court erred in interpreting the UPK

statute's temporary waiver provision to permit exceptions from the equal-opportunity requirements when that provision's express language makes clear that it cannot be used to create such exceptions.

Second, the district court erred in finding the congregation preference to be an exception to the equal-opportunity requirements when that preference has been repealed and is thus out of the case. Furthermore, the congregation preference didn't trigger strict scrutiny even when it was in effect because it favored religious providers over secular providers and thus did not devalue religion. And, even if the congregation preference hadn't been repealed, and even if it had treated secular providers more favorably than religious providers (not vice versa), material issues of disputed fact would still remain over whether the congregation preference's exception from the religious-affiliation provision undermined the state's interests underlying the other equal-opportunity requirements—a finding necessary to trigger strict scrutiny under the *Fulton/Tandon* rule for assessing general applicability.

For these reasons, the district court also erred when concluding that Colorado does not have a compelling interest in declining to grant

DPCA permission to deny equal opportunity to children and families—

because that conclusion rested on the court's earlier mistakes in

determining that Colorado had granted such permission to others.

Finally, none of DPCA's other arguments—unaddressed by the

district court—support a grant of summary judgment to DPCA on its

free exercise claim. UPK's equal-opportunity requirements are neutral

and generally applicable. Rational-basis review thus applies, and UPK

satisfies this, and indeed any, level of scrutiny.

For these reasons, this Court should reverse the district court's

grant of summary judgment to DPCA and remand for further

proceedings.

## STANDARD OF REVIEW

On appeal from a grant of summary judgment in a First

Amendment case, the standard of review is de novo and requires "an

independent examination of the whole record." *Rio Grande Foundation

v. Oliver*, 57 F.4th 1147, 1159 (10th Cir. 2023). The same is true of this

Court's review of justiciability questions. *United States v. Sup. Ct. of*

*N.M.*, 839 F.3d 888, 898 (10th Cir. 2016); *Citizens for Peace in Space v. City of Colo. Springs*, 477 F.3d 1212, 1219 (10th Cir. 2007).

## ARGUMENT

I.    **The district court violated Rule 56 by resolving disputed issues of material fact without trial, including those necessary to establish this dispute's justiciability.**

A district court must draw all reasonable inferences in favor of the nonmovant at the summary judgment stage. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Tolan v. Cotton*, 572 U.S. 650, 657 (2014). The weighing of the evidence and the drawing of legitimate inferences are findings of fact to be made at trial, not by a judge on summary judgment. *Liberty Lobby*, 477 U.S. at 255.

Among other things, the discovery undertaken since the district court's preliminary injunction ruling exposed disputed issues of material fact that must be resolved to establish this dispute's standing and ripeness.[4] The parties in this case completed seven months of

---

[4] CDEC previously raised the issues of standing and ripeness in its motion to dismiss and in its opposition to DPCA's motion for a preliminary injunction. 1.App.152-75. Although the district court

discovery, including depositions of thirteen witnesses, production of 7,024 pages of documents, and a site visit to DPCA's preschool. Based on this discovery, DPCA's motion for summary judgment relied on 83 alleged "undisputed material facts," 3.App.582-93, and CDEC responded with 26 outright denials and an additional 19 partial denials of those "facts" with supporting record evidence to establish the basis for disputing those material facts, along with nine additional material facts disputed by the parties. 9.App.1812-22; 9.App.1824-26. The district court nevertheless disregarded this evidence and deprived CDEC of its Rule 56 right to contest the evidence.

### A. Determining whether DPCA can establish standing requires resolution of material issues of disputed facts.

To establish standing, a plaintiff must show (1) an injury in fact, (2) a connection between the injury and the alleged conduct, and (3) redressability. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157

---

rejected those arguments when granting DPCA's motion for a preliminary injunction, 1.App.259-77, the evidence developed through discovery since that ruling reveals disputed issues of material fact that must be resolved to determine this dispute's justiciability.

(2014). An "injury in fact" must be "concrete and particularized" and "actual or imminent, not 'conjectural' or hypothetical." *Id*. To pursue a pre-enforcement challenge, DPCA is required to show that "the threatened injury is certainly impending, or there is a substantial risk that the harm will occur." *Mahmoud v. Taylor*, 145 S. Ct. 2332, 2358 (2025). DPCA asserts that the injury threatened is its potential exclusion from UPK if CDEC was to find DPCA in violation of the Program's equal opportunity requirements. *See* 1.App.34-35. But DPCA has not shown that any exclusion is "certainly impending," or shown any "substantial risk" of exclusion.

More specifically, DPCA alleged that its religious beliefs require policies that treat children differently based on gender identity regarding "restroom usage, pronouns, dress codes, and student housing during school expeditions and field trips," and that UPK burdens its religious exercise by requiring compliance with the Program's equal-opportunity requirements. 1.App.17. But the evidence developed through discovery revealed disputed material facts regarding whether DPCA actually has such policies and whether any such policies actually

treat preschoolers differently based on gender identity. Without resolution of these facts, DPCA cannot establish, as is required for standing, that "the threatened injury is certainly impending, or there is a substantial risk that the harm will occur," *see Mahmoud*, 145 S. Ct. at 2358, especially since DPCA has participated in and received funding from UPK since the Program's inception.

For example, DPCA asserted that its "Sensitive School Spaces" policy requires children to utilize the bathroom that correlates with their sex assigned at birth regardless of their gender identity. 1.App.24. During discovery, however, a site visit and deposition testimony revealed that DPCA does not segregate its preschool bathrooms by sex. 6.App.1336:13-21; 9.App.1997 (all preschoolers use single-stall classroom bathrooms for all genders); 5.App.1132¶¶5-18; 9.App.1865-66. DPCA's preschool instead has single-stall bathrooms in each preschool classroom that can be used by any child, regardless of sex or gender identity. 6.App.1336:13-21; 9.App.1997. Even if a preschooler sought to use a bathroom in the primary DPCA building, its Head of School testified that the primary building has a single-stall unisex staff

bathroom and that students have used that bathroom in the past. 5.App.1133; 9.App.1997. The Head of School further testified that male students would be allowed to use the female restroom in the DPCA building in a variety of circumstances. 5.App.1137-38. DPCA thus has no clear enforcement of gender-specific bathroom policies for preschoolers anywhere in the school.

The evidence developed during discovery also revealed that DPCA has no sex-specific dress code for preschoolers, and has no gender-based policy regarding haircuts, jewelry, nail polish, or makeup use. 5.App.1192¶¶7-10, 18-22; 5.App.1206¶¶19-22; 6.App.1351¶¶1-20; 9.App.2000 p.60:12-18; 9.App.2030 p.51:11-22; 9.App.1851 (no preschool dress code apart from recommending "casual play clothes and non-skid shoes"). That evidence also revealed that DPCA's own witnesses disagree regarding the existence and application of any alleged pronoun policies to preschoolers and their families. 5.App.1228:18-19 (no language directly addresses pronouns); 6.App.1359:25-1360:2; 9.App.2024 p.27:21-23. Discovery further revealed that DPCA does not take preschoolers on field trips or expeditions, so it has no reason to

address the "housing" issues alleged in its complaint. 6.App.1342:11-15, 1343:2-9; 9.App.1998 p.53:1-10 (no overnight trips for preschoolers). And again, DPCA has received UPK funding since the Program's inception.

For these reasons, determining whether DPCA can establish that any "threatened injury is certainly impending"—or that there is any risk, substantial or otherwise, that it will experience injury—requires resolution of material issues of disputed fact. *See Mahmoud*, 145 S. Ct. at 2358. In *Mahmoud*, the Supreme Court found that the challengers established injury because the school's introduction of LGBTQ+ storybooks into classrooms, combined with its refusal to permit parents to opt out of discussions involving those storybooks, burdened parents' free exercise rights to control their children's religious upbringing. *Id.* at 2360. Here, in contrast, disputed issues of material fact remain over whether DPCA has any policies in place that require the denial of equal opportunity to preschoolers or their families based on gender identity, and thus DPCA has not established an injury-in-fact. *See Susan B. Anthony List*, 573 U.S. at 157.

**B. Determining whether DPCA's claims are ripe for adjudication requires resolution of material issues of disputed fact.**

Determining whether claims are ripe for adjudication requires consideration of two factors: (1) the fitness of the issue for judicial resolution; and (2) the hardship to the parties of withholding judicial consideration. *Abbott Laboratories v. Gardner*, 387 U.S. 136, 149 (1967). The facts unearthed in discovery show that DPCA's speculative claims are not fit for judicial decision, and that delay of judicial consideration will cause no undue hardship.

**1. The claims raised by DPCA are not fit for judicial resolution.**

In determining whether an issue is fit for judicial review, courts focus on "whether the case involves uncertain or contingent future events that may not occur as anticipated, or indeed may not occur at all." *New Mexicans for Bill Richardson v. Gonzales*, 64 F.3d 1495, 1499 (10th Cir. 1995) (citing 13A Wright, Miller & Cooper, *Federal Practice & Procedure*, § 3532 at 112 (3d Ed.).

No witness recalled that DPCA ever enrolled a gender-diverse preschooler and no evidence suggests that it ever will be faced with the

opportunity to do so. 9.App.1875-76. Discovery also confirmed that no family has ever requested an exception from DPCA's alleged policies, and no evidence suggested that a family ever will. *See* 5.App.1079-80; 5.App.1094¶¶21-25; 5.App.1095¶¶1-6. And, as explained above, the evidence developed during discovery revealed disputed issues of material fact about whether DPCA actually has policies that require it to treat preschoolers differently based on gender identity.

"[J]udicial intervention where administrative action is contingent and dependent on context" is inappropriate and inhibits quality judicial decision making. *Sierra Club v. Yeutter*, 911 F.2d 1405, 1416 (10th Cir. 1990). For DPCA's free exercise claim to be fit for judicial resolution, the family of a gender-diverse UPK preschool student would have to enroll in DPCA and make a request inconsistent with DPCA's purported polices (the existence and application of which are disputed). Then, DPCA would have to deny that request in a way that violates UPK's equal-opportunity requirements. Determining the merits of DPCA's claims thus requires reliance upon uncertain or contingent future events that may not occur as anticipated or indeed may not occur

at all. *New Mexicans for Bill Richardson*, 64 F.3d at 1499. This would

be akin to requesting an advisory opinion, and the "federal courts do not

render advisory opinions." *Norvell v. Sangre de Cristo Dev. Co., Inc.*, 519

F.2d 370, 375 (10th Cir. 1975); *see also Aetna Life Ins., Co. v. Haworth*,

300 U.S. 227, 239-41 (1937) ("It must be a real and substantial

controversy admitting of specific relief through a decree of a conclusive

character, as distinguished from an opinion advising what the law

would be upon a hypothetical state of facts.").

## 2.     Withholding judicial consideration will not cause undue hardship to DPCA.

For a finding of ripeness, DPCA would have to establish that UPK

creates a "direct and immediate dilemma." *New Mexicans for Bill*

*Richardson*, 64 F.3d at 1499 (*citing El Dia, Inc. v. Hernandez Colon*, 963

F.2d 488, 495 (1st Cir. 1992)). DPCA faces no such dilemma.

DPCA has participated in UPK and received payments for the

preschool services it has provided since the Program's inception.

9.App.2008-09¶¶33-35. At no point since it began participating in UPK

has DPCA changed any of its alleged policies, nor the way it applies

policies to preschoolers. 10.App.2256¶20-22; *see also* 9.App.2009¶35

("The Department has never asked DPCA to change any of its practices or policies."). Delay of judicial consideration thus does not pose an undue hardship to DPCA.

For these reasons, this Court should reverse and remand for resolution of the disputed issues of material fact necessary to establish this dispute's justiciability.

## II.     UPK is neutral and generally applicable.

"[T]he government is generally free to place incidental burdens on religious exercise so long as it does so pursuant to a neutral policy that is generally applicable." *Mahmoud,* 145 S. Ct. at 2360*, see also Emp. Div., Dep't of Hum. Res. of Oregon v. Smith,* 494 U.S. 872, 879 (1990) ("[T]he right of free exercise does not relieve an individual of the obligation to comply with a 'valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes)'"). Rational-basis review thus applies to the government's actions that incidentally burden religion, unless the plaintiff can prove that they are not

generally applicable or not neutral. *See Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 525 (2022) (burden on movant).

The district court erred, as a matter of law and in ignoring numerous issues of disputed material fact, when it held that the temporary waiver provision and the congregation preference permit exceptions from the equal-opportunity requirements such that strict scrutiny applies. But neither creates an exception to UPK's equal-opportunity exceptions—and thus neither triggers strict scrutiny.

## A. The statute's "temporary waiver" provision doesn't permit individualized exceptions from the equal-opportunity requirements.

A government program is not generally applicable (and thus triggers strict scrutiny under the Free Exercise Clause) when the challenger can show that it creates a mechanism for individualized exceptions, because such a mechanism permits the government to use that discretion to selectively burden religious actors compared to secular actors. *Fulton v. City of Phila.*, 593 U.S. 522, 533 (2021); *Does 1-11 v. Bd. of Regents of Univ. of Colo.,* 100 F.4th 1251, 1277 (10th Cir. 2024). UPK has no such mechanism.

The district court nevertheless held that C.R.S. § 26.5-4-205(1)(b)(II) ("the temporary waiver provision") permits individualized exceptions from the equal-opportunity requirements (thus triggering strict scrutiny) by permitting CDEC to "grant temporary exemptions to the quality-standards requirements as 'necessary to ensure the availability of a mixed delivery system within a community.'" 10.App.2195 (citing C.R.S. § 26.5-4-205(1)(b)(II)). But the district court omitted key statutory language in its quotation of this provision, and entirely failed to address two express limitations that separately, and independently, make clear that this provision cannot be used to grant exceptions from the equal-opportunity requirements.

First, this provision forbids its use to suspend any quality standard relating to health and safety, even temporarily. Instead, it authorizes CDEC [to] "allow a preschool provider that does not meet the quality standards to participate in the preschool program for a limited time while working toward compliance with the quality standards; *except that each preschool provider must meet all quality standards relating to health and safety as a condition of participating in the*

*preschool program.*" C.R.S. § 26.5-4-205(1)(b)(II) (emphasis added).

CDEC reasonably interprets the equal-opportunity requirements (that protect children from discrimination that can cause mental, physical, and emotional harm) to be among UPK's health and safety standards such that they cannot be waived at any time. 3.App.782:1-14; 4.App.949-51; 9.App.2079:5-12; *see also* 2.App.531 ("The evidence in this case establishes that the statutory equal-opportunity requirement was included in the UPK Statute so that eligible children would not experience discrimination on the bases identified in the statute and so that they can grow to their maximum ability and not be placed in an unsafe or unhealthy environment."). The temporary waiver provision thus permits no exceptions from those requirements.

Indeed, the equal-opportunity requirements have been part and parcel of UPK's commitment to safe and healthy publicly-funded preschools from the very beginning. *See* 2.App.343 p.19:18-25; 9.App.2079:9-12. As Colorado's General Assembly found, stressful experiences early in life have destructive impacts on the brain's architecture—while responsive, nurturing relationships between young

children and their caregivers can lead to more secure attachment.

C.R.S. § 26.5-1-113(1)(a). Deposition testimony, moreover, explained

how the statute's legislative history and implementation reflect a

"whole child" approach, emphasizing the importance of safe, healthy,

and nurturing learning environments free from discrimination. C.R.S.

§§ 26.5-4-202(1)(b); 26.5-4-203(12); 26.5-4-204(2); 2.App.406-07;

2.App.343-44.

The Act thus expressly directed CDEC to require quality

standards that reflect best practices regarding academic and cognitive

development, healthy environments, social-emotional learning, and

child and family outcomes; and, then expressly required those quality

standards to include the equal-opportunity requirements. C.R.S. § 26.5-

4-205(1)(a), (2)(b). As the district court concluded in *St. Mary*, "it is clear

the General Assembly did not intend to allow [CDEC] to waive any

standard that would have potentially caused physical or mental harm

to preschool children." 2.App.531; *see also* 2.App.530-31 (interpreting

the temporary waiver provision and the statutory term "health and

safety standard" to conclude that "Defendants' view of the waiver

provision is consistent with the plain language and the purpose of the statute.").

Second, even if the equal-opportunity requirements were not among UPK's health and safety standards—and they are—the temporary waiver provision also separately makes clear that it is available only to a provider that is "working toward compliance" with all other quality standards. C.R.S. § 26.5-4-205(1)(b)(II). The temporary waiver provision seeks to provide time for small providers, in-home providers, and other providers new to preschool education, to come into compliance with requirements for quality preschool education such as the professional development requirements for teachers and staff. *See* 8 C.C.R. 1404-1 § 4.114. But a provider requesting a temporary waiver from the equal-opportunity requirements would not satisfy that provision's requirement that they be working towards compliance with that standard because agreeing not to deny equal opportunity does not require additional time or training. As the district court in *St. Mary* observed, "there is no basis for speculating that the General Assembly envisioned the temporary waiver provision as applying to the equal-

opportunity requirement given that it is unlikely any provider would need to violate the requirement for a limited time while working toward compliance." 2.App.531-32.

In short, UPK's temporary-waiver provision constrains CDEC's ability to grant temporary waivers, making clear that such waivers are available only when "necessary to ensure the availability of a mixed delivery system within a community," only so long as the provider meets "all quality standards relating to health and safety as a condition of participating in the preschool program," and only so long as that provider is "working toward compliance" with *all* of the quality standards. C.R.S. § 26.5-4-205(1)(b)(II). A provider seeking waiver of the equal-opportunity requirements wouldn't satisfy these requirements. Contrast the exemption at issue in *Fulton* that permitted a commissioner to grant exceptions from contractual nondiscrimination requirements in "his/her *sole discretion.*" 593 U.S. at 535 (emphasis added).

The district court's three-sentence discussion of UPK's temporary waiver provision nevertheless entirely failed to consider either of these

express textual limitations that make clear that the equal-opportunity requirements are not subject to waiver, even temporarily. 10.App.2202-03. The district court thus erred as a matter of law in interpreting this provision to permit exceptions from the equal-opportunity requirements.[5]

### B. Because the congregation preference has been repealed, it does not create an exception from the equal-opportunity requirements.

The district court also found that the congregation preference creates an exception from the equal-opportunity requirements and thus triggers strict scrutiny. 10.App.2202-03. But the congregation preference has been repealed and is now out of the case. 10.App.2186-92. It thus does not create an exception from the equal-opportunity requirements, and does not provide a basis for finding that those requirements are not generally applicable such that strict scrutiny applies.

---

[5] Even if this question—of whether the temporary waiver provision permits exceptions from the equal-opportunity requirements—were characterized as a question of fact rather than of law, the relevant facts are disputed, and summary judgment is thus inappropriate.

In its initial rule-making, CDEC sought to define the term "congregation" as expansively as possible so that faith-based providers could define their own community, and the final rule (developed after feedback from faith-based providers) defined "congregation" capaciously and deferentially to mean "members of the community that the faith-based provider serves as the faith-based provider defines that community," 1.App.248-49¶¶34-41; 3.App.610. In developing this preference, CDEC never intended to create an exception to the equal-opportunity requirements, and it consistently made clear that it would investigate allegations that a provider was using any preference, including the congregation preference, to violate any of the equal-opportunity requirements. 9.App.2082-83.

The district court in *St. Mary*, however, ruled that the congregation preference created an exception from the provision requiring equal opportunity regardless of religious affiliation by "permit[ting] faith-based providers to prioritize access to their services for members of their congregation, however they choose to define that term." 2.App.544. At the same time, that district court determined that

the UPK statute does not authorize CDEC to create exceptions from the equal-opportunity requirements—and indeed, CDEC has consistently emphasized that the UPK statute permits no such exceptions. 2.App.540; 1.App.120; 8 C.C.R. 1404-1 § 4.109(B).

Committed to complying with all statutory requirements, CDEC initiated a Notice of Proposed Rulemaking to repeal the congregation preference to eliminate its inadvertent exception from the religious-affiliation provision when the statute permits no exceptions from the equal-opportunity provisions.[6] *See* Colo. Sec'y of State, Notice of Proposed Rulemaking 2024-00528 (Oct. 11, 2024) available at https://www.sos.state.co.us/CCR/eDocketDetails.do?trackingNum=2024-00528. The congregation preference's repeal was finalized November 21,

---

[6] CDEC's arguments in its response to DPCA's motion for summary judgment, filed shortly after the *St. Mary* court's order, included an argument that the congregation preference did not permit exceptions from the religious-affiliation provision. After further review and consideration of the *St. Mary* order, however, CDEC decided to repeal that preference to ensure compliance with the statutory equal-opportunity requirements that permit no exception. *See* Answer Br., *St. Mary*, No. 24-1267 (Oct. 16, 2024) Dkt. 68 at 7 n.2, 43-44.

2024, and became effective January 14, 2025. *Id.* Starting with AY25-26, the congregation preference is no longer in place. *Id.*

In accepting DPCA's argument that the congregation preference created an exception to the equal opportunity requirements, the district court entirely ignored that the preference had been repealed.[7] 10.App.2202-03. Instead, the order inexplicably relies on the court's preliminary injunction ruling, and inaccurately describes the congregation preference as remaining in place. *Id.* at 2203 ("As explained in the preliminary injunction order, the Department allows categorical exemptions from its admission policies for preschools operated by houses of worship that seek to reserve seats for members of the school's 'congregation.' That remains the case now.") (citation omitted).

---

[7] CDEC informed the district court of CDEC's initiation of its plans to repeal the congregation preference on October 11, 2024. 10.App.2172-85. CDEC alerted the district court that the congregation preference's repeal had been finalized on January 16, 2025. 10.App.2186-92. The district court issued its order on February 24, 2025. 10.App.2207.

In disregarding the repeal of the congregation preference, the district court erred as a factual matter. Where a district court fails to acknowledge evidence and fails to view evidence in the light most favorable to the nonmoving party in disregard of the summary judgment standard, reversal is appropriate. *Tolan*, 572 U.S. at 659-60.

Moreover, even if the congregation preference were still in effect, the district court erred in its analysis of whether that preference—that favored religious preschools over secular preschools—would have triggered strict scrutiny under the Free Exercise Clause. The Supreme Court's general-applicability analysis screens for circumstances where governments "treat any comparable *secular* activity more favorably than *religious* exercise[,]" thus de-valuing religion compared to secular activities. *Tandon v. Newsom*, 593 U.S. 61, 62 (2021) (emphases added). As the Court has made clear, government action is not generally applicable "if it prohibits *religious* conduct while permitting *secular* conduct that undermines the government's asserted interests in a similar way." *Fulton*, 593 U.S. at 534 (emphases added). But even when the congregation preference was in effect, it did not trigger Free

Exercise Clause suspicion under the *Fulton/Tandon* rule because it favored religious preschools over secular preschools and thus did not devalue religion. *See Does 1-11,* 100 F.4th at 1277, (government programs that grant exceptions for secular but not religious reasons are not generally applicable because they devalue religion). Indeed, to hold otherwise would perversely discourage governments from ever choosing to accommodate religion in the first place.

The congregation preference thus did not trigger strict scrutiny under the *Fulton/Tandon* rule for assessing general applicability even when it was in effect. Yet the district court failed to cite the *Fulton/Tandon* rule—much less apply it—in its consideration of the congregation preference, and thus again erred as a matter of law. 10.App.2203.

The district court also disregarded disputed issues of material fact about the congregation preference's operation even when it was in effect. In particular, the district court indicated that the congregation preference preferred "formal religious organizations ('congregations') over less traditional religious endeavors (Darren Patterson academy)"

and described the congregation preference as "contemplat[ing] exemptions for religious or secular 'congregations' but does not permit exemptions for the religious reasons that Plaintiff has sought here." 10.App.2203.

Not so. CDEC ensured that the congregation preference was available to all faith-based providers regardless of denomination, religion, or congregational structure by defining "congregation" broadly to mean "members of the community that the faith-based provider serves as the faith-based provider defines that community." 3.App.610, 615. As CDEC continuously reiterated throughout this case, DPCA misunderstood the congregation preference. Compare 10.App.2288-89 with 1.App.30, 33.

For these reasons, too, this Court should reverse and remand.

## III. CDEC satisfied rational-basis—indeed, any level of scrutiny—in declining to grant DPCA permission to deny equal opportunity based on gender identity.

The district court mistakenly concluded that Colorado could not have a compelling interest in denying DPCA an exception that would

cause harm to children because it had mistakenly found CDEC willing

to tolerate that harm by permitting exceptions to others.

> ### A. The district court erred in its application of strict scrutiny that turned on its earlier mistakes in finding exceptions to the equal-opportunity requirements.

The district court did not dispute that publicly-funded preschools

harm children when they deny them equal opportunity based on gender

identity. 10.App.2205 ("I do not doubt the harm that discrimination

may cause to the precocious preschoolers who understand the

concept. . . ."); *id.* ("I assume that Defendants could prove at trial that

preschoolers and their families would be harmed by facing

discrimination from Plaintiff."). Instead, the district court erroneously

held that Colorado did not have a compelling interest in protecting

children from this harm because that court had mistakenly concluded

that CDEC created other exceptions from the equal-opportunity

requirements that would permit this harm. *Id.* at 2205-06 ("[T]he fact

that Defendants permit exemptions from the Program's anti-

discrimination rules undermines their contention that this interest is

constitutionally compelling.").

But, as explained above, the district court made errors of law and ignored disputed issues of material fact when it mistakenly found that the temporary waiver provision and the congregation preference created exceptions to the equal-opportunity requirements and thus erroneously chose to apply strict scrutiny. The district court then doubled down on these errors in applying strict scrutiny when it concluded that Colorado could not have a compelling interest for denying DPCA an exception that would cause harm to children because it had mistakenly found CDEC willing to tolerate that harm by permitting exceptions to others.

B. **The district court also disregarded disputed issues of material fact in failing to recognize that the congregation preference wouldn't have triggered strict scrutiny even if it were still in effect.**

As the Supreme Court has made clear, government action is not generally applicable "if it prohibits religious conduct while permitting secular conduct *that undermines the government's asserted interests in a similar way.*" *Fulton*, 593 U.S. at 534 (emphasis added); *see also Tandon,* 593 U.S. at 62 ("whether two activities are comparable" for Free Exercise purposes "must be judged against the asserted

government interest that justifies the regulation at issue."). But even when it was in effect, the now-repealed congregation preference not only treated religious providers more favorably than secular providers, it also created an exception only from the religious-affiliation provision, and thus did not necessarily undermine the state's interests underlying the gender-identity provision at issue here.

More specifically, the equal-opportunity requirements identify eight separate characteristics for protection. C.R.S. § 26.5-4-205(2)(b). And DPCA effectively concedes that the equal-opportunity provisions comprise separate and distinct protections when it seeks an exemption only from the gender identity provision—and not from the other equal-opportunity requirements. *See* 1.App.17¶¶11, 12; 1.App.18¶20; 1.App.41-42¶B. For this reason, the *St. Mary* district court considered alleged exceptions to each equal-opportunity requirement separately because "instead of enacting a generic nondiscrimination provision, the General Assembly specifically enumerated each characteristic" and "the specific State interests in eliminating discriminatory barriers for

children and families and protecting children from discrimination are distinct depending on the basis for the discrimination." 2.App.538.

So, even if the congregation preference hadn't been repealed, and even if the congregation preference treated secular providers more favorably than religious providers, material issues of disputed fact would still remain over whether the congregation preference's exception from the religious-affiliation provision necessarily undermined the state's interests underlying the gender-identity requirement—a finding necessary to trigger strict scrutiny under the *Fulton/Tandon* rule for assessing general applicability.

For example, permitting faith-based providers to reserve space for members of their congregation needn't have undercut Colorado's interests in ensuring equal opportunity regardless of race and ethnicity and thus the congregation preference, when it was in effect, needn't have triggered strict scrutiny of a refusal to grant a publicly-funded provider permission to deny equal opportunity based on race or ethnicity. Nor, for the same reasons, did permitting faith-based providers to reserve space for members of their congregations

necessarily undercut Colorado's interests in ensuring equal opportunity regardless of gender identity. As the district court in *St. Mary* observed, "it would be illogical to find that if Defendants violate Plaintiffs' constitutional rights with the implementation of a single aspect of the equal-opportunity requirement, then Plaintiffs automatically should not be bound by any aspect of the requirement, leaving children and families with the other characteristics less protected." 2.App.539 n.34.

In other words, the congregation preference created an exception from the provision requiring equal opportunity regardless of religious affiliation, and no more. So, when the congregation preference was in effect, strict scrutiny would have applied to a denial of a publicly-funded provider's request for an exemption from the religious-affiliation provision. But, strict scrutiny would only have applied to CDEC's refusal to grant DPCA permission to deny equal opportunity based on gender identity, if the congregation preference's exception from the religious-affiliation provision undercut the state's interests underlying its gender-identity provision. This determination would have required resolution of disputed material facts regarding whether children

experience distinct barriers to preschool access and to safe and healthy learning environments based on gender identity, and thus whether the congregation preference's exception from the religious-affiliation provision necessarily undermined the states' interests underlying the gender identity provision.[8]

The district court in this case failed to cite this element of the *Fulton/Tandon* standard, much less apply it to the facts of this case, in granting summary judgment. For these reasons, too, this Court should reverse and remand.

---

[8] CDEC's evidence on this issue included expert testimony establishing that gender-diverse children who experience discrimination, especially in school contexts, suffer a range of harms to their health, safety, and well-being. 7.App.1391-1402. Gender-diverse children experience higher incidences of such early adverse childhood experiences ("ACEs") than do cisgender children, and these experiences can undermine those children's sense of safety and stability. 7.App.1391-94. Those excluded from religious communities based on their LGBTQ+ status, moreover, may experience additional serious harms. 7.App.1399-1400; *see also* 2.App.538-39 (discussing distinct barriers to equal opportunity based on gender identity).

## IV. None of DPCA's other Free Exercise Clause arguments support the district court's grant of summary judgment.

DPCA made multiple additional assertions that UPK's equal-opportunity requirements are not neutral or not generally applicable, thus triggering strict scrutiny. But the district court did not address these arguments, instead addressing only the temporary waiver and the (now-repealed) congregation preference. 10.App.2203. None of DPCA's other arguments provide a basis for granting summary judgment.

### A. The UPK statute's text makes clear that permitting providers to prioritize families with low income does not create an exception from UPK's equal-opportunity requirements.

DPCA urged the district court to find that permitting providers to prioritize families with low income creates an exception from UPK's requirement that publicly-funded providers ensure equal opportunity regardless of income status. 3.App.594-95. But this argument ignores the statute's plain language and express objectives, which make clear that permitting providers to prioritize families with low income does not deny equal opportunity based on income status in violation of the statute.

Because families with low income have long experienced barriers to preschool access, the UPK Act expressly directs the prioritization of children in those families, and then expressly requires the inclusion of Head Start providers that prioritize those families. C.R.S. §§ 26.5-4-202; 26.5-4-203(14)(e); 26.5-4-204(1)(b) and (3)(a)(III); 26.5-4-205(1); 26.5-4-206. To comply with this statutory directive, CDEC developed a preference to permit Head Start providers to reserve space for Head Start-eligible (*i.e.*, low-income) children. 8 C.C.R. 1404-1 § 4.109(A)(4).

Consistent with the UPK statute's text, CDEC reasonably interprets the equal-opportunity provisions as a one-way ratchet, protecting children of families with low income (but not children of families with higher income) from the denial of equal opportunity based on their income status.[9] This interpretation appropriately and sensibly

---

[9] Other statutes similarly protect low-income (and not higher-income) individuals from income-based discrimination. For instance, the Equal Credit Opportunity Act prohibits creditors from discriminating against any applicant "because all or part of the applicant's income derives from any public assistance program[,]"15 U.S.C. § 1691(a)(2). And governments frequently designate certain public benefits as available only to low-income recipients. *E.g.,* 7 U.S.C. § 2011 et seq. (Food Stamp program).

harmonizes all of the statute's provisions: both the equal-opportunity requirements and the directive to include Head Start providers and prioritize the children of families with low income. *See* C.R.S. § 2-4-201(1)(b) (declaring legislature's presumption that "entire statute is intended to be effective"); *see also* 2.App.542 (interpreting the UPK statute to conclude that "prioritizing low-income children… [is] permissible under the equal-opportunity requirement"). Permitting Head Start providers to reserve space for families with low-income thus does not deny equal opportunity in violation of the UPK statute.

## B.    Nor does CDEC permit exceptions from any other equal-opportunity requirement.

DPCA strained to imagine a variety of other exceptions from the equal-opportunity requirements. For example, it asserted that the preference permitting providers to reserve seats for their employees' children creates an exception from the equal-opportunity requirements because "many faith-based schools require employees to share their beliefs—including those related to marriage, sexuality, and gender." 3.App.594. But the record provides no factual support for DPCA's speculation that this preference permits providers to deny equal

opportunity to preschool children and families on bases prohibited by the statute nor that faith-based providers are denying equal opportunity to preschool children and families. 9.App.2080:19-21; 9.App.2081:19-24; 9.App.2082:10-19; 8 C.C.R. 1404-1 § 4.109(B); 3.App.801:16-18; 3.App.841:20-842:11.

DPCA then asserted that allowing dual-language providers to reserve space for children who can speak the relevant languages—or allowing providers to prioritize refugees or those on public assistance, to serve all boys or all girls, or to limit enrollment based on parents' marital status—would create exceptions from the equal-opportunity requirements. 3.App.594-95. But even if CDEC were to approve all of these hypothetical preferences, the UPK statute doesn't include language ability, immigration status, receipt of public assistance benefits, sex, or marital status among the characteristics protected by the equal-opportunity requirements. *See* C.R.S. § 26.5-4-205(2)(b). For this reason, such preferences would not create exceptions from the equal-opportunity requirements.

In the same paragraph, DPCA asserted that CDEC allows providers to "decline a student if they cannot accommodate the student's disability," and then suggested that this would be an exception from UPK's disability provision. 3.App.595. But DPCA mischaracterized the deposition testimony. 2.App.371-72. In discussing the requirements for placing a child with an Individualized Education Program (IEP) with a publicly-funded provider, CDEC Director Dawn Odean explained the requirements of an IEP, which are to ensure that a child is placed in a program that can meet the child's needs through the IEP. 2.App.372. Ms. Odean also explained that CDEC would work with a provider and family if the provider were matched with a child who lacks an IEP but has an undiagnosed disability and the provider could not meet the child's needs. *Id*. CDEC's goal is to "ensure the best program for that child." *Id*. Nothing in the record supports DPCA's claim that publicly-funded providers can exclude students based on disability in violation of the equal-opportunity requirements. *Id*.

Next, DPCA mischaracterizes the "programmatic preferences" as creating "exceptions" from its equal-opportunity requirements when

they do nothing of the sort. *See* 3.App.595. Developed after public feedback on how to implement a mixed delivery system of public and private providers, these preferences enable providers to maintain their relationships with certain communities and maintain specialized areas of focus so long as these relationships and specialties are not defined by characteristics protected by the statute. *See* 2.App.373 p.70:2-5; 2.App.379 p.96:7-10, 23-25; 2.App.380 p.97:5-11; 8 C.C.R. 1404-1 § 4.109(B). Because UPK's algorithm would otherwise match children with providers randomly or on a first-come, first-served basis, these preferences permit departures from UPK's default algorithm for matching children with preschool providers. But these preferences do *not* permit exceptions from the equal-opportunity requirements.

CDEC approved providers' requests for this preference in UPK's inaugural year that enabled providers to reserve space, for instance, for children in their neighborhood, for families seeking STEM curriculum, and for families employed by a specific employer like a hospital or college. *See* 2.App.373-74; 8 C.C.R. 1404-1 § 4.109(A)(9). None involved exceptions from the equal-opportunity requirements. Relatedly, as the

*St. Mary* district court concluded, the plaintiffs in that case could point to no instance where the programmatic preference enabled exceptions to UPK's equal-opportunity requirements. 2.App.533-34; *see also Church v. Polis*, 2022 WL 200661 at *9 (10th Cir. Jan. 24, 2022) (unpublished) (law neutral and generally applicable because "the so-called" exemptions didn't "actually operate" as exemptions) (citations omitted).

CDEC does not and will not grant a programmatic preference that violates UPK's equal-opportunity requirements. *See* 2.App.533-34; 8 C.C.R. 1404-1 § 4.109(B); 4.App.1004:3-10, 19-24; 9.App.2086:1-5. DPCA's mischaracterization of the programmatic preferences and how they work cannot support a summary judgment ruling.

Finally, DPCA asserted that CDEC would create exceptions to the equal-opportunity requirements by allowing preschools to serve only gender-nonconforming children, children of color, or the LGBTQ community, pointing to Ms. Odean's testimony in *St. Mary*. 3.App.595. But DPCA relied on cherry-picked portions of Ms. Odean's trial testimony in *St. Mary* when she was asked to speculate on-the-fly about

hypothetical requests that neither she nor CDEC had ever contemplated. 9.App.2083-86. During her testimony she made clear that CDEC has never considered, much less received or approved, requests for those hypothetical preferences and wouldn't approve requests that violate any of the equal-opportunity requirements. *Id.* Ms. Odean also made clear she does not have sole authority to approve preference requests and would consult with others (including the senior leadership team and legal counsel) to ensure that any requested preference complies with the law. *Id.* The district court in *St. Mary* credited Ms. Odean's testimony. 2.App.543. ("Ms. Odean's testimony confirms that [CDEC] does not have the authority to grant any exemption from the equal-opportunity requirement. . . . I cannot conclude that Defendants have the discretion to grant such exemptions based merely on hypotheticals and speculation when nothing in the UPK Statute or official documents from [CDEC] supports that it does.").

### C. UPK does not exclude any provider because of its religious character or exercise.

DPCA also asserted that UPK is not neutral towards religion—thus triggering strict scrutiny—because it "categorically excludes"

religious providers due to their religious character, 1.App.37-38, invoking *Carson v. Makin*, 596 U.S. 767 (2022). In *Carson,* the Supreme Court held that the government engages in "categorical" exclusion of religious schools, and thus violates the Free Exercise Clause, when it excludes those schools from a government benefit program "solely" because they are religious. *Id.* at 780, 785.

But UPK is nothing like the program at issue in *Carson,* which "specifically carved out private religious schools from those eligible to receive [public] funds" by expressly excluding religious schools from participating in the state's tuition assistance program. *Id.* at 780. To the contrary, CDEC sought to include religious providers from UPK's outset, including by convening an interfaith working group. 1.App.177¶¶12-13; 2.App.347 p.33:1-5, 2.App.372. At least 41 faith-based providers—including DPCA—participate in UPK and at least 1,026 children have been matched with those providers. 9.App.2008¶30(iii). Even more participated in the 2024-25 school year. 9.App.2010¶47.

Even though DPCA itself has participated in UPK since the Program's beginning, it nevertheless claims that it is categorically excluded because it does not agree, for religious reasons, to comply with the equal-opportunity requirements. 1.App.16-17, 1.App.178¶24. But UPK's equal-opportunity requirements ensure that all publicly-funded preschools—regardless of their religious or secular nature—provide children and families with equal opportunity to enroll and receive preschool services regardless of protected class status. The relevant Free Exercise Clause analysis is thus provided not by *Carson*'s analysis of government's categorical exclusion of religious entities because they are religious, but instead by the free exercise analysis for government action that has the incidental effect of burdening religious practice. *See Mahmoud,* 145 S. Ct. at 2360 ("Under our precedents, the government is generally free to place incidental burdens on religious exercise so long as it does so pursuant to a neutral policy that is generally applicable."); *see also Emp. Div., Dep't of Hum. Res. of Oregon,* 494 U.S. at 879 ("[T]he right of free exercise does not relieve an individual of the obligation to comply with a 'valid and neutral law of general applicability on the

ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes)'").

Because UPK's equal-opportunity requirement does not exclude faith-based providers solely because of their religious status or exercise, *Carson* does not apply. *See* 2.App.521 (concluding that *Carson* does not apply because UPK's equal-opportunity requirements do not exclude providers based on religious character); *see also Youth 71Five Ministries v. Williams*, No. 24-4101, 2025 WL 2385151 *6 (9th Cir. August 18, 2025) (holding that *Carson* did not apply to a state's requirement that applicants for public-funding grants certify that they do not discriminate based on protected class status because that requirement did not exclude applicants based on their religious character).

## D. The equal-opportunity provisions are neutral.

"A law is neutral so long as its object is something other than the infringement or restriction of religious practices." *Grace United Methodist Church v. City of Cheyenne*, 451 F.3d 643, 649-50 (10th Cir. 2006). Nothing about the UPK equal-opportunity requirements' text, legislative history, or implementation suggests that their object is to

suppress religious conduct. Those requirements apply to all publicly-funded providers—secular as well as religious. And, as explained above, CDEC sought to include religious providers from UPK's outset, with over 40 faith-based providers—including DPCA—participating in UPK. 1.App.177¶13, 1.App.178¶24, 1.App.245¶2(d).

DPCA nevertheless strained to allege three indications of Defendants' non-neutrality, 3.App.576-607. None suggest hostility to religion, and all rely on disputed issues of material fact. First, DPCA inaccurately claims that CDEC "refused to accommodate the School's religious objections while allowing exceptions for many secular reasons," and that this demonstrates religious hostility. *Id.* at 597. But this simply recycles DPCA's mistaken claims that the equal-opportunity requirements permit exceptions and are thus not generally applicable. For the reasons discussed above, there are no exceptions to the equal-opportunity requirements—and exceptions that don't exist cannot then provide evidence of religious hostility.

DPCA next asserted that CDEC demonstrated religious hostility by requiring providers to comply with the statutory equal-opportunity

requirements before those requirements had been enshrined in rule, and by requiring providers to comply with Paragraph 18(B) (the contractual provision requiring equal employment opportunity that CDEC later determined to be unnecessary). *Id.* But as CDEC's evidence makes clear, because of UPK's ambitious timeline for implementation, CDEC didn't have time to promulgate rules before the Program's inaugural year and simply enforced the equal-opportunity requirements as they were required by statute. 4.App.879, 4.App.880:13-18; 9.App.2006¶¶13-14. And CDEC initially included Paragraph 18(B) in the Program Service Agreement required of all providers simply as part of another agency's pre-existing template. 9.App.2009¶44.

Finally, DPCA asserted that CDEC "fabricated" burdens for faith-based providers by issuing a fact sheet stating that UPK does not permit public funding for preschool services that involve "religious programming." 3.App.598. But CDEC's evidence establishes that the fact sheet reflected one employee's early misunderstanding—while CDEC was getting up and running—about how UPK worked, compared to how past child care programs worked: the fact sheet thus reflected

that employee's honest mistake about the operation of a brand-new program, rather than religious hostility. 9.App.2007¶¶21-25. CDEC's evidence also establishes that the fact sheet never reflected CDEC's enforcement policies or practices regarding providers' religious programming—and that, indeed, UPK does not regulate or review providers' religious teaching or curriculum. 3.App.698:17-25, 3.App.699, 3.App.700:14-16; 9.App.2007¶¶19-25, 9.App.2073; *see also* 9.App.2007¶19 ("The Department has never had a rule or requirement that regulates faith-based providers' curricula or that treats faith-based providers differently than any other UPK providers.").

## E.   The equal-opportunity requirements are narrowly tailored to achieve Colorado's compelling interests.

Because UPK's equal-opportunity requirements are neutral and generally applicable, rational-basis review applies. But even if strict scrutiny were to apply, refusing to permit publicly-funded providers to deny equal opportunity is narrowly tailored to achieving Colorado's compelling interests in ensuring equal opportunity to enroll in and

receive safe and healthy publicly-funded preschool services.[10] C.R.S. §§ 26.5-4-204(1); 26.5-4-205(2).

DPCA offered just one argument that Colorado could achieve its compelling interests while exempting DPCA from the equal-opportunity requirements: that CDEC could simply ensure that families "who desire an 'affirming' environment for transgender-identifying children are placed *only* in preschools willing to take an 'affirming' approach." 3.App.604. DPCA contends this "would allow those families to have the desired environment for their children, while still allowing other

---

[10] As explained above, the district court did not dispute that the denial of equal opportunity in this setting harms children. 10.App.2205-06; *see* also *Trujillo v. Taos Mun. Schs.*, 1996 WL 366214 at *3 (10th Cir., July 1, 1994) (noting the "vital state interest in providing a safe environment conducive to learning"); *Martinez v. Mafchir*, 35 F.3d 1486, 1490 (10th Cir. 1994) (recognizing that "the state itself has a compelling interest in the health, education and welfare of children"); *Foote v. Ludlow Sch. Comm.*, 128 F.4th 336, 357 (1st Cir. 2025) (finding this interest to be "at its apex" when the state "seeks to protect children who are particularly vulnerable, such as transgender minors"). The district court instead found that CDEC had no compelling interest in denying DPCA's request for an exception based on its mistaken conclusion that CDEC had permitted other exceptions through the temporary waiver provision and congregation preference. 10.App.2205-06.

families to choose an educational environment that reinforces their beliefs and values to their children." *Id.*

But the evidence shows that families prefer certain preschool environments for many different reasons—for example, families (including those with gender-diverse children) may choose DPCA because of its small class sizes, its religious focus, its location close to their home or work, or because of the area's limited preschool options. 5.App.1040; 6.App.1282¶¶14-21; 9.App.2008¶32. And although no family can be sure that a preschool will be located near its home, the equal-opportunity requirements ensure that no child will be forced—*because of* their protected-class status—to travel a greater distance for publicly-funded preschool.

Colorado's interest is not in ensuring that all children have access to *some* publicly-funded preschool services; it seeks instead to ensure that children have *equal* opportunity, regardless of protected-class status, to receive the high-quality, publicly-funded preschool services that best meet their needs. Colorado cannot achieve this interest if some publicly-funded preschools are permitted to deny equal

opportunity to children based on gender identity. CDEC's refusal to grant providers permission to deny equal opportunity is thus narrowly tailored in pursuit of Colorado's compelling interest. *See* 2.App.549.

## CONCLUSION

In granting summary judgment to DPCA, the district court made errors of law and disregarded the evidence developed during discovery that revealed multiple disputed issues of material fact. CDEC respectfully asks this Court to reverse the district court's judgment and remand for further proceedings.

## STATEMENT CONCERNING ORAL ARGUMENT

CDEC believes that oral argument is appropriate and will assist the Court in reaching a decision.

Respectfully submitted this 10th day of September 2025.

PHILIP J. WEISER
Attorney General

*/s/ Helen Norton*
HELEN NORTON*
Deputy Solicitor General
VIRGINIA R. CARRENO*
Second Assistant Attorney General
JANNA K. FISCHER*
Senior Assistant Attorney General

67

Colorado Department of Law
Ralph L. Carr Judicial Center
1300 Broadway, 10th Floor
Denver, Colorado 80203
Telephone: 720-508-6374
Email: helen.norton@coag.gov
Email: virginia.carreno@coag.gov
Email: janna.fischer@coag.gov
*Counsel of Record for Defendants-
  Appellants

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT**

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and this Court's briefing order because it contains 11,136 words, excluding the parts exempted under Fed. R. App. P. 32(f) and Tenth Circuit R. 32(B).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and Tenth Circuit R. 32 because it uses 14-point Century Schoolbook font, a proportionally spaced typeface.

Dated: September 10, 2025

/s/ *Helen Norton*
HELEN NORTON*
Deputy Solicitor General
VIRGINIA R. CARRENO*
Second Assistant Attorney General
JANNA K. FISCHER*
Senior Assistant Attorney General II
Colorado Department of Law
Ralph L. Carr Colorado Judicial
Center
1300 Broadway, 10th Floor

Denver, Colorado 80203
Telephone: 720-508-6374
Email: helen.norton@coag.gov
Email: virginia.carreno@coag.gov
Email: janna.fischer@coag.gov
*Counsel of Record for Defendants
  Appellants

# Addendums

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Daniel D. Domenico**

Civil Action No. 1:23-cv-01557-DDD-STV

DARREN PATTERSON CHRISTIAN ACADEMY,

     Plaintiff,

v.

LISA ROY; and
DAWN ODEAN,

     Defendants.

---

## ORDER GRANTING MOTIONS FOR SUMMARY JUDGMENT

---

Last academic year Colorado implemented its new Universal Pre-school Program (the parties tend to refer to this as the "UPK" Program, but I try to use my words and will call it the "Program" or "Universal Preschool") —a program that allows children to attend the preschool of their parents' choice for free. Plaintiff is a private, Christian preschool currently participating in the program. As a condition of participating in the program, schools must agree to a number of conditions, including that they not discriminate on the basis of religion, gender, sexual orientation, or gender identity. Pursuant to its faith,[1] however, Plaintiff refuses to hire employees who do not share its faith and requires its staff

---

[1]   Defendants do not dispute that Plaintiff's position is motivated by a bona fide religious belief.

10.  App.2193

and students to abide by certain policies determined by biological sex rather than gender identity.

After agreeing to participate in the program, Plaintiff raised concerns with Defendants—two state executives charged with overseeing the universal preschool program—that its religious policies may run afoul of the state's non-discrimination requirements. Defendants refused to grant Plaintiff an exemption to those requirements, and this suit followed. In late 2023 I denied Defendants' motion to dismiss and preliminarily enjoined Defendants from enforcing certain of the Program's anti-discrimination provisions against Plaintiff.

Since then, Defendants have withdrawn one of the provisions that I found likely to violate Plaintiff's First Amendment rights. Plaintiff's claims pertaining to that provision are therefore moot. Because the other provision remains in effect, however, Plaintiff's claims pertaining to it still present a live controversy. Since there is no material fact, but only legal arguments remaining in dispute, a trial is not warranted and Defendants are permanently enjoined from enforcing the provision against Plaintiff.

## BACKGROUND

In 2020, Colorado voters approved a referendum that established a dedicated source of funding for statewide preschool. The state legislature enacted implementing legislation in 2022. Colo. Rev. Stat. § 26.5-4-201 *et seq*. That legislation created the "Colorado universal preschool program." *Id.* § 26.5-4-204. The stated purposes of the program are (1) to provide children with high-quality preschool services free of charge, (2) to provide access to preschool services in the year immediately preceding kindergarten for children in low-income families and children "who lack overall learning readiness due to qualifying factors," (3) to provide access to preschool services for younger children who have

disabilities, are in low-income families, or lack overall learning readiness, and (4) "to establish quality standards for publicly funded preschool providers that promote children's early learning and development, school readiness, and healthy beginnings." *Id.* § 26.5-4-204(1)(a)–(d).

To accomplish these goals, the legislature also created the Department of Early Childhood to oversee the program. Under the program, eligible preschool providers receive tuition reimbursement from the state for certain students. Every child is eligible for up to half-day, voluntary preschool each week for the year prior to kindergarten. *Id.* § 26.5-4-204(2); Dkt. 28-1 ¶ 6. For younger preschoolers, the state may reimburse tuition if the student has a disability or is low-income and meets certain "qualifying factors." *See* Colo. Rev. Stat. § 26.5-4-204(3)(a). Under the program, students first apply for tuition coverage and list their preferred preschools. *See id.* § 26.5-4-208(3). The Department will only match students with one of their preferred preschools. Dkt. 28-1 at ¶¶ 15–16.

The legislature tasked the Department with recruiting preschool providers and for establishing "quality standards" that providers must meet to remain eligible for state funding. Colo. Rev. Stat. § 26.5-4-205(1). Under state statute, those quality standards, "at a minimum," must require providers to "provide eligible children an equal opportunity to enroll and receive preschool services regardless of race, ethnicity, religious affiliation, sexual orientation, gender identity, lack of housing, income level, or disability, as such characteristics and circumstances apply to the child or the child's family." *Id.* § 26.5-4-205(2).

But the Department may grant temporary exemptions to the quality-standards requirements as "necessary to ensure the availability of a mixed delivery system within a community." *Id.* § 26.5-4-205(1)(b)(II).

The statute defines a "mixed delivery system" as "a system for delivering preschool services through a combination of school- and community-based preschool providers, which include family child care homes, child care centers, and head start agencies, that are funded by a combination of public and private money." *Id.* § 26.5-4-203(12).

The Department also requires providers to sign a "Program Service Agreement" before allowing them to participate in the program. *See* Dkt. 28-1 at ¶ 28; Dkt. 1-6 (exemplary Program Service Agreement). Provision 18(B) of that agreement provides, among other things, that preschools "shall not discriminate against any person on the basis of gender, race, ethnicity, religion, national origin, age, sexual orientation, gender identity, citizenship status, education, disability, socio-economic status, or any other identity." Dkt. 1-6 at 28. The agreement further provides that "Any person who thinks he/she has been discriminated against as related to the performance of the Agreement has the right to assert a claim, Colorado Civil Rights Division, C.R.S. §24-34-301, et seq." *Id.* at 28–29. The Agreement also requires providers to "strictly comply with all applicable federal and State laws, rules, and regulations," including all laws "applicable to discrimination and unfair employment practices." *Id.* at 27. State regulations implementing C.R.S. § 24-34-301 *et seq.* list "deliberately misusing an individual's preferred name, form of address, or gender-related pronoun" as "prohibited conduct" under the state's sexual harassment laws. 3 Colo. Code Regs. § 708-1:10.1 ("Statement of Purpose" noting that the purpose of the rules is to implement "Parts 3 through 7 of Article 34 of Title 24" of Colorado Revised Statutes), § 708-1:81.6 (addressing pronoun usage).

Since I entered a preliminary injunction in October 2023, Defendants have decided not to include Provision 18(B) in the 2024–2025 version of the Service Agreement. Dkt. 77 at 16. They have also testified under

oath that they do not intend to reinstate that provision or enforce it in any way going forward. *Id.* at 18. Since the material facts are not in dispute, both parties moved for summary judgment on June 21, 2024. *See* Dkt. 77; 78. Defendants' motion is granted in full and Plaintiff's is granted in part, as explained below.

## APPLICABLE LAW

A district court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party moving for summary judgment bears the burden of demonstrating that no genuine dispute of material fact exists. *Adamson v. Multi Cmty. Diversified Servs., Inc.*, 514 F.3d 1136, 1145 (10th Cir. 2008). A fact is material if it could affect the outcome of the suit under the governing law, and a factual dispute is genuine if a rational jury could find for the nonmoving party on the evidence presented. *Id.* If a reasonable juror could not return a verdict for the nonmoving party, summary judgment is proper, and there is no need for a trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

In deciding whether the moving party has carried its burden, courts do not weigh the evidence, and instead must view it and draw all reasonable inferences from it in the light most favorable to the nonmoving party. *Adamson*, 514 F.3d at 1145; *Scott v. Harris*, 550 U.S. 372, 378 (2007). But a nonmovant's unsupported conclusory allegations or mere traces of evidence are not sufficient to demonstrate a genuine factual dispute. *Maxey v. Rest. Concepts II, LLC*, 654 F. Supp. 2d 1284, 1291 (D. Colo. 2009); *Scott*, 550 U.S. at 380 ("The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."). And "[i]f a party fails to properly

support an assertion of fact or fails to properly address another party's assertion of fact . . . the court may . . . consider the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e)(2).

## DISCUSSION

### I.  Defendants' Motion for Summary Judgment (Dkt. 77)

"Federal courts do not possess a roving commission to publicly opine on every legal question," even ones involving important legal or constitutional matters. *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021). The federal courts' subject-matter jurisdiction is limited, and among the most foundational limitations is that Article III of the Constitution permits federal courts to decide only "Cases" or "Controversies." U.S. Const. art. III, § 2. "[T]he existence of a live case or controversy is a constitutional prerequisite to federal court jurisdiction." *McClendon v. City of Albuquerque*, 100 F.3d 863, 867 (10th Cir. 1996); *see also Allen v. Wright*, 468 U.S. 737, 750 (1984) ("The case-or-controversy doctrines state fundamental limits on federal judicial power in our system of government.").

"To qualify as a case fit for federal-court adjudication, 'an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed.'" *Arizonans for Off. English v. Ariz.*, 520 U.S. 43, 67 (1997). "The doctrines of standing and mootness aim to ensure federal courts stay within Article III's bounds throughout the litigation." *Rio Grande Found. v. Oliver*, 57 F.4th 1147, 1159–60 (10th Cir. 2023); *see also Allen*, 468 U.S. at 750. "Standing concerns whether a plaintiff's action qualifies as a case or controversy when it is filed; mootness ensures it remains one at the time a court renders its decision." *Rio Grande Found.*, 57 F.4th at 1160.

"[T]he irreducible constitutional minimum of standing contains three elements." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). "First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Id.* (cleaned up). "Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Id.* (cleaned up). "Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* at 561 (internal quotation marks omitted).[2]

Defendants' recycled arguments that Plaintiff never had standing to begin with fail for the same reasons they failed originally. *See* Dkt. 53 at 9–27. Without rehashing that same analysis here, the facts of this case support the conclusions that Plaintiff may be arguably violating the anti-discrimination terms of the Program and related statutes and that it credibly fears enforcement or at least investigation of its compliance. Plaintiff brought this case to vindicate its religious objections to the terms imposed by the Program by law and regulation. That remains a live case or controversy that is within the federal courts' jurisdiction.

Whether Plaintiff's claims pertaining to certain aspects of the Program are now moot, however, is a distinct question, and it does appear

---

[2]    *See also Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240-41 (1937) (dispute is only cognizable case or controversy if it is both "definite, concrete, and touches on the legal relations of the parties" and "sufficiently immediate and real"); *Rezaq v. Nalley*, 677 F.3d 1001, 1008 (10th Cir. 2012) (plaintiff seeking injunctive relief must show "ongoing, personal stake in the outcome of the controversy, a likelihood of substantial and immediate irreparable injury, and the inadequacy of remedies at law").

that intervening developments have rendered some aspects of Plaintiff's claims moot and nonjusticiable. "Mootness usually results when a plaintiff has standing at the beginning of a case, but, due to intervening events, loses one of the elements of standing during litigation; thus, courts have sometimes described mootness as 'the doctrine of standing set in a time frame.'" *WildEarth Guardians v. Pub. Serv. Co. of Colo.*, 690 F.3d 1174, 1182 (10th Cir. 2012); *see also Smallwood v. Scibana*, 227 F. App'x 747, 748 (10th Cir. 2007) ("Mootness is implicated when a case or controversy, originally present, ceases to exist."). Mootness, "though analytically similar to standing," differs in some ways. *WildEarth Guardians*, 690 F.3d at 1182. As relevant here, "the plaintiff bears the burden of demonstrating standing, [while] the defendant bears the burden of proving mootness." *Id.* at 1183.

While Plaintiff's challenges to the application of Provision 18(B) to its policies, educational goals, and hiring practices may once have been ripe, Defendant's withdrawal of that provision from the 2024–2025 UPK Service Agreement means that Plaintiff's claims addressing Provision 18(B) no longer present an active controversy which the federal courts are capable of resolving. Any ruling on those claims would be no more than advisory. *See Rio Grande Silvery Minnow v. Bureau of Reclamation*, 601 F.3d 1096, 1109–10 (10th Cir. 2010) ("It is well established that what makes a declaratory judgment action a proper judicial resolution of a case or controversy rather than an advisory opinion is the settling of some dispute which affects the behavior of the defendant toward the plaintiff.") (cleaned up and internal quotation marks and citation omitted). *See also St. Mary Cath. Par. in Littleton et al. v. Roy et al.*, 1:23-cv-02079-JLK, Dkt. 116 at 41 (analyzing the same question as to other plaintiffs).

Plaintiff is correct, of course, that Defendants bear the "heavy burden" of proving mootness. *Brown v. Buhman*, 822 F.3d 1151, 1167 (quoting *Rio Grande Silvery Minnow*, 601 F.3d at 1116); *see also* Dkt. 89 at 10. But that burden "is not insurmountable, especially in the context of government enforcement." *Id*. "Most cases that deny mootness following the government officials' voluntary cessation 'rely on *clear showings* of reluctant submission [by governmental actors] and a desire to return to the old ways.'" *Id*. (quoting *Rio Grande Silvery Minnow*, 601 F.3d at 1117 (brackets and emphasis in original)). "A case ceases to be a live controversy if the possibility of recurrence of the challenged conduct is only a speculative contingency." *Id*. at 1117 (cleaned up and internal quotation marks and citation omitted).

The possibilities about which Plaintiff is concerned — that Defendants may reverse course or initiate investigations for Plaintiff's prior conduct — are speculative at most. As Defendants note, "the Department's leadership has made clear, under oath at trial and in a sworn declaration, that it will not enforce or reinstate 18(B) against *any* preschool provider." Dkt. 94 at 11 (emphasis in original). That is far more than an "informal promise or assurance on the part of the [government] defendants that the challenged practice will cease." *Rio Grande Silvery Minnow*, 601 F.3d at 1118 (quoting *Burbank v. Twomey*, 520 F.2d 774, 748 (7th Cir. 1975)).  It is an official promise, made under penalty of perjury, that Defendants will refrain from the exact conduct which Plaintiff claims makes this case an ongoing controversy. *See also St. Mary Cath. Par.*, 1:23-cv-02079-JLK, Dkt. 116 at 42 ("The possibility of Defendants implementing the same or a substantially similar policy to paragraph 18(B) in the future is a speculative contingency, and any determination regarding that speculative policy would necessarily be advisory."); *Grace Bible Fellowship et al. v. Polis et al.*, 1:20-cv-02362-DDD-

NRN, Dkt. 182 at 12 ("As for plaintiffs' reasserted free-exercise challenges to the CDEA, their as-applied claim is moot."). If in fact the state were to alter its position, a live controversy would again exist and federal courts would be constitutionally authorized to intervene. But until then, we are not. Defendant's Motion for Summary Judgment, Dkt. 77, is granted, and Plaintiff's first and fourth claims, as well as those portions of its second, third, fifth and sixth claims pertaining to Provision 18(B), are dismissed.

## II.  Plaintiff's Motion for Summary Judgment (Dkt. 78)

As to Plaintiff's remaining claims, its motion for summary judgment is granted. While Defendants now maintain[3] that the "quality standards" provision in the UPK Service Agreement is a neutral law of general applicability, the record is clear, as it was at the preliminary injunction stage, that it is not and that it is subject to strict scrutiny. Because it cannot withstand such demanding scrutiny, Plaintiff is entitled to a narrow permanent injunction against enforcement of that provision.

The standard for a permanent injunction is the same as a preliminary injunction, except that a permanent injunction "requires showing actual success on the merits, whereas a preliminary injunction requires showing a substantial likelihood of success on the merits." *Prairie Band Potawatomi Nation v. Wagnon*, 476 F. 3d 818, 822 (10th Cir. 2007). Because the prior order granting a preliminary injunction addressed the other factors, Dkt. 53, and nothing of relevance to that analysis has changed in the intervening time, here I only address whether Plaintiff has actually succeeded on the merits.

---

[3]  Defendants did not raise any substantive arguments at the preliminary injunction stage and instead chose to challenge Plaintiff's claims solely on the grounds that it did not have standing to sue.

"[L]aws incidentally burdening religion are ordinarily not subject to strict scrutiny under the Free Exercise Clause so long as they are neutral and generally applicable." *Emp't Div., Dept. of Hum. Res. v. Smith*, 494 U.S. 872, 878–82 (1990). Where a law "invite[s] the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions," however, it is not generally applicable and strict scrutiny applies. *Fulton v. City of Phila.*, 593 U.S. 522, 533 (2021) (internal quotation marks omitted).

As explained in the preliminary injunction order, the Department allows categorical exemptions from its admission policies for preschools operated by houses of worship that seek to reserve seats for members of the school's "congregation." Dkt. 53 at 6; 33. That remains the case now. Because such houses of worship can impose requirements on their congregations—including the same sorts of rules that Darren Patterson imposes on its staff and students—such congregations may be able to effectively exempt themselves from these anti-discrimination rules. Preferences for formal religious organizations ("congregations") over less traditional religious endeavors (Darren Patterson academy) are constitutionally impermissible. *Colo. Christian Univ. v. Weaver*, 534 F.3d 1245, 1259 (10th Cir. 2008) (law violated the Free Exercise Clause where it "discriminate[d] amongst religious institutions on the basis of the pervasiveness or intensity of their belief"). And as Defendants admit, "'congregations' need not be understood in religious terms." Dkt. 90 at 24. That means that the "quality standards" provision at issue here contemplates exemptions for religious or secular "congregations" but does not permit exemptions for the religious reasons that Plaintiff has sought here.

The statute itself also empowers the Department to grant individualized exemptions from the quality standards if doing so is "necessary to

ensure the availability of a mixed delivery system within a community." Colo. Rev. Stat. § 26.5-4-205(1)(b)(II). Such a broad grant of discretion to provide exemptions, standing alone, may be sufficient to render the anti-discrimination laws no longer generally applicable. *See Fulton*, 593 U.S. at 535 (holding that law granting "sole discretion" to city commissioner to exempt anti-discrimination laws was not generally applicable even where city never granted an exemption). Here, seemingly in contrast with *Fulton*, the Department has provided exemptions to others—or expressed a willingness to do so—while denying an exemption for Plaintiff. The fact that the state recognizes conditions could exist in which it would exempt a preschool from the quality standards, but does not consider Plaintiff's religious convictions sufficiently compelling to do so here, triggers strict scrutiny.[4] *Tandon v. Newsom*, 593 U.S. 61, 62 (2021) ("[G]overnment regulations are not neutral and generally applicable, and therefore trigger strict scrutiny under the Free Exercise Clause, whenever they treat *any* comparable secular activity more favorably than religious exercise") (emphasis in original).

The quality standards provision fails that exacting standard. While Defendants argue that "[e]ven if strict scrutiny were to apply, determining whether Defendants' action satisfies such review requires consideration of disputed facts," they have not demonstrated a compelling interest even assuming they could prove facts showing the "harm that discriminatory treatment poses to preschoolers." Dkt. 90 at 29.

---

[4]    That is so despite Defendants' argument that "[w]hether the nondiscrimination requirements are neutral is a disputed issue of material fact." The Supreme Court made clear in *Fulton* that a statute is not generally applicable, as a matter of law, when it prohibits religious exemptions but permits secular ones that undermine its stated interests in the same way. 593 U.S. at 534.

Anti-discrimination principles no doubt serve important purposes. But as Plaintiff correctly notes, "broadly formulated interests" do not suffice, and Defendants must do more than profess a "compelling interest in enforcing [their] non-discrimination policies generally"—they must demonstrate why they have a compelling interest in "denying an exception" to Plaintiff. *Fulton*, 593 U.S. at 541; Dkt. 93 at 13. Even assuming Defendants' facts are true, as I must for purposes of this motion, they have not done so here. I do not doubt the harm that discrimination may cause to the precocious preschoolers who understand the concept, or that religious parents with gay or transgender children may suffer if Plaintiff is permitted to exclude them from its preschool. But the state's effort to prevent that harm does not permit it to abridge Plaintiff's First Amendment rights, at least where, as here, Defendants' "system of exceptions" undermines its "contention that its non-discrimination policies can brook no departures." *Fulton*, 593 U.S. at 542. Defendants have offered no convincing explanation for "why its interest[s] [are] served by granting exemptions" for some reasons "but not others," and this subverts its contention that its stated goal is constitutionally compelling and that its policies are narrowly tailored to achieve it. *Does 1–11 v. Bd. of Regents of Univ. of Colo.*, 100 F.4th 1251, 1273 (10th Cir. 2024). Accordingly, there are no legitimately disputed material facts that would necessitate a trial.

Because Colo. Rev. Stat. § 26.5-4-205 permits exceptions in the discretion of the government, but the government refuses to allow an exception to accommodate Plaintiff's sincere religious beliefs, the statute is not neutral as a matter of law. And I assume that Defendants could prove at trial that preschoolers and their families would be harmed by facing discrimination from Plaintiff. But that is not a material dispute because the fact that Defendants permit exemptions from the Program's anti-discrimination rules undermines their contention that this interest

is constitutionally compelling. There is thus no material disputed fact that trial is necessary to resolve. Even under Defendants' version of the facts, the provision cannot be constitutionally applied to Plaintiff. *See, e.g., Hagelin for President Comm. v. Graves*, 25 F.3d 956, 959 (10th Cir. 1994) (Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law.") (quoting Fed. R. Civ. P. 56(c)).

Plaintiff's Motion for Summary Judgment, Dkt. 78, is granted to the extent it seeks a permanent injunction enjoining enforcement of the Service Agreements' quality standards provision.[5]

## CONCLUSION

It is ORDERED that:

Defendant's Motion for Summary Judgment, **Dkt. 77**, is **GRANTED**, and Plaintiff's claims pertaining to Provision 18(B) are **DISMISSED AS MOOT**;

Plaintiff's Motion for Summary Judgment, **Dkt. 78**, is **GRANTED IN PART** as to all of Plaintiff's remaining claims, and Defendants, their officers, agents, servants, employees, and attorneys, and any others who are in active concert or in participation with any of the above, are **PERMANENTLY ENJOINED** from expelling, punishing, withholding funds from, or otherwise disciplining Plaintiff under the Universal Preschool Program on the basis that Plaintiff's policies, as alleged in the

---

[5]   Because a permanent injunction is justified on Free Exercise grounds alone, there is no need to address Plaintiff's additional contentions that Defendants' rules violate its rights under the Free Speech and Equal Protection Clauses. *See* Dkt. 78 at 24–32.

10.  App.2206

verified complaint, violate the program's statutory or contractual anti-discrimination provisions;

Defendant's Motion to Strike, or, in the Alternative, Narrow the Use at Trial of Dr. Stephen Levine's Expert Disclosure, **Dkt. 83**, is **DENIED AS MOOT**;

Defendant's First Contested Motion to Amend the Joint Amended Scheduling Order, **Dkt. 84**, is **UNREFERRED** and **DENIED AS MOOT**;

The Clerk of Court is **DIRECTED** to close this case.

DATED: February 24, 2025          BY THE COURT:

Daniel D. Domenico
United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:23-cv-01557-DDD-STV

DARREN PATTERSON CHRISTIAN ACADEMY,

    Plaintiff,

v.

LISA ROY; and
DAWN ODEAN,

    Defendants.

_____

FINAL JUDGMENT

_____

    In accordance with the orders filed during the pendency of this case, and

pursuant to Fed. R. Civ. P. 58(a), the following Final Judgment is entered.

    Pursuant to and in accordance with Fed. R. Civ. P. 58(a) and the Order Granting

Motions for Summary Judgment, filed February 24, 2025, by the Honorable Daniel D.

Domenico, United States District Judge, and incorporated herein by reference as if fully

set forth, it is hereby

    ORDERED that judgment is hereby entered in favor of Defendants, Lisa Roy and

Dawn Odean, and against Plaintiff, Darren Patterson Christian Academy, on

Defendants' Motion for Summary Judgment. It is further

    ORDERED that Plaintiff's claims pertaining to Provision 18(B) are DISMISSED

AS MOOT. It is further

ADD 16                    10.  App.2208

ORDERED that judgment is hereby entered in favor of Plaintiff, Darren Patterson Christian Academy, and against Defendants, Lisa Roy and Dawn Odean, on Plaintiff's Motion for Summary Judgment. It is further

ORDERED that as to all of Plaintiff's remaining claims, and Defendants, their officers, agents, servants, employees, and attorneys, and any others who are in active concert or in participation with any of the above, are PERMANENTLY ENJOINED from expelling, punishing, withholding funds from, or otherwise disciplining Plaintiff under the Universal Pre-school Program on the basis that Plaintiff's policies, as alleged in the verified complaint, violate the program's statutory or contractual anti-discrimination provisions. It is further

ORDERED that this case is closed.

DATED at Denver, Colorado this 24th day of February, 2025.

FOR THE COURT:

JEFFREY P. COLWELL, CLERK


*s/ Robert R. Keech*
Robert R. Keech,
Deputy Clerk

2

ADD 17                    10.  App.2209

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:23-cv-01557-DDD-STV

DARREN PATTERSON CHRISTIAN ACADEMY,

      Plaintiff,

v.

LISA ROY; and
DAWN ODEAN,

      Defendants.

---

## <u>AMENDED</u> FINAL JUDGMENT

---

      In accordance with the orders filed during the pendency of this case, and pursuant to Fed. R. Civ. P. 58(a), the following Final Judgment is entered.

      Pursuant to and in accordance with Fed. R. Civ. P. 58(a) and the Order, filed April 7, 2025, by the Honorable Daniel D. Domenico, United States District Judge, and incorporated herein by reference as if fully set forth, it is hereby

      ORDERED that judgment is hereby entered in favor of Defendants, Lisa Roy and Dawn Odean, and against Plaintiff, Darren Patterson Christian Academy, on Defendants' Motion for Summary Judgment. It is further

      ORDERED that Plaintiff's claims pertaining to Provision 18(B) are DISMISSED AS MOOT. It is further

ADD 18      10.  App.2223

ORDERED that judgment is hereby entered in favor of Plaintiff, Darren Patterson Christian Academy, and against Defendants, Lisa Roy and Dawn Odean, on Plaintiff's Motion for Summary Judgment, with respect to its Free Exercise claim, but not its Free Speech or Equal Protection Claims. It is further

ORDERED that as to Plaintiff's Free Exercise claim, Defendants, their officers, agents, servants, employees, and attorneys, and any others who are in active concert or in participation with any of the above, are PERMANENTLY ENJOINED from expelling, punishing, withholding funds from, or otherwise disciplining Plaintiff under the Universal Pre-school Program on the basis that Plaintiff's policies, as alleged in the verified complaint, violate the program's statutory or contractual anti-discrimination provisions. It is further

ORDERED that this case is closed.

DATED at Denver, Colorado this <u>7th</u> day of April 2025.

FOR THE COURT:

JEFFREY P. COLWELL, CLERK


<u>s/ Robert R. Keech</u>
Robert R. Keech,
Deputy Clerk

2

ADD 19                    10.  App.2224