No. 25-1187

## UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

DARREN PATTERSON CHRISTIAN ACADEMY,

*Plaintiff-Appellee,*

v.

LISA ROY, et al.,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the District of Colorado
Case No. 1:23-cv-01557
Honorable Daniel D. Domenico

## RESPONSE BRIEF OF APPELLEE
### Oral Argument Requested

David A. Cortman
Ryan J. Tucker
Jeremiah Galus
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
dcortman@ADFlegal.org
rtucker@ADFlegal.org
jgalus@ADFlegal.org

John J. Bursch
ALLIANCE DEFENDING FREEDOM
440 First St., NW, Suite 600
Washington, DC 20001
(616) 450-4235
jbursch@ADFlegal.org

Jacob E. Reed
ALLIANCE DEFENDING FREEDOM
44180 Riverside Pkwy
Lansdowne, VA 20176
(571) 707-4655
jreed@ADFlegal.org

*Counsel for Appellee*

## DISCLOSURE STATEMENT

Darren Patterson Christian Academy is a religious, nonprofit corporation. It issues no stock and has no parent corporation.

# TABLE OF CONTENTS

Disclosure Statement ............................................................... i

Table of Authorities ................................................................ v

Statement of Related Cases ................................................. ix

Introduction ............................................................................ 1

Statement of Jurisdiction ....................................................... 3

Statement of Issues ................................................................ 4

Statement of the Case ............................................................ 5

    A.    Darren Patterson Christian Academy and its religious beliefs and practices ............................................. 5

    B.    Colorado's Universal Preschool Program and the Equal Opportunity Provision ........................................ 8

    C.    The Department adds the Equal Opportunity Provision to its Program Service Agreement and imposes even more barriers for religious schools ...................................... 10

    D.    The Department rejects requests for a religious exemption, forcing Darren Patterson to sue ........................ 11

    E.    The Department enforces the Equal Opportunity Provision against schools like Darren Patterson but exempts others. .................................................. 13

    F.    Procedural History .............................................. 15

Standard of Review .............................................................. 20

Summary of the Argument ................................................... 20

Argument ............................................................................... 23

I.    The case is justiciable ................................................... 23

A.    Darren Patterson has standing. ...........................................23

B.    The case is ripe. ....................................................................28

II.    The Department violates the Free Exercise Clause. ....................30

A.    The Department's actions are neither neutral nor generally applicable. ...........................................................30

1.    The Department created many exemptions that undermine its asserted interests. ...............................31

2.    The Department can also grant individualized exemptions but refuses to accommodate Darren Patterson. .................................................................39

3.    The Department has not acted neutrally by imposing additional requirements on faith-based providers not required by statute or regulation. ..........44

B.    The Department's enforcement of the Equal Opportunity Provision excludes Darren Patterson because of its religious character and exercise. ..................46

C.    *St. Mary* does not decide this case. ......................................51

III.    The Department compels and restricts speech in violation of the Free Speech Clause. ................................................................53

IV.    The Department treats Darren Patterson worse than similarly situated schools in violation of the Equal Protection Clause. ...................................................................................55

V.    The Equal Opportunity Provision fails strict scrutiny. ................56

A.    There is no compelling interest in interfering with Darren Patterson's internal policies and affairs. ................56

B.    The Department's actions are not narrowly tailored. ..........58

VI.    The district court properly granted a permanent injunction. ........60

Conclusion ................................................................................ 61

Statement Regarding Oral Argument ..................................... 61

Certificate of Compliance ...................................................... 62

Certificate of Digital Submission ........................................... 63

Certificate of Service .............................................................. 64

# TABLE OF AUTHORITIES

<u>**Cases**</u>

*303 Creative, LLC v. Elenis*,
600 U.S. 570 (2023) .......................................................... 17, 53, 55

*Allen v. United Services Automobile Association*,
907 F.3d 1230 (10th Cir. 2018) ..................................................... 37

*Ashaheed v. Currington*,
7 F.4th 1236 (10th Cir. 2021) .................................................. 55–56

*Awad v. Ziriax*,
670 F.3d 1111 (10th Cir. 2012) ............................................... 29, 60

*Bones v. Honeywell International, Inc.*,
366 F.3d 869 (10th Cir. 2004) ...................................................... 20

*Carson v. Makin*,
596 U.S. 767 (2022) ................................................................ 47–50

*Catholic Charities Bureau, Inc. v. Wisconsin Labor & Industry Review Commission*,
605 U.S. 238 (2025) ...................................................................... 34

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*,
508 U.S. 520 (1993) .............................................. 34, 38, 44–45, 57

*City of Mesquite v. Aladdin's Castle, Inc.*,
455 U.S. 283 (1982) ...................................................................... 33

*Does 1-11 v. Board of Regents of University of Colorado*,
100 F.4th 1251 (10th Cir. 2024) .............................................. 34, 58

*Employment Division v. Smith*,
494 U.S. 872 (1990) ................................................................ 46–47

*Espinoza v. Montana Department of Revenue*,
591 U.S. 464 (2020) ................................................................ 47–49

*Fellowship of Christian Athletes v. San Jose Unified School District Board of Education,*
    82 F.4th 664 (9th Cir. 2023) ........................................ 37, 43–44, 55

*Fulton v. City of Philadelphia,*
    593 U.S. 522 (2021) ............................. 31–33, 35–36, 39–40, 44, 57

*Gelboim v. Bank of America Corp.,*
    574 U.S. 405 (2015) ......................................................................... 3

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal,*
    546 U.S. 418 (2006) ....................................................................... 50

*Hosanna–Tabor Evangelical Lutheran Church and School v. EEOC,*
    565 U.S. 171 (2012) ....................................................................... 47

*Initiative & Referendum Institute v. Walker,*
    450 F.3d 1082 (10th Cir. 2006) ..................................................... 29

*Kennedy v. Bremerton School District,*
    597 U.S. 507 (2022) ................................................................ 30, 56

*Knox v. SEIU,*
    567 U.S. 298 (2012) ....................................................................... 33

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992) ....................................................................... 23

*Mahmoud v. Taylor,*
    145 S. Ct. 2332 (2025) ................................................................... 50

*Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Commission,*
    584 U.S. 617 (2018) ....................................................................... 46

*Meriwether v. Hartop,*
    992 F.3d 492 (6th Cir. 2021) ................................................... 54–55

*Our Lady of Guadalupe School v. Morrissey-Berru,*
    591 U.S. 732 (2020) ....................................................................... 52

*Peck v. McCann,*
    43 F.4th 1116 (10th Cir. 2022)......................................20, 24, 29–30

*Prairie Band Potawatomi Nation v. Wagnon,*
    476 F.3d 818 (10th Cir. 2007) ...........................................................60

*Reed v. Town of Gilbert,*
    576 U.S. 155 (2015) ...........................................................................53

*Roman Catholic Diocese of Brooklyn v. Cuomo,*
    592 U.S. 14 (2020) .......................................................................35, 60

*Rumsfeld v. Forum for Academic and Institutional Rights, Inc.,*
    547 U.S. 47 (2006) .............................................................................55

*St. Mary Catholic Parish v. Roy,*
    154 F.4th 752 (10th Cir. 2025)...........................ix, 36, 40–42, 49–51

*St. Mary Catholic Parish v. Roy,*
    736 F. Supp. 3d 956 (D. Colo. 2024)...............................................51

*Stewart v. City of Oklahoma City,*
    47 F.4th 1125 (10th Cir. 2022).........................................................20

*Susan B. Anthony List v. Driehaus,*
    573 U.S. 149 (2014) ....................................................21, 23–24, 28

*Tandon v. Newsom,*
    593 U.S. 61 (2021) .....................................................31, 35–36, 57

*Texas v. Johnson,*
    491 U.S. 397 (1989) ...........................................................................54

*Thomas v. Review Board of Indiana Employment Security Division,*
    450 U.S. 707 (1981) ...........................................................................26

*Trinity Lutheran Church of Columbia, Inc. v. Comer,*
    582 U.S. 449 (2017) ......................................................................47–50

*Warth v. Seldin,*
    422 U.S. 490 (1975) ...........................................................................23

## Statutes / Regulations

28 U.S.C. § 1291 ........................................................................3

28 U.S.C. § 1331 ........................................................................3

28 U.S.C. § 1343 ........................................................................3

42 U.S.C. § 1983 ........................................................................3

Colo. Code Regs. § 1402-1:2.423......................................................25

Colo. Code Regs. § 1402-1:2.425......................................................25

Colo. Code Regs. § 1404-1:4.104........................................................8

Colo. Code Regs. § 1404-1:4.109...................................15, 34, 36, 40–41

Colo. Code Regs. § 708-1:81.6.........................................................24

Colo. Code Regs. § 708-1:81.8.........................................................24

Colo. Code Regs. § 708-1:81.9.........................................................24

Colo. Rev. Stat. § 26.5-4-203 .........................................................8

Colo. Rev. Stat. § 26.5-4-204 ...................................................4, 8, 45, 59

Colo. Rev. Stat. § 26.5-4-205 .......................................8–9, 35–36, 39–40

## Other Authorities

Colo. Dep't of Early Childhood, *Info. Memo Clarifying Applicability of CADA Regulations to Licensing* (June 20, 2025).......................59

## Rules

Fed. R. Civ. P. 56(a)..................................................................20

## STATEMENT OF RELATED CASES

There are no prior appeals or any related appeals. However, Appellee advises the Court of the recent ruling in *St. Mary Catholic Parish v. Roy*, 154 F.4th 752 (10th Cir. 2025), which involved a similar but distinguishable constitutional challenge to the same Equal Opportunity Provision at issue here.

## INTRODUCTION

Plaintiff Darren Patterson Christian Academy seeks to participate in Colorado's Universal Preschool Program without being excluded or penalized for its religious beliefs and practices. But the Colorado Department of Early Childhood denied the school an exemption from the Program's "Equal Opportunity Provision," which the Department interprets as prohibiting the school's faith-based policies on bathrooms, dress codes, and pronouns. The district court correctly granted summary judgment for Darren Patterson and issued a permanent injunction, allowing the school and its families to participate in the Program without threat of exclusion or punishment.

The Court should affirm. The Department exempts other providers from the same provision, affording them "the flexibility needed ... to meet their organizational requirements, or other unique situations." 3.App.676. Yet it refuses to accommodate Darren Patterson. Such unequal treatment is unconstitutional. And recent Supreme Court precedents establish that the government cannot force a religious school to choose between its faith and public benefits, nor may it use funding conditions to intrude on matters of internal governance.

The Department will likely invoke this Court's recent decision in *St. Mary*. But that case does not control. As the Department itself recognized, *St. Mary* is "distinguishable." Defs.' Resp. to Notice of

Related Case at 1, *St. Mary Cath. Par. v. Roy*, 1:23-cv-02079 (D. Colo. Aug. 25, 2023), ECF No. 26. The schools there sought to deny *enrollment* based on religious criteria. But Darren Patterson welcomes everyone regardless of belief and background. Its policies simply ensure that the school's internal conduct and instruction remain consistent with its religious views on sexuality and gender. In other words, while *St. Mary* concerned enrollment practices, this case concerns day-to-day operations.

The record here on how the Equal Opportunity Provision operates in practice also differs, including evidence that was missing in *St. Mary*. This case also includes an additional free-speech claim: the Department's attempt to compel the school to use "preferred pronouns" contrary to its beliefs—an issue not addressed by *St. Mary*. And unlike the schools in that case, Darren Patterson has participated successfully in the Program under a preliminary injunction since its inception, demonstrating that its faith-based policies neither undermine the Program's goals nor harm the State's asserted interests.

Because the district court's judgment vindicates fundamental First Amendment protections, it should be affirmed.

## STATEMENT OF JURISDICTION

Darren Patterson Christian Academy sued Colorado officials Lisa Roy and Dawn Odean in the United States District Court for the District Court of Colorado under 42 U.S.C. § 1983, alleging violations of the First and Fourteenth Amendments to the United States Constitution. The district court properly exercised federal-question jurisdiction under 28 U.S.C. §§ 1331 and 1343.

After discovery, the district court granted summary judgment for Darren Patterson and issued a permanent injunction. The permanent injunction was "justified on Free Exercise grounds alone," so the summary-judgment ruling did not address Darren Patterson's free-speech and equal-protection arguments and directed the clerk to "close" the case. 10.App.2206–07. Because this constitutes a final decision under 28 U.S.C. § 1291, the Court has jurisdiction over all Darren Patterson's claims. *See Gelboim v. Bank of Am. Corp.*, 574 U.S. 405, 408 (2015) ("A final decision is one by which a district court disassociates itself from a case.") (citation modified).

## STATEMENT OF ISSUES

When the Colorado legislature created the Universal Preschool Program, it directed the Department to "establish a mixed delivery system" allowing parents to choose providers "from as broad a range as possible." Colo. Rev. Stat. § 26.5-4-204(2). Darren Patterson is a small Christian school that joined the Program but was told it must follow an "Equal Opportunity Provision," which the Department interprets as prohibiting the school's faith-based bathroom, dress code, and pronoun policies. The Department denied Darren Patterson's request for a religious exemption yet allowed exceptions for other providers to give them "the flexibility needed" to "meet their organizational requirements, or other unique situations." 3.App.676. The district court granted summary judgment after discovery and issued a permanent injunction allowing Darren Patterson to participate in the Program while upholding its religious practices.

This appeal raises two issues:

1.      Whether Darren Patterson had standing to challenge the Equal Opportunity Provision when the Department made that provision a condition of Program participation, and when violating the Provision triggers potential investigations, expulsion, and other penalties.

2.      Whether the Equal Opportunity Provision violates Darren Patterson's rights to free exercise, free speech, and equal protection.

## STATEMENT OF THE CASE

### A.     Darren Patterson Christian Academy and its religious beliefs and practices

Named after a 14-year-old boy who was killed by a drunk driver, Darren Patterson Christian Academy was founded in 1982 to give local children the opportunity Darren Patterson never had: to attend a local Christian school. 1.Supp.App.038. Over 40 years later, the school continues to serve families and children who desire a Christian education. *Id.* It is the only Christian school in Chaffee County with a preschool and elementary and middle school. *Id.*

As a "distinctly Christ-centered" school, Darren Patterson teaches from a Christian perspective, and many families choose the school for its Christian faith and focus. 1.Supp.App.038–39. The Tippetts and Eulers, for example, chose Darren Patterson's preschool because the school shares their religious convictions, aligns its policies with biblical beliefs, and teaches from a "Christian worldview." 1.Supp.App.048, 51.

The school is "missional": students and families of *all* faiths and backgrounds can enroll—including non-Christians and those who identify as LGBT. 5.App.1076–79, 1102; 1.Supp.App.038. Indeed, Darren Patterson, including its "Busy Bees" preschool, has students from non-Christian families and other families who do not completely agree with its faith. 5.App.1081–82; 6.App.1279, 1316–17. But to ensure that its missional mindset is not misunderstood for compromise, the

5

school asks all parents to sign an agreement affirming they "will support and uphold" the school's "religious mission, intent, policies, rules, and requirements." 1.Supp.App.011; 5.App.1079–80; 6.App.1327–29.

The preschool, Busy Bees, enrolls 30 to 50 children each year, ranging from 2 ½ to 5 years old. 1.Supp.App.039. Most Busy Bees graduates attend Darren Patterson's elementary school. *Id.* Like the rest of the school, Busy Bees' goal is to equip "students for excellence in Christian life and service by providing a nurturing, distinctively Christian school environment that emphasizes knowing Christ, imitating His character, and integrating the Bible in life while learning and mastering academic knowledge and skills." 1.App.57.

The education provided is rooted in the school's religious beliefs. The school has daily prayer and devotions, conducts Bible classes and lessons, and holds weekly chapel services. 1.Supp.App.039. It also incorporates Christ-centered expeditionary learning, where students embark on outdoor expeditions like climbing, backpacking, cross-country skiing, kayaking, and more. *Id.* These expeditions encourage students to put faith into practice, strengthen friendships, and appreciate all God's creation. *Id.*[1]

---

[1] Expeditions are tailored for age. Older students go on overnight adventures, while preschoolers go on nature walks, trips to the local library, and the like. *See* 5.App.1043–44. The Complaint's allegations about overnight sleeping arrangements concerned the Blanket

In all things, the school strives "to teach the truth about God" and "present the Word of God as the authoritative source upon which to build a life that has purpose and meaning." 1.Supp.App.003. To that end, all teachers and staff are expected to "[t]each the Bible as God's inspired Word" and to help students "develop[ ] the mind of Christ toward godliness and sin." 1.Supp.App.020. Teachers incorporate biblical teachings and principles in all classes; attend and sometimes lead weekly chapel services; pray for and with students; and lead morning devotionals. 1.Supp.App.031–36.

Given these expectations and requirements, Darren Patterson hires only those who share and live out its faith. 1.Supp.App.016, 42. All employees must agree to a "Lifestyle Statement," which requires them to be a "born-again Christian" and adhere to certain lifestyle requirements. 1.Supp.App.028. This ensures the school's religious mission and message are consistent and credible. 1.Supp.App.042. As explained below, the Department initially prohibited these religious hiring practices and dropped the prohibition only after being sued.

The school's religious beliefs also guide every aspect of its curriculum, operations, and policies. 1.Supp.App.040–42; 5.App.1073–74. Relevant here is that the school believes and teaches God created only two unique, immutable sexes—male and female—and aligns its

_____

Provision, which (as discussed below) prohibited discrimination against "any person" and applied to all students, not just preschoolers.

internal policies accordingly. 1.Supp.App.040–41. Its "sensitive school spaces" policy, for example, explains that the school "adheres to a Biblical definition of gender" and that gender is based on "biological sex," "not a choice made by parents or students." 1.App.53. This sincere religious belief informs the school's policies on bathroom usage, dress codes, and the use of pronouns. As explained by the Head of School and Preschool Director, the school applies those policies based on sex, not gender identity. 1.Supp.App.041; 5.App.1109 (bathrooms); 5.App.1116–17 (pronouns); 5.App.1183 and 1190–91 (dress code); 6.App.1334–35 (bathrooms); 6.App.1353 (dress code); 6.App.1358 (pronouns).

## B.    Colorado's Universal Preschool Program and the Equal Opportunity Provision

Colorado's Universal Preschool Program guarantees every four-year-old in the state at least 15 hours per week of state-funded preschool, regardless of family income. Colo. Rev. Stat. § 26.5-4-204; Colo. Code Regs. § 1404-1:4.104(C). Private licensed childcare providers can participate, Colo. Rev. Stat. § 26.5-4-203(14), and the Colorado legislature directed the Department to "establish a mixed delivery system" allowing parents to choose providers "from as broad a range as possible," *id.* § 26.5-4-204(2).

The legislature also instructed the Department to "establish by rule the quality standards that each preschool provider must meet to receive [Program] funding." Colo. Rev. Stat. § 26.5-4-205(1)(a). One such

standard is the Equal Opportunity Provision, which generally mandates that providers must "provide eligible children an equal opportunity to enroll and receive preschool services regardless of race, ethnicity, religious affiliation, sexual orientation, gender identity, lack of housing, income level, or disability, as such characteristics and circumstances apply to the child or the child's family." *Id.* § 26.5-4-205(2)(b).

Nevertheless, if needed "to ensure the availability of a mixed delivery system," the Department "may allow" providers to participate "for a limited time while working toward compliance with the quality standards." Colo. Rev. Stat. § 26.5-4-205(1)(b)(II). While such providers must meet all standards "relating to health and safety," *id.*, the Department "may," but need not, "prohibit a preschool provider" from participating if it "fails to meet one or more of the quality standards." *Id.* § 26.5-4-205(b)(I). The Department also developed a process by which providers could request exceptions from Program requirements to give them "the flexibility needed ... to meet their organizational requirements, or other unique situations." 3.App.676. As detailed below, the Department has granted exceptions allowing providers to limit or deny enrollment based on otherwise protected characteristics.

Families wishing to participate in the Program must apply and list their preferred preschools before being matched with one of their choices. 3.App.795–96. Preschools are notified of any match first and can decline placements if they lack open seats or if they decide a family

9

is not a good fit. 3.App.797–98. If a preschool declines a match, the family is not told why; the Department simply matches the student to the next school on his or her list. 3.App.798.

The Department has had no problem finding preschools that want to participate in the Program. Just under 2,000 preschools signed up for the Program's inaugural year and even more joined for later years. 3.App.828. As for Chaffee County, there are multiple preschools participating including the Buena Vista School District ("The Grove"). 5.App.1052; 6.App.1281–82; *see also* 2.Supp.App.245–46.

### C. The Department adds the Equal Opportunity Provision to its Program Service Agreement and imposes even more barriers for religious schools.

To participate, preschools must sign a Program Service Agreement and agree to its terms. 3.App.753. Although the Department did not adopt any quality standards by rule for the inaugural year (as required by statute), 3.App.692–93, it inserted the Equal Opportunity Provision directly into the Program Service Agreement and has included that provision in all later years' agreements, 1.App.63; 4.App.878–79.

Besides the Equal Opportunity Provision, the Department added another, even broader restriction to the inaugural year's agreement. That provision, referred to as the "Blanket Provision" or "Provision 18(B)" in the court below, prohibited providers from "discriminat[ing]

against *any person* on the basis of gender, race, ethnicity, religion, national origin, age, sexual orientation, gender identity, citizenship status, education, disability, socio-economic status, or any other identity." 1.App.88 (emphasis added). The provision was not legally required but added unilaterally by the Department.

The Department knew both provisions posed problems for faith-based providers but included them anyway. 4.App.883–84, 968–69.

The Department also published a "Fact Sheet" telling "faith-based preschools" they could not participate if "state funds" would be used "during hours of religious programming." 1.Supp.App.059. But that condition wasn't required by any statute or regulation either. *See* 3.App.696–98 (deposition testimony admitting that fact). Yet despite receiving repeated requests for clarification, the Department has never published any written document or guidance instructing faith-based providers that the condition no longer applies. *See* 1.Supp.App.077–87 (email requests for clarification); 1.App.117–18 (letter from coalition of faith-based providers).

### D. The Department rejects requests for a religious exemption, forcing Darren Patterson to sue.

After learning about the Program, Darren Patterson was excited to participate. 1.Supp.App.042–43. The school applied for the Program's inaugural year and electronically signed the Program Service Agreement. 1.Supp.App.043. Although the school's application was

approved, it later learned that the Agreement's Equal Opportunity and Blanket Provisions would prevent it from operating consistently with its religious beliefs. *Id.* This was "incredibly disappoint[ing]" because Darren Patterson thought the Program was "universal" and open to all state-licensed preschools. *Id.*

Others were disappointed too. For example, a coalition of religious schools and organizations wrote to Governor Jared Polis in February 2023, explaining that the Equal Opportunity Provision and purported restriction on religious instruction violated their First Amendment rights. 1.App.117–18. In response, Defendant Roy wrote back saying that the Department could not "create an exemption." 1.App.120.

For its part, Darren Patterson sent an email in May 2023 to request a religious exemption from "certain aspects" of the Equal Opportunity and Blanket Provisions. 1.App.124. The school explained that it "welcomes all children and families" but the provisions conflicted with its religious beliefs, including its "policies on bathroom and locker room usage, pronoun usage, and dress codes." *Id.* The school also expressed concern that the Blanket Provision—which prohibited discrimination against "any person" based on "religion," "sexual orientation," or "gender identity"—interfered with its religious practice of hiring only those who share and live out its faith. *Id.*

Again, Defendant Roy insisted the Department could not create exemptions. 1.App.123. She later testified that she denied Darren

12

Patterson's request based on the Department's interest in "ensur[ing] that children have safe and welcoming environments." 4.App.972–73. Yet she admitted that the only inquiries she made before denying the exemption was to review the school's website and determine how many seats it had in the Program. 4.App.973–74.

Darren Patterson sued in June 2023 before the school year began. 1.App.15–43. As detailed below, the district court granted a preliminary injunction allowing the school to participate in the Program while maintaining its religiously based policies. Although the Department initially defended both provisions, *see* 1.App.201 ("Colorado has a compelling interest in eliminating discrimination in hiring as well as in educational access."), it has since removed the Blanket Provision and now defends only the Equal Opportunity Provision.

### E.    The Department enforces the Equal Opportunity Provision against schools like Darren Patterson but exempts others.

The Department has played "coy," 1.App.269, about its enforcement of the Equal Opportunity Provision, claiming that Darren Patterson "points to nothing but imagined enforcement," 1.App.234. But there is nothing imaginary about it.

For one thing, the Department made the Provision a condition of participation by adding it to the annual Program Service Agreement. So Darren Patterson must agree in writing that it will comply with the

Provision to remain in the Program. For another, discovery showed that when the Department was telling the district court that Darren Patterson's fears were "speculative," 1.App.235, it was simultaneously investigating two anonymous complaints alleging discrimination against providers with policies like Darren Patterson's. One complaint concerned pronoun usage for a transgender-identifying child. 1.Supp.App.074–75. The other concerned bathroom usage for "students with differing gender identities." 1.Supp.App.071–72. The Department investigated both complaints because they alleged violations of the Equal Opportunity Provision. 3.App.791; 1.Supp.App.093–94.

Despite strictly enforcing the Equal Opportunity Provision against schools like Darren Patterson, the Department has allowed over 1,000 providers to turn away students and families for a wide variety of reasons. 3.App.799–80. The Department first called these accommodations "exception[s]" but renamed them "programmatic preferences" after being sued. 3.App.798–99.

The Department unilaterally created its exception process during the Program's inaugural year. *See* 3.App.798–79 (exceptions created for 23-24 school year before any rulemaking). That process allowed preschools to submit requests for an "Approved Exception" to "provide the flexibility needed for [them] to meet their organizational requirements, or other unique situations." 3.App.676. As examples of the "types of exceptions" it would approve, the Department identified situations

where a preschool "only serves a specific subgroup of the population," such as "teen moms" and "refugees," and situations in which a family "has failed to previously comply with [the] provider's policies and procedures," including "behavioral policies." *Id.*

As a result of this process, the Department ultimately codified ten categories of exceptions through regulation. 3.App.615, 799. These regulatory exceptions allowed providers to deny enrollment based on income level and disability and to restrict enrollment to children of employees, among other things. 3.App.615. They also allowed faith-based providers to limit enrollment to "members of their congregation." *Id.* And they included a broad "catch-all" exception that allowed providers to limit enrollment based on a range of factors—such as belonging to a specific community, having certain competencies or interests, having a particular relationship to the provider or its employees, students, or families, receiving certain public assistance benefits, or participating in a specific activity. 3.App.615–16; *see also* Colo. Code Regs. § 1404-1:4.109(A)(9).

## F.   Procedural History

Darren Patterson sued in June 2023, alleging violations of the Free Exercise, Free Speech, and Equal Protection Clauses, as well as its First Amendment rights to religious autonomy and expressive association. 1.App.15–43.

**Preliminary Injunction.** Shortly after filing its complaint and before the school year began, Darren Patterson moved for a preliminary injunction. 1.App.5. The district court granted that motion after an evidentiary hearing, enjoining the Department "from expelling, punishing, withholding funds from, or otherwise disciplining [Darren Patterson] under the Universal Preschool Program on the basis that [its religiously based] policies, … violate the program's statutory or contractual antidiscrimination provisions." 1.App.290. The court rejected the Department's standing and ripeness arguments and held that Darren Patterson was likely to succeed on the merits. 1.App.259–286.

On standing, the court concluded that Darren Patterson was at least arguably in violation of the challenged provisions and faced a credible threat of enforcement. 1.App.263. The provisions' plain terms arguably prohibited the school from "having discriminatory policies even if there are no instances of those policies being applied to someone who would feel aggrieved." 1.App.263–64. Any third party could also file an anonymous complaint, "jeopardiz[ing] its participation in the program or subject[ing] it to burdensome investigations." 1.App.267, 273. The Department refused to disavow enforcement or clarify whether it viewed the school's policies as violations. 1.App.263. Darren Patterson thus "credibly fears" consequences. 1.App.273.

As for ripeness, the court held that the Department's arguments failed "for the same reasons." 1.App.274. The case raised "purely legal

16

questions," as "[e]veryone agrees on what [Darren Patterson's] policies allow and disallow" and "[t]he statute is quite clear, as is the program agreement." 1.App.276. Withholding review would create a "direct and immediate dilemma": the school could follow its religious beliefs only "at the risk of immediate termination." 1.App.277.

On the merits, the district court first held that the Blanket Provision likely violated the Religion Clauses because it interfered with ministerial hiring. 1.App.279–80. It also likely violated the school's right to expressive association by forcing it to "hire those who disagree with its religious expression and evangelistic mission." 1.App.281.

The court further found Free Exercise violations because the provisions (1) forced the school to choose between its beliefs and program participation, contrary to *Trinity Lutheran*, *Espinoza*, and *Carson*, and (2) were not neutral and generally applicable, triggering and failing strict scrutiny. 1.App.281–82.

Finally, the court held the provisions likely violated the Free Speech Clause by compelling the use of "preferred pronouns." 1.App.285. The government simply "may not compel a person to speak its own preferred messages." *Id.* (citing *303 Creative, LLC v. Elenis*, 600 U.S. 570, 586 (2023)).

The Department did not appeal, and the case proceeded to discovery.

17

**Summary Judgment/Permanent Injunction.** After discovery, the parties cross-moved for summary judgment. 1.App.10–11.

The Department moved for partial summary judgment on Darren Patterson's employment-related claims. It argued that the school never faced a credible threat of enforcement for its employment decisions and that the applicable provision (the Blanket Provision) had been removed from later years' agreements, making those claims moot. 2.App.315–38. Darren Patterson's motion argued that the school was entitled to summary judgment on all claims, and that the Department's post-hoc removal of the Blanket Provision did not moot its employment-related claims. 3.App.576–607.

The district court granted the Department's motion and dismissed the employment-related claims, believing the Department had "made clear" through sworn testimony "that it will not enforce or reinstate [the provision] against *any* preschool provider." 10.App.2201. Although the district court agreed that promise mooted the employment-related claims, it rejected the Department's "recycled arguments that [Darren Patterson] never had standing to begin with for the same reasons they failed originally." 10.App.2199.

As for the claims related to the school's bathroom, dress code, and pronoun policies, the district court granted Darren Patterson's motion and issued a permanent injunction prohibiting the Department from

"expelling, punishing, withholding funds from, or otherwise disciplining" the school for its religiously based policies. 10.App.2206–07. The Department's enforcement of the Equal Opportunity Provision was not "neutral and generally applicable" because the Department allowed exceptions for others "while denying an exemption for [Darren Patterson]." 10.App.2204. The Department had created an exception for more "formal religious organizations" that allowed them to reserve seats for members of their "congregation," and retained the power to grant additional exemptions if "necessary to ensure the availability of a mixed delivery system." 10.App.2203–04.[2] Such exceptions undermined any argument that the Department could not accommodate Darren Patterson's religiously based policies—indeed, the Department "offered no convincing explanation" for the unequal treatment. 10.App.2205.

Because a permanent injunction was "justified on Free Exercise grounds alone," there was "no need to address" the school's arguments under the Free Speech and Equal Protection Clauses. 10.App.2206.

---

[2] The district court properly considered the congregation exception, even though the Department ultimately repealed it. That exception was no longer "in place" "[s]tarting with" the 2025-26 academic year. Appellants' Br. 41. So the exception existed—and was being used by other schools—when the district court issued its decision in February 2025.

## STANDARD OF REVIEW

This Court reviews the district court's grant of summary judgment de novo. *Stewart v. City of Oklahoma City*, 47 F.4th 1125, 1131 (10th Cir. 2022). Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine only "if a rational jury could find in favor of the nonmoving party on the evidence presented." *Stewart*, 47 F.4th at 1132 (citation modified). To defeat summary judgment, the nonmovant's evidence "must be based on more than mere speculation, conjecture, or surmise." *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004). "Furthermore, this court may affirm a grant of summary judgment on grounds other than those relied on by the district court when the record contains an adequate and independent basis for that result." *Id.*

## SUMMARY OF THE ARGUMENT

The Court should affirm Darren Patterson's right to participate in the Program consistent with its faith.

The district court rightly found standing. The Department makes compliance with the Equal Opportunity Provision a condition of participation and enforces that provision through investigations and other penalties. Darren Patterson need not wait to be "penal[ized]" or "explicitly threatened" to sue. *Peck v. McCann*, 43 F.4th 1116, 1129 (10th Cir. 2022). A "substantial risk" of harm is enough. *Susan B. Anthony List v.*

20

*Driehaus,* 573 U.S. 149, 158 (2014) ("*SBA List*") (citation modified). The school's faith-based policies conflict with the Provision, and the Department's refusal to disavow enforcement—along with investigations of providers alleged to have similar policies—confirms a credible threat. The case is also ripe because the issues presented are purely legal, and delaying resolution imposes hardship on the school and its families. Darren Patterson must either abandon its religious policies to remain in the Program or face penalties, making judicial review necessary.

The district court also correctly held that the Equal Opportunity Provision violates Darren Patterson's free-exercise rights. The record shows the Department can grant exemptions *and has done so*—allowing providers to limit or deny enrollment based on religion, gender identity, sex, marital status, income level, disability, and other protected traits. Yet it refuses to accommodate Darren Patterson.

The Department's actions also exhibit a lack of neutrality. In addition to treating secular reasons for an exemption better than religious ones, the Department initially prohibited the school's religious hiring practices through the Blanket Provision and misrepresented Program requirements for faith-based providers in official materials. It admitted these restrictions lacked any legal basis only after being sued.

The Department violates the Free Exercise Clause in other ways too. Supreme Court precedent forbids forcing a religious school to choose between its faith and public benefits. And the government may

not leverage funding conditions to control a religious school's internal governance. The Department's enforcement of the Equal Opportunity Provision does both, triggering strict scrutiny, which it cannot meet.

The *St. Mary* decision is distinguishable. That case involved enrollment criteria, while this case concerns government control over internal policies. Discovery also produced evidence missing in *St. Mary*. Beyond the exceptions referenced in that case, the record here shows the Department allows providers to: restrict enrollment to children of employees, even if they condition employment on religion or other protected traits, 3.App.806–07; deny families for not complying with their "policies and procedures," including their "behavioral policies," 3.App.676; deny students with disabilities they cannot accommodate, 3.App.810–11; restrict enrollment to all boys or all girls, 3.App.774; restrict enrollment to children with married parents, 3.App.775; and have a policy of not admitting children of a certain race, 3.App.766–67. The record also shows the Department has allowed providers to participate in the Program without agreeing to the Equal Opportunity Provision as written, 3.App.736–37, 740, and that the Department knowingly deterred faith-based participation by publishing a "Fact Sheet" that wrongly said faith-based providers could participate only if "state funds" were not "applied during hours of religious programming." 1.Supp.App.059.

22

Darren Patterson also asserts an additional free-speech claim over "preferred pronouns." Moreover, the school has participated successfully under a preliminary injunction since the Program's inception—proving that its faith-based policies neither undermine the Program's goals nor harm any asserted state interest.

## ARGUMENT

### I. The case is justiciable.

#### A. Darren Patterson has standing.

The Department questions standing. But the district court twice held that Darren Patterson could challenge the Equal Opportunity Provision, once after an evidentiary hearing and once after reviewing a full summary-judgment record. 1.App.259–73; 10.App.2199. Incidentally, the *St. Mary* panel held that the Catholic schools there had standing too. 154 F.4th at 762. That's not surprising. Standing ensures that the plaintiff is "a proper party to invoke judicial resolution of the dispute." *Warth v. Seldin*, 422 U.S. 490, 518 (1975). And when, as here, a plaintiff is "an object of the action (or foregone action) at issue," "there is ordinarily little question" that he has standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561–62 (1992).

Here, Darren Patterson must show an actual or imminent injury, causation, and redressability. *SBA List,* 573 U.S. at 157–58. It need not first subject itself to "penalty" or be "explicitly threatened"—especially

23

in the First Amendment context, where "unique interests" cause courts to analyze standing "more leniently." *Peck*, 43 F.4th at 1129. Instead, Darren Patterson must show only that there is a "substantial risk" of the challenged law harming it. *SBA List*, 573 U.S. at 158 (citation modified). Not a certainty, only "an objectively justified fear of real consequences." *Peck*, 43 F.4th at 1132 (citation modified). It has met that burden. As the district court recognized, Darren Patterson intends "to engage in a course of conduct arguably affected with a constitutional interest," its activities are at least "arguably" proscribed by the challenged law, and it faces "a credible threat of prosecution." *SBA List*, 573 U.S. at 159 (citation modified); 1.App.259–73.

The Department doesn't seriously dispute any of this. It conceded below that the school's bathroom, dress code, and pronoun policies are "motivated by a bona fide religious belief." 10.App.2193. It has investigated other providers for allegedly having similar policies that violate the Equal Opportunity Provision, and it has "staunch[ly]" refused to disavow enforcement against Darren Patterson, *Peck*, 43 F.4th at 1133 (refusal to disavow carries "heavy weight"). What's more, the State—including the Department—enforces other gender-identity rules precisely how the school fears.[3] All this proves standing.

---

[3] *See* Colo. Code Regs. § 708-1:81.9(B) (individuals must be allowed "use of gender-segregated facilities that are consistent with their gender identity"); *id.* § 708-1:81.6(A)(4) (unlawful harassment to "[d]eliberately misus[e] ... gender-related pronoun"); *id.* § 708-1:81.8 ("shall not require

Yet the Department demands a justiciability trial. Why? Because it believes Darren Patterson *might* not have the policies it says it has, pointing to supposed inconsistencies in deposition testimony. *See* Appellants' Br. 24–26. The Court should reject the argument.

*First*, the Department didn't oppose summary judgment on that ground below. The only justiciability argument it made concerned the school's employment-related claims based on removal of the Blanket Provision. *See* 9.App.1807–42. The Court should reject this belated attempt to conjure up reasons for a needless trial.

*Second*, Darren Patterson's authenticated documents and sworn testimony consistently state that the school believes and teaches that God created only two unique, immutable sexes—male and female—and that the school aligns its bathroom, dress code, and pronoun policies accordingly. 1.Supp.App.040–41; *see also* 1.App.53 ("sensitive school spaces" policy); 5.App.1109 (bathrooms); 5.App.1116–17 (pronouns); 5.App.1183 and 1190–91 (dress code); 6.App.1334–35 (bathrooms); 6.App.1353 (dress code); 6.App.1358 (pronouns). The First Amendment simply does not allow government officials, judges, or juries to tell a

---

an individual to dress or groom in a manner inconsistent with the individual's gender identity"); *see also id.* §§ 1402-1:2.423(B) and (D)(2), 1402-1:2.425(I), (Department regulations stating that children's resident camps must allow campers to "sleep in the same room or tent with individuals whose gender identity is consistent their gender identity" and to use "gender-segregated toilet facilities" and "gender-segregated showers" "consistent with their gender identity").

religious school that it misunderstands its own beliefs and practices. Darren Patterson's "religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection." *Thomas v. Rev. Bd. of Ind. Emp. Sec. Div.*, 450 U.S. 707, 714 (1981).

*Third*, the Department's cherry-picked deposition testimony is not inconsistent with the school's stated beliefs and policies. For example, the Department says that "a site visit and deposition testimony revealed" the school does not separate bathrooms by sex. Appellants' Br. 25. Not true. Darren Patterson's plans for a renovated preschool building include single-stall restrooms, *see* 5.App.1141, but the record makes clear that its preschool operated within the main school building during this lawsuit. 5.App.1125. The main building has sex-separated bathrooms, and the Head of School testified that preschool students would continue to access those bathrooms when using that building for various activities such as gym and chapel, even after they move into the renovated preschool building. 5.App.1226–27, 1252–53.

The Department's reference to students using the staff's single-stall bathroom "in the past," Appellants' Br. 25–26, doesn't tell the whole story either. That testimony refers to the Head of School's eight-year-old son using the staff bathroom without permission, something his father "admonished" him for. 5.App.1133–34. And the Department's

assertion that boys can use the girls' restroom "in a variety of circum-stances," Appellants' Br. 26, refers to hypotheticals posed to the Head of School where "the other bathroom is full" and there is "a potty emer-gency," 5.App.1137–38. As the Head of School explained in response to that game of "gotcha," neither of those situations "conflict with [the school's] religious beliefs" because they have "nothing to do with what [the school is] communicating about gender identity." 5.App.1137–38.

The Department's attempt to cast doubt on the school's other poli-cies fares no better. On the dress code, the school's handbook says that students must "[d]ress appropriately" and avoid clothing that "causes, or is likely to cause, disruption of the educational process." 9.App.1900. The Head of School repeatedly testified that Darren Patterson expects all students to dress consistently with their "sex." 5.App.1183, 1186–91. True, the school's written dress code doesn't explicitly mention "haircuts, jewelry, nail polish, or makeup use." Appellants' Br. 26. But that makes no difference. The school applies its dress code in view of its beliefs, concerned not with isolated instances but whether a child's dress is "intending to communicate" that the child identifies "different[ly] than" his or her "sex." 5.App.1192; *accord* 6.App.1352; 9.App.2000, 2032.

Same thing for pronouns. The Head of School testified that the school's pronoun policy flows directly from its religious beliefs about sexuality and gender. 5.App.1228; *see* 9.App.1909 ("DPCA adheres to a

Biblical definition of gender (Genesis 1:27).”). And the Preschool Director testified that, whether in writing or not, the school's “policy” is to only use pronouns that correspond with sex. 6.App.1360.

In sum, the undisputed facts “support the conclusions that [Darren Patterson] may be arguably violating the anti-discrimination terms of the Program and related statutes and that it credibly fears enforcement or at least investigation of its compliance.” 10.App.2199. The school “brought this case to vindicate its religious objections to the terms imposed by the Program by law and regulation.” *Id.* “That remains a live case or controversy.” *Id.*

## B.    The case is ripe.

The Department next says a trial is needed to determine whether this over-two-year-old case is ripe. But again, the Department didn't make this argument when opposing summary judgment, so the Court shouldn't credit it now. Even so, the Department's objection is prudential, not jurisdictional. *SBA List*, 573 U.S. at 167. And once jurisdiction is established, “a federal court's obligation to hear and decide” the case “is virtually unflagging.” *Id.* (citation modified).

This case easily meets the test for prudential ripeness. The two central factors are “the fitness of the issue[s] for judicial resolution” and “the hardship to the parties of withholding judicial consideration.” *Peck*,

43 F.4th at 1133 (citation modified). The test is not "rigid or mechanical" but "relaxed" in First Amendment cases. *Id.* (citation modified).

First, the case is fit for decision because the Equal Opportunity Provision is plain on its face, and the school's policies violate it. The Department cannot deny this, nor has it disavowed enforcement. At bottom, this case asks whether the government can prohibit a religious school from aligning its own bathroom, dress code, and pronoun policies with its beliefs about sexuality and gender as a condition of Program participation. The Department says it can; Darren Patterson says it can't. That legal dispute needs no "[f]urther factual development," *Awad v. Ziriax*, 670 F.3d 1111, 1125 (10th Cir. 2012), and "does not depend on any uncertain, contingent future events," *Initiative & Referendum Institute v. Walker*, 450 F.3d 1082, 1098 (10th Cir. 2006).

Second, withholding judicial review would cause great hardship to Darren Patterson and its families. Agreeing to comply with the Equal Opportunity Provision is not optional but a condition of participation. Because the Department interprets the Provision to cover every aspect of the school's operations (not just admissions and enrollment), Darren Patterson cannot make the required affirmation without jettisoning its religiously based policies. And if the school makes the affirmation but fails to comply, the Department can kick the school out of the Program or impose other penalties without "notice or a cure period." 1.App.78 (2023-24 Agreement); 3.App.638 (2024-25 Agreement). The Department

29

also can independently initiate an investigation and will "immediately" investigate any third-party complaint—whether submitted orally, in writing, or anonymously. 3.App.712–13; 1.Supp.App.063.

The Department responds by noting that Darren Patterson has participated in the Program since its "inception" and that "no family has ever requested an exception from" the school's policies. Appellants' Br. 29–30. But that doesn't warrant a trial on ripeness. The school "has never been excluded" or forced "to change any policy," *id.* at 19, because an *injunction* has protected it since year one. Without an injunction, Darren Patterson must either withdraw from the Program—harming its students and families—or risk immediate "expulsion," "termination of the program agreement," "withholding of future funds," and "burdensome investigations." 1.App.273; *see also* 1.Supp.App.055. Putting the school to that choice creates "a direct and immediate dilemma" justifying judicial review. *Peck*, 43 F.4th at 1134.

## II.    The Department violates the Free Exercise Clause.

### A.    The Department's actions are neither neutral nor generally applicable.

Strict scrutiny applies because the Department's actions burden Darren Patterson's religious exercise but are not neutral and generally applicable. *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 526 (2022).

30

### 1. The Department created many exemptions that undermine its asserted interests.

A challenged law or policy "lacks general applicability if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Fulton v. City of Phila.*, 593 U.S. 522, 534 (2021). Indeed, "government regulations are not neutral and generally applicable, and therefore trigger strict scrutiny under the Free Exercise Clause, whenever they treat *any* comparable secular activity more favorably than religious exercise." *Tandon v. Newsom*, 593 U.S. 61, 62 (2021) (per curiam). "It is no answer that a State treats some comparable secular [entities] or other activities as poorly as or even less favorably than the religious exercise at issue." *Id.* The Free Exercise Clause demands more.

"[W]hether two activities are comparable for the Free Exercise Clause must be judged against the asserted government interest that justifies the regulation at issue." *Id.* "Comparability is concerned with the risks various activities pose, not the reasons why people" engage in the activities. *Id.* And it doesn't matter whether the "risks" posed have ever materialized into actual harm. *Id.*

The district court faithfully applied these principles. The Department says the Provision serves the government's interest in "eliminating discrimination ... in educational access." 1.App.201; *accord* Appel-

lants' Br. 64–65. But the record shows the Department allows many exceptions undermining this purported interest, and that the Department does not pursue its interest against all schools.

Take the congregation exception. Although the Equal Opportunity Provision says preschools must provide all eligible children with "an equal opportunity to enroll" regardless of "religious affiliation," "sexual orientation," and "gender identity," the Department developed an exception that allowed faith-based providers to reserve some or all their seats for members of their "congregation." 3.App.615; 4.App.908–09. That allowed more "formal religious organizations"—those with "congregations"—to "effectively exempt" their preschools from the Equal Opportunity Provision. 10.App.2203. For example, Defendant Odean admitted the exception allowed Catholic providers to reserve seats for Catholics and Lutheran providers to reserve seats for Lutherans. 4.App.1000. And the district court concluded the exception would allow providers to "impose" the "same sorts of rules" on their congregations that are at issue here. 10.App.2203. That proved the Department can make exceptions to the Equal Opportunity Provision, destroying any argument of general applicability. *See Fulton*, 593 U.S. at 533–34.

The Department resists this conclusion. It first argues that the congregation exception has since "been repealed" and "is now out of the case." Appellants' Br. 38. It then argues that, even if the district court properly considered the exception, it does not "trigger Free Exercise

32

Clause suspicion" because it "favored religious preschools over secular preschools." *Id.* at 42–43. Neither argument is persuasive.

First, the district court did not err by considering the facts that existed at the time of its ruling. The congregation exception was still available to—and being used by—providers when the district court ruled in February 2025. While the Department initiated rulemaking to remove the exception *after* summary-judgment motions were fully briefed, it admits the exception remained "in place" until the start of the 2025-26 academic year, nearly six months *after* the district court ruled on the motions. *See* Appellants' Br. 41 ("*Starting* with AY25-26, the congregation preference is no longer in place.") (emphasis added). The district court was right to issue a declaratory judgment and injunction based on the existing facts.[4]

Second, later removing the exception does not change the fact that the Department created it in the first place—and did so unilaterally without rulemaking. *See* 3.App.799 (developed before any rulemaking). That the Department can create and then remove exceptions at will proves the law is not generally applicable. *Fulton*, 593 U.S. at 533.

---

[4] It is also "well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982). This is especially so when, as here, the defendant "continues to defend" its "legality." *Knox v. SEIU*, 567 U.S. 298, 307 (2012).

Third, that the exception favored some *religious* conduct over Darren Patterson's religious exercise does not absolve the Department but amplifies the constitutional problem. A law is not neutral or generally applicable if it "discriminates against *some* or all religious beliefs." *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 532 (1993) (emphasis added). That, of course, means the Department cannot treat comparable secular activity better than religious exercise. But neither may it "grant exemptions for some religions, but not others, because of differences in their religious doctrines." *Does 1-11 v. Bd. of Regents of Univ. of Colo.*, 100 F.4th 1251, 1257 (10th Cir. 2024); *accord Cath. Charities Bureau, Inc. v. Wis. Lab. & Indus. Rev. Comm'n*, 605 U.S. 238, 252 (2025) (religious exemption cannot turn on "theological choices driven by the content of different religious doctrines").

In addition to the congregation exception, the record shows the Department does not strictly enforce the Equal Opportunity Provision against all providers. Consider the employer-employee exception that allows any provider to "limit some or all" of their "UPK seats" for children of employees, an exception not addressed by the *St. Mary* panel. 3.App.806–07; Colo. Code Regs. § 1404-1:4.109(A)(5). Because many religious employers condition employment on shared beliefs and practices—including those related to sexuality and gender—this exception also allows preschools to limit enrollment based on "religious

affiliation," "sexual orientation," or "gender identity." In fact, if Darren Patterson's religious beliefs did not compel it to be "missional" and open its doors to all families, it could reserve its universal preschool seats for children of employees, necessarily depriving those who do not share its faith an "equal opportunity to enroll." Colo. Rev. Stat. § 26.5-4-205(2)(b).

The Department does not disagree. It simply doubts that the employer-employee exception is being used this way. *See* Appellants' Br. 53–54. But there is no denying that many faith-based preschools hire only coreligionists—indeed, Darren Patterson does. And the general-applicability analysis is concerned with what the law *allows* and whether that would undermine the government's asserted interest.

In *Tandon*, the Supreme Court described its decision in *Roman Catholic Diocese* by noting that it was enough there that the activities "treated more favorably than religious worship either '[had] contributed to the spread of COVID-19' or '*could*' have presented similar risks." *Tandon*, 593 U.S. at 62 (quoting *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 17 (2020) (per curiam)) (emphasis added). And in *Fulton*, the Supreme Court similarly explained that the mere possibility of exceptions "renders a policy not generally applicable, regardless whether any exceptions have been given." 593 U.S. at 537.

The Department also cannot have it both ways. It mooted the school's employment-related claims by swearing to the district court that it will not interfere with *any* provider's past or future employment

practices. So providers must be free to hire according to their faith and thus use the employer-employee exception in a way that "undermines the government's asserted interests." *Fulton*, 593 U.S. at 534.

While either of these exceptions is enough to trigger strict scrutiny, *see Tandon*, 593 U.S. at 62, there are many more.

For instance, the Equal Opportunity Provision says all providers must provide children with an "equal opportunity to enroll and receive preschool services" regardless of "income level." Colo. Rev. Stat. § 26.5-4-205(2)(b). Yet the Department has created exceptions allowing providers to "prioritize the placement of low-income children" and to prefer families who "receiv[e] specific public assistance benefits." 3.App.615, 803; *see also* Colo. Code Regs. § 1404-1:4.109(A)(4) & (9).

The Department rationalizes these class-based exceptions by claiming the Program's "objectives" justify treating low-income families more favorably than middle-class ones. Appellants' Br. 51–52. The Department thus "interprets" the Equal Opportunity Provision "as a one-way ratchet": "protecting children of families with low income (but not children of families with higher income)." *Id.* at 52. The *St. Mary* panel did the same. 154 F.4th at 771–72.[5] But the Program's stated

---

[5] The *St. Mary* panel focused solely on the Department's exception for federal Head Start programs. 154 F.4th at 771–72. It did not address that the Department more broadly allows *any* provider to prefer students based on whether the child or family "receive[s] specific public assistance benefits." Colo. Code Regs. § 1404-1:4.109(A)(9).

objectives are universal: publicly funded preschool for *all* families, and an equal opportunity to enroll, regardless of income level. The Department's "one-way ratchet" cannot be squared with a *universal* preschool program or the Equal Opportunity Provision's plain terms. This Court should "eschew adding terms to a statute's plain text under the guise of interpreting it." *Allen v. United Servs. Auto. Ass'n*, 907 F.3d 1230, 1239 n.5 (10th Cir. 2018).

Nor does the legal analysis change if the Colorado legislature would have wanted (or even expected) the Department to develop such income-based exceptions. *Contra* Appellants' Br. 52–53. They are exceptions all the same, whether legislatively approved or not. While such exceptions might serve "admirable goals," *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 688 (9th Cir. 2023) ("*FCA*") (en banc), so would an exception for schools like Darren Patterson. It is indeed admirable to protect religious freedom and ensure that families like the Tippetts and Eulers have a preschool option that reaffirms rather than refutes lessons taught at home.

There's more. Despite the Equal Opportunity Provision stating that providers cannot deny enrollment based on "disability," the Department admitted that providers need not accept students with disabilities they cannot accommodate. 3.App.810–11. That may be "common sense." *FCA*, 82 F.4th at 688. But it is also common sense that students and families *choosing* a Christian preschool be expected to

37

follow that school's faith-based policies. The Department recognizes this reality for other schools: they can decline a family "who has failed to previously comply with [the] provider's policies and procedures," including its "behavioral policies." 3.App.676. Why can other providers impose their codes of conduct but not Darren Patterson?

The Department also conceded that the Equal Opportunity Provision does not forbid providers from restricting enrollment to all boys or all girls. 3.App.774. Nor does the Provision prohibit providers from limiting enrollment to children with married parents. 3.App.775. So denying enrollment based on sex and marital status is fine, but the Department enforces Program rules to forbid Darren Patterson—which welcomes *everybody*—from aligning its own bathroom, dress code, and pronoun policies with its religious beliefs about sexuality and gender.

The Department glosses over the inconsistency by simply saying that the text of the Equal Opportunity Provision does not list "sex" or "marital status" as protected characteristics. Appellants' Br. 54. But if the purpose of that provision is to "eliminat[e] discrimination ... in educational access," 1.App.201, then that oversight further proves the Provision is "underinclusive," *Lukumi*, 508 U.S. at 543. The Provision is not generally applicable when it "fail[s] to prohibit nonreligious conduct that endangers [its] interests in a similar or greater degree" than Darren Patterson's religious exercise does. *Id.*

## 2. The Department can also grant individualized exemptions but refuses to accommodate Darren Patterson.

The Equal Opportunity Provision is also not generally applicable because there are "mechanism[s] for individualized exemptions." *Fulton*, 593 U.S. at 533 (citation modified). The mere possibility of such exceptions destroys general applicability "because it invites the government to decide which reasons for not complying with the policy are worthy of solicitude." *Id.* at 537 (citation modified). This is true "regardless whether any exceptions have been given." *Id.*

There are two mechanisms for individualized exemptions here. First, as the district court correctly concluded, the statute underlying the Equal Opportunity Provision "empowers the Department to grant individualized exemptions from the quality standards if doing so is 'necessary to ensure the availability of a mixed delivery system within a community.'" 10.App.2203–04 (quoting C.R.S. § 26.5-4-205(1)(b)(II)). That the State "recognizes conditions could exist in which it would exempt a preschool from the quality standards, but does not consider [Darren Patterson's] religious convictions sufficiently compelling to do so here, triggers strict scrutiny." 10.App.2204.

Second, the Department developed a process by which providers can submit individualized exception requests to ensure they have the "flexibility needed" to "meet their organizational requirements, or other unique situations." 3.App.676. That process has since been enshrined in

39

rule through the "catch-all" exception, which allows providers to prefer children and families that are "part of a specific community," "hav[e] specific competencies or interests," or "participat[e] in a specific activity." Colo. Code Regs. § 1404-1:4.109(A)(9). This likewise destroys general applicability because it invites the government to weigh which reasons for not complying with the Equal Opportunity Provision are "worthy of solicitude." *Fulton*, 593 U.S. at 537.

The Department's counterarguments are unpersuasive. The Department first contends that the underlying statute does not allow temporary waivers from the Equal Opportunity Provision because providers must be "working toward compliance" with the Provision to be eligible for one. Appellants' Br. 36 (citing Colo. Rev. Stat. § 26.5-4-205(1)(b)(II)). In the Department's view, no provider seeking a waiver of that provision would likely be "working toward compliance" because complying with it "does not require additional time or training." *Id.* The *St. Mary* panel agreed. *See* 154 F.4th at 770–71.

But the Supreme Court rejected a similar argument in *Fulton*. There, the city argued that a provision allowing for possible exceptions did not undermine general applicability because the record showed the city had "never granted one." 593 U.S. at 537. The mere possibility of an exception, the Court explained, rendered the policy "not generally applicable," regardless whether any exception was likely. *Id.* That principle controls here.

40

In any event, the Department cites no evidence to support its assertion, and the *St. Mary* panel didn't either. But the record *in this case* shows that participating preschools did in fact receive a temporary waiver before agreeing to the Equal Opportunity Provision. Specifically, Adams County Head Start providers—which restrict enrollment based on income—were allowed to participate and receive payments without signing the Program Service Agreement, in light of concerns about violating the prohibition on income-based discrimination. 3.App.736–37, 740; *see also* 1.Supp.App.068–69 (addendum dated October 31, 2023).

The Department's alternative argument that the Equal Opportunity Provision relates to "health and safety," and cannot be waived, is also unsupported. The Department can point to no statute, regulation, or policy specifying which quality standards relate to "health and safety," and its mere say-so cannot defeat summary judgment. *See St. Mary*, 154 F.4th at 771 (declining to address the Department's health-and-safety argument).

The Department next points to a regulation that says providers "must still comply" with the Equal Opportunity Provision when "utilizing" any of the myriad exceptions, including the "catch-all" exception. Colo. Code Regs. § 1404-1:4.109(B); *see* Appellants' Br. 57. But the Department adopted that regulation *after* it first created the exceptions and *after* it was sued. In any event, it just invites the question: what does the Department treat as compliance? The Department has shown

41

it will flexibly interpret the Equal Opportunity Provision as a "one-way ratchet" when needed to advance favored secular values while rigidly interpreting the Provision against disfavored religious exercise.

Take Defendant Odean's sworn testimony. She admitted providers could use the "catch-all" exception to prefer gender-nonconforming children, children of color from historically underserved areas, and children or families from the LGBTQ community despite the text of the Equal Opportunity Provision prohibiting such preferences. 4.App.1002–05. The *St. Mary* panel downplayed this concession as responding to "a series of hypotheticals posed unexpectedly to one witness at trial." 154 F.4th at 770. But it wasn't just any one witness; it was the Program Director. And there is nothing unexpected about the Program Director being asked about the enforcement of Program rules in a lawsuit focused on that very issue.

Even so, the record is clearer here. Over six months *after* her trial testimony in *St. Mary*—plenty of time to reflect—Defendant Odean expressed the same sentiment in sworn deposition testimony here:

> Q: Okay. So could a preschool have a policy of not admitting children of a certain race and still participate in the program.
>
> A: If that was elevated to us, we would follow those procedures to determine what exactly is said and what situation and how that pertains to the Universal Preschool Program and follow that

> process to determine whether they were able to
> participate or not.
>
> . . .
>
> Q: So it's possible a school with that policy could
> participate in UPK?
>
> A: Well, a lot of things are possible. That could be
> possible.

3.App.766–67.[6]

The Ninth Circuit's en banc decision in *FCA* is instructive. There, a public school district stripped a Christian student group of official status because the group—which "welcome[d] all students" to join— required its leaders to affirm its "core religious beliefs." 82 F.4th at 672. The school district asserted interests in "prohibiting discrimination" and "ensuring equal access for all students." *Id.* at 689. But the court held that the nondiscrimination policies were not neutral or generally applicable. First because other clubs could "discriminate expressly— even on otherwise protected grounds." *Id.* The South Asian Heritage Club and Senior Women Club, for example, could restrict membership based on ethnicity and sex. *Id.* at 688–89. And second, because student

---

[6] Defendant Odean's inability to say that the Equal Opportunity Provision categorically forbids any racial preferences or exclusions— despite the Provision's plain terms—stems from the Department's decision to interpret and apply the Provision with an "equity lens." 4.App.938, 958.

43

groups could "discriminate based on other 'non-discriminatory' criteria," decided by the district "on a case-by-case basis." *Id*. at 688.

Same here. The Department interprets and enforces the Equal Opportunity Provision loosely for preferred providers, and it has created a process by which it can evaluate and grant exception requests on a case-by-case basis. Having such "broad discretion to grant exemptions on less than clear considerations removes its non-discrimination policies from the realm of general applicability and thus subjects the[m] to strict scrutiny." *FCA*, 82 F.4th at 688.

### 3. The Department has not acted neutrally by imposing additional requirements on faith-based providers not required by statute or regulation.

Strict scrutiny also applies because the Department "proceed[ed] in a manner intolerant of religious beliefs" and "restrict[ed] practices because of their religious nature." *Fulton*, 593 U.S. at 533. Because the Free Exercise Clause "forbids subtle departures from neutrality" and "covert suppression of particular religious beliefs," the Court "must survey meticulously the circumstances of governmental categories to eliminate, as it were, religious gerrymanders." *Lukumi*, 508 U.S. at 534 (citation modified).

The Department exhibited a lack of neutrality in several ways.

First, the Department created exceptions for secular reasons while refusing any for Darren Patterson's policies. Such unequal treatment

"devalues religious reasons ... by judging them to be of lesser import than nonreligious reasons" and "single[s] out" the school's religious practice "for discriminatory treatment." *Lukumi*, 508 U.S. at 537–38; *see also id*. at 531 ("failure to satisfy" general applicability "likely [an] indication that" neutrality "has not been satisfied").

Second, the Department conditioned Program participation on compliance with another, more onerous nondiscrimination rule—the Blanket Provision—that the Department now concedes was unnecessary. This put religious schools to the choice of giving up their beliefs and practices (including those related to employment) and participating the Program. Such a "gratuitous restriction[ ] on religious conduct ... seeks not to effectuate the stated governmental interests, but to suppress the conduct because of its religious motivation." *Lukumi*, 508 U.S. at 538 (citation modified).

Finally, rather than alleviating burdens for faith-based providers, the Department engineered more. The Department wrongly told faith-based providers that they could participate in the Program only if "state funds" were not "applied during hours of religious programming." 1.Supp.App.059. Such a condition flouted the legislature's directive for a "mixed delivery system." Colo. Rev. Stat. § 26.5-4-204(2). The Department now blames "one employee's early misunderstanding." Appellants' Br. 63–64. But the condition was broadcasted far and wide through an *official* Department publication, not a single employee's misstatement.

45

1.Supp.App.059 ("Fact Sheet"). Worse, the Department never corrected the error despite being told as early as December 2022 that the condition hindered faith-based participation. 1.Supp.App.078–79. And Department officials continued to repeat it as late as November 2023, telling those who asked that "UPK funds cannot be used for religious instruction and must be used for things outside of religious time." 1.Supp.App.083. It wasn't until discovery in this lawsuit that the Department finally admitted no statute or regulation justified the condition. 3.App.698.

Taken together, all this shows the Department did anything but give "full and fair consideration" to faith-based providers' "religious objection[s]." *Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*, 584 U.S. 617, 640 (2018).

**B.    The Department's enforcement of the Equal Opportunity Provision excludes Darren Patterson because of its religious character and exercise.**

In *Employment Division v. Smith*, the Supreme Court held that laws incidentally burdening religion are subject to strict scrutiny if they are not neutral and generally applicable. 494 U.S. 872, 878–82 (1990). But that test doesn't control every case, and even a "neutral law of general applicability" is not "necessarily constitutional under the Free Exercise Clause." *Trinity Lutheran Church of Columbia, Inc. v. Comer*,

582 U.S. 449, 461 n.2 (2017) (citing *Hosanna–Tabor Evangelical Lutheran Church and School v. EEOC*, 565 U.S. 171 (2012)). The Supreme Court has been careful to distinguish neutral and generally applicable laws from those that "impose special disabilities" on religion or "lend [the government's] power to one or the other side in controversies over religious authority or dogma." *Smith*, 494 U.S. at 877.

The Supreme Court has thus repeatedly "held that a state may not exclude religious observers from receiving otherwise available educational funding because of a school's religious status or practice." 1.App.281–82 (citing *Trinity Lutheran*, 582 U.S. at 462; *Espinoza v. Mont. Dep't of Revenue*, 591 U.S. 464, 487 (2020); and *Carson v. Makin*, 596 U.S. 767, 780 (2022)). That is because the Free Exercise Clause "protects against indirect coercion or penalties on the free exercise of religion, not just outright prohibitions." *Carson*, 596 U.S. at 778 (citation modified).

In *Trinity Lutheran*, a church preschool was denied a playground resurfacing grant because the government excluded applicants controlled by a church. 582 U.S. at 455–56. The Court held that the policy was unconstitutional because it disqualified eligible recipients based on their "religious character," imposing a "penalty on the free exercise of religion that trigger[ed] the most exacting scrutiny." *Id.* at 462.

In *Espinoza*, the Court similarly struck down the Montana constitution's no-aid provision because it prevented religious schools

47

from participating in the state's scholarship program based on "the religious character of the schools." 591 U.S. at 476. The Court explained that when the government decides to "subsidize private education," it cannot then decide to "disqualify some private schools solely because they are religious." *Id.* at 487.

And in *Carson*, the Court rejected Maine's attempt to avoid these broad principles. Maine argued that *Trinity Lutheran* and *Espinoza* were distinguishable because its tuition assistance program excluded private schools based not on their religious *status* but their religious *activity*, arguing that "a school is excluded only if it promotes a particular faith and presents material through the lens of that faith." *Carson*, 596 U.S. at 786–87. The Court rejected that argument, noting the very reason religious schools exist is to teach their faith. *Id.* at 787. "[T]he prohibition on status-based discrimination under the Free Exercise Clause is not a permission to engage in use-based discrimination." *Id.* at 788.

These "unremarkable principles" are dispositive. *Carson*, 596 U.S. at 780. The Equal Opportunity Provision forbids Darren Patterson from operating consistently with its beliefs about sexuality and gender. The school can either participate in the Program or continue its religious exercise, but not both. If it elects the latter, its "freedom [of religion] comes at the cost of automatic and absolute exclusion from the benefits of a public program for which the [school] is otherwise fully qualified." *Trinity Lutheran*, 582 U.S. at 462. By forcing the school—and the

48

families who share its beliefs—to decide between faith or funding, the Department "penalizes the free exercise of religion" and engages in religious discrimination that is "odious to our Constitution." *Carson*, 596 U.S. at 779–80 (citation modified).

It is no defense that *some* faith-based providers can participate while others with disfavored religious practices cannot. *Contra* Appellants' Br. 59; *St. Mary*, 154 F.4th at 763–64. Maine also argued that its funding condition didn't exclude all religious schools but only those engaged in prohibited religious activity. *Carson*, 596 U.S. at 786–87. But the Supreme Court rejected that argument. *Id.* at 788.

Nor can the Department evade *Trinity Lutheran*, *Espinoza*, and *Carson* by claiming those cases forbid only "categorical" exclusions that "specifically carve out private religious schools." Appellants' Br. 59. To the contrary: they broadly hold that "a State violates the Free Exercise Clause when it excludes religious observers from otherwise available public benefits" because of their "religious character," "religious activity," or "religious exercise." *Carson*, 596 U.S. at 778–81 (citing *Trinity Lutheran*, 582 U.S. at 462; *Espinoza*, 591 U.S. at 475–76). That is true "[r]egardless of how the benefit and restriction are described." *Carson*, 596 U.S. at 789.

Just this year, the Supreme Court held the government cannot condition access to publicly funded education on religious observers' "willingness to accept a burden on their religious exercise." *Mahmoud v.*

*Taylor*, 145 S. Ct. 2332, 2359 (2025) (citing *Trinity Lutheran*, 582 U.S. at 462). That was true even though the condition there applied to all students and families and made no reference at all to religion. *Id.* at 2341–42. *Mahmoud* proves the principles in *Trinity Lutheran*, *Espinoza*, and *Carson* cannot be strictly confined to laws with "categorical" religious exclusions.

None of this means, as the *St. Mary* panel worried, that the government will be unable to "plac[e] almost any condition on school funds." 154 F.4th at 764 n.9. There are many conditions that Darren Patterson readily accepts and follows; it seeks a narrow exception from just one. To suggest otherwise "echoes" a "classic rejoinder": "If I make an exception for you, I'll have to make one for everybody, so no exceptions." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 435–36 (2006). The Supreme Court rejects such "slippery-slope argument[s]." *Id.* at 436.

In sum, the First Amendment forbids the government from conditioning an otherwise available benefit on giving up protected practices that "lie at the very core of the mission of a private religious school." *Carson*, 596 U.S. at 787 (citation modified). Because that is what the Department has done, strict scrutiny applies.

**C.    *St. Mary* does not decide this case.**

The Department—which is litigating both cases—acknowledged
that the *St. Mary* case is "distinguishable." Defs.' Resp. to Notice of
Related Case at 1, *St. Mary Cath. Par. v. Roy*, 1:23-cv-02079 (D. Colo.
Aug. 25, 2023), ECF No. 26. On this point, the Department is correct.

*First*, "the policies and conduct at issue in the two cases differ
materially." *St. Mary Cath. Par. v. Roy*, 736 F. Supp. 3d 956, 997 n.32
(D. Colo. 2024), *aff'd*, 154 F.4th 752 (10th Cir. 2025). The schools in *St.
Mary* sought to participate in the Program while denying admission and
enrollment based on religious criteria. By contrast, Darren Patterson
welcomes all students and families regardless of belief or background. It
seeks only to maintain consistency between its internal policies—
governing bathrooms, dress codes, and pronouns—and its sincerely held
beliefs. These policies do not close the school's doors to any student;
they merely preserve the school's ability to teach and operate in a
manner that coherently reflects its faith.

That distinction matters. Indeed, the *St. Mary* panel summarized
its ruling as "simply" holding "that when a school takes money from the
state that is meant to ensure universal education, then its doors must
be open to all." 154 F.4th at 775. Darren Patterson's doors *are* open to
all. Yet the Department seeks to use the same funding mechanism to
reach inside the school's internal governance—dictating how the school
teaches and lives out its faith. The First Amendment forbids such an

51

intrusion. *See Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 747 (2020) (the First Amendment gives religious organizations "independence in matters of faith and doctrine and in closely linked matters of internal government").

*Second*, the parties here had the benefit of full discovery, while discovery in *St. Mary* was truncated due to an expedited bench trial. The record here is more developed, including concrete facts and specific arguments about the Department's enforcement of the Equal Opportunity Provision that were not before the *St. Mary* panel.

*Third*, unlike *St. Mary*, this case includes a free-speech claim arising from the Department's attempt to force Darren Patterson to use "preferred pronouns" contrary to its beliefs. 1.App.285. That issue was not addressed by the *St. Mary* panel and presents an independent First Amendment violation warranting separate consideration.

*Finally*, Darren Patterson has been protected by a preliminary injunction since the Program's inaugural year, allowing the school and its families to participate fully and successfully. That experience confirms that Darren Patterson's participation and faith-based policies pose no threat to the Program's goals or to the State's interests.

## III.   The Department compels and restricts speech in violation of the Free Speech Clause.

The Equal Opportunity Provision violates Darren Patterson's free-speech rights by requiring the school and its staff to use "preferred pronouns as a condition of participating in the [P]rogram." 1.App.285.

The Free Speech Clause guarantees the "freedom to think as you will and to speak as you think." *303 Creative,* 600 U.S. at 584 (citation modified). This "protects an individual's right to speak his mind regardless of whether the government considers his speech sensible and well intentioned or deeply misguided and likely to cause anguish or incalculable grief." *Id.* at 586 (citation modified). The government cannot compel speech—to force "a person to speak its own preferred messages." *Id.* Nor can it regulate speech based on content—"because of the topic discussed or the idea or message expressed." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015).

The Department does both. Its interpretation of the Equal Opportunity Provision requires providers to use pronouns based on another's self-proclaimed gender identity. But Darren Patterson can't do that. The school believes that God created us male and female and that trying to change one's sex is harmful. Science backs up that belief. *See* 1.Supp.App.105–200 (expert report of Dr. Stephen B. Levine). Accordingly, the school uses pronouns based on sex and will not lie to students and parents by using "preferred pronouns" that differ from a

53

student's or parent's sex. Nor will the school teach or profess that sex is mutable. All this is protected speech. *See Meriwether v. Hartop*, 992 F.3d 492, 511–12 (6th Cir. 2021).

Below, the Department said the school didn't "establish" that the Equal Opportunity Provision compels "certain pronouns." 9.App.1838. But it no longer makes that argument. That's because discovery showed the Department investigated a provider for allegedly not using preferred pronouns, 1.Supp.App.074–75, 93, and the Department's Executive Director and Program Director testified that they interpret the Provision to require "preferred pronouns," 3.App.770 (would investigate a provider if it had a policy "of only referring to children by pronouns that correspond to the child's biological sex"); 4.App.974–75 (rule ensures that no child "feel[s] othered," which could include not using preferred pronouns). And the Department has argued that Darren Patterson should "refer to all children by their names" to "obviate pronoun use while treating children equally." 9.App.1838. That proves the point: the Department tells a Christian school it cannot use sex-reflexive pronouns when speaking to students, staff, and families.

Nor does the Equal Opportunity Provision regulate only conduct. *Contra* 9.App.1837 (making this argument in response to Darren Patterson's summary-judgment motion). It directly compels the school's choice of pronouns. And the "spoken or written word" is protected speech. *Texas v. Johnson*, 491 U.S. 397, 404 (1989). Pronouns "carry a

message" about whether the subject is male or female and whether sex is objective and fixed or subjective and changeable. *Meriwether*, 992 F.3d at 507. So the Department's rule is nothing like the Solomon Amendment in *Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, which required law schools to provide equal *access* to military recruiters. 547 U.S. 47 (2006). The Equal Opportunity Provision directly regulates participating providers' *speech*.

"When a state [nondiscrimination] law and the Constitution collide, there can be no question which must prevail." *303 Creative*, 600 U.S. at 592. This case is no different. The Equal Opportunity Provision "collide[s] with the protections of the Constitution," so it must "yield." *FCA*, 82 F.4th at 695. The Department "cannot wield its authority to categorically silence dissenting viewpoints," nor may it "act as classroom thought police." *Meriwether*, 992 F.3d at 507.

## IV. The Department treats Darren Patterson worse than similarly situated schools in violation of the Equal Protection Clause.

The unequal treatment also violates the Equal Protection Clause. *See Ashaheed v. Currington,* 7 F.4th 1236, 1249 n.11 (10th Cir. 2021) (free exercise and equal protection claims often overlap). The Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike." *Id*. at 1249 (citation modified). When the government discriminates based on "a suspect classification or a

deprivation of a fundamental right such as free exercise of religion, strict scrutiny applies." *Id.* at 1250.

The Department's many exceptions allow other schools to skirt the Equal Opportunity Provision, yet the Department "refuse[s] to provide [Darren Patterson] any exemptions for its policies." 1.App.283. Because the Department's impermissible line-drawing treats Darren Patterson worse than similarly situated preschools and deprives the school of a fundamental right, strict scrutiny applies for this reason as well. *See Ashaheed*, 7 F.4th at 1251 ("similarly situated" entities must only be "alike in 'all relevant respects'—not all respects").

## V.   The Equal Opportunity Provision fails strict scrutiny.

Now the "burden shifts" to the Department to prove its interpretation and enforcement of the Equal Opportunity Provision "serve[s] a compelling interest" and is "narrowly tailored to that end." *Kennedy*, 597 U.S. at 531–32. It cannot.

### A.   There is no compelling interest in interfering with Darren Patterson's internal policies and affairs.

The Department asserts an interest in preventing discrimination and ensuring equal treatment in the Program. Neither justifies burdening the school's constitutional rights. The Department cannot rely on "broadly formulated interests," but must instead show a compelling interest in "denying an exception" *to* Darren Patterson.

56

*Fulton*, 593 U.S. at 541 (citation modified). And on that point, *Fulton* is dispositive.

In *Fulton*, Philadelphia advanced a nearly identical interest in equal treatment of foster parents and children to justify excluding Catholic Social Services. *Id.* But the city's "system of exceptions" undermined any "contention that its non-discrimination policies can brook no departures." *Id.* at 542. So too here: the exceptions to the Equal Opportunity Provision prove the Department's interests are not "of the highest order." *Id.* at 541 (quoting *Lukumi*, 508 U.S. at 546).

Recognizing this, the Department argues that an exception from one component of the Provision does not "necessarily undermine[ ]" the rest. Appellants' Br. 47–50. In the Department's view, allowing providers to deny enrollment based on race, disability, income level, or some other protected trait might not "undercut the state's interests underlying its gender-identity provision." Appellants' Br. 49.

That's wrong. As explained, the congregation and employer-employee exceptions allow providers to limit enrollment based on gender identity. *See* supra Section II.A.1. And importantly, there is no separate "gender-identity provision." There is just one Equal Opportunity Provision that lists gender identity with other protected characteristics. "[W]hether two activities are comparable for purposes of the Free Exercise Clause must be judged against the asserted government interest that justifies the regulation." *Tandon*, 593 U.S. at

62. And here, the interest is the same for all listed characteristics—indeed, that is why the legislature included them all in the same statute. *See also* 9.App.1834 (interest in eliminating "discrimination on statutorily-identified bases"); 3.App.760–61 (testifying that each protected characteristic is equally important and that the Department has "the same" interest for each).

### B.    The Department's actions are not narrowly tailored.

The exceptions are also fatal to narrow tailoring. The Department cannot "explain why its interest[s] [are] served by granting exemptions" to some providers "but not others." *Does 1-11*, 100 F.4th at 1273. In fact, the Department never even *considered* whether less restrictive alternatives were available. Defendant Roy testified that she denied Darren Patterson's exemption request based on the Department's interest in "ensur[ing] that children have safe and welcoming environments," 4.App.973, but later admitted that all she did was review the school's website and never considered any alternatives to denying the request, 4.App.973–74.

There are many alternatives to trampling on Darren Patterson's religious freedom. Consider the Department's gender-identity rules for resident camps, childcare centers, and neighborhood youth organizations. The Department requires those entities to assign bathrooms, showers, and sleeping arrangements by gender identity, not sex, but

*exempts religious organizations* from that requirement. Colo. Dep't of Early Childhood, *Info. Memo Clarifying Applicability of CADA Regulations to Licensing* (June 20, 2025), perma.cc/X3VC-EMJB. That proves the State can pursue its interests without infringing Darren Patterson's religious exercise.

The Department also could refine its matching and placement process to ensure that families who desire an "affirming" environment for transgender-identifying children are placed only in preschools willing to take that approach, no matter the harm.[7] This would allow *all* families to choose an educational environment that reinforces their beliefs and values while allowing *all* schools to participate in the Program without sacrificing their beliefs and practices. Such an alternative is more respectful of religion, ensures that everyone who wants to participate in the Program gets to, and facilitates the "mixed delivery system" the legislature said it wanted. Colo. Rev. Stat. § 26.5-4-204(2).

---

[7] "[T]he scientific literature has consistently shown that the vast majority of minors who want to be, or insist that they are, members of the opposite sex desist from this identity during childhood and adolescence." 1.Supp.App.113. But children who begin social transition overwhelmingly persist in their dysphoria, leading to "puberty blockers, cross-sex hormones and surgical interventions." 1.Supp.App.115.

## VI.    The district court properly granted a permanent injunction.

The elements required for a permanent injunction are the same as for a preliminary injunction, except that it "requires showing actual success on the merits." *Prairie Band Potawatomi Nation v. Wagnon*, 476 F.3d 818, 822 (10th Cir. 2007). The district court correctly held that all elements were satisfied here.

First, Darren Patterson has proven actual success, so "no further showing of irreparable injury is necessary." *Awad*, 670 F.3d at 1131 (citation modified). A First Amendment violation "unquestionably constitutes irreparable injury." *Roman Cath. Diocese*, 592 U.S. at 19.

Second, a permanent injunction benefits the public interest. When a law is "unconstitutional, the interests of the government 'do not outweigh' the plaintiff's rights to have its constitutional rights protected." 1.App.288 (quoting *Awad*, 670 F.3d at 1131). Nor is the public interest served by excluding faith-based providers because of their sincere religious beliefs and practices. That just reduces the number of Program providers available to students and families. "Indeed, exclusion of a preschool is inherently anti-universal, and denying participation based on one's protected beliefs or speech is not equitable." *Id.* The Department has been enjoined for over two years now, and everyone has benefited. Darren Patterson has participated in the Program while remaining true to its religious convictions; children

60

and families have benefited by using Program funds at the school of their choice; and the Department lacks any evidence of harm to it or the public that has resulted from the injunction.

## CONCLUSION

The Court should affirm.

## STATEMENT REGARDING ORAL ARGUMENT

This case involves important constitutional principles and protections that affect millions of 10th Circuit residents. Although the district court's ruling is straightforward and correctly applies Supreme Court precedent to the facts of this case, counsel believes that oral argument will be helpful to the Court's resolution of the questions presented.

Dated: November 10, 2025

Respectfully submitted,

*s/Jeremiah Galus*

John J. Bursch
ALLIANCE DEFENDING FREEDOM
440 First St., NW, Suite 600
Washington, DC 20001
(616) 450-4235
jbursch@ADFlegal.org

Jacob E. Reed
ALLIANCE DEFENDING FREEDOM
44180 Riverside Pkwy
Lansdowne, VA 20176
(571) 707-4655
jreed@ADFlegal.org

David A. Cortman
Ryan J. Tucker
Jeremiah Galus
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
dcortman@ADFlegal.org
rtucker@ADFlegal.org
jgalus@ADFlegal.org

*Counsel for Appellee*

61

## CERTIFICATE OF COMPLIANCE

This brief complies with the word limit of Fed. R. App. P. 32(a)(7)(B) because this brief contains 12,993 words, excluding parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in Word 365 using a proportionally spaced typeface, 14-point Century Schoolbook.

Dated: November 10, 2025

*s/Jeremiah Galus*
Jeremiah Galus
*Counsel for Appellee*

**CERTIFICATE OF DIGITAL SUBMISSION**

I hereby certify that with respect to the foregoing:

(1) all required privacy redactions have been made per 10th Cir. R. 25.5;

(2) if required to file additional hard copies, that the ECF submission is an exact copy of those documents;

(3) the digital submissions have been scanned for viruses with the most recent version of a commercial virus scanning program, Cortex XDR, Agent version 7.8.1, and according to the program are free of viruses.

_s/Jeremiah Galus_
Jeremiah Galus
*Counsel for Appellee*

63

## CERTIFICATE OF SERVICE

I hereby certify that on November 10, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Tenth Circuit using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users, and that service will be accomplished by the CM/ECF system.

s/Jeremiah Galus
Jeremiah Galus
*Counsel for Appellee*